# EXHIBIT 105

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF GEORGIA**

**ATLANTA DIVISION**

DELTA AIR LINES, INC.,

       Plaintiff,

v.

MARRIOTT INTERNATIONAL, INC.,

       Defendant.

Case No. 1:20-cv-01125-SCJ

**EXPERT REBUTTAL REPORT SUBMITTED BY DR. BRUCE ISAACSON IN RESPONSE TO THE EXPERT REPORTS OF CAROL A. SCOTT, PH.D.; PHILIP C. ZERRILLO; AND DAVID FRANKLYN**

1

**Table of Contents**

2

3   **Section 1: Background for This Report** ...................................................................**1**

4       Retention and Assignment ........................................................................... 1

5       Summary of My Opinions Regarding DAL's Confusion Surveys ................................. 2

6       Qualifications, Materials Reviewed, and Compensation ......................................... 7

7   **Section 2: The Scott Report and Survey** ...........................................................**8**

8       Overview of the Scott Survey and My Opinions Relating to the Scott Survey............................ 8

9       My Opinions About the Scott Report and Survey ................................................... 11

10  **Section 3: The Zerrillo Report and Survey** .......................................................**23**

11      Overview of the Zerrillo Survey and My Opinions Relating to the Zerrillo Survey ................. 23

12      My Opinions About the Zerrillo Report and Survey ............................................... 26

13  **Section 4: The Franklyn Report and Survey** ....................................................**37**

14      Overview of the Franklyn Survey and My Opinions ............................................... 37

15      My Opinions About the Franklyn Report and Survey............................................... 40

16  **Section 5: Summary of My Opinions** ...............................................................**51**

17

18  **Exhibit**

19  Exhibit 10: Dr. Bruce Isaacson CV and Testimony Experience

20

21

22

23

24

25

26

27

28

**Section 1: Background for This Report**

**Retention and Assignment**

1.      I have been retained by attorneys representing Marriott in this matter and have previously provided an expert report in this matter.[1]

2.      This report provides my opinions in response to the Expert Report of Carol A. Scott, Ph.D. (the "Scott Report"),[2] the Expert Report of Philip C. Zerrillo (the "Zerrillo Report"),[3] and the Expert Report of David Franklyn (the "Franklyn Report"),[4] all submitted on behalf of Delta Air Lines, Inc. ("DAL"), including the likelihood-of-confusion surveys provided in those reports (the "Scott Survey," "Zerrillo Survey," and "Franklyn Survey").

3.      This report is organized in five sections:

      i.      Section 1 summarizes my opinions regarding the reports and surveys referenced in Paragraph 2 and addresses the scope of my retention and assignment, my qualifications, and the materials I reviewed.

      ii.      Section 2 provides my opinions and analysis relating to the Scott Report and the Scott Survey.

      iii.      Section 3 provides my opinions and analysis relating to the Zerrillo Report and the Zerrillo Survey.

      iv.      Section 4 provides my opinions and analysis relating to the Franklyn Report and the Franklyn Survey.

      v.      Section 5 provides a summary of my opinions in this matter.

---

[1] "Expert Report Submitted by Dr. Bruce Isaacson Measuring the Likelihood of Confusion Between Delta Hotels by Marriott and Delta Air Lines" ("Isaacson Expert Report"), signed March 17, 2023.

[2] "Expert Report of Carol A. Scott, Ph.D.," dated March 13, 2023.

[3] "Expert Report of Philip C. Zerrillo," dated March 13, 2023.

[4] "Expert Report of David Franklyn Regarding Level of Confusion Between Delta Air Lines and Marriott's Delta Hotels," dated March 17, 2023.

4.      I understand that Dr. David Neal also provided an expert report, including a likelihood-of-confusion survey in this matter (the "Neal Report" and "Neal Survey"). I have not been asked to provide an opinion on the Neal Report and Neal Survey, but the fact that I have not been asked to provide an opinion on the report and survey does not mean that I agree with Dr. Neal's approach or conclusions. Indeed, to the extent that the Neal Survey mirrors the Scott and Zerrillo Surveys, my criticisms of those surveys described in this report would apply as well to the Neal Survey and Neal Report.

5.      In light of the ongoing nature of this matter, I respectfully reserve the right to supplement this report.

**Summary of My Opinions Regarding DAL's Confusion Surveys**

6.      Dr. Scott, Dr. Zerrillo, and Mr. Franklyn (collectively, the "DAL Experts") conducted confusion surveys and described the results of those surveys in their reports. As summarized in this section, and as described later in this report, those surveys (collectively, the "DAL Surveys") are each deeply flawed in a manner that makes them unreliable, and that makes their measures not reflective of confusion under real-world conditions. Depending on the survey, the flaws involve incorporating leading questions and images, failing to replicate real-world conditions, and interviewing consumers who are not relevant to this dispute, among other concerns.

7.      For example, Dr. Scott conducted a likelihood-of-confusion survey using the Eveready format.[5] Her survey interviewed people who "(a) booked or purchased one or more nights in a hotel room, or one or more bookings of a hotel meeting room, a hotel conference facility, or a hotel restaurant, [at a hotel located at or near an airport,] in the last 18 months, or (b) plan to do so in the next 18 months."[6] Her survey interviews conducted in 2021 showed respondents

---

[5] The Scott Report refers to Dr. Scott's work as two surveys. Because both used the same questions, differing only in the images shown to respondents and the year they were conducted, this report refers collectively to the "two surveys" as a single Scott Survey.

[6] Scott Report, ¶ 10.

1   the website for Delta Hotels by Marriott Indianapolis Airport as it appeared in that year.  As a

2   control, Dr. Scott used a similar website, but showing a fictional brand, Debut Hotels by

3   Marriott Indianapolis Airport.  The Scott Survey interviews conducted in 2023 showed the

4   same pages for the Indianapolis Airport location as they appeared in 2023, and added test and

5   control groups that saw webpages Delta Hotels by Marriott Norfolk Airport or Debut Hotels by

6   Marriott Norfolk Airport, and Delta Hotels by Marriott Detroit Metro Airport or Debut Hotels

7   by Marriott Detroit Metro Airport.[7]

8   8.      Based on her survey, Dr. Scott concluded that "a substantial percentage of prospective

9   consumers of services of Marriott's Delta Hotels airport locations are likely to be confused."[8]

10  9.      Based on my analysis of the Scott Report and the Survey, I conclude that the Scott

11  Survey is not reliable because it incorporated multiple leading references to airports and air

12  travel, did not replicate real-world market conditions, did not reflect the relevant universe of

13  potential purchasers, and used flawed phrasing that asked for a legal conclusion.

14  10.     Like Dr. Scott, Dr. Zerrillo also conducted an Eveready likelihood-of-confusion survey.

15  The Zerrillo Survey interviewed past and potential purchasers of hotel rooms, hotel meeting

16  rooms, hotel conference facilities, and hotel restaurants at a hotel with 2.5, 3, 3.5, or 4 stars.[9]

17  The Zerrillo Survey showed test respondents the websites for Delta Hotels by Marriott

18  Cincinnati Sharonville and Delta Hotels by Marriott Virginia Beach Bayfront Suites.  Control

19  respondents saw websites that were similar in most respects, but replaced "Delta Hotels" with

20  the fictional "Debut Hotels."[10]

21  11.     Based on his survey, Dr. Zerrillo concluded that "there is strong evidence that Marriott's

22  use of the DELTA name is likely to cause confusion in the marketplace by consumers mistakenly

23  believing that Delta, the Plaintiff, owns, operates, or manages Delta Hotels, is affiliated or

24  connected with Delta Hotels, or needed to provide permission or approval to Delta Hotels to

25  _____

26  [7] Scott Report, ¶¶ 14-15.

    [8] Scott Report, ¶ 50.

27  [9] Zerrillo Report, ¶ 19.

28  [10] Zerrillo Report, ¶ 24.

1   use the name."[11]

2   12.    Based on my analysis of the Zerrillo Report and Survey, I conclude that the Zerrillo

3   Survey is not reliable because it incorporated leading questions, used images that do not

4   reflect the marketplace, did not reflect the relevant universe of hotel room purchasers, and

5   used flawed phrasing that asked for a legal conclusion.

6   13.    Mr. Franklyn also conducted a likelihood-of-confusion survey, but his survey used the

7   Squirt, or lineup, format.  The Franklyn Survey interviewed past or prospective purchasers of

8   hotel room reservations and showed the DAL website followed by a series of hotel websites,

9   including either the website for Delta Hotels by Marriott or a control website showing Debut

10  Hotels by Marriott, as well as websites for Radisson Hotels, Crowne Plaza Hotels, and

11  Doubletree Hotels.  Based on his survey, Mr. Franklyn concluded that "it is clear that a

12  significant percentage of consumers experience confusion as to the source, sponsorship,

13  and/or affiliation of the Delta Hotels brand with Delta, and that this confusion is the result of

14  Marriott's use of the 'Delta' name."[12]

15  14.    Based on my analysis of the Franklyn Report and Survey, I conclude that the Franklyn

16  Survey is not reliable because it used a highly leading survey format, mentioned air travel

17  before asking confusion questions, interviewed respondents who are not relevant to this

18  matter, and sourced respondents using undefined and improper methods.  In particular, the

19  Franklyn Survey placed hotel brands side by side in the survey without demonstrating that

20  consumers ever encounter those brands with the same proximity in the marketplace.

21  15.    DAL's three DAL Surveys share certain elements in common as they purport to measure

22  possible confusion.  For example, two of the surveys use the Eveready format; the third, by Mr.

23  Franklyn, uses the Squirt, or lineup, format.  All three DAL Surveys create a control by changing

24  "Delta Hotels" to "Debut Hotels," use the same "Debut Hotels" logo design, and show images

25  of hotel webpages.

26  

27  [11] Zerrillo Report, ¶ 62.

28  [12] Franklyn Report, p. 7.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No. 1:20-cv-01125-SCJ

16.     The three DAL Surveys also share common design elements that are improper for a likelihood-of-confusion survey and that make the measures from those surveys unreliable.  For example, the Eveready surveys conducted by Drs. Scott and Zerrillo both used the phrase "Aside from hotel services" at the start of three substantive questions intended to measure likelihood of confusion.  As shown by Table A, in the Scott and Zerrillo Surveys, the three questions that began with the phrase "Aside from hotel services" were responsible for more than half of the confusion measured in both surveys.

**Table A: Summary of Confusion Measures in the Scott and Zerrillo Surveys**

| Scott Survey[13] | Test | Control | Net Measure |
|---|---|---|---|
| Overall confusion measure | 26.7% | 0.2% | 26.5% |
| Questions that do not mention "Aside from hotel services" | 10.2% | 0.1% | 10.1% |
| Questions that mention "Aside from hotel services" | 16.5% | 0.1% | 16.4% |
| **Zerrillo Survey[14]** | **Test** | **Control** | **Net Measure** |
| Overall confusion measure | 21.8% | 0.0% | 21.8% |
| Questions that do not mention "Aside from hotel services" | 9.7% | 0.0% | 9.7% |
| Questions that mention "Aside from hotel services" | 12.1% | 0.0% | 12.1% |

---

[13] Scott Report, ¶ 24; Table 4; Exhibit 4.  The data shown is from both the 2021 and 2023 interviews combined.  The measures shown as "Overall confusion measure" are from Questions 1, 2, 3, 5, 6, 7, 9, 10, and 11.  The measures shown as "Questions that do not mention 'Aside from hotel services'" are from Questions 1, 2, 5, 6, 9, and 10.  The measures shown as "Questions that mention 'Aside from hotel services'" are from Questions 3, 7, and 11.  In this report, where question numbers from the Scott Survey are referenced, those numbers match the main body of the Scott Report, database, and data map, and not the report's Exhibit 4—Survey Document.  *See* footnote 18 for a more detailed explanation.

[14] Zerrillo Report, ¶¶ 59-61.  The data shown is from both the Cincinnati and Virginia Beach interviews combined.  The measures shown as "Overall confusion measure" are from Questions 1, 2, 3, 5, 6, 7, 9, 10, and 11.  The measures shown as "Questions that do not mention 'Aside from hotel services'" are from Questions 1, 2, 5, 6, 9, and 10.  The measures shown as "Questions that mention 'Aside from hotel services'" are from Questions 3, 7, and 11.

17.    Table A shows that the overall net confusion measure Dr. Scott reported was 26.5%. However, more than half of that confusion measure comes from questions that began with "Aside from hotel services," which had a combined net confusion measure of 16.4%, while the net confusion based on questions without that phrase was 10.1%.

18.    Table A also shows that Dr. Zerrillo claimed an overall net confusion measure of 21.8%. As with the Scott Survey, the majority of Dr. Zerrillo's overall confusion measure came from questions that started with "Aside from hotel services."  The net confusion from these questions was 12.1%, while the net confusion measure from questions without that phrase was 9.7%.  The pattern of these results demonstrates the effect of the leading phrase "Aside from hotel services."

19.    In addition, neither of the Scott or Zerrillo Surveys qualified respondents as reserving a hotel room in a price range that is typical for Delta Hotels by Marriott properties.  The Scott Survey did not qualify respondents on price point, star ratings, or any other measure of price or quality.  The Zerrillo Survey attempted to qualify respondents based on purchases from hotels with certain star ratings.  As explained in this report, the descriptions of star ratings in the Zerrillo Survey were vague and likely difficult for some respondents to answer, particularly given differences in star rating systems across companies and organizations that issue star ratings.

20.    For the Scott and Zerrillo Surveys, there were also similarities in the ways that respondents viewed the webpages for the hotel properties.  Both of these surveys showed respondents the webpages for the hotel properties without showing any other webpages that would likely be viewed in the process of locating the hotel property webpage, such as a search page at marriott.com.  Consequently, the Scott and Zerrillo Surveys failed to replicate the process by which consumers would locate the hotel property page under real-world conditions.

21.    As discussed in this report, the similarities between the three DAL Surveys described in this report introduced common problems that result in unreliable measures of likelihood of confusion for each survey.

- 6 -

1

2  **Qualifications, Materials Reviewed, and Compensation**

3  22.    My prior expert report in this matter includes a description of my work experience,

4  education, publications, speaking engagements, and expert witness experience.  Exhibit 10 to

5  this report provides my CV, which is an updated version of my CV in Exhibit 1 to my prior

6  expert report.

7  23.    As I described in my expert report, I am President of a marketing research and

8  consulting firm.  Over my career, I have personally designed, conducted, and analyzed many

9  hundreds of research studies, including many litigation surveys.  I have provided testimony

10  relating to surveys that I and others have conducted in matters involving federal courts, state

11  court, the Trademark Trial and Appeal Board (TTAB), the United States Department of Justice,

12  the United States Federal Trade Commission, the United States International Trade

13  Commission, the National Advertising Division of the Better Business Bureau, the Court of

14  Federal Claims, and other venues and authorities.

15  24.    By way of my education, I have earned Doctor of Business Administration and Master of

16  Business Administration degrees from Harvard Business School, as well as a Bachelor of Science

17  degree from Northwestern University.

18  25.    For purposes of this rebuttal report, I have reviewed some of the materials I previously

19  reviewed in preparing my prior expert report.  I also reviewed the Expert Reports referenced at

20  the beginning of this report, including electronic versions of the databases for the three DAL

21  Surveys discussed in this report.

22  26.    In addition, I consulted published literature and cases, as well as other documents cited

23  in this report.  I also rely on my knowledge in fields such as surveys, consumer behavior, and

24  marketing.

25  27.    For activities related to this report, my time is billed at a rate of $950 per hour.  My firm

26  also bills at lower rates for the time of staff members.  My compensation is not dependent on

27  the outcome of this matter.

28

1

2

**Section 2: The Scott Report and Survey**

3    **Overview of the Scott Survey and My Opinions Relating to the Scott Survey**

4    28.    Dr. Scott conducted her likelihood-of-confusion survey using the Eveready format,

5    which shows respondents an allegedly infringing trademark but does not show the trademark

6    that is allegedly infringed.  The Scott Survey interviewed people who, among other criteria, had

7    booked or purchased one or more nights in a hotel room or made one or more bookings of a

8    hotel meeting room, a hotel conference facility, or a hotel restaurant that was located at or

9    near an airport in the last 18 months, or planned to do so in the next 18 months.[15]

10    29.    Dr. Scott conducted the interviews for the first part of her survey in February of 2021

11    and conducted additional interviews in December of 2022 and January of 2023.[16]  Respondents

12    who qualified for the 2021 interviews were randomly assigned to see one of two images.  Test

13    respondents saw an image of the website for Delta Hotels by Marriott Indianapolis Airport as it

14    appeared in 2021; control respondents saw an image of the same website, but with the name

15    "Delta Hotels by Marriott" changed to "Debut Hotels by Marriott."

16    30.    In the 2022-2023 interviews, test respondents were randomly assigned to see one of

17    three hotel websites, for Delta Hotels by Marriott Indianapolis Airport, Delta Hotels by Marriott

18    Norfolk Airport, or Delta Hotels by Marriott Detroit Metro Airport.  Control respondents in the

19    2022-2023 interviews viewed control versions of those same websites, in which "Delta" was

20    again changed to "Debut."[17]

21

22

23

24

25

26    [15] Scott Report, ¶ 10.

27    [16] Scott Report, ¶ 7.

28    [17] Scott Report, ¶¶ 14-15.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No. 1:20-cv-01125-SCJ

31.    Respondents were then asked three series of questions to measure confusion. Questions 1,[18] 2, and 3 measured confusion as to source, asking what company or companies respondents thought owned, operated, or managed the hotel; what made them think that; and, aside from hotel services, what other products or services the company or companies they had mentioned provided.[19]

32.    The next series of questions measured confusion as to business affiliation or connection.  Question 4 was a filter question asking whether respondents thought the hotel they were shown had a business affiliation or connection with another company or companies. For those who answered yes, Questions 5, 6, and 7 asked what company or companies they thought had a business affiliation or connection with the hotel; what made them think that; and, aside from hotel services, what other products or services the company or companies they had mentioned provided.[20]

33.    The final series of questions measured confusion as to permission or approval. Question 8 was a filter question asking whether respondents thought the hotel they were shown "needed to get permission or approval" from another company or companies to use this hotel name.  For respondents who answered yes, Questions 9, 10, and 11 asked for the company or companies from which the company that owned, operated, or managed the hotel needed to get permission or approval; what made them think that; and, aside from hotel services, what other products or services the company or companies they had mentioned provided.[21]

---

[18] Exhibit 4–Survey Document to the Scott Report numbers the survey questions differently from the way the numbering is handled in the main body of the Scott Report, the Scott data file, and Scott data map.  Specifically, Question 2 in the main body of the report asks "What makes you think that this hotel is owned, operated, or managed by [CURRENT ANSWER FROM Q1]?"  In Exhibit 4, this question comes after Question 1 and is labeled "a."  This report uses the numbering used in the Scott Report, the Scott data file, and Scott data map, even when it references Exhibit 4.

[19] Scott Report, ¶ 17.

[20] Scott Report, ¶ 18.

[21] Scott Report, ¶ 19.

34.    To calculate confusion, Dr. Scott examined whether responses to these questions referred to either (a) "Delta Air Lines" or (b) "Delta" without specifying DAL and referred to airlines or air travel in a follow-up question.[22]  Across all confusion questions combined, Questions 1, 2, 3, 5, 6, 7, 9, 10, and 11, Dr. Scott claimed net confusion measures of 26.5% for the combined data from the 2021 and 2023 images, including net confusion measures of 29.3% for the 2021 image that showed Delta Hotels by Marriott Indianapolis Airport; 31.9% for the 2023 image that showed Delta Hotels by Marriott Indianapolis Airport; 18.5% for the 2023 image that showed Delta Hotels by Marriott Norfolk Airport; and 26.1% for the 2023 image that showed Delta Hotels by Marriott Detroit Metro Airport.[23]  (Net measures were calculated as a test measure minus the corresponding control measure.[24])

35.    In my opinion, the Scott Survey does not provide reliable measures of likelihood of confusion, and the measures from the survey do not reflect confusion in the real world. Specifically:

      i.    **The Scott Survey was leading due to references to airports and air travel.**  The Scott Survey prompted respondents to provide answers that referenced DAL by referring to airports and air travel many times.  The survey's confusion measures therefore reflect leading phrasing rather than genuine confusion that would exist in the real-world marketplace.  Certain follow-up questions in the Scott Survey were also leading because they explicitly told respondents to answer thinking about products or services "aside from hotel services."

      ii.    **The Scott Survey failed to replicate the conditions that consumers are likely to encounter in the real-world marketplace.**  Surveys intended to simulate the real-world marketplace should reflect the conditions of the real world.  The websites measured in the Scott Survey failed to reflect the manner in which

---

[22] Scott Report, ¶ 24.

[23] Scott Report, ¶ 49, Table 4.

[24] Scott Report, ¶ 49, Table 4.

consumers are likely to encounter Delta Hotels by Marriott properties in their searches for a hotel because they did not show the search webpages that consumers would likely use to locate the webpage of a specific hotel property.

iii. **The Scott Survey did not reflect the relevant universe of potential purchasers in this matter.** By limiting the universe of respondents to those looking for a hotel at or near an airport, the Scott Survey excluded certain hotel consumers who are relevant to this dispute, creating a group of survey respondents that does not reflect the full spectrum of consumers for Delta Hotels by Marriott. The Scott Survey also failed to qualify respondents as purchasing hotel rooms at a price point or quality level that is similar to those of Delta Hotels by Marriott, which further limits its applicability to this dispute.

iv. **The Scott Survey used flawed phrasing that asked for a legal conclusion.** The Scott Survey asked respondents whether permission from another company or companies to use a hotel name was needed, which impermissibly sought a legal conclusion.

### My Opinions About the Scott Report and Survey

36.     This section describes my opinions about the Scott Report and Survey in detail.

####     I.     The Scott Survey was leading due to references to airports and air travel.

37.     An element of a survey, such as a question or instruction, is leading if it suggests certain responses to respondents or otherwise leads them to certain responses: "A question is called leading if the (desired) answer to the question is included or implied in the question itself."[25] Leading elements in a survey can create "demand effects," which may cause respondents "to ascertain [what they believe is] the true purpose of the experiment and respond in a manner

---

[25] Rappeport, Mike. "Design Issues and the Value of Multiple Controls." *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann, ABA Publishing, 2022, pp. 258-259.

which will support the hypothesis being tested," leading "the totality of cues which convey an experimental hypothesis to the subject" to "become significant determinants of subjects' behavior."[26]

38.    The Scott Survey included phrasing that was leading and likely to produce demand effects.  Before it asked respondents the substantive questions that measured confusion, the Scott Survey provided numerous mentions of air travel or airports.  For example:

    i.    The Scott Survey qualified respondents as looking for "a hotel located at or near an airport."[27]

    ii.    Qualifying questions in the Scott Survey included the terms "air travel," "airline," and "airport hotel."[28]

    iii.    The instructions appearing before the webpage image included a reference to "airport," reminding respondents to look at the webpage "as you may see it if you were looking for a hotel near an airport."[29]

39.    In total, before showing respondents the webpage for Delta Hotels by Marriott, the Scott Survey included five references to air travel or airports.

40.    The leading effect of these multiple references to air travel or airports is more concerning because the Scott Survey was limited to Delta Hotels by Marriott locations near airports.[30]  The Scott Survey measured only Delta Hotels by Marriott webpages that had the word "airport" in the property name, including "Delta Hotels Indianapolis Airport," "Delta Hotels Norfolk Airport," and "Delta Hotels Detroit Metro Airport."  This does not match real-

---

[26] Orne, Martin T., "On the Social Psychology of the Psychological Experiment: with Particular Reference to Demand Characteristics and their Implications."  *American Psychologist*, vol. 17, 1962, p. 779.

[27] Scott Report, ¶ 7.

[28] Scott Report, Exhibit 4–Survey Document, pp. 2-3, 5-6.

[29] Scott Report, Exhibit 4–Survey Document, p. 7.

[30] Scott Report, ¶ 14.

world conditions, because only about 10% of Delta Hotels by Marriott locations in the U.S. are airport locations, while approximately 90% are not airport locations.[31]

41.    The Scott Survey is also leading because it instructed respondents to think about products or services that are not hotel services when answering questions that measured confusion as to source, affiliation, or permission.

42.    For example, Question 3 in the Scott Survey asked, "Aside from hotel services, what other products or services, if any, do you think [CURRENT ANSWER FROM Q1] provides?" Question 7 in the Scott Survey asked, "Aside from hotel services, what other products or services, if any, do you think [CURRENT ANSWER FROM Q5] provides?" Question 11 in the Scott Survey asked, "Aside from hotel services, what other products or services, if any, do you think [CURRENT ANSWER FROM Q9] provides?"[32]

43.    The phrasing of these three questions explicitly instructed respondents away from providing answers involving hotel services and toward providing other types of answers. Because DAL claims that its trademarks are strong and famous,[33] this phrasing likely surfaced latent associations with the word "Delta" that relate to DAL.

44.    The phrase "aside from hotel services" exists only in the context of the survey, and Dr. Scott provided no evidence that consumers ever encounter ads or branding for Delta Hotels by Marriott in a real-world context that asks them to consider the ad or branding in a manner that is "aside from hotel services." This phrasing is not only leading, but also does not match how consumers encounter Delta Hotels by Marriott in the real world.

---

[31] I understand that there are 48 Delta Hotels by Marriott properties in the U.S. (*See* "Delta Hotels." *Delta Hotels*, https://delta-hotels.marriott.com/our-locations/. Accessed March 27, 2023.) Dr. Scott notes that "Marriott operates five Delta Hotels near a U.S. airport." Consequently, these five locations comprise only 10.4% of the Delta Hotels by Marriott locations in the U.S. (calculated as 5 divided by 48, multiplied by 100).

[32] Scott Report, Exhibit 4–Survey Document, pp. 9, 12, and 14.

[33] First Amended Complaint, ¶¶ 1, 2.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No. 1:20-cv-01125-SCJ

45.     This leading phrasing is particularly concerning because Marriott is a hotel company with many brands that offer "hotel services," and the wording of the questions led respondents *away* from considering likely answers related to hotel services.  Affiliation or connection questions are not unusual in Eveready surveys,[34] and the Scott Survey could easily have asked about affiliation or connection with brands, products, or services without using the leading phrase "Aside from hotel services."

46.     The effect of these leading questions is apparent in the measures from the Scott Survey. Table B below shows the Scott Survey's overall confusion measures as well as confusion measures for (a) questions that mentioned "Aside from hotel services," versus questions that did not mention this phrase, and (b) questions asked before the first occurrence of "Aside from hotel services," versus questions asked starting with the first occurrence of this phrase.

### Table B: Summary of Confusion Measures in the Scott Survey

| Scott Survey, 2021 and 2023 Images Combined | Test | Control | Net Measure |
|---|---|---|---|
| Overall confusion measure (Questions 1, 2, 3, 5, 6, 7, 9, 10, and 11)[35] | 26.7% | 0.2% | 26.5% |
| Questions that do not mention "Aside from hotel services" (Questions 1, 2, 5, 6, 9, and 10) | 10.2% | 0.1% | 10.1% |
| Questions that mention "Aside from hotel services" (Questions 3, 7, and 11) | 16.5% | 0.1% | 16.4% |
| Questions asked before the first occurrence of "Aside from hotel services" (Questions 1 and 2) | 2.8% | 0.0% | 2.8% |
| Questions asked from the first occurrence of "Aside from hotel services" (Questions 3, 5, 6, 7, 9, 10, and 11) | 23.9% | 0.2% | 23.7% |

---

[34] Jay, E. Deborah.  *"He Who Steals My Good Name*: Likelihood-of-Confusion Surveys in TTAB Proceedings."  *The Trademark Reporter*, vol. 104, no. 5, 2014, pp. 1156-1157.

[35] Scott Report, Table 4.

47.    Table B shows that across all confusion questions combined (Questions 1, 2, 3, 5, 6, 7, 9, 10 and 11), the net confusion measure Dr. Scott reported was 26.5%.  However, more than half of that confusion measure came from Questions 3, 7, and 11, which began with "Aside from hotel services."  Questions 3, 7, and 11 had a net confusion measure of 16.4%, while the net confusion based on Questions 1, 2, 5, 6, 9, and 10 was 10.1%.

48.    Table B also compares the data for Questions 1 and 2, which were asked before respondents encountered the leading "Aside from hotel services" language, with data from the other questions that measured confusion in the Scott Survey.  The net confusion measure for Questions 1 and 2 combined was 2.8%, showing that the survey measured very little confusion before the leading "aside from hotel services" language was introduced.

49.    This analysis demonstrates the leading effects of that language.  Questions 5 and 6 asked about confusion as to business affiliation or connection and Questions 9 and 10 asked about confusion as to permission or approval.  Those are common topics for confusion questions in Eveready surveys,[36] but the Scott Survey's leading use of "Aside from hotel services" affected the survey's measures.

50.    In addition to other leading elements, the Scott Survey was also leading because the question measuring confusion as to permission or approval explicitly instructed respondents to answer regarding the name of the hotel.  Question 8 of the Scott Survey asked, "Regarding the name of this hotel, which of the following do you think is true?"  The response options for this question included "The company that owns, operates, or manages this hotel needed to get permission or approval from another company to use this hotel name" and "The company that owns, operates, or manages this hotel did not need to get permission or approval from another company to use this hotel name."[37]  Question 8 refers to "the name of this hotel," and the response options refer to "this hotel name."

---

[36] Jay, E. Deborah.  "*He Who Steals My Good Name*: Likelihood-of-Confusion Surveys in TTAB Proceedings."  *The Trademark Reporter*, vol. 104, no. 5, 2014, pp. 1156-1158.

[37] Scott Report, Exhibit 4–Survey Document, pp. 12-13.

51.     For respondents who viewed the test websites, "the name of this hotel" and "this hotel name" included the word "Delta."  The phrasing of Question 8 instructed respondents to think about the name, and not to consider other aspects of the website and hotel property they were shown.  The phrasing of this question is unusual, because it emphasizes the hotel name in the context of a question asking about permission or approval, possibly suggesting to some respondents that the hotel name related in some manner to permission or approval.

52.     This type of leading language can produce demand effects by suggesting that a relationship exists between two marks when, in the real world, "the possibility might not even have occurred to the vast majority of consumers who see the items."[38]  Courts have criticized confusion surveys that incorporated phrasing that led respondents toward certain types of answers, and away from other types of answers.[39]

53.     The language of the survey places the name "Delta Hotels by Marriott" in the same context as a question asking whether permission or approval was required.  If respondents had not been asked a question phrased in this manner, they may never have considered this possible connection.  Answers to such a question may fail to reflect the real world.  Also, as described earlier, the survey's references to air travel and airports may have led respondents to think of air travel and airports when responding to the confusion questions.

54.     As a result of the leading phrasing in the Scott Survey, the survey cannot provide a valid measure of likelihood of confusion in this matter.

---

[38] *See Simon Prop. Group LP v. MySimon, Inc.,* 104 F. Supp. 2d 1033, 1048 (S.D. Ind. 2000).  ("'[D]emand effects'…bias the survey by suggesting to respondents, at least implicitly, that they should believe there is at least some sort of relationship between the different items when the possibility might not even have occurred to the vast majority of consumers who see the items.")

[39] Swann, Jerre B. "Likelihood of Confusion." *Trademark and Deceptive Advertising Surveys:  Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann, ABA Publishing, 2012, p. 76; *see* footnote 139, e.g., *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1135 (C.D. Cal. 1998); *Frisch's Rests., Inc. v. Shoney's, Inc.*, 759 F.2d 1261 (6th Cir. 1985).  Footnote 139 notes that the court in *Mattel* criticized a "survey clearly designed to adduce evidence of confusion; with the first question, the survey 'implanted' a…response in respondents' minds."

**II.    The Scott Survey failed to replicate the conditions that consumers are likely to encounter in the real-world marketplace.**

55.    The leading phrasing in the Scott Survey was exacerbated by the design of the survey, which failed to replicate the manner in which consumers are likely to encounter Delta Hotels by Marriott in the real-world marketplace.

56.    A survey provides a simplified environment intended to provide measures on a specific topic, such as likelihood of confusion.  The measures from a survey are relevant only if the survey reflects real-world conditions, which can occur only if the survey reasonably replicates the interactions through which consumers experience a product or service in the real-world marketplace.  Consequently, "the survey expert must make every reasonable effort to duplicate the marketplace conditions under which consumers are likely to encounter the mark at issue"; this "requires the survey expert to find out how the allegedly infringing product is typically encountered in the marketplace."  The failure to replicate marketplace conditions may result in a survey being excluded,[40] and "the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results."[41]

57.    Given the nature of this matter, a survey that purports to measure likelihood of confusion must reflect the ways in which consumers may search for hotels in the real world; otherwise, respondents may answer questions in ways that do not reflect the marketplace. Despite this fundamental principle, the webpages shown in the Scott Survey did not replicate the conditions under which those webpages might be seen by consumers in the real-world marketplace, because the Scott Survey showed the webpages for three Delta Hotels properties

---

[40] Edwards, G. Kip and J. David Mayberry. "The *Daubert* Revolution and Lanham Act Surveys." *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann, ABA Publishing, 2022, p. 354.

[41] McCarthy, J. Thomas.  § 32:163 "Survey methodology—Approximating market conditions." *McCarthy on Trademarks and Unfair Competition*, 5th ed., Thomson Reuters, 2021, p. 32-457.

without showing images of searches that consumers would likely conduct before reaching those webpages.[42]

58.    As Figure 1 below shows, the 2021 webpage for Delta Hotels Indianapolis Airport includes a path to reach that webpage that reads "Marriott.com / Delta Hotels and Resorts / Indianapolis / Hotel."[43]  A search for the same hotel on Google locates the current webpage for the hotel at the URL https://www.marriott.com/en-us/hotels/indde-delta-hotels-indianapolis-airport/overview/.[44]


**Figure 1: Top of Scott Survey Image for the 2021 Delta Hotels Indianapolis Airport[45]**



59.    In the real world, consumers can reach the home page for this hotel property by searching through marriott.com, google.com, or other websites or search engines.  Consumers can reach the other webpages measured in the Scott Survey—Delta Hotels by Marriott Norfolk Airport and Delta Hotels by Marriott Detroit Metro Airport—through a similar search process. Given the long URLs for all three of these properties, it is unlikely that a consumer looking for a hotel room at one of them will navigate directly to the webpage for the property shown in the Scott Survey by typing the URL into their web browser.

60.    The Scott Survey showed respondents only the webpage for the Delta Hotels by Marriott property and did not show any webpages, such as marriott.com or google.com, that are likely required to locate the webpage for the hotel property.  These other pages are likely

---

[42] The likelihood-of-confusion survey I submitted in this matter did not include images of a Google search, but it did include images of two other search processes.  It also included an image of a home page that is not an interior page of a website, unlike the images used in the Scott Survey.

[43] Scott Report, Exhibit 5B, p. 76.

[44] "Delta Hotels Indianapolis Airport."  *Delta Hotels*, https://www.marriott.com/en-us/hotels/indde-delta-hotels-indianapolis-airport/overview/.  Accessed April 11, 2023.

[45] Scott Report, ¶ 21.

an essential part of the process of searching for the hotel properties measured in the Scott

Survey.  Including them in the survey would provide important context, such as helping to

clarify that the survey relates to the search for a hotel room.  In the real world, this context is

likely available to consumers as they search for a hotel room.  Because the Scott Survey did not

show any of these search pages, consumers taking the Scott Survey were deprived of important

elements that they would have had if they were searching for a hotel room in the real world.

### III.     The Scott Survey did not reflect the relevant universe of potential purchasers in this matter.

61.     In any survey, including surveys using the Eveready format, the universe of respondents

who complete the survey is one of the most fundamental aspects of survey design.  A survey

enables the researcher to gather opinions among a group of respondents instead of

interviewing the entire population, and then projects the results from that group of

respondents to the entire population of relevant consumers.  If the group interviewed in the

survey does not represent the population of interest, then the opinions gathered in the survey

may fail to measure the opinions of the population of interest.[46]  As one reference states,

"Selection of the proper universe is a crucial step, for even if the proper questions are asked in

a proper manner, if the wrong persons are asked, the results are likely to be irrelevant."[47]  The

*Reference Guide on Survey Research* states, "A survey that provides information about a wholly

irrelevant population is itself irrelevant.  Courts are likely to exclude the survey or accord it little

weight."[48]

62.     Because the Scott Survey interviewed only respondents who purchased or planned to

purchase hotel services from a hotel at or near an airport, the survey failed to represent the

---

[46] Diamond, Shari Seidman. "Reference Guide on Survey Research." *Reference Manual on Scientific Evidence*, 3rd ed., National Academies Press, 2011, p. 377.

[47] McCarthy, J. Thomas. § 32:159 "Relevant 'universe' surveyed – Defining the universe." *McCarthy on Trademarks and Unfair Competition*, 5th ed., Thomson Reuters, 2021, p. 32-438.

[48] Diamond, Shari Seidman. "Reference Guide on Survey Research." *Reference Manual on Scientific Evidence*, 3rd ed., National Academies Press, 2011, pp. 377-378.

1    relevant universe of consumers in this matter.  The Scott Survey interviewed respondents

2    qualified, among other criteria, as (a) in the last 18 months, having booked or purchased a stay

3    in a hotel, motel or vacation resort, or having booked or purchased use of a hotel meeting

4    room, a hotel conference facility, or a hotel restaurant at "An airport hotel (that is, a hotel

5    located at or near an airport)," or (b) in the next 18 months, planning to book or purchase a

6    stay in a hotel or vacation resort, or planning to book or purchase use of a hotel meeting room,

7    a hotel conference facility, or a hotel restaurant at "An airport hotel (that is, a hotel located at

8    or near an airport)."[49]

9    63.    As described earlier, about 90% of the properties for Delta Hotels by Marriott are not

10   airport locations.  Consequently, a survey measuring whether hotel consumers are likely to be

11   confused by the name "Delta Hotels by Marriott" should not be limited to consumers using

12   services at airport hotels.  Because the Scott Survey interviewed only consumers who booked

13   or planned to book services at an airport hotel, the survey universe excluded potential

14   respondents who are relevant to this litigation.

15   64.    Also, the universe of respondents for the Scott Survey was over-inclusive because it did

16   not require respondents to have purchased a hotel service at a price point or quality level

17   comparable to that of Delta Hotels by Marriott.  As described earlier, the Scott Survey qualified

18   respondents if they had purchased "a stay for at least one night in a hotel, motel, or vacation

19   resort" or "use of a hotel meeting room, a hotel conference facility, or a hotel restaurant" in

20   the last 18 months, or planned to do so in the next 18 months, as long as that hotel was "a

21   hotel located at or near an airport."[50]  Nowhere in this series of qualifying questions did Dr.

22   Scott qualify respondents according to the price or quality level of the hotel where the

23   respondents made or planned to make their purchases.  This is despite the fact that hotels,

24   motels, and vacation resorts may include properties with very different price points and quality

25   levels from those of Delta Hotels by Marriott.

26   _____

[49] Scott Report, Exhibit 4–Survey Document, pp. 4-6.  Question S6 asked about "a hotel, motel, or

27   vacation resort," but Question S7 asked only about "a hotel or vacation resort."

[50] Scott Report, Exhibit 4–Survey Document, pp. 4-6.

28

65.    While Dr. Scott's choice to qualify only patrons of airport hotels was unnecessarily narrow, her choice to not require a quality or price level similar to that of the Delta Hotels by Marriott properties was unnecessarily wide, allowing respondents to qualify for the Scott Survey even if they are not relevant to this matter.

**IV.    The Scott Survey used flawed phrasing that asked for a legal conclusion.**

66.    In addition to the other problems described so far in this section, the Scott Survey also asked questions to measure confusion using phrasing that courts have criticized as asking for a legal conclusion.

67.    In a typical Eveready survey, after respondents view the disputed mark or product as it appears in the marketplace, respondents answer a series of questions to measure different types of confusion.  For example, in the Scott Survey, Questions 1, 2, and 3 asked for the company or companies that owns, operates, or manages this hotel, and also asked about any other products or services that company provides.  Questions 5, 6, and 7 asked about business affiliation or connection.

68.    Question 8 of the Scott Survey asked respondents whether "the company that owns, operates, or manages this hotel <u>needed to get permission or approval</u> from another company to use this hotel name," "The company that owns, operates, or manages this hotel <u>did *not* need to get permission or approval</u> from another company to use this hotel name," or they didn't know or were unsure.  Question 9 asked, "From what company or companies did the company that owns, operates, or manages this hotel need <u>permission or approval</u>?"  Also, Question 10 asked, "What makes you think that the company(s) that owns, operates, or manages this hotel needed to get <u>permission or approval</u> from [CURRENT ANSWER FROM Q9]?"[51]

---

[51] Scott Report, Exhibit 4–Survey Document, pp. 12-14.

69.    These three questions asked whether a company or companies *needed* to get permission or approval.  Rather than measuring whether respondents were confused, the phrasing of this question "improperly ask[s] respondents for a legal conclusion."[52]

70.    Courts have afforded little weight to surveys that asked about permission or approval in this way.[53]  As noted by the court in one matter, that is because the phrasing "mistakenly asks respondents what they believe is the legal requirement," rather than asking whether the company did or did not receive permission or approval.[54]  In another matter, the court explained that answers to the question of whether permission or approval was needed "carry little weight" in measuring confusion.[55]

71.    Eveready surveys commonly ask about confusion as to permission or approval,[56] but use phrasing that does not ask for a legal conclusion.  Questions 8, 9, and 10 in the Scott Survey would not have sought a legal conclusion if they had asked whether the company or companies that owned, operated, or managed the hotel did or did not receive permission or approval, instead of asking whether they <u>needed</u> to receive permission or approval.[57]

72.    The next section describes my opinions about the Zerrillo Report and Survey.

---

[52] *NFL Properties Inc. v. ProStyle Inc.*, 16 F. Supp. 2d 1012, 1017 (E.D. Wis. 1998).

[53] McCarthy, J. Thomas.  § 32:175 "Survey Formats—Methods for eliciting buyer perceptions."  *McCarthy on Trademarks and Unfair Competition*, 5th ed., Thomson Reuters, 2021, pp. 32-522 through 32-525. *See also* Jacoby, J.  "Sense and Nonsense in Measuring Sponsorship Confusion."  *Cardozo Arts & Entertainment Law Journal*, vol. 24*,* no. 1, 2006, pp. 75-80, 92-93.

[54] *Novo Nordisk of N. Am. v. Eli Lilly & Co.*, 1996 WL 497018 (S.D.N.Y. Aug. 30, 1996).

[55] *Vuitton Malletier v. Dooney Burke*, 340 F. Supp. 2d 415 (S.D.N.Y. 2004).

[56] Swann, Jerre B.  "Likelihood of Confusion and the Straitened Scope of Squirt."  *The Trademark Reporter*, vol. 98, no. 3, 2008, p. 742.  *See also* Jay, E. Deborah.  "*He Who Steals My Good Name*: Likelihood-of-Confusion Surveys in TTAB Proceedings."  *The Trademark Reporter*, vol. 104, no. 5, 2014, p. 1157.

[57] Questions asking about permission or approval are not required in confusion surveys, and confusion surveys are often conducted without such questions.  (*See* Jay, E. Deborah.  "*He Who Steals My Good Name*: Likelihood-of-Confusion Surveys in TTAB Proceedings."  *The Trademark Reporter*, vol. 104, no. 5, 2014, p. 1157.)  It is possible to include questions asking about permission or approval in a confusion survey without using phrasing that asks for a legal conclusion.

1

2

**Section 3: The Zerrillo Report and Survey**

3  **Overview of the Zerrillo Survey and My Opinions Relating to the Zerrillo Survey**

4  73.     Like Dr. Scott, Dr. Zerrillo conducted a likelihood-of-confusion survey that used the

5  Eveready format.  The Zerrillo Survey interviewed respondents who, among other qualification

6  criteria, answered that they had (a) booked or stayed one or more nights in a hotel with 2.5, 3,

7  3.5, or 4 stars in the last 18 months; (b) booked or purchased use of a hotel meeting room, a

8  hotel conference facility, or a hotel restaurant at a hotel with 2.5, 3, 3.5, or 4 stars in the last

9  18 months; (c) were likely to book or stay one or more nights at a hotel with 2.5, 3, 3.5 or 4

10  stars in the next 18 months; or (d) were likely to book or purchase use of a hotel meeting

11  room, a hotel conference facility, or a hotel restaurant at a hotel with 2.5, 3, 3.5, or 4 stars in

12  the next 18 months.[58]

13  74.     Respondents were randomly assigned to view an image of a website for either Delta

14  Hotels by Marriot Cincinnati Sharonville or Delta Hotels by Marriott Virginia Beach Bayfront

15  Suites.  Respondents viewed either a test website or a control website.  For the control

16  websites for the Zerrillo Survey, as with the Scott Survey, "Delta Hotels by Marriott" was

17  altered to "Debut Hotels by Marriott."[59]

18  75.     Once respondents confirmed that they could see the images clearly,[60] they were asked

19  three series of questions to measure confusion.  Questions 1, 2, and 3 measured confusion as

20  to source, asking what company or companies respondents thought owned, operated, or

21  managed this hotel chain; what made them think that this hotel chain was owned, operated, or

22  managed by that company; and, aside from hotel services, what other products or services

23  they thought the company whose name they entered in Question 1 provided.[61]

24

25  _____

26  [58] Zerrillo Report, ¶ 19.

26  [59] Zerrillo Report, ¶ 26.

27  [60] Zerrillo Report, ¶ 20.

28  [61] Zerrillo Report, ¶¶ 29-31.

76.     The next series of questions measured confusion as to business affiliation or connection.  Question 4 was a filter question asking respondents whether they thought that the hotel chain they were shown had or did not have a business affiliation or connection with another company or companies.  For those who answered yes, Questions 5, 6, and 7 asked what company or companies they thought had a business affiliation or connection with this hotel chain; what made them think that this hotel chain had a business affiliation or connection with that company; and aside from hotel services, what other products or services they thought that the company they entered in Question 5 provided.[62]

77.     The next series of questions measured confusion as to permission or approval.  Question 8 was a filter question asking whether the company that owned, operated, or managed this hotel chain needed or did not need to get permission or approval from another company to use this hotel name.  For those who answered yes, Questions 9, 10, and 11 asked from what company or companies the company that owned, operated, or managed this hotel chain needed to get permission or approval; what made them think that the company(s) that owned, operated, or managed this hotel chain needed to get permission or approval from that other company; and, aside from hotel services, what other products or services, if any, they thought the company they entered in Question 9 provided.[63]

78.     It appears that Dr. Zerrillo counted every response that referenced a company whose name included "Delta" as confused if that respondent also referred to airline or flight services in the same series of questions.[64]  Across Questions 1, 2, 3, 5, 6, 7, 9, 10, and 11, Dr. Zerrillo concluded that the net confusion measure was at least 27.7% for the Cincinnati website, at least 15.8% for the Virginia Beach website, and at least 21.8% for the combined data from both

---

[62] Zerrillo Report, ¶¶ 38-41.

[63] Zerrillo Report, ¶¶ 49-52.

[64] Zerrillo Report, Figures 2, 3, 4, and 5.  The Zerrillo Report does not specify how Dr. Zerrillo calculated confusion.  These figures show how Dr. Zerrillo appears to have calculated confusion, based on the analysis in his report.

hotel properties.[65]  (Net measures are calculated as a test measure minus the corresponding control measure.)

79.     In my opinion, the Zerrillo Survey does not provide reliable measures of likelihood of confusion for multiple reasons.  Specifically:

i.    **Questions in the Zerrillo Survey were leading.**  Like the Scott Survey, the Zerrillo Survey asked respondents what products or services "aside from hotel services" were provided by the companies they believed were related to the hotels in the images they saw.  This instruction improperly led respondents away from providing answers related to hotel services and toward answers related to other products and services, raising the survey's confusion measures in a manner that does not reflect confusion in the real world.

ii.   **The images shown in the Zerrillo Survey did not reflect the marketplace.**  The measures from a survey reflect the real world only if the survey reasonably replicates real-world conditions.  The Zerrillo Survey showed images that did not correspond to how consumers shop for hotel services in the real world because the images did not include a web search or any search results.

iii.  **The Zerrillo Survey did not reflect the relevant universe of potential purchasers of hotel services.**  The Zerrillo Survey attempted to qualify respondents as purchasing hotel rooms with a certain number of rating stars, but this qualification was worded in an unclear manner that provided no clear standard for respondents, forcing them to guess when providing responses.

iv.   **The Zerrillo Survey used flawed phrasing that asked for a legal conclusion.**  Like the Scott Survey, the Zerrillo Survey asked whether the company that owned, operated, or managed the hotel needed permission or approval, which impermissibly sought a legal conclusion.

---

[65] Zerrillo Report, ¶ 61.  Dr. Zerrillo notes that he found one potentially confused control respondent who referred to "Delta" unspecified without also referring to any airline services, and that he did not count this respondent as confused.  Zerrillo Report, ¶ 60.

**My Opinions About the Zerrillo Report and Survey**

80.      This section describes my opinions about the Zerrillo Report and Survey in detail.

        **I.      Questions in the Zerrillo Survey were leading.**

81.      As described earlier in the section discussing the Scott Survey, a leading question is one that suggests a particular answer to respondents, or that suggests concepts or ideas that respondents might not have otherwise considered.  Also as described earlier, survey questions and other elements of surveys should not be leading.  However, like the Scott Survey, the Zerrillo Survey contained leading questions.

82.      As in the Scott Survey, confusion questions in the Zerrillo Survey used the phrase "Aside from hotel services."  For example, the first question in the Zerrillo Survey that measured confusion was Question 1, which asked respondents what company or companies they thought owned, operated, or managed this hotel chain.  Question 2 asked respondents what made them think that the hotel chain was owned, operated, or managed by that company.  The next question, Question 3, asked, "Aside from hotel services, what other products or services, if any, do you think [CURRENT ANSWER FROM Q1] provides?  Please mention all that you are aware of."[66]  Like the questions from Dr. Scott that used this phrase, this question not only assumed that respondents were thinking of products or services beyond hotel services, but instructed respondents to provide answers about products or services other than hotel services.

83.      Also, like Dr. Scott, Dr. Zerrillo repeated this phrase twice more in his survey.  Question 7 in the Zerrillo Survey asked, "Aside from hotel services, what other products or services, if any, do you think [CURRENT ANSWER FROM Q5] provides?  Please mention all that you are aware of."  Also, Question 11 asked, "Aside from hotel services, what other products or services, if any, do you think [CURRENT ANSWER FROM Q9] provides?  Please mention all that you are aware of."[67]  Thus, respondents were exposed to the phrase "aside from hotel

---

[66] Zerrillo Report, Exhibit A, Question 3.

[67] Zerrillo Report, Exhibit A, Questions 7, 11.

services" as many as three times in the Zerrillo Survey, depending on their answers to other questions.

84.      As with this phrase in the Scott Survey, the phrase "Aside from hotel services" in the Zerrillo Survey instructed respondents not to provide answers involving hotel services and led them toward other types of answers.  Because Delta Hotels by Marriott and Marriott primarily offer hotel services, the phrase "Aside from hotel services" steered respondents away from answers that would indicate a lack of confusion.  Given that DAL claims that its trademarks are strong and famous, this phrasing likely surfaced latent associations with the word "Delta" that relate to DAL.

85.      In addition, the phrase "Aside from hotel services" exists only in the context of the Zerrillo Survey, and Dr. Zerrillo provided no evidence that consumers ever encounter ads or branding for Delta Hotels by Marriott in a real-world context that asks them to consider the ad or branding in a manner that is "Aside from hotel services."  This phrasing was not only leading, but also did not match how consumers encounter Delta Hotels by Marriott in the real world.

86.      As with the use of this phrase in the Scott Survey, the effect of the Zerrillo Survey's use of "Aside from hotel services" is apparent in the data from the survey.  Table C below shows the Zerrillo Survey's overall confusion measures as well as confusion measures for (a) questions that mentioned "Aside from hotel services," versus questions that did not mention this phrase, and (b) questions asked before the first occurrence of "Aside from hotel services," versus questions asked starting with the first occurrence of this phrase.

**Table C: Summary of Confusion Measures in the Zerrillo Survey**

| Zerrillo Survey, combined data from Cincinnati and Virginia Beach | Test | Control | Net Measure |
|---|---|---|---|
| Overall confusion measure (Questions 1, 2, 3, 5, 6, 7, 9, 10, and 11)[68] | 21.8% | 0.0% | 21.8% |
| Questions that do not mention "Aside from hotel services" (Questions 1, 2, 5, 6, 9, and 10) | 9.7% | 0.0% | 9.7% |
| Questions that mention "Aside from hotel services" (Questions 3, 7, and 11) | 12.1% | 0.0% | 12.1% |
| Questions before the first mention of "Aside from hotel services" (Questions 1 and 2) | 1.0% | 0.0% | 1.0% |
| Questions asked from the first occurrence of "Aside from Hotel services" (Questions 3, 5, 6, 7, 9, 10, and 11) | 20.8% | 0.0% | 20.8% |

87.    Table C shows that across all confusion questions combined, Dr. Zerrillo claimed a net confusion measure of 21.8%.  However, as with the Scott Survey, the majority of the Zerrillo Survey's overall confusion measure comes from Questions 3, 7, and 11, which all start with "Aside from hotel services."  The net confusion from these three questions is 12.1%, while the other questions that measured confusion (Questions 1, 2, 5, 6, 9, and 10) have a combined net confusion measure of 9.7%.  That is, those three questions generated a net confusion measure larger than the other six questions used to generate the overall confusion measure.  These results demonstrate the effect of the leading phrasing of Questions 3, 7, and 11.

88.    Table C also compares the data for Questions 1 and 2, which were asked before respondents encountered the leading "Aside from hotel services" language, with data from the other questions that measured confusion in the Zerrillo Survey (Questions 3, 5, 6, 7, 9, 10, and 11).  The net confusion measure for all of those questions combined was 20.8%, whereas the combined net confusion measure for Questions 1 and 2 was 1.0%.  This further demonstrates the effect of the leading "Aside from hotel services" language.

---

[68] Zerrillo Report, ¶ 63, Figure 5.

89.     The leading nature of this survey design is also evident in the Zerrillo Survey's qualifying questions, which referenced airlines or air travel.  Question S4 asked whether respondents had taken any surveys on a variety of topics in the last 30 days, including any survey on "Air travel in the United States."  The next question, Question S5, asked, "Which of the following types of companies, if any, do you or anyone in your immediate family or household work for?"  One response item for this question was "A travel agency or airline."[69]  In both instances, the respondents saw "air travel" and "airline" before the main confusion questions were asked.  By the time a respondent was qualified to continue with the main part of the Zerrillo Survey, they would have seen references to "air travel" or "airline" twice, which might prompt them to think about air travel when they might otherwise not have.

90.     Questions S4 and S5 would not be leading if Dr. Zerrillo had asked these questions at the end of the survey, after asking the questions that measured confusion.  Because Dr. Zerrillo did not do this, the results of the Zerrillo Survey are subject to any leading effect from Questions S4 and S5.[70]

## II.    The images shown in the Zerrillo Survey did not reflect the marketplace.

91.     The leading phrasing in the Zerrillo Survey was exacerbated by the design of the survey, which failed to replicate the manner in which consumers are likely to encounter Delta Hotels by Marriott in the real-world marketplace.  As described earlier, courts have excluded surveys that fail to replicate marketplace conditions,[71] because measures from a survey are relevant only if

---

[69] Zerrillo Report, Exhibit A, Questions S4, S5.

[70] In addition, there appears to be a minor programming error in the Zerrillo Survey.  In Question 5, respondents who answered "I don't know" were supposed to have skipped Questions 6 and 7 and gone to Question 8.  A programming error appears to have caused 108 respondents to be asked Questions 6 and 7, which they were supposed to have skipped.  Zerrillo Report, Exhibit A, data file (provided as Final_Excel_012023.XLSX).

[71] Edwards, G. Kip and J. David Mayberry. "The *Daubert* Revolution and Lanham Act Surveys." *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann, ABA Publishing, 2022, p. 354.

the survey reasonably replicates the interactions through which consumers may experience a product or service in the real-world marketplace.

92.     Despite this core principle and expectation, the webpages shown in the Zerrillo Survey did not replicate the situations in which those webpages might be seen by consumers in the real-world marketplace.  After respondents were qualified for this survey, they were shown an image from the website of either Delta Hotels by Marriott Cincinnati Sharonville or Delta Hotels by Marriott Virginia Beach Bayfront Suites.  As Figure 2 below shows, the images for both of these properties include the URL of that webpage.

**Figure 2: Top of Zerrillo Survey Webpages**
**for Delta Hotels Cincinnati and Delta Hotels Virginia Beach[72]**





---

[72] Zerrillo Report, Exhibit B.

93.     As Figure 2 shows, the webpage for the Delta Hotels by Marriott Cincinnati property shows a URL of https://www.marriott.com/en-us/hotels/cvgde-delta-hotels-cincinnati-sharonville/overview/.  The webpage for the Delta Hotels by Marriott Virginia Beach location shows a URL of https://www.marriott.com/en-us/hotels/orfdb-delta-hotels-virginia-beach-bayfront-suites/overview/.[73]  Given the long URLs for these two properties, it is unlikely that a consumer looking for the webpage for either of these properties will navigate directly to their webpages by typing the URLs into their web browser.

94.     However, consumers can reach the two Delta Hotels by Marriott websites shown in the Zerrillo Survey by searching through marriott.com, google.com, or other websites or search engines.  For example, Marriott's home page features a search bar at the top of the page that allows consumers to search for specific properties.  Similarly, a Google search for the term "Delta Hotels Cincinnati" lists the webpage for the Delta Hotels by Marriott Cincinnati property among the top search results.

95.     The Zerrillo Survey showed respondents only the webpages for two Delta Hotels by Marriott properties and did not show any of the webpages, such as marriott.com or google.com, that likely would be used to locate these webpages for the hotel properties.[74] These search pages are likely an essential part of the process of finding the hotel webpages measured in the Zerrillo Survey.  In the survey, they would provide important context, such as helping to clarify that the survey relates to the search for a hotel room.  In the real world, this context is likely available to most consumers searching for a hotel room.  Because the Zerrillo Survey did not show any of these search pages, consumers taking the Zerrillo Survey were deprived of important elements that they would likely have available if they were searching for a hotel room in the real world.

---

[73] Zerrillo Report, Exhibit B.

[74] The likelihood-of-confusion survey I submitted in this matter did not include images of a Google search, but it did include images of two other search processes.  It also included an image of a home page that is not an interior page of a website, unlike the images used in the Zerrillo Survey.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No. 1:20-cv-01125-SCJ

### III. The Zerrillo Survey did not reflect the relevant universe of potential purchasers of hotel services.

96. As previously mentioned, the universe of respondents to be interviewed is one of the most important aspects of survey design, and a survey that asks questions of the wrong respondents can be irrelevant.[75] Like the survey from Dr. Scott, the Zerrillo Survey did not reflect the relevant universe of consumers of hotel services.

97. Among other criteria, the Zerrillo Survey qualified respondents who "either in the last 18 months had, or in the next 18 months were likely to, (1) book or stay for at least one night in a hotel (specifically, a 2.5, 3, 3.5 or 4 star hotel) or (2) book or purchase use of a hotel meeting room, a hotel conference facility, or a hotel restaurant (specifically, a 2.5, 3, 3.5 or 4 star hotel)."[76] As this quote indicates, the Zerrillo Survey qualified respondents based on hotel star ratings.

98. In the Zerrillo Survey, Question S8 asked, "You indicated that you booked or purchased a stay for at least one night in a hotel in the last 18 months. If you recall, how many stars was the hotel? If you booked or purchased nights in more than one hotel in the last 18 months, please select all that apply." Similarly, Question S9 asked, "You indicated that you booked or purchased the use of a hotel meeting room, a hotel conference facility, or a hotel restaurant in the last 18 months. If you recall, how many stars was the hotel? If you booked or purchased these services in more than one hotel in the last 18 months, please select all that apply." Questions S10 and S11 asked similar questions with regard to future purchases, and the survey included a question asking, "If you know, how many stars will the hotel be?" Respondents qualified on these questions if they selected a star rating of 2.5 to 4 stars.[77]

99. Dr. Zerrillo asserted that, "I also understand that DELTA HOTELS properties in the United States range from around 2.5 to 4 stars, based on my review of popular sites such as

---

[75] McCarthy, J. Thomas. § 32:159 "Relevant 'universe' surveyed – Defining the universe." *McCarthy on Trademarks and Unfair Competition*, 5th ed., Thomson Reuters, 2021, p. 32-438.

[76] Zerrillo Report, ¶ 19.

[77] Zerrillo Report, Exhibit A, Questions S8-S11.

www.hotels.com and www.expedia.com."[78]  The Zerrillo Survey's questions asking about star ratings assumed that respondents knew what star ratings mean and represent, and also presumed that Delta Hotels by Marriott properties fall in the range from 2.5 to 4 stars.

100.    However, star ratings may not have had the same meaning for every respondent and may have been ambiguous for many respondents, because many companies issue such ratings and the ratings systems can be inconsistent and use different scales.[79]  I am not aware of any standard scale for hotel ratings in the United States.[80]

101.    Dr. Zerrillo claimed that he derived the star ratings range for his survey by reviewing "popular sites such as www.hotels.com and www.expedia.com,"[81] but he provided no evidence to support his contention that the Delta Hotels by Marriott properties measured in his survey fell in the range of 2.5 to 4 stars.  Also, while he claimed to have reviewed ratings from two websites, he did not claim to have reviewed or considered hotel ratings from other sources, such as Google, Orbitz, Trivago, Hotwire, Yelp, Tripadvisor, Booking.com, the Automobile Club, *Frommer's*, *Forbes Travel Guide*, *Travel Weekly*, Facebook, Oyster, Travelocity, ReservationDesk.com, or other websites or publications related to hotels and travel.

---

[78] Zerrillo Report, ¶ 19, FN 1.

[79] Pitrelli, Monica.  "What Do Hotel 'Star' Ratings Really Mean?  Here's a Breakdown."  *CNBC*, Dec. 13, 2022, https://www.cnbc.com/2022/12/11/what-do-hotel-star-ratings-mean-heres-a-breakdown.html.  Accessed March 27, 2023.

[80] Cunningham, Sean.  "What Hotel Star Ratings Actually Mean Today."  *CNN*, Nov. 7, 2022, https://www.cnn.com/travel/article/hotel-star-rating-meanings/index.html.  Accessed March 27, 2023.

[81] Zerrillo Report, ¶ 19, FN 1.

102.    These publications and websites use ratings systems that are independent from one another, and different ratings systems may use different scales that are derived from different sources or user bases.  For example, Expedia offers ratings of one to five stars, which the company assigns according to what is typical for that class of hotel.[82]  *Travel Weekly*, a travel industry publication that classifies hotels, uses a 10-tier classification system that provides information about amenities and price at a rated hotel.[83]  *Forbes Travel Guide* offers a three-point rating system, awarding five stars for "often iconic properties with virtually flawless service and amazing facilities," four stars for "exceptional properties, offering high levels of service and quality of facility to match," and a recommended rating for "excellent properties with consistently good service and facilities."[84]  Tripadvisor uses a "popularity ranking" on a scale of one to five "bubbles," which relies on the "quality, recency and quantity of reviews that a business receives from users."[85]

103.    Because many publications and websites provide hotel star ratings, there is no way to know what the star ratings in the Zerrillo Survey actually meant.  The Zerrillo Survey did not define star ratings and did not indicate which system of star ratings it referenced.  As a result of this, some respondents may have provided answers according to a rating scale that was different from those that Dr. Zerrillo had in mind.

---

[82] "Star Ratings (hotel class)."  *Expedia*, https://www.expedia.com/Hotel-Star-Rating-Information. Accessed April 12, 2023.

[83] "Hotel Rankings: Northstar Travel's 10-Tier Classification System."  *Travel Weekly*, https://www.travelweekly.com/Hotels/About-Classifications.  Accessed April 12, 2023.

[84] "We are the only independent, global rating system for luxury hotels, restaurants and spas."  *Forbes Travel Guide*, popup window accessed by clicking "Learn How We Inspect" at https://www.forbestravelguide.com/award-winners.  Accessed April 12, 2023.

[85] "How the Popularity Ranking works."  *Tripadvisor*, https://www.tripadvisor.com/business/insights/hotels/resources/tripadvisor-popularity-ranking. Accessed April 12, 2023.

**IV.  The Zerrillo Survey used flawed phrasing that asked for a legal conclusion.**

104.    As with the Scott Survey, the Zerrillo Survey asked questions that used phrasing that courts have criticized as asking for a legal conclusion.

105.    In the Zerrillo Survey, Question 8 asked, "Regarding the name of this hotel chain, which of the following do you think is true?"[86]  The response options included, "The company that owns, operates, or manages this hotel chain <u>needed to get permission or approval</u> from another company to use this hotel name," "The company that owns, operates, or manages this hotel chain <u>did *not* need to get permission or approval</u> from another company to use this hotel name," and "Don't Know / Not Sure."  Similarly, Question 9 asked, "From what company or companies did the company that owns, operates, or manages this hotel chain need <u>permission or approval</u>?"[87]  Question 10 asked, "What makes you think that the company(s) that owns, operates, or manages this hotel chain needed to get <u>permission or approval</u> from [CURRENT ANSWER FROM Q9]?"[88]

106.    These questions in the Zerrillo Survey have the same flaw as the questions in the Scott Survey asking whether the company that owns, operates, or manages the hotel needed permission or approval.  As with those questions, Questions 8, 9, and 10 in the Zerrillo Survey "improperly ask[ed] respondents for a legal conclusion."[89]  As noted earlier, courts have given little weight to the results of survey questions that ask respondents for a legal conclusion.[90]

---

[86] Zerrillo Report, Exhibit A, Question 8.

[87] Zerrillo Report, Exhibit A, Question 9.

[88] Zerrillo Report, Exhibit A, Question 10.

[89] *NFL Properties Inc. v. ProStyle Inc.*, 16 F. Supp. 2d 1012, 1017 (E.D. Wis. 1998).

[90] *NFL Properties Inc. v. ProStyle Inc.*, 16 F. Supp. 2d 1012, 1017 (E.D. Wis. 1998).  *See also Novo Nordisk of N. Am. v. Eli Lilly & Co.*, 1996 WL 497018 (S.D.N.Y. Aug. 30, 1996); *Vuitton Malletier v. Dooney Burke*, 340 F. Supp. 2d 415 (S.D.N.Y. 2004).

107.    Eveready surveys commonly ask about confusion as to permission or approval (although this is not a requirement),[91] but can do so using phrasing that does not ask for a legal conclusion.  As with the Scott Survey, the Zerrillo Survey would not have asked for a legal conclusion if it had asked whether the hotel did or did not receive permission or approval, instead of asking whether the hotel needed to receive permission or approval.

108.    The next section describes my opinions about the Franklyn Report and Survey.

---

[91] Swann, Jerre B.  "Likelihood of Confusion and the Straitened Scope of Squirt."  *The Trademark Reporter*, vol. 98, no. 3, 2008, p. 742.  *See also* Jay, E. Deborah.  "*He Who Steals My Good Name*: Likelihood-of-Confusion Surveys in TTAB Proceedings."  *The Trademark Reporter*, vol. 104, no. 5, 2014, p. 1157.

1

**Section 4: The Franklyn Report and Survey**

2

3    <u>Overview of the Franklyn Survey and My Opinions</u>

4    109.    Unlike the other experts described in this report, Mr. Franklyn conducted a confusion

5    survey that used the Squirt, or lineup, format, in which respondents are exposed to both the

6    allegedly infringed trademark and the allegedly infringing trademark, along with other marks

7    from competitors not involved in the dispute.  The Franklyn Survey interviewed respondents

8    who, among other qualification criteria, had purchased a reservation for a hotel stay online in

9    the past 18 months, or were likely to make such a purchase in the next 12 months.[92]

10   110.    After qualifying for the Franklyn Survey, respondents were shown an image of the DAL

11   website (at delta.com).[93]  After two "buffer" questions,[94] respondents were divided into a test

12   group and a control group.  The test group saw a series of images of hotel websites that

13   included the Delta Hotels by Marriott website (at delta-hotels.marriott.com), as well as

14   websites for DoubleTree Hotels (at hilton.com/en/doubletree/), Crowne Plaza Hotels (at

15   ihg.com/crowneplaza/hotels/us/en/reservation), and Radisson Hotels (at

16   radissonhotels.com/en-us/).[95]  The control group for the Franklyn Survey saw the same images

17   of hotel websites, except that, as with the Scott and Zerrillo Surveys, Delta Hotels by Marriott

18   was changed to "Debut Hotels by Marriott."[96]

19   111.    Once respondents confirmed that they could see the images clearly, they were asked a

20   series of questions to measure confusion for each of the websites for Delta Hotels by Marriott,

21   Doubletree, Crowne Plaza, and Radisson.  The Franklyn Survey asked the confusion questions

22   with the websites in view.

23

24   ───────────────────────

25   [92] Franklyn Report, p. 31.

     [93] Franklyn Report, p. 15.

26   [94] Franklyn Report, pp. 17-18.

27   [95] Franklyn Report, p. 27.

28   [96] Franklyn Report, pp. 18-20.

112.    Question A109 asked whether the respondent believed the hotel shown in the website was owned or operated by the same company they were shown in the first section of the Franklyn Survey (namely, the company shown in the DAL website image) or by a different company.[97]  Respondents who answered affirmatively were next asked Question A110, "Why do you say that?"[98]

113.    Question A111 asked respondents whether they believed that the hotel shown in the website was or was not sponsored or approved by the company shown in the first section of the Franklyn Survey (the company shown in the DAL website image).[99]  Respondents who answered that they did believe the hotel shown in the website was sponsored or approved by the company in the first section of the survey were asked Question A112, "Why do you say that?"[100]

114.    Question A113 asked respondents whether they believed that the hotel shown in the website had a business affiliation or connection with the company shown in the first section of the Franklyn Survey (the company shown in the DAL website image).[101]  Respondents who answered that they did believe there was a business affiliation or connection with the company in the first section of the survey were asked Question A114, "Why do you say that?"[102]

115.    This process of showing a hotel website and asking Questions A109 through A114 was repeated for each hotel website.  The websites were shown in random order.

---

[97] Franklyn Report, p. 21, and Appendix B - Questionnaires/Instructions, p. 5.

[98] Franklyn Report, p. 22, and Appendix B - Questionnaires/Instructions, p. 5.

[99] Franklyn Report, p. 23, and Appendix B - Questionnaires/Instructions, p. 6.

[100] Franklyn Report, p. 24, and Appendix B - Questionnaires/Instructions, p. 6.

[101] Franklyn Report, p. 25, and Appendix B - Questionnaires/Instructions, p. 6.

[102] Franklyn Report, p. 26, and Appendix B - Questionnaires/Instructions, p. 6.

116.    The surveys that Dr. Scott and Dr. Zerrillo conducted used an Eveready format, which measures confusion through comments provided in respondents' own words.  By contrast, the Franklyn Survey used the lineup format, which measures confusion through the answers respondents select in response to closed-ended questions.  Mr. Franklyn appears to have counted respondents as confused if they answered in Questions A109, A111, or A113 that the Delta Hotels by Marriott website image showed a hotel that was owned or operated by, sponsored or approved by, or affiliated or connected with the same company shown in the DAL website image.[103]  Across those three confusion questions, Mr. Franklyn concluded that net confusion was 36.1%.[104]

117.    In my opinion, the Franklyn Survey does not provide a reliable measure of the likelihood of confusion in this matter for several reasons.  Specifically:

> i.    **The Franklyn Survey is leading because it placed marks in proximity without showing that those marks have proximity in the marketplace, and because it mentioned air travel prior to measuring confusion.**  Mr. Franklyn measured confusion using the lineup format, and the Franklyn Survey showed websites for DAL and Delta Hotels by Marriott, as well as other hotel brands, in succession, separated only by two distractor questions.  Despite placing these brands in proximity, the Franklyn Report offers no evidence that consumers will routinely encounter these websites with such proximity in the marketplace.  Mr. Franklyn described scenarios where he claimed that these brands could be encountered by consumers at the same time or in rapid succession; he did not measure any scenario that he claimed could lead to proximity.  The Franklyn Survey is also leading because it mentioned words related to air travel more than once prior to asking confusion questions.

---

[103] Franklyn Report, pp. 40, 41, 43, 47-49, and Appendix B - Questionnaires/Instructions, pp. 5-6..

[104] Franklyn Report, p. 46.

Expert Rebuttal Report of Dr. Bruce Isaacson
Case No. 1:20-cv-01125-SCJ

ii.    **The Franklyn Survey interviewed respondents who are irrelevant to this dispute.** The Franklyn Survey did not require respondents to specify a price range or a quality level for hotel stays that they had purchased or planned to purchase; consumers of any type of hotel could qualify for the survey, regardless of whether they had stayed in a hotel room of a price point or quality level that is similar to that of Delta Hotels by Marriott.

iii.    **The Franklyn Survey located prospective respondents using undefined and improper methods.** The Franklyn Survey located prospective respondents from a "programmatic marketplace" rather than from a panel provider that directly manages and provides prospective respondents for surveys. The Franklyn Report provides no information about the methods that this marketplace uses to locate, recruit, or manage prospective respondents for surveys. The problems with this source are evident in the fact that 84% of the interviews for the Franklyn Survey were conducted on a single day.

**My Opinions About the Franklyn Report and Survey**

118.    This section describes my opinions about the Franklyn Report and Survey in detail.

I.    **The Franklyn Survey is leading because it placed marks in proximity without showing that those marks have proximity in the marketplace, and because it mentioned air travel prior to measuring confusion.**

119.    As described earlier in this report, a leading element in a survey is one that suggests a particular answer to respondents, or that suggests concepts or ideas that respondents might not have otherwise considered. Also as described earlier, survey questions and other elements of surveys should not be leading. However, like the Scott and Zerrillo Surveys, the Franklyn Survey contains leading elements. Specifically, the Franklyn Survey used a survey design that is extremely leading, particularly because it placed marks in proximity without offering any

evidence that those marks have proximity in the marketplace in a manner similar to how they were shown in the survey.

120.     Unlike the other surveys discussed in this report, the Franklyn Survey used the Squirt format to measure likelihood of confusion.  A Squirt survey replicates a scenario where a consumer encounters both a plaintiff's and a defendant's marks or brands at the same time, or in rapid succession, in the marketplace.  Because the Squirt survey format asks respondents to consider two marks or brands at the same time or in rapid succession, it can be used only when consumers would encounter those marks or brands in that manner in the real world—that is, when those marks or brands have proximity in the marketplace.[105]  As noted in one publication, "a Squirt proponent must demonstrate that there are 'a significant number of real world situations in which both marks at issue are likely to be evaluated in close proximity or side-by-side.'"[106]  Marks or brands have proximity when they regularly appear near one another in the same stores or at the same online retailers, or there is evidence that consumers regularly encounter the marks or brands at the same time or in rapid succession.

121.     If the Squirt format were used to place marks or brands next to each other in a context where those marks or brands are not often encountered together in the marketplace, the format would not reflect marketplace conditions and the measures from the survey would not apply to the real world, making those measures irrelevant.  This applies to both placing a plaintiff's and defendant's marks in proximity, and placing other brands in proximity that are part of the lineup but are not disputed in the matter.  Courts have given surveys little weight or excluded surveys altogether for placing brands side by side when they did not have proximity in the marketplace, in matters such as *Sazerac Co. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013 (N.D. Cal. 2017), *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 219, 231 (S.D.N.Y. February 9, 2010), *Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, 2007 WL 2258688

---

[105] Swann, Jerre B.  "Likelihood of Confusion Studies and the Straitened Scope of Squirt."  *The Trademark Reporter*, vol. 98, no. 3, 2008, p. 751.

[106] Swann, Jerre B.  "Eveready and Squirt—Cognitively Updated."  *The Trademark Reporter*, vol. 106, no. 4, 2016, p. 744.

1   (S.D.N.Y. 2007), *Conopco, Inc. v. Cosmair, Inc.*, 49 F.Supp.2d 242 (S.D.N.Y. 1999), *Water Pik, Inc.*

2   *v. Medical-Sys., Inc.* 726 F.3d 1136 (10th Cir. 2013), and *Leelanau Wine Cellars, LTD. v. Black &*

3   *Red, Inc.*, 452 F. Supp. 2d 772 (W.D. Mich. 2006).[107]  (The Trademark Trial and Appeal Board

4   has also criticized Squirt surveys at least partly for this reason, including in *Marshall Field & Co.*

5   *v. Mrs. Fields Cookies*, 25 USPQ 2d 1321, 1333-34 (TTAB 1992).[108])

6   122.    Like other lineup surveys, the Franklyn Survey showed a series of brands in proximity,

7   which replicated a scenario where those brands would have proximity in the marketplace,

8   either because they are offered in physical proximity or are typically encountered one after

9   another in rapid succession.  After showing the DAL website, the Franklyn Survey showed test

10  respondents the websites for Delta Hotels by Marriott, Radisson Hotels, Crowne Plaza Hotels,

11  and Doubletree Hotels.  The Franklyn Survey showed no other websites, such as a search

12  engine or travel agency website, to respondents.

13  123.    The Franklyn Report offered no evidence that real-world consumers would visit these

14  particular websites at the same time or even sequentially, without first searching another

15  website or a series of websites, such as a search engine, a travel agency website, or websites

16  for competitor hotels or airlines.  The presentation of websites in the Franklyn Survey is highly

17  leading because it placed those websites in proximity without showing that they have

18  proximity in the real world and that they appear in proximity without any other websites.  As

19  one source wrote, "The need for competitive proximity is thus on a par with the need for a

20  control as a prerequisite for a Squirt's validity.  Complementary products (shaving gel/razor

21  blades) may suffice to support a Squirt survey, but not-directly-competing products, even if

22  they (like bourbon and zinfandel) inhabit the same category and the same store, no longer

23

24  _____

25  [107] In addition to the cases listed in this section, *see also National Distillers Products v. Refreshment Brands*, 198 F. Supp. 2d 474 (S.D.N.Y. 2002), criticizing a lineup survey for making respondents

26  "artificially aware" of products.

27  [108] "The presentation of the packages side-by-side also appears to us to be prejudicial inasmuch as they are unlikely to be seen in this mode in an actual encounter in the marketplace."  *Marshall Field & Co. v.*

28  *Mrs. Fields Cookies*, 25 USPQ 2d 1321, 1333-34 (TTAB 1992).

suffice to assure that the aiding in a Squirt format replicates what takes place in the real world."[109]

124.    Demand effects arise from cues in a survey that can lead respondents to provide information they believe the survey's sponsor wants them to provide, rather than their genuine opinions, in an effort be helpful.[110]  When some aspect of a survey provides respondents with what they see as a clue or cue regarding the survey's purpose, it can create demand effects.  For this reason, demand effects can bias the results of the survey.[111]

125.    In his report, Mr. Franklyn attempted to justify his decision to conduct a lineup survey by presenting a series of scenarios that he claimed show proximity.  Apparently based on these scenarios, Mr. Franklyn asserted that "it is highly likely that consumers could encounter these brands in physical and/or temporal proximity."[112]

126.    For example:

    i.    Mr. Franklyn claimed that DAL and Delta Hotels by Marriott appear in the results from Google searches for the terms "delta hotel," "delta hotels reservations," "delta hotel booking," and "delta hotel vacation."[113]

    ii.    Mr. Franklyn claimed that "consumers booking a trip could encounter both brands at issue when looking at the parties' respective websites during the same

---

[109] Swann, Jerre B.  "Likelihood-of-Confusion Surveys."  *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann, ABA Publishing, 2022, p. 71.

[110] Orne, Martin T.  "On the Social Psychology of the Psychological Experiment: With Particular Reference to Demand Characteristics and Their Implications."  *American Psychologist*, vol. 17, 1962, p. 779.

[111] Bless, Herbert, Fritz Strack, and Norbert Schwarz.  "The informative functions of research procedures."  *Journal of European Social Psychology*, vol. 23, 1993, p. 153.

[112] Franklyn Report, p. 10.

[113] Franklyn Report, p. 10; Franklyn materials cited, including screenshot of Google searches for "delta hotel" (Bates numbers DELTA_00004517-DELTA_00004527), "delta hotels reservations" (Bates numbers DELTA_00021031-DELTA_00021033), "delta hotel booking" (Bates numbers DELTA_00004843-DELTA_00004845), "delta hotel vacation" (Bates numbers DELTA_00004848-DELTA_00004850), and "delta hotel booking" again (Bates numbers DELTA 00147800-DELTA 00147801).

Internet browsing session," [114] or on trip aggregator websites, such as Booking.com, Priceline, Hotels.com, or Travelocity.[115]

iii.   Mr. Franklyn claimed that consumers could encounter both brands at the websites for DAL or Marriott,[116] and that consumers who stay at Delta Hotels could encounter the DAL mark at the airport, could encounter both marks at the airport,[117] or that "consumers who arrive at an airport on a Delta flight could encounter Delta Hotels as part of their visit…This includes seeing the hotel itself and the shuttle vans offered by Delta Hotels."[118]

iv.   Mr. Franklyn claimed that consumers staying at a Delta Hotels by Marriott property could encounter the DAL mark on the hotel business center's computer screen.[119]

127.   Although Mr. Franklyn claimed that these scenarios show proximity, the scenarios fail to provide evidence of proximity for the Franklyn Survey, because his survey did not measure any of those scenarios and instead measured an entirely different scenario.  The Franklyn

---

[114] Franklyn Report, p. 10.

[115] Franklyn Report, p. 11; Franklyn materials cited, including screenshots of a Booking.com search for a DAL flight to and Delta Hotels by Marriott location in Helena, Montana (Bates number DELTA 00056445), an Expedia.com search for a DAL flight to and Delta Hotels by Marriott location in Norfolk, Virginia (Bates numbers DELTA_00056451-DELTA_00056453), a Priceline.com search for a DAL flight to and Delta Hotels by Marriott location in Baltimore, Maryland (Bates number DELTA_00056458), a Hotels.com search for a DAL flight to and Delta Hotels by Marriott location in Detroit, Michigan (Bates numbers DELTA_00144816-DELTA_00144817), and a Travelocity.com search for a DAL flight to and Delta Hotels by Marriott location in Indianapolis, Indiana (Bates numbers DELTA_00144863-DELTA_00144865).

[116] Franklyn Report, p. 11; Franklyn materials cited, including screenshots from a search of the DAL webpage showing a hotel search for the Delta Hotels Phoenix Mesa location (Bates numbers DELTA_00018705-DELTA_00018706).

[117] Franklyn Report, pp. 11-12; Franklyn materials cited, including an image of Delta Airlines signage near an airport baggage carousel (Bates number DELTA_00069134) and an airport exit (Bates number DELTA_00069135).

[118] Franklyn Report, pp. 11-12; Franklyn materials cited, including four images of a Delta Hotels airport shuttle van (Bates number MARRIOTT0011382).

[119] Franklyn Report, p. 11; Franklyn materials reviewed, including the same image repeated six times of the Delta Hotels business center for the Grand Rapids Airport location (Bates numbers DELTA_00007523-DELTA_00007528).

Survey did not measure the results from Google searches for certain terms, screen captures from Internet browsing sessions or trip aggregator websites, pictures depicting how consumers would encounter both marks at the airport, or images of consumers encountering the DAL mark on a computer screen at a Delta Hotels by Marriott property. Also, Mr. Franklyn offered no evidence in his report about how often these scenarios might exist, if ever. For example, Mr. Franklyn has not offered any evidence about the prevalence with which consumers encounter both DAL and Delta Hotels by Marriott simultaneously at trip aggregator websites, or how often consumers encounter the DAL mark on a computer screen at a Delta Hotels by Marriott property.

128.    Instead of measuring any of the scenarios that Mr. Franklyn suggested could cause consumers to encounter DAL and Delta Hotels by Marriott in proximity, the Franklyn Survey measured webpages for DAL, Delta Hotels by Marriott, DoubleTree, Crowne Plaza, and Radisson. These webpages were shown individually in the survey, unconnected by any elements a consumer might use in the real world to locate all these webpages, such as a search process, a search engine, or a travel agency website. Mr. Franklyn offered no evidence that consumers routinely visit these websites in succession, without visiting any other websites, or that the Franklyn Survey represented the manner in which consumers encounter these airline and hotel websites in the real world.

129.    The Franklyn Survey could have used the Eveready format, which shows only a single trademark. Other experts who provided confusion surveys on behalf of DAL used the Eveready format, which is often used in matters involving well-known marks. DAL claims that its DELTA mark is well-known and famous,[120] and a survey submitted on behalf of DAL concluded that the DELTA mark is well-known, commercially strong, and famous.[121]

---

[120] First Amended Complaint, dated June 12, 2020, ¶¶ 1, 2, 3, 18, 22 23, 36, 43, 75, 76, 77, 80, 81, and 82.

[121] Report of E. Deborah Jay, Ph.D., at 2, *Delta Air Lines, Inc. v. Marriott International, Inc.*, No. 20 Civ. 01125 (N.D. Ga. February 27, 2023).

130.    The Franklyn Report does not explain why Mr. Franklyn chose to use the Squirt format instead of the Eveready format in a matter in which his client asserts that it is well-known and famous.  Instead, Mr. Franklyn chose the lineup format, which places DAL and Delta Hotels by Marriott in proximity and explicitly asks respondents to consider a variety of possible connections between them.  As one author has written, "In cases involving strong marks, the Eveready test should be considered the gold standard for fundamental cognitive and marketing reasons," so that "an expert who employs a different format should be prepared to defend the variant in questioning from a skeptical adversary and court."[122]  Mr. Franklyn's report does not explain why he chose a format that, in this context and the manner in which it was implemented, has inherently leading elements.

131.    The Franklyn Survey exacerbated its leading structure by also using leading qualification questions that mentioned airlines or flights multiple times before asking the questions that measured confusion.  For example, In Question 4, the Franklyn Survey asked if the respondent or anyone in their household worked for particular industries, one of which was a "company that offers travel related services such as a travel agent, airline, or hotel."[123]  Question 5 asked respondents about online purchases in the past 18 months and Question 6 asked about online purchases they are likely to make in the next 12 months.  Both questions presented seven response options, one of which read, "A ticket for a flight on a commercial airline."

132.    Also, Question A102 provided this introduction before showing the image for DAL: "Please review this website as if you were considering purchasing a ticket for a commercial flight, reviewing it for as long as you typically would."[124]  This introduction explicitly instructed respondents to consider a context related to a flight.  The Franklyn Survey's repeated references to airlines and flights were leading, because they prompted respondents to think about flights and airlines when they might not otherwise have considered such a context.

---

[122] Swann, Jerre B.  "Likelihood of Confusion Studies and the Straitened Scope of Squirt."  *The Trademark Reporter*, vol. 98, no. 3, 2008, pp. 746, 748.

[123] Franklyn Report, Appendix B - Questionnaires/Instructions.

[124] Franklyn Report, Appendix B - Questionnaires/Instructions, p. 3.

**II.    The Franklyn Survey interviewed respondents who are irrelevant to this dispute.**

133.    Like other confusion surveys discussed in this report, the Franklyn Survey interviewed respondents who are irrelevant to this dispute.  In particular, the Franklyn Survey failed to qualify respondents as purchasing or reserving hotel rooms or other hotel services at a price range or quality level that is relevant to Delta Hotels by Marriott.

134.    The Franklyn Survey qualified respondents as "consumers who have purchased online a reservation for a hotel stay within the past 18 months and/or who intend to purchase online a reservation for a hotel stay in the next 12 months."[125]  In the Franklyn Survey, Question 5 asked respondents if they had purchased certain items online in the past 18 months, including "A reservation for a hotel stay."  Question 6 asked respondents if they were likely to purchase certain items online in the next 12 months, including "A reservation for a hotel stay."  The Franklyn Survey did not narrow down the universe of potential respondents in any further fashion and did not ask about the price point or quality level of any hotel stays that respondents had purchased or planned to purchase.

135.    There are many hotels that are at very different price points and quality levels from Delta Hotels by Marriott.  Mr. Franklyn could have qualified respondents according to the prices they have paid or expect to pay for a hotel room, or he could have referenced the quality level of the hotel in some other fashion.  Because the Franklyn Survey did not include any questions qualifying prospective respondents on price point or quality level, there is no way to know whether any respondents in his survey would ever stay at a hotel property that has a price point or quality level similar to the properties operated as Delta Hotels by Marriott.

---

[125] Franklyn Report, p. 31.

### III.  The Franklyn Survey located prospective respondents using undefined and improper methods.

136.    In addition to the other problems described in this section, the Franklyn Survey also located prospective respondents using undefined and improper methods.

137.    In the Franklyn Report, Mr. Franklyn claimed that he located prospective respondents for the Franklyn Survey from "Lucid, a leading supplier of online samples for surveys."  The Franklyn Report also claimed that "Lucid utilizes appropriate industry procedures for ensuring the integrity and quality of its panels."[126]

138.    In the context of surveys conducted online, a "panel" refers to a large group of prospective survey respondents and a "panel provider" is an online entity that maintains a database containing prospective respondents.  For example, the confusion survey I conducted in this matter sourced respondents from a panel provider called Dynata; my report includes an exhibit that provides detailed information about Dynata, including information on the panels that Dynata operates.[127]  The Scott Survey sourced respondents from Dynata, as well as from a company called Prodege.[128]  The Zerrillo Survey also sourced respondents from Dynata.[129]

139.    The Franklyn Report offers no additional information about Lucid, or about the methods that Lucid uses to locate, recruit, and manage prospective respondents, such as the sources from which Lucid locates prospective respondents, how Lucid recruits those prospective respondents, or what incentives Lucid provides for survey completion.  This may be because, based on what Lucid publishes online, it appears that Lucid does not operate any panels of prospective respondents, but instead is a only an intermediary that provides respondents for surveys from other sources that Mr. Franklyn has failed to identify or specify.

---

[126] Franklyn Report, p. 35.

[127] Isaacson Expert Report, ¶ 55 and Exhibit 4.

[128] Scott Report, ¶ 9.  Dr. Scott hired Prodege and Dynata through a survey company, SimpleOpinions.

[129] Zerrillo Report, ¶ 22.

140.    Online material from Lucid indicates that "Lucid does not own or operate any online panels or other sample sources."[130]  Instead, Lucid claims to be a "programmatic marketplace" that "connects buyers and sellers of survey sample" and provides access to "350 sample suppliers."[131]  Lucid was acquired by a company called Cint in January 2022,[132] and Cint claims to have access to "4600+ survey panels."[133]

141.    The Franklyn Report did not specify which of the 350 sample suppliers or 4600+ survey panels the Franklyn Survey used to source respondents, or how those sample suppliers or panels recruit or manage prospective respondents.  This information is highly relevant in a litigation survey.  For example, it is generally expected that panel providers will not disclose the identities of survey respondents, and will take steps to validate or verify respondent identities and eligibility for surveys.[134]  There is no way to know whether Lucid follows these or other best practices, because material that Lucid placed online appears to indicate that Lucid does not operate any panels of its own, and consequently would not be able to control the operation or makeup of the panels it does offer.

142.    The problems with using a company such as Lucid to locate prospective respondents are evident in the timing of interviews for the Franklyn Survey.  All interviews for the Franklyn Survey occurred during a period lasting only four days, from November 19, 2021 to November 22, 2021.  The survey interviewed a total of 542 respondents.  Of these, 457 interviews, or 84% of the survey's interviews, were conducted on Friday, November 19, the first day the survey was offered.  Only 14 interviews (2.6% of all interviews) were conducted during the weekend, with 71 interviews (13.1%) conducted on Monday, November 22.

---

[130] "Esomar 36."  *Lucid*, https://luc.id/esomar-2/, Item 5.  Accessed March 29, 2023.

[131] "Esomar 36."  *Lucid*, https://luc.id/esomar-2/.  Accessed March 29, 2023.

[132] "About Us."  *Cint*, https://www.cint.com/about/.  Accessed March 29, 2023.

[133] "Cint."  *Cint*, https://www.cint.com/.  Accessed March 29, 2023.

[134] Diamond, Shari Seidman.  "Reference Guide on Survey Research."  *Reference Manual on Scientific Evidence*, 3rd ed., National Academies Press, 2011, p. 417.

143.    The respondents for the Franklyn Survey were therefore heavily weighted toward weekdays, with 97% of interviews taking place on a Friday and a Monday.  This is in opposition to best practices for surveys, which call for interviews to be balanced across weekdays and weekends to reduce selection bias.  Selection bias can be caused when a survey interviews people who are available only during certain time periods, such as weekdays, and does not interview people who are available during other time periods, such as weekends.

144.    The next section describes my conclusions in response to the three DAL Surveys and their corresponding reports discussed in this report.

1

**Section 5: Summary of My Opinions**

2

3    145.    For the following reasons, I have reached the conclusion that the Scott likelihood-of-

4    confusion survey is unreliable.

5          i.    The Scott Survey was leading due to references to airports and air travel.

6          ii.    The Scott Survey failed to replicate the conditions that consumers are likely to

7                 encounter in the real-world marketplace.

8          iii.   The Scott Survey did not reflect the relevant universe of potential purchasers in

9                 this matter.

10         iv.    The Scott Survey used flawed phrasing that asked for a legal conclusion.

11   146.    For the following reasons, I have reached the conclusion that the Zerrillo likelihood-of-

12   confusion survey is unreliable.

13         i.    Questions in the Zerrillo Survey were leading.

14         ii.    The images shown in the Zerrillo Survey did not reflect the marketplace.

15         iii.   The Zerrillo Survey did not reflect the relevant universe of potential purchasers

16                of hotel services.

17         iv.    The Zerrillo Survey used flawed phrasing that asked for a legal conclusion.

18   147.    For the following reasons, I have reached the conclusion that the Franklyn likelihood-of-

19   confusion survey is unreliable.

20         i.    The Franklyn Survey is leading because it placed marks in proximity without

21                showing that those marks have proximity in the marketplace, and because it

22                mentioned air travel prior to measuring confusion.

23         ii.    The Franklyn Survey interviewed respondents who are irrelevant to this dispute.

24         iii.   The Franklyn Survey located prospective respondents using undefined and

25                improper methods.

26

27

28

148.    I have also concluded that the three DAL Surveys share in common certain design
elements that make the measures from those surveys unreliable.

  i. The Eveready surveys conducted by Drs. Scott and Zerrillo both inserted the phrase "Aside from hotel services" at the start of key questions that purport to measure likelihood of confusion.

  ii. None of the three DAL Surveys qualified respondents as reserving a hotel room in a price or quality range that is typical for Delta Hotels by Marriott properties. Also, the Zerrillo Survey used descriptions of star ratings that were vague and likely difficult for some respondents to answer, given the differences in star ratings across companies and organizations that issue star ratings.

  iii. The webpages used in the Scott and Zerrillo Surveys do not reflect how consumers in the real world are likely to locate Delta Hotels by Marriott in their search for a hotel.

Executed in Encino, California, on April 20, 2023.

_____
Dr. Bruce Isaacson

**Exhibit 10:**
**Dr. Bruce Isaacson CV and Testimony Experience**

## MMR STRATEGY GROUP
*Creating growth through customer insight.™*

16501 Ventura Boulevard, Suite 601, Encino, CA 91436 • Phone (818) 464-2400 • www.mmrstrategy.com

# DR. BRUCE R. ISAACSON, DBA, MBA

---

***MMR Strategy Group, Encino, CA***                                        2005 - Present
**PRESIDENT**

MMR provides surveys, analysis, and consulting to measure the attitudes and behaviors of customers and consumers.  MMR has three practice areas:

1. <u>Claim Substantiation</u>: Research and consulting to substantiate claims that involve consumer perceptions, and are made in packages, advertising, and other types of marketplace communications.

2. <u>Litigation Surveys</u>: Surveys and testimony for intellectual property matters.

3. <u>Marketing Research and Consulting</u>:  Marketing research and consulting to help clients grow sales, develop marketing strategies, and improve products and services.

As President, I design studies, manage research projects, and provide consulting relating to marketing, research, consumer behavior, and strategy.

I have conducted many hundreds of surveys during my career, and frequently provide surveys, testimony, and rebuttals for intellectual property litigation and claim substantiation.

I have provided testimony relating to litigation surveys in a wide variety of venues involving federal courts, state courts, the Trademark Trial and Appeal Board (TTAB), the National Advertising Division (NAD) of the Better Business Bureau, the International Trade Commission, the Trademark Trial and Appeal Board, the Federal Trade Commission, the Court of Federal Claims, and others.

I have been retained in more than 200 matters, and have been retained in more than 20 matters by government agencies including the U.S. Federal Trade Commission, the U.S. Department of Justice, and the U.S. Patent and Trademark Office.

I speak and write on topics relating to marketing research, marketing strategy, litigation surveys, and consumer behavior.

**MMR**

**Education**

- Doctor of Business Administration in Marketing, **Harvard Business School**, 1995.  Awarded Dean's Doctoral Fellowship.
- MBA with High Distinction, **Harvard Business School**, 1991.  Graduated in top 5% of class as a Baker Scholar.
- Bachelor of Science in Engineering with focus on Regional Development, Northwestern University Technological Institute, 1985.

**Publications**

**When to Conduct an Eveready Survey: The Importance of Aided Awareness.**  *The Trademark Reporter*, May-June, 2021.

**Book Review of *Trademark and Deceptive Advertising Surveys:  Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann.**  *The Trademark Reporter*, September, 2013.

**Playing Nice With Legal:  How Research Can Help Keep Marketing Claims in Compliance.**  *Quirk's Marketing Research Review*, January, 2013.

**The Quantity of Presidential Polls and the Quality of Marketing Research.**  *Green Book Blog*, October, 2012.

**Three Critical Questions to Evaluate Intellectual Property Surveys.**  *Intellectual Property Today*, September, 2012.  Co-authors: Professor Jonathan Hibbard and Professor Scott Swain.

**Asking the Right Questions (in Litigation Surveys).**  *Intellectual Property Magazine*, October, 2012.

**Why Online Consumer Surveys Can Be a Smart Choice in Intellectual Property Cases** (with Professor Jonathan Hibbard and Professor Scott Swain).  Intellectual Property Law Newsletter of the American Bar Association, Intellectual Property Law Section, May 2008.

**Bose Corporation:  The JIT II Program (A), (B), (C), and (D)** (with Professor Roy Shapiro).  Harvard Business School cases 9-694-001, -002, -003, and -004.

**Bose Corporation:  The JIT II Program Teaching Note.**  Harvard Business School teaching note 5-695-017.

**Buyer-Supplier Relationships:  Antecedents, Management, and Consequences.**  Harvard Business School doctoral dissertation, 1996.

**Goodyear:  The Aquatred Launch** (with Professor John Quelch).  Harvard Business School case 9-594-106.  Best seller.

**Goodyear:  The Aquatred Launch Teaching Note** (with Professor John Quelch).  Harvard Business School teaching note 5-595-016.

**Industrial Marketing** (with Professor V. Kasturi Rangan).  In *AMA Management Handbook, Third Edition*, edited by John J. Hampton.  New York:  Amacom Books, 1994, pp. 2-101 to 2-108.

**Managing Buyer-Supplier Relationships.**  Preface to *JIT II:  Revolution in Buying and Selling*, edited by Lance Dixon and Anne Millen Porter.  Newton, MA:  Cahners Publications, Inc., 1994.

**Philip Morris:  Marlboro Friday (A) and (B).**  Harvard Business School case 9-596-001 and -002.

**Scope and Challenge of Business-to-Business Marketing** (with Professor V. Kasturi Rangan).  Harvard Business School class note 9-594-125.

**Vistakon:  1 Day Acuvue Disposable Contact Lenses** (with Professor Alvin J. Silk and Marie Bell).  Harvard Business School case 9-596-087.

**What is Industrial Marketing?** (with Professor V. Kasturi Rangan).  Harvard Business School class note 9-592-012.


<u>**Honors, Appointments, Affiliations**</u>

- Member, American Marketing Association (AMA)

- Member, International Trademark Association (INTA)

- Member, Marketing Research Association (MRA)

- Member, Brand Activation Association (BAA)

- Member, Editorial Board, *Journal of Business-to-Business Marketing,* 1994 - present

- Member, *The Trademark Reporter* Committee, International Trademark Association, 2010 - present

- Policy Advisory Board, Joint Center for Housing Studies at Harvard University, 1999 - 2001

- Winner, Doctoral Dissertation, Institute for Study of Business Markets, Penn State, 1994

- George S. Dively Award for Innovative Research, Harvard Business School, 1993

- George F. Baker Scholar, Harvard Business School (top 5% of class), 1991

- Dean's Doctoral Fellowship, Harvard Business School, 1993 -1995

**Selected Speaking Engagements**

Frequent speaker at industry conferences and client events on topics relating to marketing and strategy, including:

- Speaker on panel, "Survey Says: The Use of Consumer Perception Surveys in Advertising-Related Litigation," held at Davis & Gilbert, LLP, March, 2020.

- Speaker on panel, "What Can Trademark Practitioners Learn from Advertising and Marketing Professionals?"  International Trademark Association Annual Conference, May, 2018.

- Moderator for roundtable discussion, "Trademark Surveys: How Requirements Differ by Venue and Authority," International Trademark Association Annual Conference, May, 2018.

- Guest lecturer on "Litigation Surveys" to advertising law class at Loyola Law School, September, 2021; September, 2020; October, 2019; and October, 2018.

- Moderator for roundtable discussion, "Using Surveys to Measure Product Usage, Configuration, and Damages in Trademark, Copyright, and Patent Matters," International Trademark Association Annual Conference, May, 2016.

- Panelist for "Battle of the Experts – Deploying the Proper Scientific Methodology for Supporting or Challenging Claims," Advanced Forum on Resolving & Litigating Advertising Disputes, March, 2015.

- Guest lecturer on the legal aspects of marketing to MBA classes held at University of California – Irvine, November, 2015, and December, 2015.

- Speaker for presentation, "Using Surveys to Measure Attitudes and Behaviors," U.S. Department of Justice, Civil Division, Commercial Litigation Branch, March, 2015.

- Speaker for presentation, "Improving Customer Experience with Customer Journey Maps," Corporate Researchers Conference, sponsored by the Marketing Research Association, October, 2013.

- Speaker on panel for seminar, "Trademark Protection in Cyberspace," sponsored by the Los Angeles County Bar Association (LACBA), May, 2013.

- Moderator for round table discussion, "Using Survey Evidence for Claim Substantiation," International Trademark Association Annual Conference, May, 2013.

- Speaker and panelist for multi-day conference, "Advertising Claims Support: Case Histories and Principles," conference hosted by The Institute for Perception, April, 2013.

MMR

- Moderator for roundtable discussion, "Replicating Marketplace Conditions in Trademark Surveys," International Trademark Association Annual Conference, 2011.

- Moderator for roundtable discussion, "The Use of Surveys in Intellectual Property Litigation," International Trademark Association Annual Conference, 2010.

- Faculty on panel at expert forum, "Litigating & Resolving Advertising Disputes," American Conference Institute, June, 2010.

- Speaker for presentation, "The Use of Online Surveys in Intellectual Property Litigation," National Advertising Division (NAD) Annual Conference, October, 2009.

- Speaker for presentation, "Integrating Research Techniques for Deeper Customer Insights: Blurring Boundaries Between Research Methods," American Marketing Association Annual Marketing Research Conference, September, 2008.

- Speaker for presentation, "Understanding Your Customer and Making Tough Strategic Choices," International Restaurant & Foodservice Show of New York, March, 2008.

- Presented Continuing Legal Education (CLE) seminar titled, "Measuring Consumer Attitudes and Behaviors in Intellectual Property Litigation." Presented to:

  - Orange County Bar Association, November, 2007.

  - Baker Botts, LLP, March, 2008.

  - Amster, Rothstein & Ebenstein LLP,  March, 2008.

  - Fulwider Patton, LLP, March, 2008.

- Speaker for presentation, "Understanding Today's Customers and Making Tough Choices – Lessons Learned From Starbucks," Western Foodservice & Hospitality Expo, August, 2007.

- Speaker for presentation titled, "What Can We Learn from Customer Satisfaction Studies?" Real Trends Marketing & Technology Expo, September, 2006.

**Blogging and Commentary**

I have written posts and white papers at www.MMRStrategy.com that include:

**Litigation Surveys**

- "How to Measure False Advertising in a Litigation Survey" (November, 2012)

- "Using Surveys to Estimate Damages in Patent Infringement Matters" (October, 2012)

**MMR**

- "Apple vs. Samsung: Litigation Surveys as Evidence" (August, 2012)

- "What is the Theory Behind Your Lanham Act Survey?" (June, 2012)

- "Keyword Infringement Surveys: The New Frontier in Measuring Likelihood of Confusion" (June, 2012)

- "The Challenge of Replicating Marketplace Conditions in Intellectual Property Surveys" (May, 2012)

**Claim Substantiation**

- "When it Comes to 'Up To' Claims, Make Sure You Have the Right Substantiation" (February, 2013)

- "Critical Research Steps and Core Principles of Claim Substantiation" (white paper)

- "How Many Industries are Affected by Claim Substantiation?" (June, 2012)

- "Lessons in Claim Substantiation from the Pom Wonderful Decision" (May, 2012)

- "How Claim Substantiation Differs from Traditional Marketing Research" (May, 2012)

**Marketing and Marketing Research**

- "Lessons in Pricing Strategy from JCPenney" (May, 2013)

- "Why You Should (Almost) Never Use the van Westendorp Pricing Model" (March, 2013)

- "Three Types of Market Segmentation and the 2012 Presidential Election" (October, 2012)

- "Presidential Polls and the Quality of Marketing Research" (October, 2012)

- "Sizing the Potential of a New Market or New Product" (white paper)

- "MaxDiff vs. Conjoint:  Which is Better to Measure Consumer Preferences?" (white paper)

- "Ten Best Practices to Improve Your Concept and Product Tests" (white paper)

- "Using Choice-Based Market Segmentation to Improve Your Marketing Strategy" (white paper)

- "What Your Tracking Study Should Measure About Your Customers" (white paper)

- "Using Customer Journey Maps to Improve Your Customer Experience" (white paper)

**MMR**

- "How to Improve Your Usage and Attitude Study" (June, 2012)

- "Five Pitfalls of Market Segmentation and How to Avoid Them" (May, 2012)

## Professional Experience Prior to MMR Strategy Group

*Fairview Company, Calabasas, CA*                                        2002 - 2004
**Managing Director**
- **West Coast Practice Leader of Executive Development for Monitor Group.**
  Designed and managed marketing and strategy executive education programs.
  Developed curriculum, served as lead faculty on programs for Fortune 100 clients.

- **Consulted with clients in technology, software, and financial services.**
  Provided consulting services in marketing and strategy.

*Intuit/Digital Insight, Calabasas, CA*                                 2001 - 2002
**Senior Vice President for Products, Marketing, and Alliances**
- **Managed business lines for $130 million provider of outsourced banking services/software.**
  Directed marketing, strategy, alliances, mergers, acquisitions, resellers, and pricing for 9
  business lines.  Managed $29 million budget and staff of 40.

- **Built product management and strategy functions.**
  Set priorities for $22 million R&D budget.  Directed $51 million acquisition and post-
  merger conversion of 150 new clients.

*Move, Inc., Westlake Village, CA*                                       1999 - 2001
**President, Home Services**
- **Founded home services division for software/services provider to real estate industry.**
  Directed business unit for new division.  Built alliances with associations including
  National Association of Homebuilders and American Institute of Architects.

*PHH Corporation* **(NYSE: PHH)***, Mortgage Division, Mount Laurel, NJ*   1997 - 1999
**Vice President, Marketing**
- **Directed marketing for $26 billion outsourced mortgage services division.**
  Company provided private label loans and loan servicing for customers and partners,
  including Wells Fargo, USAA, Coldwell Banker, Century 21.  Served on 14-member
  Executive Committee.  Managed $14 million budget and 60 people in marketing, research,
  public relations, advertising, strategic planning, business development, and e-commerce.

- **Created collateral for selling, processing, and closing loans distributed to 750,000 customers annually.**
  Redesigned sales materials used by 150-person sales force.  Created point-of-sale
  materials and placed in 1,600 real estate offices nationwide.  Negotiated co-marketing
  deals.

**MMR**

- **Built online platform to originate, close, and service mortgages.**
  Created co-branded system used by 1,400 partners to originate $700 million in mortgages in 2000.  Integrated system with more than 2,000 sales and customer service reps.

***Boston Consulting Group, Chicago, IL***                                    1995 - 1997
**Consultant**
- **Consulted in marketing, strategy, and distribution for $1 billion international strategy consulting firm.**
  Designed and rolled out database marketing program for international supermarket chain.  Developed purchasing strategy for $3 billion consumer goods company.  Evaluated market strategy for $800 million division of paper goods company.

***Harvard Business School, Cambridge, MA***                                  1991 - 1995
**Dean's Doctoral Fellow**
- **Developed and implemented multi-year research project analyzing buyer-supplier alliances.**
  Authored 14 publications including best-selling case studies and articles in distribution, sales, supplier management, purchasing, branding, and new products.  Taught in Babson College Executive MBA program.

***E&J Gallo Winery, Modesto, CA***                                                1990
**MBA Intern**
- Summer intern at global winery.  Developed packaging strategy, distribution, and retailer incentive programs for the wine cooler category.

***Long Wharf Trading Company, Danvers, MA***                                1986 - 1989
**President & Co-Founder**
- **Co-founded company manufacturing high quality sewn products for advertising premiums.**
  Directed 30 employees.  Clients included banks, universities, corporations, schools, and museums.  Company was featured with full-page story in *Inc. Magazine*.

***Parsons Corporation/Barton-Aschman Associates, Evanston, IL***           1985 - 1986
**Associate Consultant**
- **Conducted strategic and operations planning for public transportation systems at global construction and regional planning company.**
  Received *President's Award* for outstanding initiative and performance.

**<u>Selected Courses Taken in MBA and Doctoral Programs</u>**

- <u>Economics and Finance</u>, including topics such as Managerial Economics; Financial Reporting and Accounting; Business, Government, and the International Economy; Corporate Finance; Product Costing; and Microeconomic Theory.

- <u>Marketing and Strategy</u>, including topics such as Marketing; Marketing Foundations Readings; New Products; Marketing Implementation; Service Management; Research Issues in Marketing; Buyer Behavior; Industrial Marketing and Procurement; Industry and Competitive Analysis; and Communications.

- <u>Sociology and Psychology</u>, including Organizational Behavior; Human Resources; Social Behavior in Organizations; Readings in Administration (two courses); and Management Policy and Practice.

- <u>Statistics</u>, including Statistical Inference; Social Network Analysis; Applied Data Analysis; and Analyzing Covariance Structures.

- <u>Research Methods and Research Design</u>, including Doctoral Research Seminar; Research Design and Measurement; Design of Field Research in Organizational Behavior; and Intervention Research and Action Science.

**MMR**

**Dr. Bruce Isaacson Litigation Expert Witness Experience**
**April 2023**

Cases in which Dr. Bruce Isaacson has testified as an expert, including written expert reports or testimony at deposition or trial, from 2014 to present.

**Delta Air Lines, Inc. v. Marriott International, Inc.**
U.S. District Court, Northern District of Georgia, Atlanta Division

**Tequila Los Abuelos S.A. DE C.V. v. Podlaska Wytwórnia Wódek "POLMOS" S.A.**
United States Patent and Trademark Office, Trademark Trial and Appeal Board

**GOLO, LLC v. Goli Nutrition Inc., a Canadian Corporation, Goli Nutrition Inc., a Delaware Corporation, and Michael Bitensky, an individual**
U.S. District Court, Southern District of Delaware

**The United States of America v. Global Occupational Safety and Health Academy, LLC**
U.S. District Court, Northern District of Illinois, Eastern Division

**US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation v. Fox News Network, LLC, Fox Corporation, and Fox Broadcasting Company, LLC**
Superior Court of the State of Delaware

**GeigTech East Bay LLC v. Lutron Electronics Co., Inc.**
U.S. District Court, Southern District of New York

**In re: Nissan North America, Inc. Litigation consolidated with Kemp, et al., and Bereda, et al. v. Nissan North America, Inc. et al**
U.S. District Court, Middle District of Tennessee, Nashville Division

**Hermès International and Hermès of Paris, Inc. v. Mason Rothschild**
U.S. District Court, Southern District of New York

**MGA Entertainment Inc. v. Clifford T.I. Harris et al.**
U.S. District Court, Central District of California, Western Division

**In the Matter of L'Oréal USA, Inc. (CeraVe Skincare Products)**
National Advertising Division of the Better Business Bureau

**Power Home Remodeling Group, LLC v. Power Home Solar, LLC d/b/a Powerhome Solar, also d/b/a Powerhome Solar & Roofing, also d/b/a Power Home Solar and Roofing**
U.S. District Court, Eastern District of Pennsylvania

**Diamond Resorts U.S. Collection Development, LLC; and Diamond Resorts Hawaii Collection Development, LLC v. Pandora Marketing, LLC d/b/a Timeshare Compliance; Intermarketing Media, LLC d/b/a Resort Advisory Group; Slattery, Sobel & Decamp, LLC; Del Mar Law Group, LLP; Carlsbad Law Group, LLP; JL "Sean" Slattery, Esq.; Unlock Legal, APLC; Miranda Dempsey, APLC, d/b/a McCroskey Legal; and Miranda McCroskey, Esq.**
U.S. District Court, Central District of California

**LEGO A/S, LEGO Systems, Inc., and LEGO Juris A/S v. ZURU Inc.**
U.S. District Court, District of Connecticut

**Rasmussen Instruments, LLC v. DePuy Synthes Products, Inc., DePuy Synthes Sales, Inc., and Medical Device Business Service Inc.**
U.S. District Court, District of Massachusetts, Eastern Division

**New Prime, Inc., d/b/a Prime, Inc., v. Amazon Logistics, Inc., Amazon.com Services LLC, and Amazon Technologies, Inc.**
U.S. District Court, Western District of Missouri, Southern Division

**Coulter Ventures, LLC v. Rogue Ridge, LLC**
United States Patent and Trademark Office, Trademark Trial and Appeal Board

**Tiffany and Company and Tiffany (NJ), LLC v. Costco Wholesale Corp.**
U.S. District Court, Southern District of New York

**In re Elysium Health-ChromaDex Litigation**
U.S. District Court, Southern District of New York

**Diamond Resorts U.S. Collection Development, LLC, and Diamond Resorts Hawaii Collection Development, LLC v. US Consumer Attorneys, P.A., Henry Portner, Esq., Robert Sussman, Pluto Marketing Inc., 1Planetmedia Inc., Newton Group Transfers, LLC, The Newton Group, ESA LLC, Interval Broker Direct, LLC, Newton Group Exit, LLC, and DC Capital Law Firm, LLP**
U.S. District Court, Southern District of Florida

**ALIIGN Activation Wear, LLC v. lululemon Athletica Canada Inc. and lululemon USA Inc.**
U.S. District Court, Central District of California, Western Division

**TravelPass Group, LLC, Partner Fusion, Inc., Reservation Counter, LLC v. Caesars Entertainment Corporation, Choice Hotels International, Inc., Hilton Domestic Operating Company, Inc., Hyatt Hotels Corporation, Marriott International, Inc., Red Roof Inns, Inc., Six Continents Hotels, Inc., Wyndham Hotels Group, LLC**
U.S. District Court, Eastern District of Texas, Texarkana Division

**American Beverage Association, California Retailers Association, California State Outdoor Advertising Association v. The City and County of San Francisco**
U.S. District Court, Northern District of California, San Francisco Division

**Barry Braverman, et al v. BMW of North America, LLC and BMW AG**
U.S. District Court, Central District of California, Southern Division

**Glaxo Group Limited v. Respirent Pharmaceuticals Co., Ltd.**
U.S. District Court, Southern District of New York

**Sulzer Mixpac AG v. DXM Co., LTD and Dentazon Corporation**
U.S. District Court, Southern District of New York

**American Massage Therapy Association v. Implus Footcare, LLC**
United States Patent and Trademark Office, Trademark Trial and Appeal Board

**Richard Sotelo, on behalf of himself and all others similarly situated v. Rawlings Sporting Goods Company, Inc.**
U.S. District Court, Central District of California, Western Division

**In re: Application of Apple Inc. for TVOS Mark (86/632,177)**
United States Patent and Trademark Office, Trademark Trial and Appeal Board

**Susan Tran, on Behalf of Herself and all Others Similarly Situated v. Sioux Honey Association, Cooperative**
U.S. District Court, Central District of California, Southern Division

**Sansi North America, LLC v. LG Electronics USA, Inc.**
U.S. District Court, Central District of California

**Lindsay and Jeff Aberin, Don Awtrey, Charles Burgess, John Kelly, Yun-Fei Lou, Joy Matza, and Melissa Yeung, individually and on behalf of all others similarly situated v. American Honda Motor Company**
U.S. District Court, Northern District of California

**Federal Trade Commission and Utah Division of Consumer Protection v. Nudge LLC et al.**
U.S. District Court, District of Utah, Central Division

**Rockwell Automation, Inc. v. Radwell International, Inc.**
U.S. District Court, District of New Jersey

**James Demetriades, an individual v. Yelp, Inc., a Delaware corporation, et al.**
Superior Court of the State of California, County of Los Angeles, Central District

**In the Matter of Certain Pocket Lighters**
United States International Trade Commission, Washington, D.C.

**Vital Pharmaceuticals, Inc. v. Monster Energy Company and REIGN Beverage Company, LLC**
U.S. District Court, Southern District of Florida

**In the Matter of Certain Motorized Vehicles and Components Thereof**
United States International Trade Commission, Washington, D.C.

**Mahindra & Mahindra, Ltd. and Mahindra Automotive North America, Inc. v. FCA US LLC**
United States District Court, Eastern District of Michigan

**MGA Entertainment Inc. and The Little Tikes Company v. Dynacraft BSC, Inc. et al.**
U.S. District Court, Central District of California

**Fuse Chicken, LLC v. Amazon.com, Inc. and Does 1-10**
U.S. District Court, Northern District of Ohio

**Diamond Foods, Inc. v. Hottrix, LLC**
U.S. District Court, Northern District of California

**Steven A. Conner DPM, P.C. v. Optum360, LLC**
U.S. District Court, Eastern District of Pennsylvania

**Stephanie Escobar, individually and on behalf of all others similarly situated v. Just Born, Inc.**
U.S. District Court, Central District of California

**Daryl White, Jr., individually and on behalf of all others similarly situated v. Just Born, Inc.**
U.S. District Court, Western District of Missouri

**Forever 21 v. Gucci America, Inc.**
U.S. District Court, Central District of California, Western Division

**Ezaki Glico Kabushiki Kaisha, d/b/a Ezaki Glico Co., LTD., and Ezaki Glico USA Corporation**
U.S. District Court, District of New Jersey

**GoPro, Inc. v. 360Heros, Inc.**
U.S. District Court, Northern District of California

**Monster Energy Company v. Integrated Supply Network, LLC**
U.S. District Court, Central District of California

**Lokai Holdings LLC v. Twin Tiger USA LLC, Twin Tiger World Markets Ltd., Rory Coppock and Troy Coppock**
U.S. District Court, Southern District of New York

**Joann Martinelli, individually and on behalf of all others similarly situated v. Johnson & Johnson and McNeil Nutritionals, LLC**
U.S. District Court, Eastern District of California

**Strategic Partners, Inc. v. Vestagen Protective Technologies, Inc.**
U.S. District Court, Central District of California, Western Division

**Federal Trade Commission v. Damian Kutzner, individually and as an officer of Brookstone Law P.C. (California), et al.**
U.S. District Court, Central District of California

**In re: National Collegiate Athletic Association Athletic Grant-In-Aid Cap Antitrust Litigation**
U.S. District Court, Northern District of California, Oakland Division

**Adidas America, Inc., Adidas AG, Adidas International Marketing B.V., Reebok International Ltd., and Reebok International Limited v. TRB Acquisitions LLC, et al.**
U.S. District Court, District of Oregon, Portland Division

**Network-1 Technologies, Inc. v. Alcatel-Lucent USA Inc., et al.**
U.S. District Court, Eastern District of Texas, Tyler Division

**In the Matter of DIRECTV LLC v. Comcast Cable Communications**
National Advertising Division of the Better Business Bureau

**Sisters of Charity of Leavenworth Health System, Inc. v. Blue Cross and Blue Shield Association**
U.S. District Court, District of Colorado

**Pinkette Clothing, Inc. v. Cosmetic Warriors Limited, dba Lush Handmade Cosmetics**
U.S. District Court, Central District of California

**LifeScan, Inc. and Johnson & Johnson v. PharmaTech Solutions, Inc. and Decision Diagnostics Corp.**
U.S. District Court, Northern District of California, Oakland Division

**General Motors LLC Ignition Switch Litigation**
U.S. District Court, Southern District of New York

**Robert S. Davidson, d/b/a Plastertech v. The United States**
United States Court of Federal Claims

**Blue Cross and Blue Shield Association, an Illinois not-for-profit corporation v. Zoom Care, P.C.; Zoom Management, Inc.; Zoomcare; Zoom Care Health Plan; and Zoom Care Washington, P.L.L.C.**
U.S. District Court, Western District of Washington at Seattle

**Kosair Charities Committee, Inc. v. Norton Healthcare, Inc. et al.**
Jefferson County, Kentucky Circuit Court, Division Five (5)

**Safelite Group, Inc. and Safelite Solutions LLC v. Lori Swanson, in her official capacity as Attorney General of the State of Minnesota, and Michael Rothman, in his official capacity as the Commissioner of the Minnesota Department of Commerce**
U.S. District Court, District of Minnesota

**Confederate Motors, Inc. v. FCA US LLC**
United States Patent and Trademark Office, Trademark Trial and Appeal Board

**Talking Rain Beverage Company, Inc. v. DS Services of America, Inc.**
U.S. District Court, Western District of Washington at Seattle

**Farouk Systems, Inc. v. AG Global Products, LLC d/b/a FHI Heat, LLC and Shauky Gulamani**
U.S. District Court, Southern District of Texas, Houston Division

**Federal Trade Commission v. LifeLock, Inc. a corporation; Robert J Maynard, Jr., individually and as an officer of LifeLock, Inc.; and Richard Todd Davis, individually and as an officer of LifeLock, Inc.**
U.S. District Court, District of Arizona

**Parallel Networks Licensing, LLC v. Microsoft Corporation**
U.S. District Court, District of Delaware

**Parallel Networks Licensing, LLC v. International Business Machines Corporation**
U.S. District Court, District of Delaware

**In the Matter of Certain Footwear Products (Complainant Converse Inc.)**
United States International Trade Commission, Washington DC

**Klauber Brothers, Inc. v. Forever 21 Retail Inc., International Intimates, Inc., and Does 1 through 10**
U.S. District Court, Central District of California

**Weber-Stephen Products LLC v. Sears Holdings Corporation, and Sears, Roebuck and Co.**
U.S. District Court, Northern District of Illinois, Eastern Division

**Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GMBH**
U.S. District Court, Southern District of New York

**Robert Namer v. Broadcasting Board of Governors and Voice of America**
U.S. District Court, Eastern District of Louisiana

**Shannon Fabrics, Inc. v. Jo-Ann Stores, Inc.**
U.S. District Court, Central District of California

**Mars, Incorporated v. The Hershey Company and Hershey Chocolate & Confectionery Corporation**
U.S. District Court, Eastern District of Virginia, Alexandria Division

**Fitbug Limited v. Fitbit, Inc.**
U.S. District Court, Northern District of California

**Patrick Dang and Michael Villa v. San Francisco Forty-Niners, Ltd., et al.**
U.S. District Court, Northern District of California

**Kreation Juicery, Inc. v. Eiman Shekarchi and April Shekarchi**
U.S. District Court, Central District of California

**Miracle 7, Inc. v. Halo Couture LLC**
U.S. District Court, Southern District of Florida

**Robert McCrary v. The Elations Company LLC**
U.S. District Court, Central District of California

**OraLabs, Inc., v. The Kind Group LLC**
U.S District Court, District of Colorado

**Philippe Charriol International Limited v. A'lor International Limited**
U.S. District Court, Southern District of California

**LegalZoom.com, Inc. v. Rocket Lawyer Incorporated**
U.S. District Court, Central District of California, Western Division

**Benchmark Young Adult School, Inc., dba Benchmark Transitions v. Launchworks Life Services, LLC dba Mark Houston Recovery Center and Benchmark Recovery Center**
U.S. District Court, Southern District of California

**Diageo North America, Inc. v. Mexcor, Inc. and EJMV Investments, LLC**
U.S. District Court, Southern District of Texas, Houston Division

**Globefill Incorporated v. Elements Spirits, Inc. and Kim Brandi**
U.S. District Court, Central District of California

**MMR**