# EXHIBIT 106

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

DELTA AIR LINES, INC.,

       Plaintiff,

v.

MARRIOTT INTERNATIONAL, INC.

       Defendant.

CIVIL ACTION NO. 1:20-CV-01125-SCJ

**EXPERT REPORT SUBMITTED BY**
**DR. BRUCE ISAACSON MEASURING**
**THE LIKELIHOOD OF CONFUSION BETWEEN**
**DELTA HOTELS BY MARRIOTT AND DELTA AIR**
**LINES**

1

**TABLE OF CONTENTS**

2

3    Overview of My Likelihood-of-Confusion Survey ...................................................... 1

4    My Qualifications ................................................................................................... 21

5    Materials Reviewed and Compensation ................................................................. 24

6    Methodology for the Likelihood-of-Confusion Survey .......................................... 25

7    Findings From the Likelihood-of-Confusion Survey .............................................. 33

8    Conclusions ........................................................................................................... 41

9

10    Exhibit 1: Dr. Bruce Isaacson CV and Testimony Experience

11    Exhibit 2: Test and Control Webpages Shown in the Survey

12    Exhibit 3: Survey Qualifying Questions and Main Questionnaire

13    Exhibit 4: Recruiting Methods and Panel Description for the Survey

14    Exhibit 5: Quality Control Measures for the Survey

15    Exhibit 6: Termination and Removal Summary

16    Exhibit 7: Codes for Analyzing Verbatim Responses

17    Exhibit 8: Cross Tabulation Tables

18    Exhibit 9: All Responses from All Survey Respondents

19

20

21

22

23

24

25

26

27

28

1.      I have been retained by attorneys representing Marriott International, Inc. in the above-captioned litigation.  This report provides the results of a survey I conducted to measure the likelihood of confusion, if any, between Delta Hotels by Marriott[1] and Delta Air Lines.

2.      The opinions expressed in this report are based on materials I reviewed, research I conducted, and my experience.  I reserve the right to supplement this report in light of discovery in this matter.

**Overview of My Likelihood-of-Confusion Survey**

3.      In this matter, Delta Air Lines has alleged that consumers are likely to "believe that the DELTA HOTELS chain is owned by, affiliated with, or sponsored by Delta, and in particular that the chain is a joint venture or cobranding project between Delta and Marriott."[2]  I designed and conducted a survey that used the "Eveready" format to measure the likelihood of confusion, if any, between Delta Hotels by Marriott and Delta Air Lines.  This format is widely used to measure likelihood of confusion, and has been described as a "standard and widely accepted survey format."[3]  Another source has described Eveready as "...a relevant, reliable and objective test of likelihood of confusion," and as the "gold standard" for confusion surveys, particularly in regard to well-known marks.[4]  Delta Air Lines claims that its DELTA marks are "famous," "well-recognized throughout the United States," "well-known," and have "widespread recognition and acclaim."[5]

---

[1] "Delta Hotels by Marriott" encompasses the various DELTA HOTELS marks alleged to infringe or otherwise violate Delta Air Lines' asserted rights.

[2] First Amended Complaint, dated June 12, 2020, ¶ 1.

[3] McCarthy, J. Thomas.  §32:174 "Survey Formats—The Eveready format for testing the likelihood of confusion issue."  *McCarthy on Trademarks and Unfair Competition*, 5th ed., Thomson Reuters, 2021, p. 32-508.

[4] Swann, Jerre B.  "Likelihood of Confusion."  *Trademark and Deceptive Advertising Surveys:  Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann, ABA Publishing, 2012, pp. 53, 63.

[5] First Amended Complaint, ¶¶ 1, 2, 17, 18.

4.    My survey replicated the webpages that consumers may see if they were searching to make a reservation for a hotel room through any of three different websites, including the website for Delta Hotels by Marriott, at www.deltahotels.com; the website for Marriott, at www.marriott.com; and the website for Expedia, an online travel website, at www.expedia.com.  Each search showed the same pages in the same order that a consumer may encounter if they searched online for a room reservation on that website.[6]

5.    The webpages shown in the survey were located through three actual online searches for hotel room reservations.  The pages measured in the three searches are as follows:

    i.    Search on the Delta Hotels by Marriott Website: This search replicated the process of a consumer visiting the homepage to make a reservation on the Delta Hotels by Marriott website, at www.deltahotels.com.[7]  Figure 1 below shows the Delta Hotels by Marriott homepage, which was the only webpage shown in this search.

    ii.    Search on the Marriott Website: This search replicated the process of a consumer searching for a reservation on the Marriott website, at www.marriott.com, for a hotel reservation in Richmond, Virginia.  This search showed the four webpages that a consumer would have seen in this search, including the Marriott homepage at www.marriott.com, search results that included a listing for the Delta Hotels by Marriott property in Richmond, a popup window for the property, and Marriott's landing page for the property.  Figures 2a, 2b, 2c, and 2d show the four images for this search.

---

[6] My survey replicated the webpage or webpages that consumers may see if they were searching for a hotel room reservation on any of three websites, including www.deltahotels.com, www.marriott.com, and www.expedia.com. For simplicity, this report refers to these three scenarios, and the webpages they involve, as searches.

[7] As of March 16, 2023, the Delta Hotels by Marriott website re-routes consumers who enter www.deltahotels.com to the website address https://delta-hotels.marriott.com/.

Expert Report of Dr. Bruce Isaacson, p. 2
CIVIL ACTION NO. 1:20-CV-01125-SCJ

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

        iii.    <u>Search on the Expedia Website</u>: This search replicated the process of a consumer using the Expedia website to search for a hotel reservation in Richmond, Virginia. This search displayed three webpages, including the homepage at www.expedia.com, search results that included a listing for the Delta Hotels by Marriott property in Richmond, and the landing page on Expedia for that property.[8]  Figures 3a, 3b, and 3c show the three images for this search.

---

[8] At the time the survey questionnaire was designed, counsel for Marriott provided data from 2019 on Delta Hotels by Marriott properties in the U.S., including room nights reserved and occupancy rates for each location.  This was the most current data available.  The Richmond property was the second-busiest property in the U.S. based on room nights reserved, and had an occupancy rate above 50%.  Also, this property displayed the Delta Hotels Marriott Vertical Logo identified in the First Amended Complaint (¶ 26).

**Figure 1: Homepage for Delta Hotels by Marriott at www.deltahotels.com[9]**



---

[9] Due to space constraints in this report, Figures 1, 2a, 2b, 2d, 3a, 3b, and 3c show the top portions of the webpages.  The survey showed each page in its entirety and all webpages in their entirety are provided in Exhibit 2.

Expert Report of Dr. Bruce Isaacson, p. 4
CIVIL ACTION NO. 1:20-CV-01125-SCJ

**Figure 2a: Homepage at www.marriott.com**



1

**Figure 2b: Search Results at www.marriott.com**



**Figure 2c: Popup Ad for Delta Hotels by Marriott at www.marriott.com**



**Figure 2d: Landing Page for Delta Hotels by Marriott at www.marriott.com**





Expert Report of Dr. Bruce Isaacson, p. 8
CIVIL ACTION NO. 1:20-CV-01125-SCJ

**Figure 3a: Homepage at www.expedia.com**



**Figure 3b: Search Results at www.expedia.com (1 of 2)**
**(first page of search results)[10]**



---

[10] The Delta Hotels by Marriott property in Richmond, Virginia was the 21st listing in the search results. Due to space constraints in the main body of this report, Figure 3b (1 of 2) shows the top part of the first page of search results, while Figure 3b (2 of 2) shows the search results that include the listing for this hotel. The survey showed each page in its entirety and all webpages in their entirety are provided in Exhibit 2.

**Figure 3b: Search Results at www.expedia.com (2 of 2)**
**(search results page with listing for Delta Hotels by Marriott in Richmond)**

**Figure 3c: Landing Page for Delta Hotels by Marriott at www.expedia.com**

6.      Due to space constraints, the main body of this report shows images from the survey in a smaller size than they were actually shown in the survey, and also shows only the top portion of some of those website pages.  In the survey, respondents were shown all webpages in a size and manner consistent with how they would encounter those pages online.[11]  For example, survey respondents were shown the entirety of each webpage, and were not shown explanatory descriptions, such as "Homepage for Delta Hotels by Marriott."

7.      Exhibit 2 provides images showing the entirety of each webpage for each search measured in the survey.  This report refers to the searches involving these webpages as the test searches.

8.      In this matter, Delta Air Lines has objected to Marriott's use of the word "Delta" as allegedly likely to cause confusion, asserting that such use is likely to cause consumers to believe that Delta Hotels by Marriott is owned by, affiliated with, or sponsored by Delta Air Lines, or that Delta Hotels by Marriott is a joint venture or cobranding project between Delta Air Lines and Marriott.[12]  My survey measured the amount of confusion, if any, associated with Marriott's use of the word "Delta" in advertising and in offering services under the Delta Hotels by Marriott brand.  To do so, my survey also measured control searches, which were similar to the test searches, except that the control searches changed the word "Delta" to the word "Alta."

---

[11] The survey showed static images of the webpages, so links on the webpages were not live.

[12] For example, see First Amended Complaint, ¶ 1.  The Complaint also objects to the sans serif font and dark blue color scheme that Delta Hotels by Marriott uses, which are incorporated in the test materials for my survey.  My survey thus measures the likelihood of confusion, if any, associated with the word "Delta" in conjunction with the sans serif font and dark blue color.

9.      The results from any survey can be affected by elements that the survey is intended to measure, as well as other extraneous elements, such as pre-existing knowledge and attitudes among respondents, respondents who guess or are inattentive, or factors other than those the survey was designed to measure.[13]  The use of control searches allows my survey to isolate the effect specifically associated with Marriott's use of the word "Delta" in connection with Delta Hotels by Marriott because they provide a means to adjust the survey's measures for the effect of these extraneous factors.

10.     Typically, a control item for a survey is designed to be reasonably similar to the test item, except that the control does not include the element or elements under dispute.[14]  The control searches in my survey were similar to the test searches because they retained elements such as text and graphics that are not disputed in this matter, but the control searches changed all uses of the word "Delta" to "Alta."  "Delta" and "Alta" have three letters in common and both words contain two syllables, two vowels, and four or five letters in total.

11.     The word "Alta" appeared in the control searches in a manner similar to the appearance of "Delta" in the test searches in terms of aspects such as font, color, and size.  In addition to changing "Delta" to "Alta," the control searches also changed the stylized D to a stylized A.

12.     Figures 4, 5, and 6 show control versions of three website images measured in my survey.  In the survey, all respondents were shown the full set of images they were assigned.  For brevity in the main body of this report, Figures 4, 5, and 6, show only the top portions of these three webpages, and do not display all webpages from the control searches.  Exhibit 2 provides the entirety of all webpages shown in the test and control searches.[15]

---

[13] Diamond, Shari Seidman.  "Reference Guide on Survey Research."  *Reference Manual on Scientific Evidence*, 3rd ed., National Academies Press, 2011, pp. 397-398.

[14] A control should share "as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed."  Diamond, Shari Seidman. "Reference Guide on Survey Research."  *Reference Manual on Scientific Evidence*, 3rd ed., National Academies Press, 2011, p. 399.

[15] The test images come from web searches conducted by MMR staff.  The control images were developed by MMR staff under my supervision, using graphics software to alter the test images.

**Figure 4: Control Version of Homepage for**
**Delta Hotels by Marriott at www.deltahotels.com[16]**



---

[16] Figures 4, 5, and 6 show only the top portions of the first webpage for each search. The survey showed all of the webpages, and showed all pages for each search.

Expert Report of Dr. Bruce Isaacson, p. 15
CIVIL ACTION NO. 1:20-CV-01125-SCJ

**Figure 5: Control Version of Landing Page for**
**Delta Hotels by Marriott Richmond at www.marriott.com**







**Figure 6: Control Version of Landing Page for
Delta Hotels by Marriott Richmond at www.expedia.com**



13.    The survey interviewed respondents who are representative of consumers who might see online advertising and/or webpages for Delta Hotels by Marriott in the real world.  Among other criteria, the survey qualified prospective respondents as answering that they were likely to make a hotel room reservation in the next 12 months, likely to make the reservation in a relevant price range, and also likely to make the reservation using a relevant method, such as by visiting a hotel website or visiting a travel website.

14.    After qualification, respondents were shown the webpages for either the test or control version of a single search on the Delta Hotels by Marriott website, the Marriott website, or the Expedia website.[17]  After viewing their assigned search, respondents answered questions that measured the likelihood of confusion, if any, associated with the search they viewed.

15.    The survey included three sets of questions to measure confusion:

    i.    Questions asking about confusion as to source: Question 1 asked respondents what company they believe owns or operates the hotel they just viewed. Question 3 asked respondents whether they are aware of other products or services offered by the company that owns or operates the hotel they just viewed.  Those who answered yes were asked Question 4, which asked what other products or services they think are offered by the company that owns or operates the hotel they viewed.

---

[17] Respondents qualified to see the searches on the Delta Hotels by Marriott website or the Marriott website if they answered that they would be likely to make a reservation for a hotel room on the website of a hotel.  Respondents qualified to see the search on the Expedia website if they answered that they would be likely to make a reservation for a hotel room on a travel website.  Respondents who qualified for more than one search were randomly assigned to the test or control version of a single search.

Expert Report of Dr. Bruce Isaacson, p. 18
CIVIL ACTION NO. 1:20-CV-01125-SCJ

ii.  <u>Questions asking about confusion as to connection or affiliation</u>: Question 6 asked respondents whether they think that the company that owns or operates the hotel they just viewed is connected or affiliated with another company. Those who answered affirmatively were asked Question 7, which asked what other company they think is connected or affiliated with the company that owns or operates the hotel they just viewed.

iii.  <u>Questions asking about an unspecified "Delta"</u>: Respondents who mentioned "Delta" in response to a question without providing additional information to identify the "Delta" they had in mind (such as Delta Hotels by Marriott, Delta Air Lines, or another Delta company) were asked Question 9, which asked what products or services are offered by the "Delta" they mentioned earlier. If the response to Question 9 mentioned "Delta" but still did not identify which "Delta" they were thinking of, Question 10 asked the respondent to identify anything else about the products or services that are offered by the "Delta" they previously mentioned.[18]

16.  Respondents were also asked Questions 2, 5, and 8, which asked, "What makes you think that?" regarding prior responses.

17.  In other words, the survey included questions to measure confusion as to source (Questions 1 and 4), and as to connection or affiliation (Question 7). Because both parties in this matter use the word "Delta," the survey also included additional questions asking about an unspecified "Delta" (Questions 9 and 10), which gave respondents who previously provided an answer referring to "Delta" without any further specification additional opportunities to indicate whether they were thinking of Delta Air Lines, Delta Hotels by Marriott, or some other "Delta." Also, Questions 2, 5, and 8 asked respondents about the reasons for their responses.

---

[18] As described later, the survey asked Questions 9 and 10 of respondents who previously provided an answer that mentioned "Delta" without mentioning certain other words, such as "hotel" or "airline," that could indicate whether the answer referred to Delta Air Lines or Delta Hotels by Marriott.

18.    The confusion measures from the survey reflect the answers to all of these questions. The survey's confusion measures across this series of questions are "unduplicated," meaning that they count each respondent only once, even if that respondent mentioned the same company in more than one response.[19]

19.    I counted respondents as confused who provided a verbatim response that mentioned Delta Air Lines or that mentioned any term possibly related to Delta Air Lines, such as flight, airline, or similar themes.[20]  Across Questions 1, 2, 4, 5, 7, 8, 9, and 10, 2.5% of respondents shown a test search, and 0.4% of respondents shown a control search, provided a response that mentioned Delta Air Lines or that mentioned any term possibly related to Delta Air Lines. After accounting for the control, the net likelihood-of-confusion measure based on these responses is 2.1%.[21]

20.    I counted respondents as not confused if they did not mention Delta Air Lines, and did not mention any term possibly related to Delta Air Lines.  Across Questions 1, 2, 4, 5, 7, 8, 9, and 10, 3.2% of respondents shown a test search, and no respondents (0.0%) shown a control search, provided responses that referred to "Delta" without specifying whether they were thinking of Delta Air Lines, Delta Hotels by Marriott, or some other Delta or other context.  As discussed later in this report, I have not counted these respondents as confused because, despite multiple opportunities through questions that measured confusion, these respondents did not mention Delta Air Lines and/or any term possibly related to Delta Air Lines.

21.    Based on these survey results, which reflect three different search processes, it is my opinion that confusion between Delta Hotels by Marriott and Delta Air Lines is unlikely.

22.    After reviewing certain background information, I discuss the survey and my findings in detail.

---

[19] For example, a respondent who provided a response in one question indicating they were confused as to source, and answered a later question with a response indicating that they were confused as to connection or affiliation, would be counted only once to measure likelihood of confusion.

[20] To be clear, I did not count responses as referring to Delta Air Lines that mentioned flight or airline in a context that clearly referred to an organization other than Delta Air Lines, such as a travel agency.

[21] The net percentage is calculated as 2.5% minus 0.4%.

**My Qualifications**

23.    I am the President of MMR Strategy Group ("MMR"), a marketing research and consulting firm, and am experienced in research, surveys, and marketing.  During my career, I have designed, conducted, and analyzed many hundreds of research studies, including many surveys for matters involving intellectual property and false advertising litigation.  I have provided testimony, by written report and/or deposition, regarding surveys that I or others conducted in more than 140 matters, including more than 45 matters involving likelihood of confusion.

24.    I have testified about surveys in matters before the National Advertising Division of the Better Business Bureau, federal courts, state courts, the Trademark Trial and Appeal Board (TTAB), the U.S. International Trade Commission, the U.S. Court of Federal Claims, and other venues and authorities.  Also, I have been retained in at least 22 matters by government agencies, including the U.S. Federal Trade Commission, the U.S. Department of Justice, and the U.S. Patent and Trademark Office.

25.    For more than 46 years, MMR Strategy Group has provided marketing research and consulting, consisting primarily of the design, execution, and analysis of thousands of surveys, as well as expertise related to marketing and strategy.  I have been President of MMR for more than 16 years.  During that time, I have provided marketing research and consulting that was not related to litigation for such well-known organizations as Farmers Insurance Group, Allstate Insurance, Goodyear Tire & Rubber Company, Nestlé USA, Inc., RE/MAX, Kaplan Test Prep, and other organizations.

26.    I have provided these and other companies with advice on topics such as marketing products and services, managing and growing brands, sizing and segmenting markets, measuring and improving customer experiences, identifying and analyzing new markets, evaluating and launching new products, satisfying and retaining customers, pricing products and services, and other topics relating to marketing, consumer behavior, and strategy.

27.    I received a Bachelor of Science degree in engineering from the Technological Institute at Northwestern University in 1985, and Master of Business Administration and Doctor of Business Administration degrees from the Harvard Graduate School of Business Administration in 1991 and 1995, respectively.  At Harvard, I received my MBA with highest distinction as a Baker Scholar and was a Dean's Doctoral Fellow, writing publications on marketing and strategy, including best-selling teaching materials.  I have won awards for research I conducted from institutions including The Institute for the Study of Business Markets at Penn State University and Harvard University.  My education included masters-level and doctoral-level coursework in marketing, research design, statistics, buyer behavior, strategy, and other topics.

28.    I have taught marketing and strategy for executive groups and executive MBA programs.  Since 1994, I have been on the editorial board of the *Journal of Business-to-Business Marketing*, which publishes peer-reviewed research on business marketing.  Since 2010, I have been a member of *The Trademark Reporter* Committee of the International Trademark Association; *The Trademark Reporter* publishes peer-reviewed research and articles on trademarks.  I am also a member of the American Marketing Association and the Insights Association (a merger of the former Marketing Research Association and the former Council of American Survey Research Organizations).  My firm is a member of the International Trademark Association.

29.    I regularly consult with clients regarding marketing, research, and strategy, and also address conferences and groups on these issues.  My public speaking includes addressing law firms and bar associations on the use of surveys in litigation, and related topics.  For example:

     i.    I am co-author of an article that discusses how to measure likelihood of confusion that was published in the May-June 2021 edition of *The Trademark Reporter*.

     ii.    In March of 2020, I was a speaker at a seminar held at a law firm to discuss the use of consumer perception surveys in litigation matters.

iii.  In May of 2018, at the annual conference of the International Trademark Association, I was a speaker on a panel discussing, among other topics, conducting surveys to support claims on packaging and advertising for litigation matters.

iv.  In 2018, 2016, 2013, and 2010, I led roundtable discussions on litigation surveys at the annual conference of the International Trademark Association.

v.  In October of 2015, I was co-presenter for a Continuing Legal Education seminar on litigation surveys sponsored by the Bar Association of San Francisco.

vi.  In March of 2015, I presented to the U.S. Department of Justice, Civil Division, Commercial Litigation Branch on the topic of using surveys to measure attitudes and behaviors.

vii.  In October of 2013, I was a speaker at the Corporate Researchers Conference hosted by the Marketing Research Association.

30.  In terms of professional experience, I have been a marketing and strategy consultant at The Boston Consulting Group, a global consulting firm; Senior Vice President at a publicly traded data processing company that is now a division of Intuit; Division President at a media-services company that (after I worked there) became a division of News Corporation; and Vice President responsible for marketing and strategy at a financial services company.  I also served as the West Coast Practice Leader of an executive-education practice at a strategy-consulting firm, where I developed and taught educational programs for marketing and strategy.

31.     I have authored or co-authored more than 18 publications on the subjects of marketing, surveys, and business strategy for publications including *The Trademark Reporter*; the *Intellectual Property Law Newsletter* of the American Bar Association's Section of Intellectual Property Law; *Intellectual Property Today*; *Intellectual Property Magazine*; *Quirk's Marketing Research Review*; and others.  My publications have included book chapters as well as teaching materials on marketing, consumer behavior, and other topics published by Harvard Business Publishing and used for business school curricula.

32.     Exhibit 1 shows my curriculum vitae and testimony experience, including matters in which I have testified as an expert during the previous four years.

**Materials Reviewed and Compensation**

33.     For purposes of my survey and this report, I have reviewed materials that include the following:

      i.     The First Amended Complaint, dated June 12, 2020, and the original Complaint, dated March 11, 2020.

      ii.    A spreadsheet from counsel that provides data on room nights and occupancy rates for Delta Hotels by Marriott locations, with the file name DELTA_2019FY_2020OctYTD_Occ_20201125.xlsx.

      iii.   The results of searches for a hotel reservation on expedia.com, marriott.com, and other travel websites, such as travelocity.com and tripadvisor.com.  Also, the results of searches for "Delta Hotels" on Google.

      iv.   Visits to the homepage for Delta Hotels by Marriott, at www.deltahotels.com.

34.     In addition, I consulted published literature and cases, which are cited in this report, and I also rely on my knowledge in fields such as surveys, consumer behavior, and marketing.

35.     For all activities related to this report and survey, my firm billed $160,000.  After this report, my time is billed at $950 per hour, with a daily rate for testimony at trial or deposition.  My compensation is not dependent on the outcome of this matter.

36.     The next section describes my likelihood-of-confusion survey in detail.

1    **Methodology for the Likelihood-of-Confusion Survey**

2    37.    All aspects of my confusion survey were designed and carried out by me, or under my

3    direct supervision.

4    38.    As described earlier, my survey used the Eveready format, a well-accepted format to

5    measure likelihood of confusion.  In a typical Eveready survey, such as my survey in this matter,

6    respondents are shown a trademark from one party, often in connection with an ad, webpage,

7    or product, and asked questions to determine whether they believe that the trademark comes

8    from another party and/or is connected or affiliated with another party.

9    39.    As I and others have noted, the Eveready format is often used to measure likelihood of

10   confusion with regard to marks that are well-known.[22]  In this matter, Delta Air Lines maintains

11   that its asserted marks are famous and "well-recognized throughout the United States," have

12   "achieved widespread recognition and acclaim," and "have been well-known and famous

13   among the general consuming public of the United States…for many years."[23]

14   40.    Exhibit 3 shows the questions used to qualify prospective respondents for the survey,

15   as well as the survey questions that measured confusion.[24]  The demographics of the survey

16   database, including gender, age, and geography, are consistent with the general population of

17   the U.S.  The following questions qualified prospective respondents for the survey:

18

19

20

21

22

23   [22] Isaacson, Bruce, and Keith A. Botner.  "When to Conduct an Eveready Survey: The Importance of
     Aided Awareness."  *The Trademark Reporter*, vol. 111, no. 3, 2021, p. 694.  ("It is widely accepted that an
24   Eveready survey is appropriate in cases involving senior marks that are well known.")  *See also* Swann,
     Jerre B.  "Eveready and Squirt: Cognitively Updated."  *The Trademark Reporter*, vol. 106, no. 4, 2016, pp.
25   728, 730, 734, 735-737.

26   [23] First Amended Complaint, ¶¶ 2, 17, 18.

27   [24] Exhibit 3 contains programming instructions that were not shown to respondents.  Exhibit 3 also
     shows survey elements such as the rotation of response options, which are not described in this
28   summary of my report.

i.   <u>Gender</u>: Question A asked respondents their gender. Of all survey interviews, 52.8% were conducted with females, and 47.2% with males.

ii.  <u>Age</u>: Question B asked respondents their age. Of all survey interviews, 24.1% were conducted with respondents 21 to 34 years old, 29.1% with respondents 35 to 54 years old, and 46.8% with respondents 55 years old or older.

iii. <u>Geography</u>: Question C asked respondents for the ZIP code of their home address. The survey includes interviews from the four regions of the U.S. established by the U.S. Census Bureau. Of all interviews, 17.0% were conducted with respondents in the Northeast, 22.0% for the Midwest, 36.9% for the South, and 24.1% for the West.[25]

iv.  <u>Likely to make a hotel room reservation</u>: Question D asked, "This question asks about certain activities. Due to the COVID-19 pandemic, some of these activities may or may not be available, or you may or may not do them now. Please answer thinking about your likelihood to do these activities in the next 12 months. Which, if any, of the following activities are you likely to do in the next 12 months?" The question asked about five different activities. Respondents qualified on this question if they answered that they are likely to "Make a hotel room reservation."[26]

---

[25] For Census Bureau regions, see "Census Regions and Divisions of the United States." *Census.gov*, Geography Division, U.S. Census Bureau, Economics and Statistics Administration, U.S. Department of Commerce, https://www2.census.gov/geo/pdfs/maps-data/maps/reference/us_regdiv.pdf, last accessed March 16, 2023.

[26] The survey interviews were conducted in September of 2021. At that time, due to the COVID-19 pandemic, many people in the U.S. were traveling less or not traveling at all. The phrasing of this question reflects these circumstances and asks respondents to consider future travel.

    v.   <u>Likely to make a hotel room reservation in a relevant price range</u>: Question E asked, "In the next 12 months, if you were going to make a reservation for a hotel room, would you be likely to make a reservation for a room in any of these price ranges?  Please answer thinking about the price before taxes and fees." The question asked about three price ranges; respondents qualified on this question if they answered affirmatively to "$100 to $250 per night," which, at the time the survey was conducted, was a typical price range for the hotel property measured in the survey.

    vi.   <u>Likely to make the hotel reservation on a hotel website or travel website</u>: Question F asked, "In the next 12 months, if you were going to make a reservation for a hotel room, which, if any, of the following methods would you be likely to use to make the reservation?"  The question asked about five different methods for making a reservation; respondents qualified on this question if they answered affirmatively to "Visit the website of a hotel" or "Visit a travel website."

41.    Prospective respondents were also screened on other criteria, such as not working for certain types of companies where they could have gained unusual knowledge,[27] not completing any surveys about hotels in the past 30 days, and taking the survey on a desktop computer, laptop computer, or tablet.

42.    After qualifying for the survey, respondents were assigned to view the test or control version of the search on the Delta Hotels by Marriott website, the Marriott website, or the Expedia website.  As part of their assigned search, respondents saw all pages related to that search, and were provided with instructions worded in a manner that reflected the search process they would see.

---

[27] The types of companies included an advertising or public relations agency, a marketing research company, a company that owns or operates a hotel, a company that owns or operates an airline, a company that owns or operates a travel website, and a travel agency.

43.    For example, after qualifying, respondents assigned to view the search on the Delta Hotels by Marriott website received this initial instruction:

> The image below shows a hotel webpage.  Because this is an image, any links in the page are not active.

> Please look at the webpage as you normally would if you were visiting it to make a reservation for a hotel room.  You may need to scroll to see all of it.  The "Next" button will appear below the webpage after a brief pause.

44.    Respondents assigned to view the search on the Marriott website received this initial instruction:

> The image below shows a webpage from a hotel company.  Because this is an image, any links in the page are not active.

> Please look at the webpage as you normally would if you were visiting it to make a reservation for a hotel room in Richmond, Virginia.  You may need to scroll to see all of it.  The "Next" button will appear below the webpage after a brief pause.

45.    The search on the Marriott website included four webpages, with the second webpage showing search results.  Before respondents were shown the second page, they were instructed:

> Now, please imagine that your search generated the search results that are shown in the image below.  Because this is an image, any links in the search results are not active.

> Please look at the search results as you normally would if you were searching for a hotel to make a reservation.  You may need to scroll to see all of it.  The "Next" button will appear below the search results after a brief pause.

46.    The third webpage in the Marriott search was a popup ad for a Delta Hotels by Marriott property in Richmond.  Prior to showing this third webpage, the survey provided this instruction:

> Now, please imagine that you clicked on one of the listings in the search results and it took you to the webpage shown below.  Because this is an image, any links in the webpage are not active.

> Please look at the webpage as you normally would if you were visiting it to make a reservation for a hotel room.  You may need to scroll to see all of it.  The "Next" button will appear below the webpage after a brief pause.

47.    The fourth webpage in the Marriott search was the landing page for a Delta Hotels by Marriott property in Richmond, Virginia.  Prior to showing this fourth webpage, the survey provided this instruction:

> Now, please imagine that you clicked "View Hotel Website" on the previous webpage and it took you to the webpage shown below.  Because this is an image, any links in the webpage are not active.

> Please look at the webpage as you normally would if you were visiting it to make a reservation for a hotel room.  You may need to scroll to see all of it.  The "Next" button will appear below the webpage after a brief pause.

48.    Respondents assigned to view the search on the Expedia website were shown three webpages, including the search at www.expedia.com, the search results page, and the landing page on Expedia for a Delta Hotels by Marriott property in Richmond, Virginia.  The instructions were phrased in a manner appropriate for this search, such as referring to "a travel webpage" instead of "a webpage from a hotel company."

49.    After respondents viewed the webpages for their assigned searches, they were asked the substantive questions that measured likelihood of confusion.

1  50.    The first series of questions measured confusion as to source:

2        i.    Question 1 asked, "What company do you believe owns or operates the hotel

3              you just viewed?"  Question 2 asked, "What makes you think that?  Please be as

4              specific as possible."  Questions 1 and 2 were open-ended; respondents

5              answered in their own words or selected "I don't know."

6        ii.   Question 3 asked, "Are you aware of any other products or services offered by

7              the company that owns or operates the hotel you just viewed?"  Respondents

8              who answered affirmatively were asked Question 4 and Question 5.  Question 4

9              asked, "What other products or services do you think are offered by the

10             company that owns or operates the hotel you just viewed?"  Question 5 asked,

11             "What makes you think that?  Please be as specific as possible."  Questions 4

12             and 5 were open-ended; respondents answered in their own words or selected

13             "I don't know."

14  51.   The next three questions measured confusion as to connection or affiliation:

15       i.    Question 6 asked, "Do you think that the company that owns or operates the

16             hotel you just viewed…"  The response options included, "Is connected or

17             affiliated with another company," "Is not connected or affiliated with another

18             company," or "Or, you don't know."  Respondents who answered affirmatively

19             were asked Question 7 and Question 8.

20       ii.   Question 7 asked, "What other company do you think is connected or affiliated

21             with the company that owns or operates the hotel you just viewed?"  Question

22             8 asked, "What makes you think that?  Please be as specific as possible."

23             Questions 7 and 8 were open-ended; respondents answered in their own words

24             or selected "I don't know."

25

26

27

28

52.    Next, two more questions provided additional inquiries to assess whether a "Delta" response provided earlier in the survey referenced Delta Hotels by Marriott, Delta Air Lines, or another "Delta" company.  After asking Question 8, the survey program scanned all prior verbatim responses for each respondent.  Respondents were asked Question 9 if they had previously mentioned the word "Delta" and had not mentioned certain words that would indicate whether they were thinking of Delta Air Lines or Delta Hotels by Marriott.  If their answer to Question 9 did not include words indicating whether they were thinking of Delta Air Lines or Delta Hotels by Marriott, they were also asked Question 10.[28]

    i.    Question 9 asked, "Even if you have already mentioned it, what products or services are offered by the 'Delta' you mentioned earlier?"

    ii.    Question 10 asked, "Is there anything else you can tell us about the products or services that are offered by the 'Delta' you mentioned?"  Questions 9 and 10 were open-ended; respondents answered in their own words or selected "I don't know."

53.    For respondents shown the search on the Marriott website, Question 11 asked, "In the next 12 months, if you were going to make a reservation for a hotel room, would you be likely to visit marriott.com?"  Respondents shown the search on the Expedia website were also asked Question 11, but with phrasing that referenced "expedia .com" instead of "marriott.com."

54.    Question 12 asked respondents whether they or any member of their household worked for certain types of companies or organizations, such as a company that owns or operates a hotel, or a company that owns or operates an airline.  Other survey questions asked respondents to confirm their home ZIP codes and to affirm that their responses were truthful.

---

[28] Respondents were asked Questions 9 and 10 if they had used the word "Delta" in a prior response and did not mention any of the following words: hotel, lodging, motel, Marriott (including certain misspellings), inn, Bonvoy, plane, flight, jet, aeroplane, SkyMile, Sky Mile, or any word involving "air."

55.    The survey was conducted online, and respondents entered their own answers to questions.  The survey located and recruited prospective respondents through an online panel[29] provided by Dynata (formerly Research Now SSI), a well-respected company that has provided sampling and data collection for 40 years, currently serves more than 6,000 client organizations, and employs a variety of quality control processes relating to panelists and responses.[30]

56.    Exhibit 4 describes the methods used to recruit prospective respondents for the survey and provides more information on the panel used for the survey.  Exhibit 5 describes the survey's many quality control procedures, including procedures to validate respondents.

57.    The survey interviews were conducted in a manner consistent with generally accepted principles for litigation surveys, including procedures for double-blind research, in which neither the panel company nor the respondents know the survey's purpose or sponsor.  The interviews were conducted from September 1, 2021 to September 13, 2021, and resulted in an initial database of 1,350 completed interviews.

58.    Exhibit 6 provides a termination summary indicating the number of respondents screened out at each qualifying question.  After the interviews were conducted, 235 respondents (17.4%) were removed during quality control or validation, including 154 (11.4%) removed for answers provided in Question 12, and 81 (6.0%) removed for other reasons.[31] This leaves 1,115 respondents in the survey database, including 555 interviews involving test searches and 560 interviews involving control searches.

---

[29] Panels offer professionally managed access to prospective survey respondents who have previously indicated their willingness to take surveys from time to time.

[30] For example, the Dynata panel uses double opt-in recruitment (respondents must opt in to the panel twice upon joining), IP address verification (verifies the unique address of computers associated with specific respondents), and response time checks (searches for surveys completed suspiciously quickly).

[31] In my experience, the number of respondents removed is typical for a survey of this sample size and structure. Question 12 asked about employment in sensitive companies or organizations, and was asked after the substantive questions to avoid any possible influence on survey measures.

59.     This survey database is very large, with more than sufficient size to be reliable.  For any survey, the "margin of error" indicates the reliability of a survey measure, with smaller margins of error indicating greater reliability or stability in survey measures.[32]  My survey has a relatively small margin of error, which indicates that the sample size is more than sufficient.[33]

60.     The next section describes my findings from the survey.


**Findings From the Likelihood-of-Confusion Survey**

61.     The questions that measured confusion were open-ended, meaning that respondents answered in their own words.  I analyzed each response to these questions to determine whether the response indicated that the respondent was confused.  To do so, I assigned codes across the open-ended responses of each respondent to reflect the theme or themes that were mentioned in their answers to the questions that measured confusion.[34]  Exhibit 7 lists these codes.

62.     Exhibit 8 presents cross tabulation tables from the data analysis, which show detailed results for all survey questions.  Exhibit 9 shows all responses to all questions from all respondents, including a data map indicating which survey responses correspond to each variable in the database.  This section summarizes the survey results.

---

[32] Statistics such as margins of error can provide general indicators of survey reliability.  *See* Diamond, Shari Seidman.  "Reference Guide on Survey Research."  *Reference Manual on Scientific Evidence,* 3rd ed., National Academies Press, 2011, pp. 382-383.

[33] For example, a measure of 2.5% at a sample size of 555 interviews has a margin of error of approximately +/- 1.3% at the 95% level of confidence.  *See* Moore, David S. et al.  "Inference for Proportions."  *Introduction to the Practice of Statistics,* 6th ed., W.H. Freeman and Company, 2009, pp. 487-524.

[34] I was assisted in the coding by MMR staff working under my supervision.  I have personally reviewed and/or assigned every code for every response from every respondent.

63.    Table A below summarizes the data from all survey questions that measure likelihood of confusion, including Questions 1, 2, 4, 5, 7, 8, 9, and 10.  As described earlier, these questions include the following:

      i.    Question 1: "What company do you believe owns or operates the hotel you just viewed?  If you don't know, please select the box labeled 'I don't know.'"

      ii.    Question 2: "What makes you think that?  Please be as specific as possible.  If you don't know, please select the box labeled 'I don't know.'"

      iii.    Question 4: "What other products or services do you think are offered by the company that owns or operates the hotel you just viewed?  If you don't know, please select the box labeled 'I don't know.'"

      iv.    Question 5: "What makes you think that?  Please be as specific as possible.  If you don't know, please select the box labeled 'I don't know.'"

      v.    Question 7: "What other company do you think is connected or affiliated with the company that owns or operates the hotel you just viewed?  If you don't know, please select the box labeled 'I don't know.'"

      vi.    Question 8: "What makes you think that?  Please be as specific as possible.  If you don't know, please select the box labeled 'I don't know.'"

      vii.    Question 9: "Even if you have already mentioned it, what products or services are offered by the 'Delta' you mentioned earlier?  If you don't know, please select the box labeled 'I don't know.'"

      viii.    Question 10: "Is there anything else you can tell us about the products or services that are offered by the 'Delta' you mentioned?  If you don't know, please select the box labeled 'I don't know.'"

64.    Also as described earlier, because both parties in this matter use the word "Delta," Questions 9 and 10 provided those respondents who had mentioned "Delta" in response to a prior question, but had not provided any further specification, with additional opportunities to

indicate whether they were thinking of Delta Hotels by Marriott, Delta Air Lines, or another Delta.[35]

65.    My analysis of the data from the eight substantive questions that measure confusion, which include Questions 1, 2, 4, 5, 7, 8, 9, and 10, focus on all the responses that each respondent provided across this entire series of questions to identify whether they mentioned any "Delta," and also to identify whether the "Delta" they mentioned referred to Delta Hotels by Marriott, Delta Air Lines, or some other Delta.  For example, a respondent who mentioned "Delta" in one of these questions, without any further specification in that particular question, may have provided an answer in response to another question that identified which "Delta" they had in mind.

66.    When analyzing these questions, I counted responses as referring to Delta Air Lines that mentioned Delta Air Lines or that mentioned any term possibly related to Delta Air Lines, such as flight, airline, or similar themes.[36]  Similarly, I counted responses as referring to Delta Hotels by Marriott that mentioned Delta Hotels, Marriott, or names relating to Marriott (such as Bonvoy or Marriott hotel brands); or that mentioned "Delta" and also mentioned words relating to Delta Hotels by Marriott, such as hotel, hotel room, restaurant, fitness center, pool, spa, or similar themes.  I counted responses as referring to "Delta" without any further specification if the response mentioned the word "Delta" but did not mention Delta Air Lines, Delta Hotels by Marriott, or any other contextual words that could identify either of these parties (such as flight or hotel).

---

[35] Respondents were asked Question 9 if their prior answers had not mentioned hotel, lodging, motel, Marriott (including certain misspellings), inn, Bonvoy, plane, flight, jet, aeroplane, SkyMile, Sky Mile, or any variation of any word that begins with "air."  They were asked Question 10 if their answer to Question 9 did not mention any of those words.  A total of 71 respondents were asked Question 9, and 23 of those respondents were asked Question 10.

[36] To be clear, I did not count responses as referring to Delta Air Lines that mentioned flight or airline in a context that clearly referred to an organization other than Delta Air Lines, such as a travel agency.

67.    Table A below summarizes the results for Questions 1, 2, 4, 5, 7, 8, 9, and 10 on an unduplicated basis, meaning that respondents who mentioned the same theme in response to more than one question were only counted once across all questions.

### Table A: Summary of Survey Measures From
### Questions 1, 2, 4, 5, 7, 8, 9, and 10 (unduplicated)

| Questions 1, 2, 4, 5, 7, 8, 9, and 10 | Test Searches | Control Searches |
|---|---|---|
| Sample size | 555 | 560 |
| Delta Air Lines or terms related to airlines[37] | 2.5% | 0.4% |
| Marriott, Delta Hotels by Marriott, or terms related to hotels[38] | 80.5% | 71.3% |
| Delta without any further specification[39] | 3.2% | 0.0% |
| An online travel agency[40] | 9.0% | 6.1% |
| A hotel company other than Marriott[41] | 1.8% | 2.5% |
| An unnamed hotel company[42] | 1.4% | 1.8% |
| Alta or Alta Hotels[43] | 0.0% | 33.0% |
| Other | 22.3% | 24.3% |
| Don't know | 7.9% | 11.4% |

[37] Reflects responses that refer in any of these questions to Delta Air Lines or any term possibly related to Delta Air Lines, such as flight, airline, SkyMiles, or similar themes.  Does not include responses that use words such as flight or airline in a context clearly referring to an organization other than Delta Air Lines, such as a travel agency.

[38] Reflects responses that refer in any of these questions to Delta Hotels by Marriott, Delta Hotels, Marriott, Bonvoy, Marriott hotels (such as Aloft, Autograph Collection, Courtyard, Fairfield, Residence Inn, Ritz-Carlton, Sheraton, Springhill Suites, W Hotels, or Westin), or responses that mention "Delta" and also mention words relating to Delta Hotels by Marriott, such as hotel, hotel room, restaurant, fitness center, pool, or spa, or similar themes.

[39] Reflects responses that refer in any of these questions to "Delta," but do not mention Delta Air Lines or Delta Hotels by Marriott, and do not refer to identifying words such as hotel, airline, or similar themes.

[40] Reflects responses that refer in any of these questions to Expedia, Travelocity, VRBO, hotels.com, trivago, booking.com, or any other online travel agency.

[41] Reflects responses that refer in any of these questions to a hotel brand that is not part of Marriott.

[42] Reflects responses that refer in any of these questions to hotel, motel, hotel room, resort, room, bedroom, accommodation, or similar themes; and does not mention any hotel company by name.

[43] Reflects responses that refer in any of these questions to Alta or Alta Hotels.

68.     Table A shows that, among respondents shown a test search, 2.5% provided a response reflecting Delta Air Lines or any term possibly related to Delta Air Lines, such as flight, airline, or similar themes,[44] compared with 0.4% of respondents shown a control search.  The most frequently mentioned theme referred to Marriott, Delta Hotels by Marriott, or terms related to hotels, which was reflected in responses from 80.5% of respondents shown a test search, and 71.3% of those shown a control search.  The table also shows that 3.2% of respondents shown a test search, and no respondents (0.0%) shown a control search, mentioned Delta without any further specification.

69.     Examples of verbatim responses that reflect Delta without any further specification, from respondents shown a test search, are listed below.  The list below provides the respondent's identification number, and also provides every verbatim response from that respondent.  The question number where the verbatim response was provided is shown in parentheses after the verbatim response.

       i.     ID # 212: "Marriott" (Q.1), "It is in the name" (Q.2), "Delta" (Q.7), "It is a part of the name" (Q.8).

      ii.    ID # 297: "delta" (Q.1), "Because it has an emblem with delta" (Q.2).

    iii.    ID # 364: "Delta" (Q.1), "it said on top and many other places" (Q.2).

    iv.    ID # 378: "Delta" (Q.1), "The name is at the top of the page." (Q.2).

     v.    ID # 412: "Delta" (Q.1), "Delta" (Q.2), "Delta" (Q.7), "Because i like it" (Q.8).

    vi.    ID # 491: "Delta" (Q.1).

   vii.    ID # 601: "Delta" (Q.1), "Logo in top left" (Q.2).

  viii.    ID # 737: "Marriot" (Q.1), "It was listed under Delta" (Q.2), "Delta" (Q.7), "They are listed upper left corner" (Q.8).

    ix.    ID # 814: "delta" (Q.1), "earn points with every perfect stay" (Q.9), "simple made perfect" (Q.10).

---

[44] To be clear, I did not count responses as referring to Delta Air Lines that mentioned flight or airline in a context that clearly referred to an organization other than Delta Air Lines, such as a travel agency.

x. ID # 827: "DELTA" (Q.1), "luggage deposit" (Q.4), "Easy to have a rest" (Q.9).

xi. ID # 953: "Delta" (Q.1), "it said Delta" (Q.2), "Delta" (Q.7), "it said Delta" (Q.8).

xii. ID # 1023: "Delta not Marriot" (Q.1), "The name" (Q.2).

xiii. ID # 1057: "Delta" (Q.1), "It says so across the top" (Q.2), "marriot" (Q.7), "From viewing the previous web pages." (Q.8).

xiv. ID # 1075: "Delta" (Q.1), "I remember seeing delta" (Q.2), "Travel" (Q.9).

xv. ID # 1094: "delta" (Q.1), "its presence in bold  and clear at the top of the screen" (Q.2), "provides a place to work and rest at the same time and restore the individual's energy" (Q.4), "from the images" (Q.5), "the multiple rooms in the pictures" (Q.7), "clear pictures" (Q.8), "i don't know" (Q.9), "no everything is clear from the pictures" (Q.10).

xvi. ID # 1103: "marryot" (Q.1), "delta" (Q.7).

xvii. ID # 1124: "dalta" (Q.1), "i don''t know" (Q.2), "i don't know" (Q.4), "nice" (Q.5).

xviii. ID # 1156: "BONVOY" (Q.1), "DELTA" (Q.2), "IT IS GOOD" (Q.9), "NONE" (Q.10).

70. These respondents had multiple opportunities to expand on their answers that included the word "Delta," yet they did not clearly specify whether they were thinking of Delta Hotels by Marriott, Delta Air Lines, or some other Delta.  For example, they did not mention Delta Air Lines; they did not mention any term or context relating to Delta Air Lines, such as flight or airline; and they did not mention any other terms relating to Delta Air Lines, such as "sky" or "miles."

71. My data analysis was conservative from the standpoint of Delta Air Lines.  For example, I coded a number of respondents who mentioned both an unspecified Delta and Marriott in their verbatim responses as referring to both Delta without any further specification and Marriott.[45]  These respondents mentioned Delta and also mentioned Marriott, yet my coding did not assume that their "Delta" response refers to Marriott.

---

[45] For example, the following respondents mentioned Marriott and Delta without any further specification across any of the questions: Respondent IDs: 212, 737, 1057, 1103, and 1156.

72.     In Questions 2, 5, and 8, respondents were asked, "What makes you think that?" as a follow up to prior questions.  Across Questions 1, 2, 4, 5, 7, 8, 9, and 10, among respondents shown a test search, 75.3% provided a response reflecting it says so, compared with 74.5% of respondents shown a control search.  Across these same questions, among respondents shown a test search, 20.2% provided a response reflecting personal experience or general knowledge, compared with 17.9% of respondents shown a control search.  Exhibit 8 shows these results.

73.     As described earlier, Questions 1, 2, 4, 5, 7, 8, 9, and 10 provided the questions to measure confusion.  The survey also included two filter questions, Questions 3 and 6.

74.     Question 3 asked respondents whether they were aware of any other products or services offered by the company that owns or operates the hotel they just viewed.  In response, 53.2% of respondents shown a test search answered affirmatively, compared with 58.9% of respondents shown a control search.  Respondents who answered affirmatively to Question 3 continued to Question 4.

75.     Question 6 asked respondents whether they think the company that owns or operates the hotel they just viewed is or is not connected or affiliated with another company.  In response, 55.3% of respondents shown a test search and 55.9% of respondents shown a control search selected "Is connected or affiliated."  Respondents who selected "Is connected or affiliated" continued to Question 7.  Exhibit 8 provides the data from responses to Questions 3 and 6.

76.     Exhibit 8 also provides the data for Question 11, which asked respondents who were shown the Marriott website or the Expedia website whether they were likely to visit marriott.com or expedia.com, respectively, in the next 12 months to make a reservation for a hotel room.  Among respondents shown the test search on the Marriott website, 76.2% answered that they would be likely to visit marriott.com to make a reservation for a hotel room, compared with 77.6% of those shown the control search on the Marriott website.  Among respondents shown the test search on the Expedia website, 86.1% answered that they would be likely to visit expedia.com to make a reservation for a hotel room, compared with 83.4% shown the control search on the Expedia website.

77.    Table B summarizes the survey's confusion measures across Questions 1, 2, 4, 5, 7, 8, 9, and 10, and provides the net measure for the percentage of respondents who provided responses to any of these questions that mentioned Delta Air Lines or any term possibly related to Delta Air Lines, such as flight, airline, or similar themes.  The net measure is calculated as the test measure minus the corresponding control measure.  The net measure removes the effect of extraneous factors from the survey measures, isolating the effect associated with the use of the word "Delta."

**Table B: Summary of Confusion Measures for Delta Air Lines**

| Questions 1, 2, 4, 5, 7, 8, 9, and 10 | Test Searches | Control Searches | Net Measure |
|---|---|---|---|
| Sample size | 555 | 560 | |
| Mentioned Delta Air Lines or terms related to airlines[46] | 2.5% | 0.4% | 2.1% |

78.    As shown in Table B, across Questions 1, 2, 4, 5, 7, 8, 9, and 10, counting respondents who mentioned Delta Air Lines or who mentioned any term possibly related to Delta Air Lines, such as flight, airline, or similar themes,[47] the likelihood-of-confusion measure is 2.5% for the test searches and 0.4% for the control searches.  The net likelihood-of-confusion measure is 2.1%, which is calculated as 2.5% minus 0.4%.

---

[46] Reflects responses that refer in any of these questions to Delta Air Lines or any term possibly related to Delta Air Lines, such as flight, airline, or similar themes.  Does not include responses that use words such as flight or airline in a context clearly referring to an organization other than Delta Air Lines, such as a travel agency.

[47] I did not count responses as referring to Delta Air Lines that mentioned flight or airline in a context that clearly referred to an organization other than Delta Air Lines, such as a travel agency.

79.    As shown earlier in Table A, 3.2% of respondents shown a test search, and no respondents (0.0%) shown a control search, provided answers that referenced "Delta" without any further specification, meaning that they did not specify whether they had in mind Delta Air Lines, Delta Hotels by Marriott, or some other Delta or other context.[48]

**Conclusions**

80.    The survey's confusion measure is based on a survey design that is conservative from the point of view of Delta Air Lines.  The survey included two questions that measure confusion as to source (Questions 1 and 4) and one question that measures confusion as to connection or affiliation (Question 7), *plus* two additional questions (Questions 9 and 10) to give respondents additional opportunities to identify Delta Air Lines or to mention any term possibly related to Delta Air Lines, such as flight, airline, or similar themes.  Also, Questions 2, 5, and 8 asked respondents to explain the reasons for their answers.

81.    As described earlier, counting only responses that unambiguously referred to Delta Air Lines or that mentioned any term possibly related to Delta Air Lines, such as flight, airline, or similar themes,[49] the likelihood-of-confusion measures are 2.5% for the test searches and 0.4% for the control searches.  The net likelihood-of-confusion measure is 2.1%.

---

[48] If the measures for "Delta" without any further specification are added to the measures for respondents who definitively mentioned Delta Air Lines or who mentioned a term related to Delta Air Lines, the combined measures would be 5.8% (calculated on a respondent basis) for the test searches and 0.4% for the control searches, for a net measure of 5.4%.  This measure would not change my conclusions from my survey.  However, since this measure includes responses that mentioned "Delta" without any further specification, it includes respondents who never, across the entire series of confusion questions, unambiguously referred to Delta Air Lines by name or even by words that provide context, such as "airline."  There is no basis to conclude that respondents who mentioned "Delta" without any further specification were thinking of Delta Air Lines, so the appropriate likelihood-of-confusion measure is 2.1%.

[49] As described earlier, in calculating likelihood-of-confusion measures, I did not count responses as referring to Delta Air Lines that mentioned flight or airline in a context that clearly referred to an organization other than Delta Air Lines, such as a travel agency.

82.    I analyzed the results separately for each of the three searches measured in the survey, including searches on the Delta Hotels by Marriott website, the Marriott website, and the Expedia website.  Based on those analyses, I conclude that the survey results do not differ in any material way across the three searches measured in my survey.

83.    As previously mentioned, across Questions 1, 2, 4, 5, 7, 8, 9, and 10 among respondents shown a test search, 2.5% provided a response reflecting Delta Air Lines or any term possibly related to Delta Air Lines, such as flight, airline, or similar themes, compared with 0.4% of respondents shown a control search.

84.    Among respondents shown the test search on the Delta Hotels by Marriott website, 2.7% provided a response reflecting Delta Air Lines or any term possibly related to Delta Air Lines, such as flight, airline, or similar themes, compared with 0.6% of respondents shown the control search on the Delta Hotels by Marriott website.  Among those shown the test search on the Marriott website, 0.5% provided a response reflecting Delta Air Lines or any term possibly related to Delta Air Lines, such as flight, airline, or similar themes, compared with 0.5% of those shown the control search on the Marriott website.  Among those shown the test search on the Expedia website, 4.3% provided a response reflecting Delta Air Lines or any term possibly related to Delta Air Lines, such as flight, airline, or similar themes, compared with 0.0% of those shown the control search on the Expedia website.  Exhibit 8 includes survey results for each of these three searches individually, and shows that there are no material differences across the confusion measures for each search.

85.    As described earlier, Question 11 asked respondents who were shown the Marriott website or the Expedia website whether they were likely to visit marriott.com or expedia.com, respectively, in the next 12 months to make a reservation for a hotel room.  There are no material differences between the confusion measures for these searches when analyzed among all respondents, or when analyzed only among respondents who answered in Question 11 that they were likely to visit marriott.com or expedia.com.

86.     Among respondents shown the test search for the Marriott website and who also indicated in Question 11 that they were likely to visit marriott.com, 0.7% provided a response across Questions 1, 2, 4, 5, 7, 8, 9, and 10 that reflects Delta Air Lines or any term possibly related to Delta Air Lines, such as flight, airline, or similar themes.  Among respondents shown the test search on the Expedia website and who also indicated in Question 11 that they were likely to visit expedia.com, 4.3% provided a response across Questions 1, 2, 4, 5, 7, 8, 9, and 10 reflecting Delta Air Lines or any term possibly related to Delta Air Lines, such as flight, airline, or similar themes.

87.     Based on these survey results, which reflect three different search processes and multiple questions that asked respondents to express their opinions, it is my opinion that confusion between Delta Hotels by Marriott and Delta Air Lines is unlikely.

1   I declare under penalty of perjury under the laws of the United States that the foregoing is true

2   and correct to the best of my belief.

3

   Executed in Encino, California, on March 17, 2023.

4

5

6

7                                           _____

8                                         Dr. Bruce Isaacson

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit 1:**

**Dr. Bruce Isaacson CV and Testimony Experience**

# MMR STRATEGY GROUP
*Creating growth through customer insight.™*

16501 Ventura Boulevard, Suite 601, Encino, CA 91436 • Phone (818) 464-2400 • www.mmrstrategy.com

# DR. BRUCE R. ISAACSON, DBA, MBA

***MMR Strategy Group, Encino, CA***                                           2005 - Present
**PRESIDENT**

MMR provides surveys, analysis, and consulting to measure the attitudes and behaviors of customers and consumers.  MMR has three practice areas:

1. <u>Claim Substantiation</u>: Research and consulting to substantiate claims that involve consumer perceptions, and are made in packages, advertising, and other types of marketplace communications.

2. <u>Litigation Surveys</u>: Surveys and testimony for intellectual property matters.

3. <u>Marketing Research and Consulting</u>:  Marketing research and consulting to help clients grow sales, develop marketing strategies, and improve products and services.

As President, I design studies, manage research projects, and provide consulting relating to marketing, research, consumer behavior, and strategy.

I have conducted many hundreds of surveys during my career, and frequently provide surveys, testimony, and rebuttals for intellectual property litigation and claim substantiation.

I have provided testimony relating to litigation surveys in a wide variety of venues involving federal courts, state courts, the Trademark Trial and Appeal Board (TTAB), the National Advertising Division (NAD) of the Better Business Bureau, the International Trade Commission, the Trademark Trial and Appeal Board, the Federal Trade Commission, the Court of Federal Claims, and others.

I have been retained in more than 200 matters, and have been retained in more than 20 matters by government agencies including the U.S. Federal Trade Commission, the U.S. Department of Justice, and the U.S. Patent and Trademark Office.

I speak and write on topics relating to marketing research, marketing strategy, litigation surveys, and consumer behavior.

MMR

**Education**

- Doctor of Business Administration in Marketing, **Harvard Business School**, 1995.  Awarded Dean's Doctoral Fellowship.
- MBA with High Distinction, **Harvard Business School**, 1991.  Graduated in top 5% of class as a Baker Scholar.
- Bachelor of Science in Engineering with focus on Regional Development, Northwestern University Technological Institute, 1985.

**Publications**

**When to Conduct an Eveready Survey: The Importance of Aided Awareness.**  *The Trademark Reporter*, May-June, 2021.

**Book Review of *Trademark and Deceptive Advertising Surveys:  Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann.**  *The Trademark Reporter*, September, 2013.

**Playing Nice With Legal:  How Research Can Help Keep Marketing Claims in Compliance.**  *Quirk's Marketing Research Review*, January, 2013.

**The Quantity of Presidential Polls and the Quality of Marketing Research.**  *Green Book Blog*, October, 2012.

**Three Critical Questions to Evaluate Intellectual Property Surveys.**  *Intellectual Property Today*, September, 2012.  Co-authors: Professor Jonathan Hibbard and Professor Scott Swain.

**Asking the Right Questions (in Litigation Surveys).**  *Intellectual Property Magazine*, October, 2012.

**Why Online Consumer Surveys Can Be a Smart Choice in Intellectual Property Cases** (with Professor Jonathan Hibbard and Professor Scott Swain).  Intellectual Property Law Newsletter of the American Bar Association, Intellectual Property Law Section, May 2008.

**Bose Corporation:  The JIT II Program (A), (B), (C), and (D)** (with Professor Roy Shapiro).  Harvard Business School cases 9-694-001, -002, -003, and -004.

**Bose Corporation:  The JIT II Program Teaching Note.**  Harvard Business School teaching note 5-695-017.

**Buyer-Supplier Relationships:  Antecedents, Management, and Consequences.**  Harvard Business School doctoral dissertation, 1996.

**Goodyear:  The Aquatred Launch** (with Professor John Quelch).  Harvard Business School case 9-594-106.  Best seller.

**Goodyear:  The Aquatred Launch Teaching Note** (with Professor John Quelch).  Harvard Business School teaching note 5-595-016.

MMR

**Industrial Marketing** (with Professor V. Kasturi Rangan).  In *AMA Management Handbook, Third Edition*, edited by John J. Hampton.  New York:  Amacom Books, 1994, pp. 2-101 to 2-108.

**Managing Buyer-Supplier Relationships.**  Preface to *JIT II:  Revolution in Buying and Selling*, edited by Lance Dixon and Anne Millen Porter.  Newton, MA:  Cahners Publications, Inc., 1994.

**Philip Morris:  Marlboro Friday (A) and (B).**  Harvard Business School case 9-596-001 and -002.

**Scope and Challenge of Business-to-Business Marketing** (with Professor V. Kasturi Rangan).  Harvard Business School class note 9-594-125.

**Vistakon:  1 Day Acuvue Disposable Contact Lenses** (with Professor Alvin J. Silk and Marie Bell).  Harvard Business School case 9-596-087.

**What is Industrial Marketing?** (with Professor V. Kasturi Rangan).  Harvard Business School class note 9-592-012.


**Honors, Appointments, Affiliations**

- Member, American Marketing Association (AMA)

- Member, International Trademark Association (INTA)

- Member, Marketing Research Association (MRA)

- Member, Brand Activation Association (BAA)

- Member, Editorial Board, *Journal of Business-to-Business Marketing,* 1994 - present

- Member, *The Trademark Reporter* Committee, International Trademark Association, 2010 - present

- Policy Advisory Board, Joint Center for Housing Studies at Harvard University, 1999 - 2001

- Winner, Doctoral Dissertation, Institute for Study of Business Markets, Penn State, 1994

- George S. Dively Award for Innovative Research, Harvard Business School, 1993

- George F. Baker Scholar, Harvard Business School (top 5% of class), 1991

- Dean's Doctoral Fellowship, Harvard Business School, 1993 -1995

MMR

**Selected Speaking Engagements**

Frequent speaker at industry conferences and client events on topics relating to marketing and strategy, including:

- Speaker on panel, "Survey Says: The Use of Consumer Perception Surveys in Advertising-Related Litigation," held at Davis & Gilbert, LLP, March, 2020.

- Speaker on panel, "What Can Trademark Practitioners Learn from Advertising and Marketing Professionals?"  International Trademark Association Annual Conference, May, 2018.

- Moderator for roundtable discussion, "Trademark Surveys: How Requirements Differ by Venue and Authority," International Trademark Association Annual Conference, May, 2018.

- Guest lecturer on "Litigation Surveys" to advertising law class at Loyola Law School, September, 2021; September, 2020; October, 2019; and October, 2018.

- Moderator for roundtable discussion, "Using Surveys to Measure Product Usage, Configuration, and Damages in Trademark, Copyright, and Patent Matters," International Trademark Association Annual Conference, May, 2016.

- Panelist for "Battle of the Experts – Deploying the Proper Scientific Methodology for Supporting or Challenging Claims," Advanced Forum on Resolving & Litigating Advertising Disputes, March, 2015.

- Guest lecturer on the legal aspects of marketing to MBA classes held at University of California – Irvine, November, 2015, and December, 2015.

- Speaker for presentation, "Using Surveys to Measure Attitudes and Behaviors," U.S. Department of Justice, Civil Division, Commercial Litigation Branch, March, 2015.

- Speaker for presentation, "Improving Customer Experience with Customer Journey Maps," Corporate Researchers Conference, sponsored by the Marketing Research Association, October, 2013.

- Speaker on panel for seminar, "Trademark Protection in Cyberspace," sponsored by the Los Angeles County Bar Association (LACBA), May, 2013.

- Moderator for round table discussion, "Using Survey Evidence for Claim Substantiation," International Trademark Association Annual Conference, May, 2013.

- Speaker and panelist for multi-day conference, "Advertising Claims Support: Case Histories and Principles," conference hosted by The Institute for Perception, April, 2013.

MMR

- Moderator for roundtable discussion, "Replicating Marketplace Conditions in Trademark Surveys," International Trademark Association Annual Conference, 2011.

- Moderator for roundtable discussion, "The Use of Surveys in Intellectual Property Litigation," International Trademark Association Annual Conference, 2010.

- Faculty on panel at expert forum, "Litigating & Resolving Advertising Disputes," American Conference Institute, June, 2010.

- Speaker for presentation, "The Use of Online Surveys in Intellectual Property Litigation," National Advertising Division (NAD) Annual Conference, October, 2009.

- Speaker for presentation, "Integrating Research Techniques for Deeper Customer Insights: Blurring Boundaries Between Research Methods," American Marketing Association Annual Marketing Research Conference, September, 2008.

- Speaker for presentation, "Understanding Your Customer and Making Tough Strategic Choices," International Restaurant & Foodservice Show of New York, March, 2008.

- Presented Continuing Legal Education (CLE) seminar titled, "Measuring Consumer Attitudes and Behaviors in Intellectual Property Litigation." Presented to:

  - Orange County Bar Association, November, 2007.

  - Baker Botts, LLP, March, 2008.

  - Amster, Rothstein & Ebenstein LLP,  March, 2008.

  - Fulwider Patton, LLP, March, 2008.

- Speaker for presentation, "Understanding Today's Customers and Making Tough Choices – Lessons Learned From Starbucks," Western Foodservice & Hospitality Expo, August, 2007.

- Speaker for presentation titled, "What Can We Learn from Customer Satisfaction Studies?" Real Trends Marketing & Technology Expo, September, 2006.

**Blogging and Commentary**

I have written posts and white papers at www.MMRStrategy.com that include:

**Litigation Surveys**
- "How to Measure False Advertising in a Litigation Survey" (November, 2012)

- "Using Surveys to Estimate Damages in Patent Infringement Matters" (October, 2012)

MMR

- "Apple vs. Samsung: Litigation Surveys as Evidence" (August, 2012)

- "What is the Theory Behind Your Lanham Act Survey?" (June, 2012)

- "Keyword Infringement Surveys: The New Frontier in Measuring Likelihood of Confusion" (June, 2012)

- "The Challenge of Replicating Marketplace Conditions in Intellectual Property Surveys" (May, 2012)

**Claim Substantiation**

- "When it Comes to 'Up To' Claims, Make Sure You Have the Right Substantiation" (February, 2013)

- "Critical Research Steps and Core Principles of Claim Substantiation" (white paper)

- "How Many Industries are Affected by Claim Substantiation?" (June, 2012)

- "Lessons in Claim Substantiation from the Pom Wonderful Decision" (May, 2012)

- "How Claim Substantiation Differs from Traditional Marketing Research" (May, 2012)

**Marketing and Marketing Research**

- "Lessons in Pricing Strategy from JCPenney" (May, 2013)

- "Why You Should (Almost) Never Use the van Westendorp Pricing Model" (March, 2013)

- "Three Types of Market Segmentation and the 2012 Presidential Election" (October, 2012)

- "Presidential Polls and the Quality of Marketing Research" (October, 2012)

- "Sizing the Potential of a New Market or New Product" (white paper)

- "MaxDiff vs. Conjoint:  Which is Better to Measure Consumer Preferences?" (white paper)

- "Ten Best Practices to Improve Your Concept and Product Tests" (white paper)

- "Using Choice-Based Market Segmentation to Improve Your Marketing Strategy" (white paper)

- "What Your Tracking Study Should Measure About Your Customers" (white paper)

- "Using Customer Journey Maps to Improve Your Customer Experience" (white paper)

- "How to Improve Your Usage and Attitude Study" (June, 2012)

- "Five Pitfalls of Market Segmentation and How to Avoid Them" (May, 2012)

**Professional Experience Prior to MMR Strategy Group**

*Fairview Company, Calabasas, CA*                                      2002 - 2004
**Managing Director**
- **West Coast Practice Leader of Executive Development for Monitor Group.**
  Designed and managed marketing and strategy executive education programs.
  Developed curriculum, served as lead faculty on programs for Fortune 100 clients.

- **Consulted with clients in technology, software, and financial services.**
  Provided consulting services in marketing and strategy.

*Intuit/Digital Insight, Calabasas, CA*                               2001 - 2002
**Senior Vice President for Products, Marketing, and Alliances**
- **Managed business lines for $130 million provider of outsourced banking services/software.**
  Directed marketing, strategy, alliances, mergers, acquisitions, resellers, and pricing for 9 business lines. Managed $29 million budget and staff of 40.

- **Built product management and strategy functions.**
  Set priorities for $22 million R&D budget. Directed $51 million acquisition and post-merger conversion of 150 new clients.

*Move, Inc., Westlake Village, CA*                                    1999 - 2001
**President, Home Services**
- **Founded home services division for software/services provider to real estate industry.**
  Directed business unit for new division. Built alliances with associations including National Association of Homebuilders and American Institute of Architects.

*PHH Corporation* **(NYSE: PHH)***, Mortgage Division, Mount Laurel, NJ*       1997 - 1999
**Vice President, Marketing**
- **Directed marketing for $26 billion outsourced mortgage services division.**
  Company provided private label loans and loan servicing for customers and partners, including Wells Fargo, USAA, Coldwell Banker, Century 21. Served on 14-member Executive Committee. Managed $14 million budget and 60 people in marketing, research, public relations, advertising, strategic planning, business development, and e-commerce.

- **Created collateral for selling, processing, and closing loans distributed to 750,000 customers annually.**
  Redesigned sales materials used by 150-person sales force. Created point-of-sale materials and placed in 1,600 real estate offices nationwide. Negotiated co-marketing deals.

- ▪ **Built online platform to originate, close, and service mortgages.**
  Created co-branded system used by 1,400 partners to originate $700 million in mortgages in 2000.  Integrated system with more than 2,000 sales and customer service reps.

***Boston Consulting Group, Chicago, IL***                                    1995 - 1997
**Consultant**
- ▪ **Consulted in marketing, strategy, and distribution for $1 billion international strategy consulting firm.**
  Designed and rolled out database marketing program for international supermarket chain.  Developed purchasing strategy for $3 billion consumer goods company.  Evaluated market strategy for $800 million division of paper goods company.

***Harvard Business School, Cambridge, MA***                                    1991 - 1995
**Dean's Doctoral Fellow**
- ▪ **Developed and implemented multi-year research project analyzing buyer-supplier alliances.**
  Authored 14 publications including best-selling case studies and articles in distribution, sales, supplier management, purchasing, branding, and new products.  Taught in Babson College Executive MBA program.

***E&J Gallo Winery, Modesto, CA***                                    1990
**MBA Intern**
- ▪ Summer intern at global winery.  Developed packaging strategy, distribution, and retailer incentive programs for the wine cooler category.

***Long Wharf Trading Company, Danvers, MA***                                    1986 - 1989
**President & Co-Founder**
- ▪ **Co-founded company manufacturing high quality sewn products for advertising premiums.**
  Directed 30 employees.  Clients included banks, universities, corporations, schools, and museums.  Company was featured with full-page story in *Inc. Magazine*.

***Parsons Corporation/Barton-Aschman Associates, Evanston, IL***                                    1985 - 1986
**Associate Consultant**
- ▪ **Conducted strategic and operations planning for public transportation systems at global construction and regional planning company.**
  Received *President's Award* for outstanding initiative and performance.

MMR

## Selected Courses Taken in MBA and Doctoral Programs

- <u>Economics and Finance</u>, including topics such as Managerial Economics; Financial Reporting and Accounting; Business, Government, and the International Economy; Corporate Finance; Product Costing; and Microeconomic Theory.

- <u>Marketing and Strategy</u>, including topics such as Marketing; Marketing Foundations Readings; New Products; Marketing Implementation; Service Management; Research Issues in Marketing; Buyer Behavior; Industrial Marketing and Procurement; Industry and Competitive Analysis; and Communications.

- <u>Sociology and Psychology</u>, including Organizational Behavior; Human Resources; Social Behavior in Organizations; Readings in Administration (two courses); and Management Policy and Practice.

- <u>Statistics</u>, including Statistical Inference; Social Network Analysis; Applied Data Analysis; and Analyzing Covariance Structures.

- <u>Research Methods and Research Design</u>, including Doctoral Research Seminar; Research Design and Measurement; Design of Field Research in Organizational Behavior; and Intervention Research and Action Science.

MMR

**Dr. Bruce Isaacson Litigation Expert Witness Experience**
**March 2023**

Cases in which Dr. Bruce Isaacson has testified as an expert, including written expert reports or testimony at deposition or trial, from 2014 to present.

**Tequila Los Abuelos S.A. DE C.V. v. Podlaska Wytwórnia Wódek "POLMOS" S.A.**
United States Patent and Trademark Office, Trademark Trial and Appeal Board

**GOLO, LLC v. Goli Nutrition Inc, a Canadian Corporation, Goli Nutrition Inc., a Delaware Corporation, and Michael Bitensky, an individual**
U.S. District Court, Southern District of Delaware

**The United States of America v. Global Occupational Safety and Health Academy, LLC**
U.S. District Court, Northern District of Illinois, Eastern Division

**US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation v. Fox News Network, LLC, Fox Corporation, and Fox Broadcasting Company, LLC**
Superior Court of the State of Delaware

**GeigTech East Bay LLC v. Lutron Electronics Co., Inc.**
U.S. District Court, Southern District of New York

**In re: Nissan North America, Inc. Litigation consolidated with Kemp, et al., and Bereda, et al. v. Nissan North America, Inc. et al**
U.S. District Court, Middle District of Tennessee, Nashville Division

**Hermès International and Hermès of Paris, Inc. v. Mason Rothschild**
U.S. District Court, Southern District of New York

**MGA Entertainment Inc. v. Clifford T.I. Harris et al.**
U.S. District Court, Central District of California, Western Division

**In the Matter of L'Oréal USA, Inc. (CeraVe Skincare Products)**
National Advertising Division of the Better Business Bureau

**Power Home Remodeling Group, LLC v. Power Home Solar, LLC d/b/a Powerhome Solar, also d/b/a Powerhome Solar & Roofing, also d/b/a Power Home Solar and Roofing**
U.S. District Court, Eastern District of Pennsylvania

**Diamond Resorts U.S. Collection Development, LLC; and Diamond Resorts Hawaii Collection Development, LLC v. Pandora Marketing, LLC d/b/a Timeshare Compliance; Intermarketing Media, LLC d/b/a Resort Advisory Group; Slattery, Sobel & Decamp, LLC; Del Mar Law Group, LLP; Carlsbad Law Group, LLP; JL "Sean" Slattery, Esq.; Unlock Legal, APLC; Miranda Dempsey, APLC, d/b/a McCroskey Legal; and Miranda McCroskey, Esq.**
U.S. District Court, Central District of California

**LEGO A/S, LEGO Systems, Inc., and LEGO Juris A/S v. ZURU Inc.**
U.S. District Court, District of Connecticut

**Rasmussen Instruments, LLC v. DePuy Synthes Products, Inc., DePuy Synthes Sales, Inc., and Medical Device Business Service Inc.**
U.S. District Court, District of Massachusetts, Eastern Division

**New Prime, Inc., d/b/a Prime, Inc., v. Amazon Logistics, Inc., Amazon.com Services LLC, and Amazon Technologies, Inc.**
U.S. District Court, Western District of Missouri, Southern Division

**Coulter Ventures, LLC v. Rogue Ridge, LLC**
United States Patent and Trademark Office, Trademark Trial and Appeal Board

**Tiffany and Company and Tiffany (NJ), LLC v. Costco Wholesale Corp.**
U.S. District Court, Southern District of New York

**In re Elysium Health-ChromaDex Litigation**
U.S. District Court, Southern District of New York

**Diamond Resorts U.S. Collection Development, LLC, and Diamond Resorts Hawaii Collection Development, LLC v. US Consumer Attorneys, P.A., Henry Portner, Esq., Robert Sussman, Pluto Marketing Inc., 1Planetmedia Inc., Newton Group Transfers, LLC, The Newton Group, ESA LLC, Interval Broker Direct, LLC, Newton Group Exit, LLC, and DC Capital Law Firm, LLP**
U.S. District Court, Southern District of Florida

**ALIIGN Activation Wear, LLC v. lululemon Athletica Canada Inc. and lululemon USA Inc.**
U.S. District Court, Central District of California, Western Division

**TravelPass Group, LLC, Partner Fusion, Inc., Reservation Counter, LLC v. Caesars Entertainment Corporation, Choice Hotels International, Inc., Hilton Domestic Operating Company, Inc., Hyatt Hotels Corporation, Marriott International, Inc., Red Roof Inns, Inc., Six Continents Hotels, Inc., Wyndham Hotels Group, LLC**
U.S. District Court, Eastern District of Texas, Texarkana Division

**American Beverage Association, California Retailers Association, California State Outdoor Advertising Association v. The City and County of San Francisco**
U.S. District Court, Northern District of California, San Francisco Division

**Barry Braverman, et al v. BMW of North America, LLC and BMW AG**
U.S. District Court, Central District of California, Southern Division

**Glaxo Group Limited v. Respirent Pharmaceuticals Co., Ltd.**
U.S. District Court, Southern District of New York

MMR

**Sulzer Mixpac AG v. DXM Co., LTD and Dentazon Corporation**
U.S. District Court, Southern District of New York

**American Massage Therapy Association v. Implus Footcare, LLC**
United States Patent and Trademark Office, Trademark Trial and Appeal Board

**Richard Sotelo, on behalf of himself and all others similarly situated v. Rawlings Sporting Goods Company, Inc.**
U.S. District Court, Central District of California, Western Division

**In re: Application of Apple Inc. for TVOS Mark (86/632,177)**
United States Patent and Trademark Office, Trademark Trial and Appeal Board

**Susan Tran, on Behalf of Herself and all Others Similarly Situated v. Sioux Honey Association, Cooperative**
U.S. District Court, Central District of California, Southern Division

**Sansi North America, LLC v. LG Electronics USA, Inc.**
U.S. District Court, Central District of California

**Lindsay and Jeff Aberin, Don Awtrey, Charles Burgess, John Kelly, Yun-Fei Lou, Joy Matza, and Melissa Yeung, individually and on behalf of all others similarly situated v. American Honda Motor Company**
U.S. District Court, Northern District of California

**Federal Trade Commission and Utah Division of Consumer Protection v. Nudge LLC et al.**
U.S. District Court, District of Utah, Central Division

**Rockwell Automation, Inc. v. Radwell International, Inc.**
U.S. District Court, District of New Jersey

**James Demetriades, an individual v. Yelp, Inc., a Delaware corporation, et al.**
Superior Court of the State of California, County of Los Angeles, Central District

**In the Matter of Certain Pocket Lighters**
United States International Trade Commission, Washington, D.C.

**Vital Pharmaceuticals, Inc. v. Monster Energy Company and REIGN Beverage Company, LLC**
U.S. District Court, Southern District of Florida

**In the Matter of Certain Motorized Vehicles and Components Thereof**
United States International Trade Commission, Washington, D.C.

**Mahindra & Mahindra, Ltd. and Mahindra Automotive North America, Inc. v. FCA US LLC**
United States District Court, Eastern District of Michigan

MMR

**MGA Entertainment Inc. and The Little Tikes Company v. Dynacraft BSC, Inc. et al.**
U.S. District Court, Central District of California

**Fuse Chicken, LLC v. Amazon.com, Inc. and Does 1-10**
U.S. District Court, Northern District of Ohio

**Diamond Foods, Inc. v. Hottrix, LLC**
U.S. District Court, Northern District of California

**Steven A. Conner DPM, P.C. v. Optum360, LLC**
U.S. District Court, Eastern District of Pennsylvania

**Stephanie Escobar, individually and on behalf of all others similarly situated v. Just Born, Inc.**
U.S. District Court, Central District of California

**Daryl White, Jr., individually and on behalf of all others similarly situated v. Just Born, Inc.**
U.S. District Court, Western District of Missouri

**Forever 21 v. Gucci America, Inc.**
U.S. District Court, Central District of California, Western Division

**Ezaki Glico Kabushiki Kaisha, d/b/a Ezaki Glico Co., LTD., and Ezaki Glico USA Corporation**
U.S. District Court, District of New Jersey

**GoPro, Inc. v. 360Heros, Inc.**
U.S. District Court, Northern District of California

**Monster Energy Company v. Integrated Supply Network, LLC**
U.S. District Court, Central District of California

**Lokai Holdings LLC v. Twin Tiger USA LLC, Twin Tiger World Markets Ltd., Rory Coppock and Troy Coppock**
U.S. District Court, Southern District of New York

**Joann Martinelli, individually and on behalf of all others similarly situated v. Johnson & Johnson and McNeil Nutritionals, LLC**
U.S. District Court, Eastern District of California

**Strategic Partners, Inc. v. Vestagen Protective Technologies, Inc.**
U.S. District Court, Central District of California, Western Division

**Federal Trade Commission v. Damian Kutzner, individually and as an officer of Brookstone Law P.C. (California), et al.**
U.S. District Court, Central District of California

MMR

**In re: National Collegiate Athletic Association Athletic Grant-In-Aid Cap Antitrust Litigation**
U.S. District Court, Northern District of California, Oakland Division

**Adidas America, Inc., Adidas AG, Adidas International Marketing B.V., Reebok International Ltd., and Reebok International Limited v. TRB Acquisitions LLC, et al.**
U.S. District Court, District of Oregon, Portland Division

**Network-1 Technologies, Inc. v. Alcatel-Lucent USA Inc., et al.**
U.S. District Court, Eastern District of Texas, Tyler Division

**In the Matter of DIRECTV LLC v. Comcast Cable Communications**
National Advertising Division of the Better Business Bureau

**Sisters of Charity of Leavenworth Health System, Inc. v. Blue Cross and Blue Shield Association**
U.S. District Court, District of Colorado

**Pinkette Clothing, Inc. v. Cosmetic Warriors Limited, dba Lush Handmade Cosmetics**
U.S. District Court, Central District of California

**LifeScan, Inc. and Johnson & Johnson v. PharmaTech Solutions, Inc. and Decision Diagnostics Corp.**
U.S. District Court, Northern District of California, Oakland Division

**General Motors LLC Ignition Switch Litigation**
U.S. District Court, Southern District of New York

**Robert S. Davidson, d/b/a Plastertech v. The United States**
United States Court of Federal Claims

**Blue Cross and Blue Shield Association, an Illinois not-for-profit corporation v. Zoom Care, P.C.; Zoom Management, Inc.; Zoomcare; Zoom Care Health Plan; and Zoom Care Washington, P.L.L.C.**
U.S. District Court, Western District of Washington at Seattle

**Kosair Charities Committee, Inc. v. Norton Healthcare, Inc. et al.**
Jefferson County, Kentucky Circuit Court, Division Five (5)

**Safelite Group, Inc. and Safelite Solutions LLC v. Lori Swanson, in her official capacity as Attorney General of the State of Minnesota, and Michael Rothman, in his official capacity as the Commissioner of the Minnesota Department of Commerce**
U.S. District Court, District of Minnesota

**Confederate Motors, Inc. v. FCA US LLC**
United States Patent and Trademark Office, Trademark Trial and Appeal Board

MMR

**Talking Rain Beverage Company, Inc. v. DS Services of America, Inc.**
U.S. District Court, Western District of Washington at Seattle

**Farouk Systems, Inc. v. AG Global Products, LLC d/b/a FHI Heat, LLC and Shauky Gulamani**
U.S. District Court, Southern District of Texas, Houston Division

**Federal Trade Commission v. LifeLock, Inc. a corporation; Robert J Maynard, Jr., individually and as an officer of LifeLock, Inc.; and Richard Todd Davis, individually and as an officer of LifeLock, Inc.**
U.S. District Court, District of Arizona

**Parallel Networks Licensing, LLC v. Microsoft Corporation**
U.S. District Court, District of Delaware

**Parallel Networks Licensing, LLC v. International Business Machines Corporation**
U.S. District Court, District of Delaware

**In the Matter of Certain Footwear Products (Complainant Converse Inc.)**
United States International Trade Commission, Washington DC

**Klauber Brothers, Inc. v. Forever 21 Retail Inc., International Intimates, Inc., and Does 1 through 10**
U.S. District Court, Central District of California

**Weber-Stephen Products LLC v. Sears Holdings Corporation, and Sears, Roebuck and Co.**
U.S. District Court, Northern District of Illinois, Eastern Division

**Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GMBH**
U.S. District Court, Southern District of New York

**Robert Namer v. Broadcasting Board of Governors and Voice of America**
U.S. District Court, Eastern District of Louisiana

**Shannon Fabrics, Inc. v. Jo-Ann Stores, Inc.**
U.S. District Court, Central District of California

**Mars, Incorporated v. The Hershey Company and Hershey Chocolate & Confectionery Corporation**
U.S. District Court, Eastern District of Virginia, Alexandria Division

**Fitbug Limited v. Fitbit, Inc.**
U.S. District Court, Northern District of California

**Patrick Dang and Michael Villa v. San Francisco Forty-Niners, Ltd., et al.**
U.S. District Court, Northern District of California

MMR

**Kreation Juicery, Inc. v. Eiman Shekarchi and April Shekarchi**
U.S. District Court, Central District of California

**Miracle 7, Inc. v. Halo Couture LLC**
U.S. District Court, Southern District of Florida

**Robert McCrary v. The Elations Company LLC**
U.S. District Court, Central District of California

**OraLabs, Inc., v. The Kind Group LLC**
U.S District Court, District of Colorado

**Philippe Charriol International Limited v. A'lor International Limited**
U.S. District Court, Southern District of California

**LegalZoom.com, Inc. v. Rocket Lawyer Incorporated**
U.S. District Court, Central District of California, Western Division

**Benchmark Young Adult School, Inc., dba Benchmark Transitions v. Launchworks Life Services, LLC dba Mark Houston Recovery Center and Benchmark Recovery Center**
U.S. District Court, Southern District of California

**Diageo North America, Inc. v. Mexcor, Inc. and EJMV Investments, LLC**
U.S. District Court, Southern District of Texas, Houston Division

**Globefill Incorporated v. Elements Spirits, Inc. and Kim Brandi**
U.S. District Court, Central District of California

**Exhibit 2:**
**Test and Control Webpages Shown in the Survey**

This exhibit shows the test and control webpages that were shown in the survey. These webpages replicate online searches to make a reservation for a hotel room at Delta Hotels by Marriott through three different online searches, conducted at:

- The website for Delta Hotels by Marriott, at www.deltahotels.com
- The website for Marriott, at www.marriott.com
- The website for Expedia, at www.expedia.com

In the survey, each respondent was shown the test or control version for a single one of these three searches.

Some webpages in this exhibit extend across multiple pages.  In the survey, each webpage was shown to respondents as one continuous image, in a size similar to how the webpage would be viewed online.

Also, this exhibit provides titles and labels, such as "Delta Hotels by Marriott - Test" or "Homepage," that were not shown to respondents in the survey.

**Delta Hotels by Marriott Website at www.deltahotels.com – Test Version (1 of 4)
Homepage**



Exhibit 2 - Isaacson Expert Report                                                    Page 2

**Delta Hotels by Marriott Website at www.deltahotels.com – Test Version (2 of 4)**
**Homepage**

## Explore Our Locations

From Chicago to Montreal and even Shanghai, we have 70+ locations with more opening soon.

Find a Delta Hotel

  

### Chicago Willowbrook

Step into the recently renovated Delta Hotels Chicago Willowbrook, featuring brand new guestrooms, lobby, dining and common areas. Just a short drive to O'Hare and Midway International airports, our hotel is ideal for business travelers and groups alike.

Explore More

### Kamloops

Enjoy the beauty of British Columbia at our new location conveniently situated in the urban business district. This progressively styled hotel blends adventuresome, regionally inspired surroundings with a sophisticated urban atmosphere.

Explore More

### Dallas Allen

Experience a sophisticated interpretation of Texas dining and art at the brand-new Delta Hotels by Marriott Dallas Allen.

Explore More

● ○ ○

**FUNDAMENTALS AND AMENITIES**

### Everything You Need... And Nothing You Don't

We think about the details that truly matter: free water and Wifi, modern guest rooms, flexible spaces that work for you, smart service and delicious fresh food on your schedule.

Explore Amenities



Exhibit 2 - Isaacson Expert Report                                           Page 3

**Delta Hotels by Marriott Website at www.deltahotels.com – Test Version (3 of 4)**
**Homepage**



Exhibit 2 - Isaacson Expert Report                                              Page 4

**Delta Hotels by Marriott Website at www.deltahotels.com – Test Version (4 of 4)**
**Homepage**



Exhibit 2 - Isaacson Expert Report                                        Page 5

**Delta Hotels by Marriott Website at www.deltahotels.com – Control Version (1 of 4)**
**Homepage**



Exhibit 2 - Isaacson Expert Report                                    Page 6

**Delta Hotels by Marriott Website at www.deltahotels.com – Control Version (2 of 4) Homepage**

## Explore Our Locations

From Chicago to Montreal and even Shanghai, we have 70+ locations with more opening soon.

**Find an Alta Hotel**

  

### Chicago Willowbrook

Step into the recently renovated Alta Hotels Chicago Willowbrook, featuring brand new guestrooms, lobby, dining and common areas. Just a short drive to O'Hare and Midway International airports, our hotel is ideal for business travelers and groups alike.

**Explore More**

### Kamloops

Enjoy the beauty of British Columbia at our new location conveniently situated in the urban business district. This progressively styled hotel blends adventuresome, regionally inspired surroundings with a sophisticated urban atmosphere.

**Explore More**

### Dallas Allen

Experience a sophisticated interpretation of Texas dining and art at the brand-new Alta Hotels by Marriott Dallas Allen.

**Explore More**

● ○ ○

FUNDAMENTALS AND AMENITIES

## Everything You Need... And Nothing You Don't

We think about the details that truly matter: free water and Wifi, modern guest rooms, flexible spaces that work for you, smart service and delicious fresh food on your schedule.



**Explore Amenities**



Exhibit 2 - Isaacson Expert Report                                    Page 7

**Delta Hotels by Marriott Website at www.deltahotels.com – Control Version (3 of 4) Homepage**



Exhibit 2 - Isaacson Expert Report                                        Page 8

**Delta Hotels by Marriott Website at www.deltahotels.com – Control Version (4 of 4) Homepage**



Exhibit 2 - Isaacson Expert Report                                                                 Page 9

**Marriott Website at www.marriott.com – Test Version (1 of 3)**
**Homepage**



Exhibit 2 - Isaacson Expert Report                                    Page 10

**Marriott Website at www.marriott.com – Test Version (2 of 3)**
**Homepage**





Exhibit 2 - Isaacson Expert Report                                                    Page 11

**Marriott Website at www.marriott.com – Test Version (3 of 3)**
**Homepage**



## Marriott Bonvoy

Marriott Bonvoy Overview ›
Member Benefits ›
Earn Points ›
Redeem Points ›
Marriott Bonvoy Credit Card ›
Marriott Insiders ›

## Meetings & Events

Meetings & Events Overview ›
Business Meetings ›
Weddings ›
Social Events ›
Group Travel ›

## Deals & Packages

Deals ›
Hotel & Flight Packages ›
Cars, Tours, Activities ›
All-Inclusive Resorts & Vacations ›
Marriott Vacation Club Offers ›
Travel Experiences ›
The Ritz-Carlton Yacht Collection ›
Resorts ›
Marriott Bonvoy Traveler ›



Top Destinations

For Guests

Our Company

Follow Us

© 1996 – 2021 ⓜ Marriott International, Inc. All rights reserved. Marriott Proprietary Information                    🌐 English

Tracking Preferences ›    •    Terms of Use ›    •    Program Terms & Conditions ›    •    Privacy Center ›    •    Do Not Sell My Personal Information ›    •    Digital Accessibility ›    •    Site Map ›    •    Help ›

prod8,ACD250C9-0AFE-5DA1-853B-A249ABE61894,rel-R21.41

Exhibit 2 - Isaacson Expert Report                                                    Page 12

**Marriott Website at www.marriott.com – Test Version (1 of 6)**
**Search Results**



Exhibit 2 - Isaacson Expert Report     Page 13

**Marriott Website at www.marriott.com – Test Version (2 of 6)**
**Search Results**



**Fairfield Inn & Suites Richmond Airport**
5252 Airport Square Lane Sandston, Virginia 23150
5.4 miles from destination  |  ●●●●○ 4.3 135 Reviews  |  Category 2
New hotel near Richmond Airport, offering modern rooms, free breakfast & more.
View Hotel Details

Fairfield
Why Fairfield by Marriott ⌃

From **141** USD / night          VIEW RATES

**Courtyard Richmond Airport**
5400 Williamsburg Road Sandston, Virginia 23150
5.5 miles from destination  |  ●●●●○ 41 620 Reviews  |  Category 3
3000 POINTS PER NIGHT LIMITED TIME ONLY FREE PARKING AIRPORT HOTEL
View Hotel Details

COURTYARD
Why Courtyard ⌃

From **130** USD / night          VIEW RATES

**Sheraton Richmond Airport Hotel**
5501 Eubank Road Sandston, Virginia 23150
5.7 miles from destination  |  ●●●●○ 3.8 26 Reviews  |  Category 3
Brand New Full Service, Closest Hotel to RIC Airport, Restaurant On Site with Starbucks Market Place
View Hotel Details

SHERATON
Why Sheraton ⌃

From **146** USD / night          VIEW RATES

**Courtyard Richmond West**
6400 West Broad Street Richmond, Virginia 23230
5.7 miles from destination  |  ●●●●○ 4.3 472 Reviews  |  Category 2
Richmond hotel with modern rooms, free Wi-Fi, dining, a pool and meeting space near Carytown.
View Hotel Details

COURTYARD
Why Courtyard ⌃

From **145** USD / night          VIEW RATES

**Residence Inn Richmond West End**
2121 Dickens Road Richmond, Virginia 23230
5.9 miles from destination  |  ●●●●○ 4.4 407 Reviews  |  Category 3
View Hotel Details

Residence INN
Why Residence Inn ⌃

From **148** USD / night          VIEW RATES

**The Westin Richmond**
6631 West Broad Street Richmond, Virginia 23230
6.2 miles from destination  |  ●●●●○ 4.4 700 Reviews  |  Category 4
The Westin Richmond showcases lovely accommodations, conveniently located in midtown.
View Hotel Details

WESTIN
Why Westin ⌃

From **293** USD / night          VIEW RATES

**Residence Inn Richmond Midtown/Glenside**
5416 Glenside Drive Richmond, Virginia 23228
6.5 miles from destination  |  ●●●●○ 4.7 22 Reviews  |  Category 3
Brand New Extended Stay Hotel off I-64 near Henrico Doctors and St. Mary's Hospitals
View Hotel Details

Residence INN
Why Residence Inn ⌃

From **123** USD / night          VIEW RATES

Exhibit 2 - Isaacson Expert Report                                      Page 14

**Marriott Website at www.marriott.com – Test Version (3 of 6)**
**Search Results**



Exhibit 2 - Isaacson Expert Report                                                    Page 15

**Marriott Website at www.marriott.com – Test Version (4 of 6)**
**Search Results**



**Courtyard Richmond Northwest/Short Pump**
3950 Westerre Parkway Henrico, Virginia 23233
10.5 miles from destination    ●●●●○ 4.4 497 Reviews    Category 2
Spacious rooms, free Wi-Fi and on-site dining near Short Pump Town Center.
View Hotel Details

COURTYARD
Why Courtyard ∧

From **136** USD / night    VIEW RATES

**Residence Inn Richmond Northwest/Short Pump**
3940 Westerre Parkway Henrico, Virginia 23233
10.5 miles from destination    ●●●●○ 4.2 366 Reviews    Category 3
View Hotel Details

Residence INN
Why Residence Inn ∧

From **151** USD / night    VIEW RATES

**Richmond Marriott Short Pump**
4240 Dominion Boulevard Glen Allen, Virginia 23240
11.3 miles from destination    ●●●●○ 4.3 721 Reviews    Category 4
Minutes away from the Short Pump Town Center and easy access to I-64, 95, 295 & 288.
View Hotel Details

MARRIOTT
Why Marriott Hotels ∧

From **158** USD / night    VIEW RATES

**Aloft Richmond West Short Pump**
3939 Duckling Drive Glen Allen, Virginia 23060
11.6 miles from destination    ●●●○○ 3.5 433 Reviews    Category 3
View Hotel Details

aloft
HOTELS
Why Aloft Hotels ∧

From **132** USD / night    VIEW RATES

**Fairfield Inn & Suites Richmond Ashland**
11625 Lakeridge Parkway Ashland, Virginia 23005
12.2 miles from destination    ●●●●● 4.6 399 Reviews    Category 3
Modern hotel with complimentary breakfast and on-site fitness center near Kings Dominion.
View Hotel Details

Fairfield
Why Fairfield by Marriott ∧

From **124** USD / night    VIEW RATES

NEW HOTEL
**SpringHill Suites Richmond Chester**
12301 Redwater Creek Road Chester, Virginia 23831
12.7 miles from destination    Category 2
View Hotel Details

SPRINGHILL
SUITES
Why SpringHill Suites ∧

Opening Soon Jan 2022

**Fairfield Inn Richmond Chester**
12400 Redwater Creek Road Chester, Virginia 23831
12.9 miles from destination    ●●●●○ 41 448 Reviews    Category 2
Newly renovated hotel convenient located off of I-95 8 miles south of Richmond
View Hotel Details

Fairfield
Why Fairfield by Marriott ∧

From **116** USD / night    VIEW RATES

Exhibit 2 - Isaacson Expert Report    Page 16

**Marriott Website at www.marriott.com – Test Version (5 of 6)**
**Search Results**



Exhibit 2 - Isaacson Expert Report                                                                 Page 17

**Marriott Website at www.marriott.com – Test Version (6 of 6)**
**Search Results**





Exhibit 2 - Isaacson Expert Report                                                    Page 18

**Marriott Website at www.marriott.com – Test Version (1 of 1)**
**Popup Ad**



Exhibit 2 - Isaacson Expert Report                                                                Page 19

**Marriott Website at www.marriott.com – Test Version (1 of 4)**
**Landing Page**



## Delta Hotels Richmond Downtown

**Rewards Category 4**    Points needed per night

Experience the Delta Hotels by Marriott Richmond Downtown! Our hotel features rooms with beautiful views of the James River, spacious indoor pool, fitness center, fast free Wi-Fi, microwave & fridge, in-room safe, onsite parking & complimentary downtown shuttle. We are located near many of the city's top businesses, such as Federal Reserve Bank, CoStar, SunTrust, UPS, VA Biotech Park, Dominion Energy & VA Commonwealth University; and are just minutes away from the VA State Capitol, Coliseum and Richmond Convention Center.

Show More



Exhibit 2 - Isaacson Expert Report                                                      Page 20

**Marriott Website at www.marriott.com – Test Version (2 of 4)**
**Landing Page**

## Guest Reviews



●●●● ◐ **4.3 out of 5.0**

Hear from our guests about their stay from **589 confirmed guest reviews**

Cleanliness
●●●●◐ 4.5

Service
●●●●◐ 4.4

---

Earn 75,000 bonus points
Plus 1 Free Night Award every anniversary with the Marriott Bonvoy Boundless™ Card.

**LEARN MORE**

---

## Key Amenities


Fitness center


Pool


Pet friendly


Free high-speed internet



**ALL HOTEL DETAILS**

**ACCESSIBILITY**

---

MARRIOTT **BONV°Y**™     **LET'S GO**     Use your app to check in, unlock doors and make requests.     DOWNLOAD

---

## Highlights

Delta Hotel's guestrooms feature upgraded bedding and towels, in addition to large work spaces designed to enhance productivity.

We're streamlining travel in iconic locations in the U.S. and Canada so that you can maintain your momentum wherever you stay with us.

Our guests also take advantage of premium fitness centers and relax in the evening at our destination bars.

---

**Awards & Accolades**




---

## Guest Rooms



Guest room, 1 King

**CHECK RATES**



Guest room, 2 Double

**CHECK RATES**



Guest room, 1 King, River View

**CHECK RATES**

Exhibit 2 - Isaacson Expert Report                                    Page 21

**Marriott Website at www.marriott.com – Test Version (3 of 4)**
**Landing Page**





Exhibit 2 - Isaacson Expert Report                                                              Page 22

**Marriott Website at www.marriott.com – Test Version (4 of 4)**
**Landing Page**



Exhibit 2 - Isaacson Expert Report                                                                    Page 23

**Marriott Website at www.marriott.com – Control Version (1 of 3)**
**Homepage**



Exhibit 2 - Isaacson Expert Report                                    Page 24

**Marriott Website at www.marriott.com – Control Version (2 of 3)**
**Homepage**





Exhibit 2 - Isaacson Expert Report                                                    Page 25

**Marriott Website at www.marriott.com – Control Version (3 of 3)
Homepage**



**Marriott Bonvoy**

Marriott Bonvoy Overview ›
Member Benefits ›
Earn Points ›
Redeem Points ›
Marriott Bonvoy Credit Card ›
Marriott Insiders ›

**Meetings & Events**

Meetings & Events Overview ›
Business Meetings ›
Weddings ›
Social Events ›
Group Travel ›

**Deals & Packages**

Deals ›
Hotel & Flight Packages ›
Cars, Tours, Activities ›
All-Inclusive Resorts & Vacations ›
Marriott Vacation Club Offers ›
Travel Experiences ›
The Ritz-Carlton Yacht Collection ›
Resorts ›
Marriott Bonvoy Traveler ›



Top Destinations                                                                                               ⌄

For Guests                                                                                                          ⌄

Our Company                                                                                                      ⌄

Follow Us

© 1996 – 2021 Marriott International, Inc. All rights reserved. Marriott Proprietary Information

Tracking Preferences ›  •  Terms of Use ›  •  Program Terms & Conditions ›  •  Privacy Center ›  •  Do Not Sell My Personal Information ›  •  Digital Accessibility ›  •  Site Map ›  •  Help ›                🌐 English

prod8,ACD250C9-0AFE-5DA1-853B-A249ABE61894,rel-R21.41

Exhibit 2 - Isaacson Expert Report                                                    Page 26

**Marriott Website at www.marriott.com – Control Version (1 of 6)**
**Search Results**



Exhibit 2 - Isaacson Expert Report                                                    Page 27

**Marriott Website at www.marriott.com – Control Version (2 of 6)**
**Search Results**



Exhibit 2 - Isaacson Expert Report                                                                 Page 28

**Marriott Website at www.marriott.com – Control Version (3 of 6)**
**Search Results**



Exhibit 2 - Isaacson Expert Report                                                    Page 29

**Marriott Website at www.marriott.com – Control Version (4 of 6)**
**Search Results**



Exhibit 2 - Isaacson Expert Report                                        Page 30

**Marriott Website at www.marriott.com – Control Version (5 of 6)**
**Search Results**



Exhibit 2 - Isaacson Expert Report                                                    Page 31

**Marriott Website at www.marriott.com – Control Version (6 of 6)**
**Search Results**





Exhibit 2 - Isaacson Expert Report                                    Page 32

**Marriott Website at www.marriott.com – Control Version (1 of 1)**
**Popup Ad**



Exhibit 2 - Isaacson Expert Report                                                                 Page 33

**Marriott Website at www.marriott.com – Control Version (1 of 4)**
**Landing Page**





Exhibit 2 - Isaacson Expert Report                                    Page 34

**Marriott Website at www.marriott.com – Control Version (2 of 4)**
**Landing Page**

## Guest Reviews



●●●●◐ **4.3 out of 5.0**

Hear from our guests about their stay from **589 confirmed guest reviews**

Cleanliness
●●●●○ 4.5

Service
●●●●○ 4.4

Earn 75,000 bonus points
Plus 1 Free Night Award every anniversary with the Marriott Bonvoy Boundless™ Card.

**LEARN MORE ⬚**

## Key Amenities


Fitness center


Pool


Pet friendly


Free high-speed internet

**ALL HOTEL DETAILS**

**ACCESSIBILITY**



## Highlights

Alta Hotel's guestrooms feature upgraded bedding and towels, in addition to large work spaces designed to enhance productivity.

We're streamlining travel in iconic locations in the U.S. and Canada so that you can maintain your momentum wherever you stay with us.

Our guests also take advantage of premium fitness centers and relax in the evening at our destination bars.

**Awards & Accolades**




## Guest Rooms



**Guest room, 1 King**

**CHECK RATES**



**Guest room, 2 Double**

**CHECK RATES**



**Guest room, 1 King, River View**

**CHECK RATES**

Exhibit 2 - Isaacson Expert Report                                    Page 35

**Marriott Website at www.marriott.com – Control Version (3 of 4)**
**Landing Page**





Exhibit 2 - Isaacson Expert Report                                        Page 36

**Marriott Website at www.marriott.com – Control Version (4 of 4)**
**Landing Page**



Exhibit 2 - Isaacson Expert Report                                    Page 37

**Expedia Website at www.expedia.com – Test Version (1 of 2)**
**Homepage**



Exhibit 2 - Isaacson Expert Report                                        Page 38

**Expedia Website at www.expedia.com – Test Version (2 of 2)**
**Homepage**



### Explore, discover, and save



Exhibit 2 - Isaacson Expert Report                                                    Page 39

**Expedia Website at www.expedia.com – Test Version (1 of 8)**
**Search Results**



Exhibit 2 - Isaacson Expert Report                                        Page 40

**Expedia Website at www.expedia.com – Test Version (2 of 8)**
**Search Results**



Exhibit 2 - Isaacson Expert Report                                    Page 41

**Expedia Website at www.expedia.com – Test Version (3 of 8)**
**Search Results**



Exhibit 2 - Isaacson Expert Report                                                Page 42

**Expedia Website at www.expedia.com – Test Version (4 of 8)**
**Search Results**



Exhibit 2 - Isaacson Expert Report                                    Page 43

**Expedia Website at www.expedia.com – Test Version (5 of 8)**
**Search Results**



Exhibit 2 - Isaacson Expert Report                                              Page 44

**Expedia Website at www.expedia.com – Test Version (6 of 8)**
**Search Results**



Exhibit 2 - Isaacson Expert Report                                                  Page 45

**Expedia Website at www.expedia.com – Test Version (7 of 8)**
**Search Results**



Exhibit 2 - Isaacson Expert Report                                        Page 46

**Expedia Website at www.expedia.com – Test Version (8 of 8)**
**Search Results**



Exhibit 2 - Isaacson Expert Report                                    Page 47

**Expedia Website at www.expedia.com – Test Version (1 of 7)**
**Landing Page**



Exhibit 2 - Isaacson Expert Report                                    Page 48

**Expedia Website at www.expedia.com – Test Version (2 of 7)**
**Landing Page**



Exhibit 2 - Isaacson Expert Report                                              Page 49

**Expedia Website at www.expedia.com – Test Version (3 of 7)**
**Landing Page**



Exhibit 2 - Isaacson Expert Report                                                Page 50

**Expedia Website at www.expedia.com – Test Version (4 of 7)**
**Landing Page**

### What's nearby

Federal Reserve Bank of Richmond Money Museum - 5 min walk

American Civil War Center at Historic Tredegar - 7 min walk

The National - 9 min walk

Virginia War Memorial - 11 min walk

Virginia State Capitol - 11 min walk

### Getting around

🚌 Richmond Main Street Station - 16 min walk

✈ Richmond Intl. Airport (RIC) - 15 min drive

### ✕ Restaurants

Cafe Ole — 4 min walk

Capital Ale House — 4 min walk

Julep's — 8 min walk

Pasture — 8 min walk

La Grotta Ristorante — 8 min walk

### About this property

**Delta Hotels by Marriott Richmond Downtown**

2 restaurants, an indoor pool, and a fitness center are available at this smoke-free hotel. Free WiFi in public areas and a free area shuttle are also provided. Additionally, a bar/lounge, a coffee shop/café, and a 24-hour business center are onsite. All 298 rooms feature comforts like Select Comfort beds and premium bedding, while conveniences include refrigerators and microwaves. Free WiFi and Netflix are standard, as are Smart TVs with cable channels. Housekeeping is available on request.

### Cleaning and safety practices

**⁺∴ Enhanced cleanliness measures**

Disinfectant is used to clean the property

High-touch surfaces are cleaned and disinfected

Follows standard sanitization guidelines of Commitment to Clean (Marriott)

**⁚👤 Social distancing**

Contactless check-in and check-out

Protective shields in place at main contact areas

Social distancing measures in place

**✓ Safety measures**

Personal protective equipment worn by staff

Masks are required at the property

Hand sanitizer provided

Reservations are required for the use of certain onsite facilities

This information is provided by our partners.

### Property amenities

**🛜 Internet**

Available in all rooms: Free WiFi

Available in some public areas: Free WiFi

**P Parking and transportation**

Self parking on site (USD 15.00 per day; includes in/out privileges)

Valet parking on site (USD 26.00 per day; includes in/out privileges)

Electric car charging station on site

Onsite parking is wheelchair accessible

Free area shuttle up to 2.00 mi

**✕ Food and drink**

Buffet breakfast available for a fee daily 6:30 AM–9:00 AM: USD 16 per person

2 restaurants and 1 coffee shop/café

1 bar

Room service available

**🖳 Things to do**

Fitness center

Indoor pool

**✓ Languages spoken**

English

Polish

Spanish

**💼 Business services**

24-hour business center

Meeting rooms

Conference space (13005 square feet)

**♿ Accessibility**

If you have requests for specific accessibility needs, please contact the property using the information on the reservation confirmation received after booking.

Accessible bathroom

Accessible bathtub

Assistive listening devices available

Braille signage

Grab bar in bathtub

Grab bar near toilet

Height-adjustable showerhead

In-room accessibility

Exhibit 2 - Isaacson Expert Report                                                                                    Page 51

**Expedia Website at www.expedia.com – Test Version (5 of 7)**
**Landing Page**

### Family friendly
Dry cleaning service
Free area shuttle
Free cribs/infant beds
Indoor pool
Laundry facilities
Microwave
Refrigerator

### Conveniences
ATM/banking services
Ballroom
Banquet hall
Elevator
Free newspapers in lobby
Front-desk safe
Gift shop/newsstand

### Guest services
24-hour front desk
Dry cleaning service
Housekeeping (on request)
Laundry facilities
Luggage storage
Multilingual staff
Porter/bellhop

Lever door handles
Low-height door lock
Portable bathtub seat
Roll-in shower
Valet for wheelchair-equipped vehicle
Visual fire alarm
Wheelchair-accessible business center
Wheelchair-accessible fitness center
Wheelchair-accessible parking
Wheelchair-accessible path of travel
Wheelchair-accessible pool
Wheelchair-accessible public washroom
Wheelchair-accessible registration desk
Wheelchair-accessible restaurant
Wheelchair-accessible van parking
Wheelchairs available on site

✓ **More**
Smoke-free property

## Room amenities

### Bedroom
Air conditioning (climate-controlled)
Blackout drapes/curtains
Free cribs/infant beds
Premium bedding
Select Comfort bed

### Bathroom
Free toiletries
Hair dryer
Shower/tub combination

### ✓ Entertainment
32-inch Smart TV
Cable channels
Netflix
Premium channels

### Food and drink
Coffee/tea maker
Free bottled water
Microwave
Refrigerator

✓ **More**
Connecting rooms available
Desk
Free local calls
Iron/ironing board
Laptop-friendly workspace
Phone
Safe

## Policies

### Check-in
Check-in from 4 PM - 2:30 AM
Late check-in subject to availability
Minimum check-in age – 21

### Special check-in instructions
Front desk staff will greet guests on arrival

### Access methods
Staffed front desk

### Pets
Pets allowed for an extra charge of USD 75 per accommodation, per stay, plus a deposit of USD 75 per stay
Up to 50 lbs

### Check-out
Check-out before noon
Express check-out

Exhibit 2 - Isaacson Expert Report                                        Page 52

**Expedia Website at www.expedia.com – Test Version (6 of 7)**
**Landing Page**



**Children and extra beds**

Children are welcome

Rollaway/extra beds are not available

Free cribs (infant beds)

**Property payment types**

## Important information

**Fees**

You'll be asked to pay the following charges at the property:

- Deposit: USD 50.00 per day

We have included all charges provided to us by the property. However, charges can vary, for example, based on length of stay or the room you book.

**Optional extras**

The following fees and deposits are charged by the property at time of service, check-in, or check-out.

- Fee for buffet breakfast: USD 16 per person (approximately)
- Self parking fee: USD 15.00 per day (in/out privileges)
- Valet parking fee: USD 26.00 per day (in/out privileges)
- Pet deposit: USD 75 per stay
- Pet fee: USD 75 per accommodation, per stay
- Service animals are exempt from fees

The above list may not be comprehensive. Fees and deposits may not include tax and are subject to change.

**You need to know**

Extra-person charges may apply and vary depending on property policy

Government-issued photo identification and a credit card, debit card, or cash deposit may be required at check-in for incidental charges

Special requests are subject to availability upon check-in and may incur additional charges; special requests cannot be guaranteed

This property accepts credit cards; cash is not accepted

Please note that cultural norms and guest policies may differ by country and by property; the policies listed are provided by the property

**We should mention**

The property has connecting/adjoining rooms, which are subject to availability and can be requested by contacting the property using the number on the booking confirmation

**4.5** Wonderful
478 reviews

| | |
|---|---|
| 5 - Excellent | 308 |
| 4 - Good | 116 |
| 3 - Okay | 32 |
| 2 - Poor | 12 |
| 1 - Terrible | 10 |

**4.6/5** Cleanliness

**4.6/5** Staff & service

**4.2/5** Amenities

**4.5/5** Property conditions & facilities

**5/5 Excellent**
**Nikki, Richmond Va.**
Traveled with partner
7 Dec 2020

☺ Liked: Cleanliness, staff & service, amenities, property conditions & facilities

I absolutely love the view from my room, very comfy bed. Overall I frequently stay when I need to and I'm never disappointed 😊😊😊😊

Stayed 1 night in Dec 2020

👍 0    🚩 Report review

**4/5 Good**
**Verified traveler**
Traveled with partner
6 Oct 2020

☺ Liked: Cleanliness, staff & service, amenities, property conditions & facilities

It was very nice, overall, would stay there again at the discounted price (~$130 per night). Only complaint was that the bed was too soft. Otherwise, great place.

Stayed 1 night in Oct 2020

👍 0    🚩 Report review

Exhibit 2 - Isaacson Expert Report                    Page 53

**Expedia Website at www.expedia.com – Test Version (7 of 7)**
**Landing Page**



Write a review

### 5/5 Excellent

**Dane**
10 Sep 2020

Liked: Cleanliness, property conditions & facilities, room comfort

**Nice, Clean, Well Position Hotel, Great Experience**

My second stay in the hotel in 6 years. Loved it both times. The King Room on the 12th floor had a beautiful view of the James River, which I requested. Clean hotel, taking care of COVID19 issues, close t historic Cary Street with restaurants and the James River promenade. Would come back again.

Stayed 2 nights in Sep 2020

👍 0    🚩 Report review

### 5/5 Excellent

**Al**
Traveled with family
17 Aug 2020

Liked: Cleanliness, staff & service, property conditions & facilities, room comfort

**Richmond VA**

Seemless. Comfortable. Clean. Would not extend my check by 30 minutes though.

Stayed 1 night in Aug 2020

👍 0    🚩 Report review

### 5/5 Excellent

**Verified traveler**
Business traveler, Traveled with partner, Traveled with pets
9 Aug 2020

Liked: Cleanliness, staff & service, amenities, property conditions & facilities

Very clean, staff is professional. If youre on the river side the view is very nice. If parking there I would keep in mind that parking garage is abnormally short. Clearance of only 6'5". Im from NYC so Im familiar with space being limited, but thats typically space to spread out. Seems odd to build it so low. Other than that I have no complaints about the hotel at all. Was a great stay and Id come back.

Stayed 1 night in Aug 2020

👍 0    🚩 Report review

See all reviews

## Stay in the know with the Expedia app

Get real-time notifications, view your trip details, and access mobile-only deals.

**Text yourself a download link**

| Country code USA +1 | Phone number | Get the app |

By providing your number, you agree to receive a one-time automated text message with a link to get the app. Standard text message rates may apply.

Scan the QR code

**PACK YOUR BAGS, WE'RE OPEN**    VIEW DEALS

About Expedia    Jobs    Investor Relations    Advertising    Newsroom    About Our Ads    Privacy Policy    Terms of Use    Site Map    Accessibility    Support    Do Not Sell My Personal Information

Expedia, Inc. is not responsible for content on external Web sites. © 2020 Expedia, Inc.,
an Expedia Group Company. All rights reserved.

**expedia group**

Exhibit 2 - Isaacson Expert Report                                                    Page 54

**Expedia Website at www.expedia.com – Control Version (1 of 2)**
**Homepage**



Exhibit 2 - Isaacson Expert Report                                                                 Page 55

**Expedia Website at www.expedia.com – Control Version (2 of 2)**
**Homepage**



**Explore, discover, and save**



Live who you are.    *corcoran*
GLOBAL LIVING

**Stay in the know with the Expedia app**
Get real-time notifications, view your trip details, and access mobile-only deals.

**Text yourself a download link**

| Country code USA +1 | Phone number | Get the app |

By providing your number, you agree to receive a one-time automated text message with a link to get the app. Standard text message rates may apply.

Scan the QR code

**Explore a world of travel with Expedia**
See our travel options

About Expedia   Jobs   Investor Relations   Advertising   Newsroom   About Our Ads   Privacy Policy   Terms of Use   Site Map   Accessibility   Support   Do Not Sell My Personal Information

Expedia, Inc. is not responsible for content on external Web sites. © 2020 Expedia, Inc, an Expedia Group Company. All rights reserved.

**expedia group**

Exhibit 2 - Isaacson Expert Report                                          Page 56

**Expedia Website at www.expedia.com – Control Version (1 of 8)**
**Search Results**



Exhibit 2 - Isaacson Expert Report                                    Page 57

**Expedia Website at www.expedia.com – Control Version (2 of 8)**
**Search Results**



Exhibit 2 - Isaacson Expert Report    Page 58

**Expedia Website at www.expedia.com – Control Version (3 of 8)**
**Search Results**



Exhibit 2 - Isaacson Expert Report                                          Page 59

**Expedia Website at www.expedia.com – Control Version (4 of 8)**
**Search Results**



Exhibit 2 - Isaacson Expert Report                                        Page 60

**Expedia Website at www.expedia.com – Control Version (5 of 8)**
**Search Results**



Exhibit 2 - Isaacson Expert Report                                                    Page 61

**Expedia Website at www.expedia.com – Control Version (6 of 8)**
**Search Results**



Exhibit 2 - Isaacson Expert Report                                                Page 62

**Expedia Website at www.expedia.com – Control Version (7 of 8)**
**Search Results**



Exhibit 2 - Isaacson Expert Report                                                Page 63

**Expedia Website at www.expedia.com – Control Version (8 of 8)**
**Search Results**



Exhibit 2 - Isaacson Expert Report                                              Page 64

**Expedia Website at www.expedia.com – Control Version (1 of 7)**
**Landing Page**



Exhibit 2 - Isaacson Expert Report                                                    Page 65

**Expedia Website at www.expedia.com – Control Version (2 of 7)**
**Landing Page**



Exhibit 2 - Isaacson Expert Report                                          Page 66

**Expedia Website at www.expedia.com – Control Version (3 of 7)**
**Landing Page**



Exhibit 2 - Isaacson Expert Report                                    Page 67

**Expedia Website at www.expedia.com – Control Version (4 of 7)**
**Landing Page**

### What's nearby

Federal Reserve Bank of Richmond Money Museum – 5 min walk

American Civil War Center at Historic Tredegar – 7 min walk

The National – 9 min walk

Virginia War Memorial – 11 min walk

Virginia State Capitol – 11 min walk

### Getting around

🚆 Richmond Main Street Station – 16 min walk

✈ Richmond Intl. Airport (RIC) – 15 min drive

### Restaurants

Cafe Ole — 4 min walk

Capital Ale House — 4 min walk

Julep's — 8 min walk

Pasture — 8 min walk

La Grotta Ristorante — 8 min walk

---

## About this property

### Alta Hotels by Marriott Richmond Downtown

2 restaurants, an indoor pool, and a fitness center are available at this smoke-free hotel. Free WiFi in public areas and a free area shuttle are also provided. Additionally, a bar/lounge, a coffee shop/café, and a 24-hour business center are onsite. All 298 rooms feature comforts like Select Comfort beds and premium bedding, while conveniences include refrigerators and microwaves. Free WiFi and Netflix and standard, as are Smart TVs with cable channels. Housekeeping is available on request.

---

## Cleaning and safety practices

### ✛ Enhanced cleanliness measures

Disinfectant is used to clean the property

High-touch surfaces are cleaned and disinfected

Follows standard sanitization guidelines of Commitment to Clean (Marriott)

### ∙👤∙ Social distancing

Contactless check-in and check-out

Protective shields in place at main contact areas

Social distancing measures in place

### ✓ Safety measures

Personal protective equipment worn by staff

Masks are required at the property

Hand sanitizer provided

Reservations are required for the use of certain onsite facilities

This information is provided by our partners.

---

## Property amenities

### 📶 Internet

Available in all rooms: Free WiFi

Available in some public areas: Free WiFi

### P Parking and transportation

Self parking on site (USD 15.00 per day; includes in/out privileges)

Valet parking on site (USD 26.00 per day; includes in/out privileges)

Electric car charging station on site

Onsite parking is wheelchair accessible

Free area shuttle up to 2.00 mi

### 🍴 Food and drink

Buffet breakfast available for a fee daily 6:30 AM-9:00 AM: USD 16 per person

2 restaurants and 1 coffee shop/café

1 bar

Room service available

### 🎫 Things to do

Fitness center

Indoor pool

### ✓ Languages spoken

English

Polish

Spanish

### 💼 Business services

24-hour business center

Meeting rooms

Conference space (13005 square feet)

### ♿ Accessibility

If you have requests for specific accessibility needs, please contact the property using the information on the reservation confirmation received after booking.

Accessible bathroom

Accessible bathtub

Assistive listening devices available

Braille signage

Grab bar in bathtub

Grab bar near toilet

Height-adjustable showerhead

In-room accessibility

Exhibit 2 - Isaacson Expert Report                                    Page 68

**Expedia Website at www.expedia.com – Control Version (5 of 7)**
**Landing Page**



**Family friendly**
- Dry cleaning service
- Free area shuttle
- Free cribs/infant beds
- Indoor pool
- Laundry facilities
- Microwave
- Refrigerator

**Conveniences**
- ATM/banking services
- Ballroom
- Banquet hall
- Elevator
- Free newspapers in lobby
- Front-desk safe
- Gift shop/newsstand

**Guest services**
- 24-hour front desk
- Dry cleaning service
- Housekeeping (on request)
- Laundry facilities
- Luggage storage
- Multilingual staff
- Porter/bellhop

- Lever door handles
- Low-height door lock
- Portable bathtub seat
- Roll-in shower
- Valet for wheelchair-equipped vehicle
- Visual fire alarm
- Wheelchair-accessible business center
- Wheelchair-accessible fitness center
- Wheelchair-accessible parking
- Wheelchair-accessible path of travel
- Wheelchair-accessible pool
- Wheelchair-accessible public washroom
- Wheelchair-accessible registration desk
- Wheelchair-accessible restaurant
- Wheelchair-accessible van parking
- Wheelchairs available on site

✓ **More**
- Smoke-free property

**Room amenities**

**Bedroom**
- Air conditioning (climate-controlled)
- Blackout drapes/curtains
- Free cribs/infant beds
- Premium bedding
- Select Comfort bed

**Bathroom**
- Free toiletries
- Hair dryer
- Shower/tub combination

✓ **Entertainment**
- 32-inch Smart TV
- Cable channels
- Netflix
- Premium channels

**Food and drink**
- Coffee/tea maker
- Free bottled water
- Microwave
- Refrigerator

✓ **More**
- Connecting rooms available
- Desk
- Free local calls
- Iron/ironing board
- Laptop-friendly workspace
- Phone
- Safe

**Policies**

**Check-in**
Check-in from 4 PM – 2:30 AM
Late check-in subject to availability
Minimum check-in age – 21

**Special check-in instructions**
Front desk staff will greet guests on arrival

**Access methods**
Staffed front desk

**Pets**
Pets allowed for an extra charge of USD 75 per accommodation, per stay, plus a deposit of USD 75 per stay
Up to 50 lbs

**Check-out**
Check-out before noon
Express check-out

Exhibit 2 - Isaacson Expert Report                                      Page 69

**Expedia Website at www.expedia.com – Control Version (6 of 7)**
**Landing Page**

**Children and extra beds**

Children are welcome

Rollaway/extra beds are not available

Free cribs (infant beds)

**Property payment types**

**Important information**

**Fees**

You'll be asked to pay the following charges at the property:

· Deposit: USD 50.00 per day

We have included all charges provided to us by the property. However, charges can vary, for example, based on length of stay or the room you book.

**Optional extras**

The following fees and deposits are charged by the property at time of service, check-in, or check-out.

· Fee for buffet breakfast: USD 16 per person (approximately)

· Self parking fee: USD 15.00 per day (in/out privileges)

· Valet parking fee: USD 26.00 per day (in/out privileges)

· Pet deposit: USD 75 per stay

· Pet fee: USD 75 per accommodation, per stay

· Service animals are exempt from fees

The above list may not be comprehensive. Fees and deposits may not include tax and are subject to change.

**You need to know**

Extra-person charges may apply and vary depending on property policy

Government-issued photo identification and a credit card, debit card, or cash deposit may be required at check-in for incidental charges

Special requests are subject to availability upon check-in and may incur additional charges; special requests cannot be guaranteed

This property accepts credit cards; cash is not accepted

Please note that cultural norms and guest policies may differ by country and by property; the policies listed are provided by the property

**We should mention**

The property has connecting/adjoining rooms, which are subject to availability and can be requested by contacting the property using the number on the booking confirmation

**4.5**   **Wonderful**
478 reviews

| | |
|---|---|
| 5 - Excellent | 308 |
| 4 - Good | 116 |
| 3 - Okay | 32 |
| 2 - Poor | 12 |
| 1 - Terrible | 10 |

**4.6/5**   **4.6/5**
Cleanliness   Staff & service

**4.2/5**   **4.5/5**
Amenities   Property conditions & facilities

**5/5 Excellent**

**Nikki, Richmond Va.**
Traveled with partner
7 Dec 2020

☺ Liked: Cleanliness, staff & service, amenities, property conditions & facilities

I absolutely love the view from my room, very comfy bed. Overall I frequently stay when I need to and I'm never disappointed 👍😊😊😊
Stayed 1 night in Dec 2020

👍 0   🚩 Report review

**4/5 Good**

**Verified traveler**
Traveled with partner
6 Oct 2020

☺ Liked: Cleanliness, staff & service, amenities, property conditions & facilities

It was very nice, overall, would stay there again at the discounted price (~$130 per night). Only complaint was that the bed was too soft. Otherwise, great place.
Stayed 1 night in Oct 2020

👍 0   🚩 Report review

Exhibit 2 - Isaacson Expert Report    Page 70

**Expedia Website at www.expedia.com – Control Version (7 of 7)**
**Landing Page**



Write a review

**5/5 Excellent**

Dane
10 Sep 2020

☺ Liked: Cleanliness, property conditions & facilities, room comfort

**Nice, Clean, Well Position Hotel, Great Experience**

My second stay in the hotel in 6 years. Loved it both times. The King Room on the 12th floor had a beautiful view of the James River, which I requested. Clean hotel, taking care of COVID19 issues, close t historic Cary Street with restaurants and the James River promenade. Would come back again.

Stayed 2 nights in Sep 2020

👍 0    🚩 Report review

**5/5 Excellent**

Al
Traveled with family
17 Aug 2020

☺ Liked: Cleanliness, staff & service, property conditions & facilities, room comfort

**Richmond VA**

Seemless. Comfortable. Clean. Would not extend my check by 30 minutes though.

Stayed 1 night in Aug 2020

👍 0    🚩 Report review

**5/5 Excellent**

Verified traveler
Business traveler, Traveled with partner, Traveled with pets
9 Aug 2020

☺ Liked: Cleanliness, staff & service, amenities, property conditions & facilities

Very clean, staff is professional. If youre on the river side the view is very nice. If parking there I would keep in mind that parking garage is abnormally short. Clearance of only 6'5". Im from NYC so Im familiar with space being limited, but thats typically space to spread out. Seems odd to build it so low. Other than that I have no complaints about the hotel at all. Was a great stay and Id come back.

Stayed 1 night in Aug 2020

👍 0    🚩 Report review

See all reviews

**Stay in the know with the Expedia app**

Get real-time notifications, view your trip details, and access mobile-only deals.

**Text yourself a download link**

| Country code USA +1 | Phone number | Get the app |

Scan the QR code

By providing your number, you agree to receive a one-time automated text message with a link to get the app. Standard text message rates may apply.

PACK YOUR BAGS, WE'RE OPEN    VIEW DEALS

About Expedia    Jobs    Investor Relations    Advertising    Newsroom    About Our Ads    Privacy Policy    Terms of Use    Site Map    Accessibility    Support    Do Not Sell My Personal Information

Expedia, Inc. is not responsible for content on external Web sites. © 2020 Expedia, Inc.,
an Expedia Group Company. All rights reserved.

expedia group

Exhibit 2 - Isaacson Expert Report    Page 71

**Exhibit 3:**
**Survey Qualifying Questions and Main Questionnaire**

MMR Strategy Group
Study #585-004
September 2021

**Survey**

**[DO NOT PRE-SCREEN OR TARGET, EXCEPT TO MEET DEMOGRAPHIC QUOTAS.]**
**[DO NOT ALLOW RESPONDENTS TO GO BACK TO ANY PRIOR QUESTION.]**
**[RANDOMLY ASSIGN YES/NO ORDER.]**
**[RANDOMLY ASSIGN REVERSE ORDER.]**

<u>**Qualifying Questions**</u>

Thank you for agreeing to participate in our survey.  If you need eyeglasses or contact lenses to see the screen clearly, please wear them to complete the survey.  Please answer every question honestly and to the best of your ability.  There are no right or wrong answers; we are only interested in your opinions.

On any question, if you don't know how to answer, it is all right to indicate that you don't know or you are not sure.  Please do not guess and please do not consult any other person or source, such as the Internet, while you take this survey.

Once you start the survey, please complete it in one session without interruption.  Also, please do not use your browser's Back button to try to return to a prior question, as this will terminate the survey.

A.      What is your gender?  **(SELECT ONE RESPONSE)**

        Female
        Male
        Prefer not to answer

**[IF "PREFER NOT TO ANSWER" OR QUOTA FILLED, TERMINATE AND SKIP TO Q.100.  IF RESPONSE DOES NOT MATCH PANEL DATA, COUNT AS "GENDER MISMATCH," TERMINATE AND SKIP TO Q.100. OTHERWISE, CONTINUE.]**

B.      What is your age?  **(SELECT ONE RESPONSE)**

        20 years old or younger
        21 to 34 years old
        35 to 54 years old
        55 years old or older
        Prefer not to answer

**[IF "20 YEARS OLD OR YOUNGER," "PREFER NOT TO ANSWER," OR QUOTA FILLED, TERMINATE AND SKIP TO Q.100.  IF RESPONSE DOES NOT MATCH PANEL DATA, COUNT AS "AGE MISMATCH," TERMINATE AND SKIP TO Q.100.  OTHERWISE, CONTINUE.]**

Exhibit 3 - Isaacson Expert Report                                                                                    Page 1

C.      Please enter the ZIP code of your home address.

[_____]
**[FORCE 5-DIGIT NUMERIC RESPONSE]**

**[ASSIGN ZIP CODE TO REGION.  IF QUOTA FILLED, TERMINATE AND SKIP TO Q.100.  OTHERWISE, CONTINUE.]**


D.      This question asks about certain activities.  Due to the COVID-19 pandemic, some of these activities **[MATCH ASSIGNED YES/NO ORDER: may or may not; may not or may]** be available, or you **[MATCH ASSIGNED YES/NO ORDER: may or may not; may not or may]** do them now. Please answer thinking about your likelihood to do these activities in the next 12 months.

Which, if any, of the following activities are you likely to do in the next 12 months?  For each activity, please answer **[MATCH ASSIGNED YES/NO ORDER: yes, no,]** or you don't know. **(SELECT ONE RESPONSE FOR EACH ACTIVITY)**

<u>RESPONSES</u>
**[MATCH ASSIGNED YES/NO ORDER.  ANCHOR "I DON'T KNOW" LAST.]**
Yes, I <u>am</u> likely to do this in the next 12 months
No, I <u>am not</u> likely to do this in the next 12 months
I don't know

<u>ACTIVITIES</u>
**[RANDOMIZE.]**
Make a hotel room reservation
Make a rental car reservation
Make a restaurant reservation
Make an appointment for eye care
Make an appointment for auto service

**[IF "YES" TO "MAKE A HOTEL ROOM RESERVATION," CONTINUE.  OTHERWISE, TERMINATE AND SKIP TO Q.100.]**

Exhibit 3 - Isaacson Expert Report                                                                              Page 2

E.      In the next 12 months, if you were going to make a reservation for a hotel room, would you be likely to make a reservation for a room in any of these price ranges?  Please answer thinking about the price before taxes and fees.  For each price range, please answer **[MATCH ASSIGNED YES/NO ORDER:** yes, no**,]** or you don't know.  **(SELECT ONE RESPONSE FOR EACH PRICE RANGE)**

In the next 12 months, if you were going to make a reservation for a hotel room …

**RESPONSES**
**[MATCH ASSIGNED YES/NO ORDER.  ANCHOR "I DON'T KNOW" LAST.]**
Yes, I <u>would</u> be likely to make a reservation for a hotel room in this price range
No, I <u>would not</u> be likely to make a reservation for a hotel room in this price range
I don't know

**[REVERSE ORDER.]**
Less than $100 per night
$100 to $250 per night
More than $250 per night

**[IF "YES" TO "$100 to $250," CONTINUE.  OTHERWISE, TERMINATE AND SKIP TO Q.100.]**


F.      In the next 12 months, if you were going to make a reservation for a hotel room, which, if any, of the following methods would you be likely to use to make the reservation?  For each method, please answer **[MATCH ASSIGNED YES/NO ORDER:** yes, no**,]** or you don't know.  **(SELECT ONE RESPONSE FOR EACH METHOD)**

In the next 12 months, if you were going to make a reservation for a hotel room …

**RESPONSES**
**[MATCH ASSIGNED YES/NO ORDER.  ANCHOR "I DON'T KNOW" LAST.]**
Yes, I <u>would</u> be likely to use this method to make a reservation for a hotel room
No, I <u>would not</u> be likely to use this method to make a reservation for a hotel room
I don't know

**METHODS**
**[RANDOMIZE.]**
Visit the website of a hotel
Visit a travel website
Visit the website of an online search engine
Call a hotel on the phone
Call a travel agent on the phone

**[IF "YES" TO "WEBSITE OF A HOTEL" AND/OR "TRAVEL WEBSITE," CONTINUE.  OTHERWISE, TERMINATE AND SKIP TO Q.100.]**

Exhibit 3 - Isaacson Expert Report                                                                                      Page 3

G.      How many surveys relating to hotels have you completed in the past 30 days?  **(SELECT ONE RESPONSE)**

**[MATCH ASSIGNED REVERSE ORDER. ANCHOR "I DON'T KNOW" LAST.]**
None
1 to 2
3 or more
I don't know

**[IF "NONE," CONTINUE.  OTHERWISE, TERMINATE AND SKIP TO Q.100.]**


H.      For quality control purposes, please select the number 7 from the list below.  **(SELECT ONE RESPONSE)**

1
3
5
7
9

**[IF "7," CONTINUE.  OTHERWISE, TERMINATE AND SKIP TO Q.100.]**


I.      Please indicate the type of device you are using to take this survey.  **(SELECT ONE RESPONSE)**

**[RANDOMIZE ORDER.  ANCHOR "OTHER" AND "I DON'T KNOW" LAST.]**
Desktop computer
Laptop computer
Tablet
Smartphone
Some other type of device not listed above
I don't know

**[IF "SMARTPHONE," "OTHER," OR "I DON'T KNOW," TERMINATE AND SKIP TO Q.100.  OTHERWISE, CONTINUE.]**

Exhibit 3 - Isaacson Expert Report                                                    Page 4

J.    Do you usually wear eyeglasses or contact lenses when you use a **[PIPE-IN DEVICE TYPE FROM Q.I; DO NOT BOLD OR CAPITALIZE]**?  **(SELECT ONE RESPONSE)**

<u>RESPONSES</u>
**[MATCH ASSIGNED YES/NO ORDER.]**
Yes, I <u>do</u> usually wear eyeglasses or contact lenses when I use a **[PIPE-IN DEVICE FROM Q.I.  DO NOT BOLD OR CAPITALIZE DEVICE.]**
No, I <u>do not</u> usually wear eyeglasses or contact lenses when I use a **[PIPE-IN DEVICE FROM Q.I. DO NOT BOLD OR CAPITALIZE DEVICE.]**

**[IF "NO," SKIP TO CELL ASSIGNMENT.  OTHERWISE, CONTINUE.]**


K.    Are you wearing your eyeglasses or contact lenses right now?  **(SELECT ONE RESPONSE)**

<u>RESPONSES</u>
**[MATCH ASSIGNED YES/NO ORDER.]**
Yes
No

**[IF "YES," SKIP TO CELL ASSIGNMENT.  OTHERWISE, CONTINUE.]**


L.    Please put on your eyeglasses or contact lenses to complete the remainder of the survey.  Are you wearing your eyeglasses or contact lenses right now?  **(SELECT ONE RESPONSE)**

<u>RESPONSES</u>
**[MATCH ASSIGNED YES/NO ORDER.]**
Yes, I <u>am</u> wearing my eyeglasses or contact lenses
No, I <u>am not</u> wearing my eyeglasses or contact lenses

**[IF "YES," CONTINUE.  OTHERWISE, TERMINATE AND SKIP TO Q.100.]**


**[CELL ASSIGNMENT:**
- **IF "YES" TO "WEBSITE OF A HOTEL" IN Q.F, QUALIFIES FOR CELLS 1, 2, 5, OR 6.**
- **IF "YES" TO "TRAVEL WEBSITE" IN Q.F, QUALIFIES FOR CELLS 3 OR 4.**
- **ASSIGN TO LEAST FULL QUALIFIED CELL.]**

Exhibit 3 - Isaacson Expert Report                                                                Page 5

**Main Questionnaire**

M.    **[IF CELLS 1 OR 2 SHOW:]**
The image below shows a hotel webpage.  Because this is an image, any links in the page are not active.

Please look at the webpage as you normally would if you were visiting it to make a reservation for a hotel room.  You may need to scroll to see all of it.  The "Next" button will appear below the webpage after a brief pause.

**[IF CELLS 3 OR 4 SHOW:]**
The image below shows a travel webpage.  Because this is an image, any links in the page are not active.

Please look at the webpage as you normally would if you were visiting it to make a reservation for a hotel room in Richmond, Virginia.  You may need to scroll to see all of it.  The "Next" button will appear below the webpage after a brief pause.

**[IF CELLS 5 OR 6 SHOW:]**
The image below shows a webpage from a hotel company.  Because this is an image, any links in the page are not active.

Please look at the webpage as you normally would if you were visiting it to make a reservation for a hotel room in Richmond, Virginia.  You may need to scroll to see all of it.  The "Next" button will appear below the webpage after a brief pause.


**[SHOW ASSIGNED IMAGE:**
- **CELL 1: 101**
- **CELL 2: 201**
- **CELL 3: 301**
- **CELL 4: 401**
- **CELL 5: 501**
- **CELL 6: 601]**

**[PLACE "Next" BUTTON BELOW THE IMAGE AFTER A 10-SECOND PAUSE.]**


**[IF CELLS 3, 4, 5, OR 6, CONTINUE. OTHERWISE, SKIP TO Q.Q.]**

Exhibit 3 - Isaacson Expert Report                                                                Page 6

N.       **[IF CELLS 3, 4, 5, or 6 SHOW:]**
         Now, please imagine that your search generated the search results that are shown in the image below.  Because this is an image, any links in the search results are not active.

         Please look at the search results as you normally would if you were searching for a hotel to make a reservation.  You may need to scroll to see all of it.  The "Next" button will appear below the search results after a brief pause.

         **[SHOW ASSIGNED IMAGE:**
         ▪  **CELL 3: 302**
         ▪  **CELL 4: 402**
         ▪  **CELL 5: 502**
         ▪  **CELL 6: 602]**

         **[PLACE "Next" BUTTON BELOW THE IMAGE AFTER A 10-SECOND PAUSE.]**


O.       **[IF CELLS 3, 4, 5, OR 6 SHOW:]**
         Now, please imagine that you clicked on one of the listings in the search results and it took you to the webpage shown below.  Because this is an image, any links in the webpage are not active.

         Please look at the webpage as you normally would if you were visiting it to make a reservation for a hotel room.  You may need to scroll to see all of it.  The "Next" button will appear below the webpage after a brief pause.

         **[SHOW ASSIGNED IMAGE:**
         ▪  **CELL 3: 303**
         ▪  **CELL 4: 403**
         ▪  **CELL 5: 503**
         ▪  **CELL 6: 603]**

         **[PLACE "Next" BUTTON BELOW THE IMAGE AFTER A 10-SECOND PAUSE.]**


**[IF CELLS 5 OR 6, CONTINUE. OTHERWISE, SKIP TO Q.Q.]**

Exhibit 3 - Isaacson Expert Report                                                                    Page 7

P.    **[IF CELLS 5 OR 6 SHOW:]**
Now, please imagine that you clicked "View Hotel Website" on the previous webpage and it took you to the webpage shown below.  Because this is an image, any links in the webpage are not active.

Please look at the webpage as you normally would if you were visiting it to make a reservation for a hotel room.  You may need to scroll to see all of it.  The "Next" button will appear below the webpage after a brief pause.

**[SHOW ASSIGNED IMAGE:**
- **CELL 5: 504**
- **CELL 6: 604]**

**[PLACE "**Next**" BUTTON BELOW THE IMAGE AFTER A 10-SECOND PAUSE.]**


Q.    Did you see **[IF CELL 1 OR 2:** the webpage**; IF CELLS 3, 4, 5, OR 6:** all of the webpages**]** clearly?  **(SELECT ONE RESPONSE)**

**RESPONSES**
**[MATCH ASSIGNED YES/NO ORDER.]**
Yes, I <u>did</u> see **[IF CELL 1, OR 2:** the webpage**; IF CELLS 3, 4, 5, OR 6:** all of the webpages**]** clearly
No, I <u>did not</u> see **[IF CELL 1, OR 2:** the webpage**; IF CELLS 3, 4, 5, OR 6:** all of the webpages**]** clearly
I don't know

**[IF "YES," CONTINUE.  OTHERWISE, TERMINATE AND SKIP TO Q.100.]**


R.    Now you will be asked a few questions about the **[IF CELLS 3, 4, 5, OR 6:** last**]** webpage you just viewed.  The webpage will stay on screen in a smaller size for the next few questions, and you can click or tap on it to see it larger.

As before, please do not guess.  If you do not know the answer to a question, please indicate that you do not know.

**[FOR QUESTIONS 1 THROUGH 10, SHOW ASSIGNED IMAGE AT THE TOP OF THE SCREEN. DISPLAY THE IMAGE IN SMALLER SIZE WITH "**Click or tap on the image if you wish to enlarge it.**" BELOW THE IMAGE.  IF CLICKED, OPEN THE IMAGE TO THE SIZE ORIGINALLY DISPLAYED.]**

**[SHOW ASSIGNED IMAGE:**
- **CELL 1: 101**
- **CELL 2: 201**
- **CELL 3: 303**
- **CELL 4: 403**
- **CELL 5: 504**
- **CELL 6: 604]**

Exhibit 3 - Isaacson Expert Report                                              Page 8

1.  What company do you believe owns or operates the hotel you just viewed?  If you don't know, please select the box labeled "I don't know."

    ┌─────────────────────────────────────────────────────────────────────┐
    │                                                                     │
    │                                                                     │
    │                                                                     │
    └─────────────────────────────────────────────────────────────────────┘

    ❑  I don't know.  **[EXCLUSIVE]**

    **[RESPONDENT MUST PROVIDE A VERBATIM OR CHECK THE BOX FOR "I DON'T KNOW."  OTHERWISE, PROVIDE THIS MESSAGE,** "You must provide an answer or check the box labeled 'I don't know.'"**]**

    **[IF "I DON'T KNOW" IS SELECTED, SKIP TO Q.3. OTHERWISE, CONTINUE.]**

2.  What makes you think that?  Please be as specific as possible.  If you don't know, please select the box labeled "I don't know."

    ┌─────────────────────────────────────────────────────────────────────┐
    │                                                                     │
    │                                                                     │
    │                                                                     │
    └─────────────────────────────────────────────────────────────────────┘

    ❑  I don't know.  **[EXCLUSIVE]**

    **[IF ASKED, RESPONDENT MUST PROVIDE A VERBATIM OR CHECK THE BOX FOR "I DON'T KNOW."  OTHERWISE, PROVIDE THIS MESSAGE,** "You must provide an answer or check the box labeled 'I don't know.'"**]**

Exhibit 3 - Isaacson Expert Report                                                                    Page 9

3.    Are you aware of any other products or services offered by the company that owns or operates the hotel you just viewed?  Please answer **[MATCH ASSIGNED YES/NO ORDER:** yes, no,**]** or you don't know.  **(SELECT ONE RESPONSE)**

**[MATCH ASSIGNED YES/NO ORDER.  ANCHOR "I DON'T KNOW" LAST.]**
Yes, I <u>am</u> aware of other products or services offered by the company that owns or operates the hotel I just viewed

No, I <u>am not</u> aware of other products or services offered by the company that owns or operates the hotel I just viewed

I don't know

**[IF "YES," CONTINUE.  OTHERWISE, SKIP TO Q.6.]**

4.    What other products or services do you think are offered by the company that owns or operates the hotel you just viewed?  If you don't know, please select the box labeled "I don't know."

❑  I don't know.  **[EXCLUSIVE]**

**[IF ASKED, RESPONDENT MUST PROVIDE A VERBATIM OR CHECK THE BOX FOR "I DON'T KNOW." OTHERWISE, PROVIDE THIS MESSAGE,** "You must provide an answer or check the box labeled 'I don't know.'"**]**

**[IF "I DON'T KNOW" IS SELECTED, SKIP TO Q.6. OTHERWISE, CONTINUE.]**

5.    What makes you think that?  Please be as specific as possible.  If you don't know, please select the box labeled "I don't know."

❑  I don't know.  **[EXCLUSIVE]**

**[IF ASKED, RESPONDENT MUST PROVIDE A VERBATIM OR CHECK THE BOX FOR "I DON'T KNOW." OTHERWISE, PROVIDE THIS MESSAGE,** "You must provide an answer or check the box labeled 'I don't know.'"**]**

Exhibit 3 - Isaacson Expert Report                                                                    Page 10

6.      Do you think that the company that owns or operates the hotel you just viewed… **(SELECT ONE RESPONSE)**

**RESPONSES**
**[MATCH ASSIGNED YES/NO ORDER.  ANCHOR "I DON'T KNOW" LAST.]**
<u>Is</u> connected or affiliated with another company,
<u>Is not</u> connected or affiliated with another company,
Or, you don't know

**[IF "IS CONNECTED OR AFFILIATED," CONTINUE.  OTHERWISE, SKIP TO INSTRUCTION BEFORE Q.9.]**

7.      What other company do you think is connected or affiliated with the company that owns or operates the hotel you just viewed?  If you don't know, please select the box labeled "I don't know."

|  |
|--|
|  |

☐  I don't know.  **[EXCLUSIVE]**

**[IF ASKED, RESPONDENT MUST PROVIDE A VERBATIM OR CHECK THE BOX FOR "I DON'T KNOW." OTHERWISE, PROVIDE THIS MESSAGE,** "You must provide an answer or check the box labeled 'I don't know.'"**]**

**[IF "I DON'T KNOW" IS SELECTED, SKIP TO Q.9. OTHERWISE, CONTINUE.]**

8.      What makes you think that?  Please be as specific as possible.  If you don't know, please select the box labeled "I don't know."

|  |
|--|
|  |

☐  I don't know.  **[EXCLUSIVE]**

**[IF ASKED, RESPONDENT MUST PROVIDE A VERBATIM OR CHECK THE BOX FOR "I DON'T KNOW." OTHERWISE, PROVIDE THIS MESSAGE,** "You must provide an answer or check the box labeled 'I don't know.'"**]**

Exhibit 3 - Isaacson Expert Report                                                                    Page 11

**[CREATE HIDDEN VARIABLE "DELTA UNSPECIFIED FLAG A". SCAN Q.1, Q.2, Q.4, Q.5, Q.7, AND Q.8. ASSIGN "DELTA UNSPECIFIED FLAG A" A VALUE OF 1 IF THE RESPONSE TO ANY OF THESE QUESTIONS INCLUDES "DELTA" AND DOES NOT INCLUDE ANY OF THE FOLLOWING KEYWORDS: "HOTEL," "LODGING," "MOTEL," "MARRIOTT," "MARIOT," "MARRIOT," "MARIOTT," "INN," "BONVOY," "PLANE," "FLIGHT," "JET," "AEROPLANE," "SKYMILE" "SKY MILE" AND ANY VARIATION OF "AIR." OTHERWISE, DELTA UNSPECIFIED FLAG = 0.]**

**[IF DELTA UNSPECIFIED FLAG A= 1, CONTINUE. OTHERWISE, SKIP TO INSTRUCTION BEFORE Q.11.]**

9.      Even if you have already mentioned it, what products or services are offered by the "Delta" you mentioned earlier?  If you don't know, please select the box labeled "I don't know."

[    ]

❑ I don't know.  **[EXCLUSIVE]**

**[IF ASKED, RESPONDENT MUST PROVIDE A VERBATIM OR CHECK THE BOX FOR "I DON'T KNOW." OTHERWISE, PROVIDE THIS MESSAGE,** "You must provide an answer or check the box labeled 'I don't know.'"**]**

**[IF DON'T KNOW IS CHECKED IN Q.9, SKIP TO INSTRUCTION BEFORE Q.11. OTHERWISE, CONTINUE.]**

**[CREATE HIDDEN VARIABLE "DELTA UNSPECIFIED FLAG B." SCAN Q.9. DELTA UNSPECIFIED FLAG B = 1 IF Q.9 DOES NOT INCLUDE ANY OF THE FOLLOWING KEYWORDS: "HOTEL," "LODGING," "MOTEL," "MARRIOTT," "MARIOT," "MARRIOT," "MARIOTT," "INN," "BONVOY," "PLANE," "FLIGHT," "JET," "AEROPLANE," "SKYMILE" "SKY MILE" AND ANY VARIATION OF "AIR."  OTHERWISE, DELTA UNSPECIFIED FLAG B = 0.]**

**[IF DELTA UNSPECIFIED FLAG B= 1, CONTINUE. OTHERWISE, SKIP TO INSTRUCTION BEFORE Q.11.]**

10.     Is there anything else you can tell us about the products or services that are offered by the "Delta" you mentioned?  If you don't know, please select the box labeled "I don't know."

[    ]

❑ I don't know.  **[EXCLUSIVE]**

**[IF ASKED, RESPONDENT MUST PROVIDE A VERBATIM OR CHECK THE BOX FOR "I DON'T KNOW." OTHERWISE, PROVIDE THIS MESSAGE,** "You must provide an answer or check the box labeled 'I don't know.'"**]**

Exhibit 3 - Isaacson Expert Report                                                                              Page 12

**[IF CELLS 3, 4, 5, OR 6 CONTINUE. OTHERWISE, SKIP TO Q.12]**

11.     In the next 12 months, if you were going to make a reservation for a hotel room, would you be likely to visit **[IF CELLS 3, OR 4:** expedia.com; **IF CELLS 5 OR 6:** marriott.com**]**?  Please answer **[MATCH ASSIGNED YES/NO ORDER:  yes, no,]** or you don't know.  **(SELECT ONE RESPONSE)**

In the next 12 months, if you were going to make a reservation for a hotel room…

<u>**RESPONSES**</u>
**[MATCH ASSIGNED YES/NO ORDER.]**
Yes, I <u>would</u> be likely to visit **[IF CELLS 3 OR 4:** expedia.com; **IF CELLS 5 OR 6:** marriott.com**]** to make a reservation for a hotel room
No, I <u>would not</u> be likely to visit **[IF CELLS 3 OR 4:** expedia.com; **IF CELLS 5 OR 6:** marriott.com**]** to make a reservation for a hotel room
I don't know

12.     Do you or does any member of your household work for any of these types of companies or organizations?  For each type of company or organization, please answer **[MATCH ASSIGNED YES/NO ORDER**: yes, no,**]** or you don't know.  **(SELECT ONE RESPONSE FOR EACH TYPE OF COMPANY OR ORGANIZATION)**

<u>**RESPONSES**</u>
**[MATCH ASSIGNED YES/NO ORDER.  ANCHOR "I DON'T KNOW" LAST.]**
Yes, <u>someone</u> in my household works for this type of company or organization
No, <u>no one</u> in my household works for this type of company or organization
I don't know

<u>**TYPES OF COMPANIES OR ORGANIZATIONS**</u>
**[RANDOMIZE.]**
An advertising or public relations agency
A marketing research company
A company that owns or operates a hotel
A company that owns or operates an airline
A company that owns or operates a travel website
A travel agency

13.     Please re-enter the ZIP code of your home address.

[_____]
**[FORCE 5-DIGIT NUMERIC RESPONSE]**

**[IF ZIP CODE DOES NOT MATCH Q.C, CONTINUE.  OTHERWISE, SKIP TO Q.15.]**

Exhibit 3 - Isaacson Expert Report                                                                                    Page 13

14.     To verify, please re-enter the ZIP code of your home address.

[_____]
**[FORCE 5-DIGIT NUMERIC RESPONSE]**

**[IF ZIP CODE MATCHES Q.C, CONTINUE.  OTHERWISE, TERMINATE AND SKIP TO Q 100.]**


15.     Please read the statement that follows and click or tap either "I agree" or "I disagree."  If any portion of the statement is not true, please click or tap "I disagree."

**STATEMENT**
I am the person who was invited to participate in this survey.  I completed this survey myself, without assistance or advice from any other person or source, and in accordance with the instructions provided in the survey.  The answers I have provided are truthful expressions of my situation and opinions.

|  |  |
|:---:|:---:|
| **I agree** | **I disagree** |

Your response to the above statement will not affect your rewards for completing the survey.


**[IF "I DISAGREE," COUNT RESPONDENT AS TERMINATED.  DO NOT COUNT AS A COMPLETED INTERVIEW AND DO NOT COUNT TOWARD QUOTAS.  REGARDLESS OF ANSWER, CONTINUE AND REWARD RESPONDENT FOR COMPLETION.  DISPLAY Q.16, DO NOT DISPLAY Q.100.]**


16.     Thank you for completing our survey.


**[IF TERMINATED, SHOW Q.100.]**

Q.100.  Thank you for your interest in this survey.  However, we are looking for individuals with specific qualifications.

Exhibit 3 - Isaacson Expert Report                                                    Page 14

**Exhibit 4:**
**Recruiting Methods and Panel Description for the Survey**

**Recruiting Methods and Panel Description for the Survey**

This Exhibit provides information about recruiting methods for the survey, as well as the panel used to locate prospective survey respondents.[1]

Survey respondents were recruited from a panel operated by a company called Dynata.[2] Dynata's panel includes millions of consumers globally who have enrolled to become prospective survey respondents from time to time. Panel members are recruited from a wide variety of sources, and the panel can represent the general population of the United States according to demographics such as gender, age, geography, and other variables.

Dynata uses a variety of quality control methods to confirm that respondents are real consumers, and to encourage honest responses in surveys. The following are examples of their quality control methods:

i.    <u>Digital Fingerprinting</u>: Digital fingerprinting records information from the devices that panel members use to complete a survey, to identify attempts to take a survey more than once from a single device.

ii.   <u>Third-Party Verification</u>: Third-party identity verification matches information from panel members to information available from other sources, which might include other websites (such as LinkedIn), the U.S. Postal Service (for address information), or other third-party information sources.

---

[1] Information regarding Dynata, its panel, and its quality control methods is based on information from the company as well as the panel book included in this exhibit.

[2] Prior to 2019, Dynata was known as Research Now SSI.

Exhibit 4 - Isaacson Expert Report                                                    Page 1

iii.   <u>Response Time Checks</u>: Response time checks look for respondents who complete a survey in an unusual amount of time.  Respondents who finish a survey suspiciously quickly are removed from the survey.  Respondents identified in this manner in a number of surveys can be eliminated from the panel.

iv.   <u>Panel Profile Checks</u>: Panel companies maintain a database with certain information about a panel member, such as demographics, or other information.  Respondents identified as providing responses inconsistent with this information in a number of surveys can be eliminated from the panel.

Dynata recruited panel members either with an email invitation or through the panel's survey dashboard or portal.  The sponsor and subject of the survey were not disclosed, so respondents remained blind as to the purpose and sponsor of the survey.  All prospective respondents answered the same qualification questions and passed through the same qualification procedures.

As described in the main body of the report, prospective respondents were qualified by answering qualifying questions in the survey.  Prospective respondents were not asked any pre-screening questions, and were not targeted based on pre-existing profile information, other than demographic characteristics (gender, age, and geography) for quota purposes.  For example, respondents who had a home address located outside of the United States were not invited into the survey.

The remainder of this exhibit provides additional information about Dynata from selected pages of their "panel book," which provides information relating to topics such as their panel, recruiting methods, and quality control procedures.

Exhibit 4 - Isaacson Expert Report                                                                                    Page 2





# THE NEW DYNAMICS OF THE INSIGHTS AND MARKETING INDUSTRY

Consumers are smarter and more empowered than ever. They are willing to share their opinions, but expect something in return: more control, better personalization, with impenetrable privacy and security.

Brands need to understand their customers holistically to deliver the right message at the right time.

At the same time, privacy and security regulations continue to increase, challenging your ability to make the most of data-driven opportunities. In a post-cookie world, first-party data has never been more critical to ensure you can deliver value at every step of the marketing journey at the speed of your business.

# YOUR CHALLENGES AND OPPORTUNITIES HAVE NEVER BEEN MORE COMPLEX

Industry dynamics demand a new blueprint for market expansion. Businesses must think differently to find ways to grow revenue, accelerate insights to market, streamline operations and stretch their budgets further.

## BUSINESS NEEDS


Support business transformation


Expand addressable markets


Drive revenue growth

## RESEARCH NEEDS


Accelerate insights to market


Stretch budgets further


Streamline internal processes


Minimize inefficiency in data and project management


Focus on revenue-generating activites

# POWERING YOUR GROWTH AND TRANSFORMATION AT EACH STEP OF THE MARKETING CONTINUUM

We help power your growth across the entire marketing journey with our solutions for insights, activation and measurement.

Harness the power of data by uncovering accurate insights and connecting data sources to activate new advertising campaigns and measure effectiveness of cross-channel marketing ROI and longer-term brand lift.





# DYNATA'S DIFFERENCE

Dynata has the largest depth, widest breadth, and highest-quality first-party panel data in the world. We own and operate the largest panel comprised of 67 million consumers, B2B panelists and hard-to-reach audiences.

Dynata is known for having the highest-quality and most trusted panel of real and engaged people in the industry. Our fully permissioned panelists are profiled with over 2,700 attributes and are sourced using unique methodologies, offering flexibility and bias controls for precise audience selection.

Panel data can be seamlessly connected to CRM and other data sources to model and scale custom audiences for campaign activation.

# DATA QUALITY, THE FOUNDATION OF ACCURATE INSIGHTS & BETTER DECISION – MAKING

High-quality data is the cornerstone of business intelligence - driving accurate insights for smarter decision-making. Quality data comes from the right people who are real and engaged, ready to share trusted insights.

Our rich recruitment sources and fully verified panelists ensure you have access to the highest quality data to protect your investment and reputation.

We employ proprietary identity verification controls and the highest, most compliant levels of data management.

Our Imperium data solution, QualityScore™, provides an automated multi-point check to assess each respondent's survey quality, reducing up to 85% of the time spent manually reviewing data and saving valuable participant responses.



**LARGEST GLOBAL SCALE & DEEPEST PROFILING**

**RICH RECRUITMENT SOURCES & FULLY-VERIFIED PANELISTS**

**THE LEADER IN FIRST-PARTY DATA WITH 40 YEARS OF EXPERIENCE**

# FULLY INTEGRATED END-TO-END PLATFORM THAT CONNECTS RESEARCH AND INSIGHTS WITH EFFECTIVE CAMPAIGN EXECUTION



## Find Your Audience

Identify and select your audience, field your survey in market and tabulate your results.

## Build Your Survey

Script and program mobile-first surveys for any question type or length.

## Improve Cross-channel Marketing ROI

Validate results against real people, measure advertising effectiveness and optimize media spend.

## Connect Data & Activate Campaigns

Connect data sources and activate audiences across channels to enhance targeting and maximize impact

## Analyze & Visualize

Uncover insights and instantly visualize findings with automated data viz and interactive dashboards.

## Publish & Share Your Results

Deliver insights to decision makers in seconds with cloud-based collaborating tools

# THE WORLD'S LARGEST FIRST-PARTY PLATFORM FOR INSIGHTS, ACTIVATION AND MEASUREMENT



**67+ MILLION**
PEOPLE REACHED



**2,700+ PROFILE ATTRIBUTES**
spanning specialty and hard-to-reach B2Baudiences
Unparalleled **DEPTH AND BREADTH** across six continents

**4 Billion**
INSIGHTS UNCOVERED ANNUALLY



**200,000+**
PROJECTS DELIVERED ANNUALLY



Extensive survey testing and data verification attributes for

**99%** **ERROR-FREE PROJECT DELIVERY**

**100+ MILLION**
survey completes annually



**GLOBAL REACH: OVER**
**6000**
CUSTOMERS IN **90 COUNTRIES**
across all major industries



**40+ years of INNOVATION**



**SCALE MATTERS**



**#1**
**FIELD SERVICES**
IN 2021 GRIT REPORT



**#3**
**DATA & ANALYTICS PROVIDER**



## GLOBAL FOOTPRINT

Dynata is uniquely positioned to deliver the most diverse B2B and B2C online sample globally for maximum feasibility, sustainability, representativeness and consistency. Our extensive reach lets us connect you to consumer, business, specialty, or hard-to-reach audiences in almost every country around the world quickly and efficiently. Connect with your Dynata sales team to find out more about our global capabilities.

### EMEA | 16M

| | | | | |
|---|---|---|---|---|
| AUSTRIA | FINLAND | IRELAND | PORTUGAL | SWEDEN |
| BELGIUM | FRANCE | ITALY | ROMANIA | SWITZERLAND |
| BULGARIA | GERMANY | NETHERLANDS | SLOVAKIA | TURKEY |
| CZECH REPUBLIC | GREECE | NORWAY | SOUTH AFRICA | UAE |
| DENMARK | HUNGARY | POLAND | SPAIN | UNITED KINGDOM |



### THE AMERICAS | 30M+

| NORTH | SOUTH |
|---|---|
| UNITED STATES | ARGENTINA |
| CANADA | BRAZIL |
| MEXICO | COLUMBIA |
| | CHILE |
| | PERU |
| | VENEZUELA |

### APAC | 22M

| | | | |
|---|---|---|---|
| AUSTRALIA | INDONESIA | PHILIPPINES | THAILAND |
| CHINA | JAPAN | SOUTH KOREA | VIETNAM |
| HONG KONG | MALAYSIA | SINGAPORE | |
| INDIA | NEW ZEALAND | TAIWAN | |

# RECRUITMENT METHODOLOGIES

Dynata has a variety of sample sources to meet your unique project requirements.

Each of our recruitment channel delivers a different population thus our panels provide diversity, representativeness and enables you to target hard-to-reach population segments.



| SOURCE NAME | RECRUITMENT | REWARDS | STRENGHTS |
|---|---|---|---|
| Loyalty Panels | By invitation to loyalty program members in travel, entertainment, media and retail. | Points or miles relevant to the program source. | More affluent. high quality. pre-validated individuals with known characteristics. |
| Organic, Open Enrollment & Partnerships | Online and mobile channels: websites, social media influencers and apps. | Reward points to redeem for cash, prizes and gift cards. | Younger, less affluent, more ethnically diverse. |
| Respondent Exchange Network | Broad range of websites, incl. schools, communities. Member logging into communities with valid username and password invited to participate. | Reward points to redeem for cash, prizes and gift cards. | Engage people who might not otherwise take part. Younger audiences. More frequent internet users. |

# HARD-TO-SOURCE PANEL DATA



## The Standard for B2B Data

Largest and deepest global reach offering more than 3 million professionals with an average of 15 attributes per member

Broadest selection of business professionals across hundreds of B2B roles

Robust and proven recruitment practices across loyalty, open and integrated channels



## Healthcare

Comprehensive patient panel offering 9M patients in 40 markets, across 300 ailments with over 2,000 studies per year

Concentrated healthcare B2B panel with more than 2.5 million allied health professionals and other healthcare business decision makers globally

Rich Healthcare Professionals Panel containing 200,000 across the US, Canada and EU5 and access to over 1M globally through partner programs



## Diversity, Equity & Inclusion

Panel recruitment using messaging and rewards to encourage maximum diversity among participants and a 3-channel strategy to ensure access to respondents who are under-represented when only using one approach

Broad-scale panelist data library includes items such as race, gender, sexual orientation and disability

Accommodations in the survey-taking process to ensure optimal engagement among diverse populations



# POWERED BY OUR PROPRIETARY TOTAL RESEARCH QUALITY SYSTEM

**Total Research Quality® System Components**

Our Total Research Quality® system is a comprehensive integrated system of tools, metrics, procedures, and policies that operates throughout the entire lifecycle of each participant across every project we complete to ensure our clients are receiving the highest quality data available. The system begins long before the data is collected and ends long after the analysis is complete.

Dynata employs proprietary identity verification controls and the highest, most compliant levels of data management and data protection.



# Panel Demographics By Country

## AMER

# UNITED STATES OF AMERICA





**43%**

GENDER

**57%**

Secondary Education or below **21%**

University, Professional or Vocational Certification **33%**

University Degree **24%**

Postgraduate, Doctorate or above **21%**

EDUCATION



INCOME

<50 K (USD) **41%**

50 - 150K **46%**

150 - 500K **11%**

>500K **2%**

AGE

| 18 - 24 | 25 - 34 | 35 - 44 | 45 - 54 | 55 - 64 | + 65 |
|---------|---------|---------|---------|---------|------|
| 11% | 20% | 23% | 14% | 14% | 19% |

**Exhibit 5:**
**Quality Control Measures for the Survey**

**Quality Control Measures for the Survey**

The interviews included a number of quality control measures and validation measures, which are described below.

1.  The survey followed "double-blind" interviewing procedures, where respondents did not know key details such as the sponsor or true purpose of the survey.

2.  The survey was pre-tested.  Before starting the full survey, a small number of interviews were conducted online and the data were examined to confirm that responses were recorded properly, that survey skip patterns were followed accurately, and that responses showed an understanding of the questions.

3.  During qualification, qualifying responses were hidden among other, non-qualifying responses.  This reduced the likelihood that respondents would guess the answers that would qualify or not qualify them for the study.

4.  Respondents were instructed not to guess, and survey questions included "I don't know" options to discourage respondents from selecting other responses that may not accurately represent their opinions.

5.  Certain question text and responses were rotated to reduce the possibility of order bias, which may occur if respondents are more likely to select a response in a particular position, such as first or last listed response.  For example, in Questions D, E, F, G, I, J, K, L, Q, 3, 6, 11, and 12, the order of responses was rotated or randomized.  Each respondent saw responses to those questions in an order that varied across respondents, with "I don't know" presented last.

6.  The survey included a quality control question.  Question H asked respondents to select the number 7 from a list of numbers.  Only respondents who selected the proper number continued through the survey.

Exhibit 5 - Isaacson Expert Report                                                                 Page 1

7.  Respondents were required to enter their ZIP code at least twice, once in Question C, and again in Question 13 and/or Question 14.  Respondents who provided ZIP codes in Questions 13 and 14 that did not match the ZIP code provided in Question C were terminated from the survey.

8.  After the interviews were conducted, verbatim responses to open-ended questions were reviewed to confirm that respondents provided answers indicating they understood the questions and were paying attention.  Respondents who provided responses that indicated a lack of attention were removed from the database.

9.  After the interviews were conducted, the amount of time each respondent took to complete the survey was reviewed to confirm that the survey was completed in a reasonable amount of time.  Respondents who completed their survey in an unusually short or an unusually long amount of time were removed.

10.  At the end of the survey, in Question 15, respondents were asked to agree or disagree to the following statement: "I am the person who was invited to participate in this survey.  I completed this survey myself, without assistance or advice from any other person or source, and in accordance with the instructions provided in the survey.  The answers I have provided are truthful expressions of my situation and opinions."  Respondents who did not agree to this statement were terminated from the survey.

11.  Respondents were recruited through a panel that maintains some pre-existing information about potential respondents.  As an additional validation step, survey responses for gender (Question A) and age (Question B) were compared with pre-existing panel data.  Respondents who provided answers that did not match existing panel data for age and/or gender were terminated.  All respondents in the final database were validated in this manner.[1]

---

[1] McCarthy, J. Thomas.  § 32:170.  "Tests of properly conducted survey—Effect of deficiencies in survey methodology."  *McCarthy on Trademarks and Unfair Competition*, 5th ed., Thomson Reuters, 2021, pp. 32-487 to 32-488.  *See also Paco Sport, Ltd., v. Paco Rabanne Parfums.*  No. 96 Civ. 1408(JES). U.S. District Court, S.D. New York, Feb. 17, 2000.

Exhibit 5 - Isaacson Expert Report                                                    Page 2

**Exhibit 6:**
**Termination and Removal Summary**

**Termination and Removal Summary**

| Reason for Termination or Removal | | Counts |
|---|---|---:|
| Q.A | Gender[1] | 381 |
| Q.B | Age[2] | 403 |
| Q.C | ZIP code | 26 |
| Q.D | Likely to make a hotel room reservation in the next 12 months | 2,653 |
| Q.E | Likely to make a hotel room reservation for $100 to $250 per night | 863 |
| Q.F | Likely to visit the website of a hotel and/or travel website to make a reservation for a hotel room | 97 |
| Q.G | Completed survey relating to hotels in past 30 days | 650 |
| Q.H | Quality control, select number "7" | 11 |
| Q.I | Device used to take the survey | 41 |
| Q.L | Not wearing eyeglasses or contact lenses if needed | 19 |
| Q.Q | Did see the webpage(s) clearly | 17 |
| Q.14 | ZIP code match | 9 |
| Q.15 | Disagree with statement | 5 |
| Respondents removed from the survey database: | | |
| | Provided open-ended responses that reflected a lack of attention | 58 |
| | Time to complete the survey[3] | 18 |
| | Have the same IP address as another respondent | 5 |
| | Q.12 Type of company or organization work for | 120 |
| | Provided open-ended responses that reflected a lack of attention and Q.12 Type of company or organization work for | 33 |
| | Time to complete the survey and Q.12 Type of company or organization work for | 1 |
| **Total number of respondents terminated or removed** | | **5,410** |

---

[1] Includes 135 respondents who selected "Prefer not to answer," and 246 who selected a gender that did not match the gender on file with the panel provider.

[2] Includes 119 respondents who selected "Prefer not to answer" or indicated their age was "20 years old or younger," and 284 who selected an age that did not match the age on file with the panel provider.

[3] Respondents who took less than one-third of the median time to complete the survey (159 seconds) or who took more than one hour to complete the survey.

Exhibit 6 - Isaacson Expert Report                    Page 1

**Exhibit 7:**
**Codes for Analyzing Verbatim Responses**