## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

DELTA AIR LINES, INC.,                    *
                                          *
     Plaintiff and                    *
     Counterclaim Defendant,          *
                                          *
     v.                               *          1:20-CV-01125-ELR
                                          *          FILED UNDER SEAL
MARRIOTT INTERNATIONAL,                   *
INC.,                                     *
                                          *
     Defendant and                    *
     Counterclaim Plaintiff,          *
     and,                             *
                                          *
MARRIOTT WORLDWIDE CORP.,                 *
                                          *
     Counterclaim Plaintiff.          *
                                          *

—————————

# O R D E R

—————————

     There are several matters presently pending before the Court.  The Court sets

out its reasoning and conclusions below.

# I.    Background[1]

## A.    The Parties

This case involves Plaintiff and Counterclaim Defendant Delta Air Lines, Inc. ("Delta"); Defendant and Counterclaimant Marriott International, Inc.; and Marriott International, Inc.'s "wholly owned subsidiary" Counterclaimant Marriott Worldwide Corporation (together with Marriott International, Inc., "Marriott"). See, e.g., Am. Compl. [Doc. 30]; Marriott's First Am. Counterclaim ¶ 11 n.1 [Doc. 46]. Delta is a well-known airline brand within the United States. See Plaintiff's

---

[1] The Court uses the Parties' proposed facts and responses as follows: where one side admits a proposed fact, the Court accepts it as undisputed for purposes of this order and cites only the proposed fact. Where one side admits a proposed fact in part, the Court cites to the proposed fact and includes the undisputed part. Where one side denies a proposed fact in whole or in part, and such fact is material, the Court reviews the record and determines whether a factual dispute exists. If the denial is without merit, either because the proposed fact has been deemed admitted or the record citation supports the proposed fact, then the Court cites only to the proposed fact and not the response. Although the Court has endeavored to deal with all objections, because the Parties object to nearly every proposed fact, the inclusion of a proposed fact with no discussion of the objection means that it been considered, but overruled. Finally, the Court excludes proposed facts that are immaterial, includes facts drawn from its review of the record, and considers all proposed facts in light of the standard for summary judgment. See LR 56.1(B)(2)(a)(2)(iii), NDGa.; see also FED. R. CIV. P. 56(c)(3); Tomasini v. Mt. Sinai Med. Ctr. of Fla., 315 F. Supp. 2d 1252, 1260 n.11 (S.D. Fla. 2004) (explaining that a district court is not obligated to "scour the record" to determine whether triable issues exist).

Statement of Material Facts ("Pl.'s SOMF") ¶¶ 23–25 [Doc. 441-1].[2]  Marriott is "one of the world's leading hotel companies[.]"  See Marriott's Answer and Counterclaim ¶ 2 [Doc. 33].  This case generally involves disputes over various trademarks owned by the Parties following Delta's execution of a Trademark Coexistence Agreement (the "Agreement") with non-party Delta Hotels Limited Partnership ("Delta Hotels") and Marriott's subsequent acquisition of Delta Hotels. See generally id.; see also Am. Compl.

**B.  The Agreement**

In 2013, Delta Hotels filed trademark applications in Hong Kong and China, most of which involved the word "Delta."  See Defendant's Statement of Undisputed Material Facts ("Def.'s SOMF") ¶ 39 [Doc. 479-1].  These trademarks fell into Classes 35, 39, 41, and 43 and covered hotel services and transportation, among

---

[2] The Court notes that this district's Local Rules require a statement of material facts in support of a summary judgment motion (or a response thereto) to be "concise" and "nonargumentative[.]" LR 56.1(B)(1)–(2), NDGa.  These documents are intended "to help the [C]ourt identify and organize the issues in the case."  Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009). Here, the Parties' respective statements of material fact are not concise—each including hundreds of proposed facts—while their respective responses are hundreds of pages long (Marriott's response to Delta's statement of material facts totals nearly 400 pages while Delta's response to Marriott's statement of additional facts totals over 400 pages), with responses to individual proposed facts often spanning multiple pages with multiple subparts and legal arguments. Although the Court is not bound to consider these proposed facts and responses because they fail to conform to the requirements of Local Rule 56.1(B), because the Court has a strong preference for deciding disputes on the merits, it has sifted through these filings and cites them throughout this order as appropriate.

other things.[3]  Id.; [Doc. 33-1 at 7].  In 2014 and 2015, Delta opposed these

trademark applications.  Def.'s SOMF ¶ 41.  At some point, Marriott became

involved in resolving this dispute because it planned on acquiring Delta Hotels.[4]

See, e.g., id. ¶¶ 45, 48, 50.  Delta and Delta Hotels subsequently negotiated "with a

view to securing a coexistence agreement . . . which would cover Hong Kong and

China."  Id. ¶ 42; Pl.'s SOMF ¶ 101.  On March 25, 2015, Delta and Delta Hotels

signed the Agreement.  Pl.'s SOMF ¶ 102.

The Agreement's recitals "express in general terms the intention with which

the Agreement was made" and almost exclusively pertain to the disputed Delta and

Delta Hotels trademarks already registered or pending in Hong Kong and China

(respectively, the "Hong Kong and China Delta Hotels Marks" and the "Hong Kong

and China Delta Marks").  [Doc. 33-1 at 1–3, 7–19]; Pl.'s SOMF ¶¶ 104, 106; Def.'s

SOMF ¶¶ 58–59.  The Agreement's final recital states that "Delta Hotels and Delta

. . . have mutually agreed that the [Hong Kong and China] Delta Hotels Marks may

co-exist with the [Hong Kong and China Delta Marks] in Hong Kong and [China]

in accordance with the terms and conditions as set out in this Agreement."  [Doc.

---

[3] According to Marriott, the United States Patent and Trademark Office ("USPTO") and its international counterparts, "under an international treaty[,] organize goods and services into 45 different 'classes.'  Goods and services are grouped into each class by type, e.g., hotel and restaurant services both fall within class 43.  [Delta's] transportation services fall within class 39." [Doc. 479 at 32 n.17].

[4] The Parties dispute the extent to which they discussed the Agreement's global implications.  See, e.g., Def.'s SOMF ¶¶ 46–48, 50–53; Plaintiff's Response to Defendant's Statement of Material Facts ¶¶ 46–48, 50–53 [Doc. 528-1].

33-1 at 3]. Following the recitals, paragraphs 1 through 4 of the Agreement discuss Delta Hotels' obligations to amend its existing applications and delete certain services and Delta's obligations to withdraw its existing oppositions to the Hong Kong and China Delta Hotels Marks. [Id. at 3–4]; Def.'s SOMF ¶ 61; Pl.'s SOMF ¶¶ 109–10. Paragraph 5 states that Delta "will not challenge . . . the [Hong Kong and China] Delta Hotels Marks in Classes 35, 39, 41, and 43 . . . as permitted under paragraphs 1 through 4 above in Hong Kong and China[.]" [Doc. 33-1 at 4]. Paragraph 6 requires Delta to not challenge Delta Hotels' trademarks applications and registrations incorporating the word "Delta" "in Classes 35, 39, 41, and 43" "in the future[,]" so long as "the goods and services . . . are consistent with the services covered by the [Hong Kong and China] Delta Hotels Marks and permitted under paragraphs 1 through 4" of the Agreement.[5] [Id.] Paragraph 6 does not contain an explicit territorial limitation. [Id.] Paragraph 9 then requires Delta and Delta Hotels to "cooperate in good faith to agree upon a mutually acceptable compromise, consent and/or co-existence along the lines set forth in this Agreement if the [Hong Kong and China Delta Hotels and Delta Marks], or similar variations including transliteration in Chinese and other languages thereof and marks for or comprising 'Delta' such as 'Delta Vacations' owned by [Delta], appear to conflict or overlap in

---

[5] Paragraphs 7 and 8 essentially mirror paragraphs 5 and 6, respectively, but with regard to Delta Hotels' obligations. [Doc. 33-1 at 4].

other jurisdictions in the future." [Id. at 5]. The Agreement is to terminate automatically should either Delta or Delta Hotels "completely and permanently abandon each and every one of" their respective identified trademarks in Hong Kong and China. [Id. at 6]; Pl.'s SOMF ¶ 119. Finally, the Agreement is binding on Delta and Delta Hotels' successors. [Doc. 33-1 at 5].

### C.    Marriott's Acquisition of Delta Hotels

"In 2013, Marriott became interested in acquiring the Delta Hotels brand and business and expanding it globally." Def.'s SOMF ¶ 7. Marriott signed an agreement to acquire Delta Hotels on January 27, 2015, and the acquisition closed on April 1, 2015. Id. ¶¶ 10, 14. Delta Hotels was founded in Canada in 1962. Id. ¶ 1. Prior to Marriott's acquisition of Delta Hotels in 2015, that brand was ██ ████████████████████████████████ with ███████████████████████████ ██████ located in Canada. [Docs. 459-1 at 3; 464-12 at 2]. Indeed, Delta Hotels only operated a single property in the United Sates—at some point in the 1980s and 1990s—called "Delta Court of Flags," and that property did not use the trademarks at issue in this suit. Defendant's Statement of Additional Facts ("Def.'s SOAF") ¶¶ 93, 132 [Doc. 516-2]; Pl.'s SOMF ¶ 184. At the time that Marriott acquired the Delta Hotels brand, there were no Delta Hotels properties within the United States. See Pl.'s SOMF ¶ 183. Upon acquisition, Marriott expanded the Delta Hotels brand to the United States. See id. ¶¶ 187–88; Def.'s SOAF ¶ 132.

Marriott acquired and used several Delta Hotels trademarks in the United States (the "Acquired Delta Hotels Marks"), and further, registered and used other newly designed Delta Hotels trademarks in the United States (the "Updated Delta Hotels Marks" and, combined, the "Delta Hotels Marks"). Pl.'s SOMF ¶ 191; Def.'s SOMF ¶ 92; [Docs. 443-4 at 4–5; 441 at 2 n.7 (Delta citing to Doc. 443-4 at 4–5 to identify the Delta Hotels Marks at issue in this suit, including trademarks registered both before and after Marriott acquired Delta Hotels); 461-4 at 269–71 (purchase agreement between Marriott and Delta Hotels listing the acquired trademark registrations in the United States); 528 at 52 n.40]. The Delta Hotels Marks are all at issue in this suit, and they are depicted in part below (both as acquired and updated by Marriott).[6] See Am. Compl. ¶ 1; [Docs. 441 at 2 n.7; 443-4 at 4–5; 528 at 52 n.40].

---

[6] According to Delta, this suit involves all of Marriott's trademarks that include the word "Delta." Am. Compl. ¶¶ 1, 5, 51–55. And Delta identifies the Delta Hotels Marks as those listed in one of Marriott's discovery responses. [See Doc. 441 at 2 n.7] (citing [Doc. 443-4 at 4–5]); see also Pl.'s SOMF ¶ 6 n.2. In its summary judgment brief and statement of material facts, Delta cites to another of Marriott's purported trademarks that uses the word "Delta." [See Doc. 441 at 2 n.7]; Pl.'s SOMF ¶ 6 n.2. However, Delta only supports that assertion with citation to its Amended Complaint and the Court's June 6, 2023 Order quoting the same. [Doc. 441 at 2 n.7] (citing Am. Compl. ¶¶ 1, 24 and [Doc. 420 at 11–14]); Pl.'s SOMF ¶ 6 n.2 (same). However, Marriott did not produce that supposed mark in the discovery response that Delta cites favorably as listing the Delta Hotels Marks, and the Court is similarly unable to locate that mark in the record other than in Delta's Amended Complaint. [See Doc. 443-4 at 4–5]; LR 56.1(B)(1), NDGa. (stating that the Court will not consider any fact that is "supported by a citation to a pleading rather than to evidence"). Otherwise, Marriott acquired and used several word trademarks from Delta Hotels such as "Delta Hotels," "Delta Privilege," "Delta RiverBoat Co.," and "Delta Hotels and Resorts." [Doc. 443-4 at 3–4].

7

**Acquired Delta Hotels Marks Examples**




**Updated Delta Hotels Marks**





### D. The Parties' Trademark Disputes

Following the execution of the Agreement between Delta and Delta Hotels on March 25, 2015, and Marriott's April 1, 2015 acquisition of Delta Hotels, the Parties consented to various trademark registrations in certain Classes and services in countries other than the United States, including Taiwan, Chile, Israel, and Australia. See, e.g., Def.'s SOAF ¶ 122; Def.'s SOMF ¶¶ 25, 106. In April 2016, Marriott opened its first Delta Hotels property in the United States. Def.'s SOAF ¶ 132. In 2017 and 2018, respectively, Marriott opened another ten (10) and eleven (11) Delta

Hotels properties in the United States.  Id. ¶¶ 135, 137.  Marriott opened some of its

Delta Hotels near airports and offered airport shuttle services to and from some of

these locations.  [See, e.g., Doc. 453-4].  On August 6, 2018, Delta's outside counsel,

Mr. Frank Benjamin, emailed Marriott's outside counsel, Mr. Paul Kilmer, regarding

the "recent development that just came to our attention" involving Marriott's use of

the Updated Delta Hotels Marks in various forms.[7]  [Doc. 461-11].  Mr. Benjamin

conveyed Delta's "obvious[] . . . concern[] about the risks of marketplace confusion"

with Delta's trademarks (the "Delta Marks")[8] and requested that Marriott voluntarily

discontinue its use of the Updated Delta Hotels Marks and "replace them with

versions that are far less likely to cause confusion."  [Id.]  Attempts at settlement

proved unfruitful.[9]  See, e.g., Pl.'s SOMF ¶ 129.

---

[7] The Parties dispute when Delta first learned of and raised the issue of Marriott's use of the Delta
Hotels Marks.  Compare Pl.'s SOMF ¶¶ 126–27, [and Doc. 461-11 (Mr. Benjamin's August 6,
2018 email to Mr. Kilmer)], with Def.'s SOMF ¶ 100, [and Docs. 443-4 at 5 (listing the Updated
Delta Hotels Marks and noting they were registered and in use as early as January 2016); 454-28
(April 21, 2016 press release announcing opening of the first of Marriott's Delta Hotels properties
in the United States); 473-12 at 51–56 (Marriott's February 8, 2016 opposition to Delta's attempt
to register the "DELTA ONE" mark claiming to be the owner of "DELTA" composite marks and
that it has the "exclusive right to use the marks in commerce"), 162 (Delta stating that "[n]either
Marriott nor its subsidiary Delta Hotels and Resorts operated any 'Delta' branded properties in the
United States *until December 2015*" (emphasis added)), 164 (Delta's response to Marriott's
opposition to Delta's U.S. trademark application for the "DELTA ONE" mark stating that as of
May 6, 2015, it was "aware that Marriott and its predecessor in interest had generally used [marks
that included the word 'Delta'] in connection with" two (2) of the Acquired Delta Hotels Marks)].
[8] The Delta Marks include dozens of different marks that use the word "Delta."  Pl.'s SOMF ¶ 6
n.2 (citing [Doc. 459-7 at 10–120]).
[9] The Parties dispute whether these settlement discussions concerned all or only some of the Delta
Hotels Marks.  See, e.g., Pl.'s SOMF ¶ 129.

## II.    Procedural History

On March 11, 2020, Delta initiated the instant suit against Marriott.  <u>See</u> Compl. [Doc. 1].  In general, Delta alleges that "Marriott's trademarks that include the word Delta" infringe on and dilute the Delta Marks.  <u>See</u> Am. Compl. ¶¶ 1, 55, 76–77; <u>see also</u> Pl.'s SOMF ¶ 6 n.2; [Docs. 441 at 2 n.7; 528 at 52 n.40].   In its Amended Complaint, Delta brings seven (7) Counts against Marriott: (I) infringement of registered trademarks pursuant to 15 U.S.C. § 1114; (II) false designation of origin pursuant to 15 U.S.C. § 1125(A); (III) deceptive trade practices pursuant to O.C.G.A. § 10-1-372; (IV) unfair competition pursuant to O.C.G.A. § 23-2-55; (V) federal law trademark dilution pursuant to 15 U.S.C. § 1125(A); (VI) Georgia law trademark dilution pursuant to O.C.G.A. § 10-1-451; and (VII) declaratory judgment that paragraph 9 of the Agreement is a non-binding agreement to agree and that Delta has not violated the same.  Am. Compl. ¶¶ 48–91.  Delta seeks a variety of forms of relief, including injunctive relief, an accounting of Marriott's profits, damages, punitive damages, and an order declaring that the Agreement "does not prevent Delta from protecting its rights to the Delta Marks against Marriott's use of the Delta Hotels Marks in the United States." <u>Id.</u> at pp. 41–45.  In its Answer to Delta's Amended Complaint, Marriott asserts the affirmative defenses of laches, acquiescence, equitable estoppel, and waiver.  Answer ¶¶ 93–96.

Marriott also brings a counterclaim for breach of contract against Delta for violation of the Agreement. Am. Counterclaim ¶¶ 26–34.

Following the close of discovery and the Court's resolution of various discovery disputes, [Docs. 343, 344, 372, 375, 377, 381, 385, 420], the Parties filed their respective motions for summary judgment. [Docs. 440, 468]. Delta seeks summary judgment on its Counts I–VI, Marriott's affirmative defenses, any disgorgement or apportionment argument with respect to its damages, Marriott's counterclaim, and Marriott's breach of contract damages theories. [See generally Doc. 440]. Marriott seeks summary judgment on Delta's claims, its affirmative defenses, and its counterclaim. [See generally Doc. 468]. These motions have been fully briefed and are ripe for the Court's review. Delta also filed nine (9) motions to exclude various of Marriott's experts, which are also ripe for the Court's review. [Docs. 437, 439, 442, 445, 450, 455, 460, 466, 471]. The Court begins with the Parties' motions for summary judgment.

## III. Motions for Summary Judgment [Docs. 440, 468]

### A. Legal Standard

The Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the

non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A factual dispute is material if resolving the factual issue might change the suit's

outcome pursuant to the governing law.  See id.

When ruling on a motion for summary judgment, the Court must view all

evidence in the record in the light most favorable to the non-moving party and

resolve all factual disputes in the non-moving party's favor.  See Reeves v.

Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  The moving party need

not positively disprove the opponent's case; rather, the moving party must show the

lack of evidentiary support for the non-moving party's position.  See Celotex Corp.

v. Catrett, 477 U.S. 317, 325 (1986).

If the moving party meets this initial burden, the non-moving party must then

present competent evidence beyond the pleadings to show that there is a genuine

issue for trial in order to survive summary judgment.  See id. at 324–26.  The

essential question is "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail

as a matter of law."  Anderson, 477 U.S. at 251–52.  "The mere existence of a

scintilla of evidence" supporting the non-movant's case is insufficient to defeat a

motion for summary judgment.  Id. at 252.  There must be evidence on which the

jury could reasonably find for the non-moving party.  See id.  "Where the record

taken as a whole could not lead a rational trier of fact to find for the nonmoving

party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Industr. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)).

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." GEBAM, Inc. v. Inv. Realty Series I, LLC, 15 F. Supp. 3d 1311, 1315–16 (N.D. Ga. 2013) (citing Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005)); accord United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984) ("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." (internal quotation omitted)). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. See United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc., 972 F. Supp. 2d 1339, 1341 (N.D. Ga. 2013). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. See id. at 1341; accord Oakley, 744 F.2d at 1555–56.

B.    **Delta's Claims**

Delta moves for summary judgment on its Counts I–VI.[10]  [See generally Doc.

441].  The Court first assess Delta's Counts I–IV before turning to Counts V and VI.

1.    Counts I–IV

In its Counts I–IV, Delta brings federal claims for infringement and false

designation of origin, as well as state claims for deceptive trade practices and unfair

competition pursuant to Georgia law.  See Am. Compl. ¶¶ 48–73.  Because the

analysis for each of these Counts is the same, the Court assesses them within the

context of Delta's Count I for trademark infringement.  See Savannah Coll. of Art

& Design, Inc. v. Sportswear, Inc., 983 F.3d 1273, 1279 (11th Cir. 2020); Glock,

Inc. v. Wuster, Civil Action No. 1:14-CV-00568, 2020 WL 11025586, at *7 (N.D.

Ga. Sept. 15, 2020); Delta Air Lines, Inc. v. Wunder, Civil Action No. 1:13-CV-

3388, 2015 WL 11242003, at *8 (N.D. Ga. Dec. 15, 2015).

The Lanham Act defines trademarks as "any word, name, symbol, or device,

or any combination therof [used] to identify and distinguish [one's] good . . . from

those manufactured or sold by others and to indicate the source of the goods."  15

U.S.C. § 1127.  "The purpose of a mark is to be identifiable as a unique entity—to

---

[10] Marriott also moves for summary judgment on Delta's claims.  [Doc. 479 at 46].  However, Marriott's entire argument in this regard is premised on its interpretation of the Agreement, which the Court rejects later in this order.  [See id.]; see also infra, Part III.E.  Thus, for the reasons discussed below, the Court denies Marriott's motion for summary judgment on Delta's claims and only discusses Delta's motion for summary judgment with regard to the same.

be knowable by a name." Commodores Ent. Corp. v. McClary, 879 F.3d 1114, 1129 (11th Cir. 2018). "Section 43(a) of the Lanham Act, codified as amended at 15 U.S.C. § 1114, creates a federal cause of action for trademark infringement." Id. at 1130 (internal citations omitted). "Unlike the general prohibition against unauthorized copying that exists in patent and copyright law, the touchstone of liability in a trademark infringement action is not simply whether there is unauthorized use of a protected mark, but whether such use is likely to cause consumer confusion." Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc., 508 F.3d 641, 647 (11th Cir. 2007). Thus, "[t]o establish a prima facie case of trademark infringement under § 43(a), a plaintiff must show (1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." Tana v. Dantanna's, 611 F.3d 767, 773 (11th Cir. 2010). The Parties do not appear to dispute the first element of the prima facia trademark infringement analysis: that Delta has valid trademark rights in the Delta Marks.

As to the second element of the prima facia trademark infringement analysis—the likelihood of confusion—courts usually consider seven (7) factors:

> (1) the strength of the allegedly infringed mark; (2) the similarity of the infringed and infringing marks; (3) the similarity of the goods and services the marks represent; (4) the similarity of the parties' trade channels and customers; (5) the similarity of advertising media used by the parties; (6) the intent of the alleged infringer to misappropriate the

proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.

Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc., 872 F.3d 1256, 1264 (11th Cir. 2017) (quoting Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc., 830 F.3d 11242, 1255 (11th Cir. 2016)).  The Eleventh Circuit has held that "the type of mark and the evidence of actual confusion are the most important."  Fla. Int'l Univ. Bd. of Trs., 830 F.3d at 1255.  "Although likelihood of confusion generally is a question of fact, in limited circumstances it may be decided as a matter of law via summary judgment."  Wreal, LLC v. Amazon.com, Inc., 38 F.4th 114, 127 (11th Cir. 2022); FCOA LLC v. Foremost Title & Escrow Servs. LLC, 57 F.4th 939, 947 (11th Cir. 2023) (noting that likelihood of confusion is a "factual inquiry").  The Court assesses each of the likelihood of confusion factors in turn.

### a.  Strength of the Delta Marks

The allegedly infringed marks, the strength of which the Court must assess, are the Delta Marks.  "Strength or distinctiveness describes a mark's ability to allow consumers to identify the source of a good or service."  FCOA LLC, 57 F.4th at 948 (internal marks and citations omitted).  Put differently, "strength is just another way of talking about consumer recognition[,]" and therefore, "[t]he stronger the mark[] . . . the greater the likelihood of confusion and the greater the protection given to the mark."  Id. (internal marks and citations omitted).  Analysis of this factor requires a

two (2)-pronged inquiry assessing the conceptual and commercial strengths of the allegedly infringed Delta Marks.  Id. at 949.

i.      Conceptual strength

"The first step in assessing strength is to determine the 'conceptual strength' of the mark."  Id.  The Eleventh Circuit has identified four (4) categories of conceptual strength, listed in descending order of strength: (1) fanciful or arbitrary; (2) suggestive; (3) descriptive; and (4) generic.  See FN Herstal SA v. Clyde Armory Inc., 838 F.3d 1071, 1083 (11th Cir. 2016).  That court has observed, however, that "[t]he demarcation between each category is more blurred than it is definite."  Coach House Rest., Inc. v. Coach & Six Rests., Inc., 934 F.2d 1551, 1559 (11th Cir. 1991).

"An arbitrary or fanciful mark bears no logical relationship to the product or service it is used to represent.  Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1357 (11th Cir. 2007).  "[S]ome of the strongest marks are 'common words' found in the dictionary.  For example, SHELL, CATERPILLAR, and APPLE.  They are intrinsically strong because they are . . . non-descriptive  and arbitrary when applied to gasoline, earth-moving equipment, and computers, respectively."  THOMAS MCCARTHY, McCarthy on Trademarks and Unfair Competition § 11.87 (4th ed. 2007).  "A suggestive mark refers to some characteristic of the goods, but requires a leap of the imagination to get from the mark to the product."  Forman, 509 F.3d at 1357–58.  In other words, "suggestive marks subtly connote something about the

service so that a customer could use his or her imagination and determine the nature

of the service." See PlayNation Play Sys., Inc. v. Velex Corp., 924 F.3d 1159, 1165

(11th Cir. 2019).

> A descriptive mark identifies a characteristic or quality of the service
> or product. . . . [A] generic name refers to a particular genus or class of
> which an individual article or service is but a member[; to] . . . the term
> by which the product or service itself is commonly known[; or to a] . . .
> depict[ion of] the product or service as a whole, rather than any
> particular feature, quality, or characteristic of the whole.

Forman, 509 F.3d at 1358. "Kodak" is an example of an arbitrary or fanciful mark

for cameras; "Penguin" is an example of a suggestive mark for refrigerators; and

"Vision Center" is an example of a descriptive mark for eyeglasses stores. See

Soweco, Inc. v. Shell Oil Co., 617 F.2d 1178, 1184 (5th Cir. 1980).[11] "Arbitrary,

fanciful, and suggestive marks are generally strong[,]" whereas "[g]eneric and

descriptive marks are so weak that they are not valid trademarks." FCOA LLC, 57

F.4th at 949. Moreover, an incontestable mark—that is, one that has been registered

for five (5) years with the USPTO and whose holder has filed the required

affidavits—is presumed to be conceptually strong. See Frehling Enters., Inc. v. Int'l

Select Grp., Inc., 192 F.3d 1330, 1336 (11th Cir. 1999); Sovereign Mil. Hospitaller

Ord. of Saint John of Jerusalem of Rhodes and of Malta v. Fla. Prior of the Knights

---

[11] Decisions by the former Fifth Circuit issued before October 1, 1981, are binding as precedent in
the Eleventh Circuit. See Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en
banc).

<u>Hospitallers of the Sovereign Order of Saint John of Jerusalem</u>, 809 F.3d 1171, 1184–85 (11th Cir. 2015).

Upon review and consideration, the Court finds that the Delta Marks are arbitrary or fanciful and are thus conceptually strong. The Delta Marks' primary characteristic is use of the word "Delta," which is defined as both the "4th letter of the Greek alphabet" as well as "of, relating to, or characteristic of The Delta region of Mississippi."[12] <u>See Delta, Merriam Webster Dictionary</u> (online edition); <u>see also Lettuce Entertain You Enters., Inc. v. Leila Sophia AR, LLC</u>, 703 F. Supp. 2d 777, 788 (N.D. Ill. 2010) (assessing the strength of the common characteristic of a family of marks rather than each individual mark). Thus, the word Delta in the Delta Marks "bears no logical relationship" to, and is arbitrary with respect to, the nationwide travel services Delta offers. <u>See Carnival Brand Seafood Co. v. Carnival Brands, Inc.</u>, 187 F.3d 1307, 1312 (11th Cir. 1999) ("CARNIVAL would be arbitrary or fanciful as compared to raw shrimp because it is a word in common usage applied to a service unrelated to its meaning" (internal marks and citations omitted)); [Doc. 459-7 at 3–113 (listing the Delta Marks, the majority of which fall within Classes

---

[12] Marriott contends that the conceptual strength of the Delta Marks is weaker because the company originally chose the word "Delta" as its name because it originally served the Mississippi Delta Region. Def.'s SOAF ¶ 1; [Doc. 516 at 10]. However, it is undisputed that Delta's services are now known and extend throughout the United States. <u>See, e.g.</u>, Pl.'s SOMF ¶¶ 23–25; Corrected Expert Report of Ravi Dhar [Doc. 461-5].

39, 41, and 43)]. Therefore, the Court finds that the Delta Marks are conceptually strong.[13]

### ii. Commercial strength

"Commercial strength refers to the real-world consumer recognition of a mark, most often created by the efforts and work of the mark holder." FCOA LLC, 57 F.4th at 950. "Commonly used evidence of commercial strength includes third-party use; advertising and promotion; sales and number and types of customers; recognition by trade, media, and customers; and survey of likely customers." Id. Additionally, a "strong showing of third-party use of the mark that significantly impacts consumer recognition of the original mark" can rebut the presumption of strength that accompanies incontestable marks. Id. "In assessing the third-party use, [courts] consider: (1) the frequency of third-party use, (2) the full names that the third-party uses, and (3) the kind of business in which the users are engaged." Id. (cleaned up). "Though the number of third-party uses is important, there is no hard-and-fast rule establishing a single number that suffices to weaken a mark." Id. Third-party use in "the same market diminish[es] a mark's strength more than uses in other markets." Id. at 950–51 (cleaned up); see also Hard Rock Cafe Int'l USA, Inc. v. RockStar Hotels, Inc., No. 17-CV-62013-BLOOM/Valle, 2018 WL 7825183,

---

[13] Additionally, Delta contends that sixteen (16) of the Delta Marks are incontestable. Pl.'s SOMF ¶ 13; [Doc. 447-16]. However, it is unclear to the Court if these registrations are accompanied by the required affidavits. [Doc. 447-16].

at *10 (S.D. Fla. June 13, 2018) ("courts within this Circuit have not limited their analysis of this factor strictly to third-party use within the same industry").

Upon review and consideration, the Court finds that disputes of material fact exist as to the commercial strength of the Delta Marks. Delta cites to unrebutted record evidence regarding its advertising, promotions, revenue, customer base, and unsolicited press coverage. [See Doc. 441 at 9–12; see also Doc. 516 at 11–14 (the relevant portion of Marriott's brief in response in which it does not address this evidence)]. However, Marriott cites to record evidence of extensive third-party use of the word "Delta" throughout the United States.[14] See, e.g., Expert Report of Rany Simms ("Simms Expert Report") at 30–39 [Doc. 445-3] (noting that there are approximately 730 active trademark registrations containing the word "Delta"); Expert Report of Robert A. Leonard ("Leonard Report") at 8–15, 29–30 [Doc. 442-4]; Rebuttal Expert Report of Professor Jerry Wind ("Wind Rebuttal Report") ¶¶ 32–52 [Doc. 518-16]; Def.'s SOAF ¶¶ 6, 11–20, 22–33, 42–50 (detailing significant revenue and advertisement expenditures for other companies that use the word "Delta"); Declaration of Delta Faucet Company [Doc. 519-11] (one of numerous declarations Marriott provides evidencing active third-party use of the word "Delta"); [Doc. 517-7]. Although many of these third-party uses are in other

---

[14] Third-party use of the word "Delta" is particularly relevant given that this case involves all of "Marriott's trademarks that include the word" "Delta" and the Delta Marks, the common characteristic of which is also the word "Delta." See Am. Compl. ¶ 1.

industries, Marriott provides several examples of use of the word "Delta" associated with trademarks in Classes 39, 41, and 43, the same categories in which many of the Delta Marks are registered. See, e.g., Simms Expert Report at 37–39 (listing eight (8) third-party registrations using the word "Delta" in the "transportation, hospitality, restaurant, lodging, and real estate field"); [Docs. 512-2 (documents related to use of "Peacock in the Delta" trademarks in Class 43); 513-25 (documents related to use of "Delta Downs" trademarks in Classes 41 and 43)]. The Court finds that a reasonable jury viewing this evidence in the light most favorable to Marriott, as the non-movant, could conclude that the extensive third-party use of the word "Delta" diminishes the commercial strength of the Delta Marks.[15] See Rockstar Hotels, Inc., 2018 WL 7825183, at *9–10 (noting that eight (8) entities within the hospitality industry and at least 140 entities in other industries in California and Florida use the words "Rock Star" in their name, that the "numerous instances" and "extensive third-party use" of those words "in connection with multiple types of products or companies" is evidence of diminished strength in the marks at issue, and

---

[15] Delta primarily relies on the Eleventh Circuit's holding in FCOA to support that Marriott's identified third-party use fails to create a dispute of fact as a matter of law. [Docs. 441 at 12–13; 563 at 6–7]. However, in that case, the court was reviewing a district court's grant of summary judgment to the defendant, it viewed the record evidence in the light most favorable to the plaintiff, and concluded that a reasonable factfinder could view the marks at issue as strong given that the defendant only cited to a list of third-party businesses—none of which included one of the words from the allegedly infringed mark or were in the same industry as that mark—and that no reliable evidence supported that the third-party businesses or marks were active. See FCOA LLC, 57 F.4th at 951–52. Thus, that case does not support that the commercial strength factor weighs in Delta's favor as a matter of law or that Delta is due summary judgment on its trademark infringement claim.

collecting cases in support); <u>FCOA LLC</u>, 57 F.4th at 950 (contemplating consideration of third-party use of marks in both the same and other industries); <u>Amstar Corp. v. Domino's Pizza, Inc.</u>, 615 F.2d 252, 260 (5th Cir. 1980) (finding that the district court afforded too little weight to third-party use that was remote or in other industries and stating that "[t]he third-party uses and registrations . . . merely limit the protection to be accorded plaintiff's mark outside the uses to which plaintiff has already put its mark").

Thus, even though the Delta Marks are conceptually strong, genuine issues of material fact remain regarding their commercial strength. Therefore, the Court finds that the first factor of the likelihood of confusion analysis, strength of the mark, does not weigh in favor of granting Delta's motion for summary judgment.

### b. *Similarity of the marks*

In evaluating the second factor of the likelihood of confusion analysis, a "court compares the [allegedly infringed and infringing] marks and considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." <u>Frehling Enters., Inc. v. Int'l Select Grp., Inc.</u>, 192 F.3d 1330, 1337 (11th Cir. 1999). "Because of its malleability, [the Eleventh Circuit] has described this analysis as a subjective eyeball test." <u>FCOA LLC</u>, 57 F.4th at 952. "[T]he closer the marks are, the more likely reasonable consumers will mistake the source of the product that each mark represents"; thus, greater similarity

between the purported infringing and infringed marks supports a finding of likelihood of confusion.  <u>Frehling Enters.</u>, 192 F.3d at 1337.  The Court compares the below Delta Marks and the Delta Hotels Marks to determine their similarity.

**<u>Delta Marks Examples</u>**[16]



---

[16] The Court uses the above exemplars for the Delta Marks because Delta fails to identify any other specific marks for comparison in its moving papers.  [<u>See</u> Doc. 442 at 2 n.7, 13–15].  Although, there are dozens of Delta Marks at issue in this case, Delta broadly argues that those are "virtually identical" and "highly similar" to the Delta Hotels Marks by listing just a few characteristics they purportedly share, such as use of the word "Delta," a blue-and-white color scheme, and sans-serif font.  [<u>See</u> <u>id.</u>]; [Doc. 441 at 2 n.7, 13–15] (identifying the Delta Marks as all marks listed at Docket Entry 459-7 between pages ten (10) and 120); Pl.'s SOMF ¶ 6 n.2.  Delta apparently chose to forego the onerous task of individually comparing the dozens of marks at issue in this case and instead left that work for the Court, greatly inhibiting its ability to conduct such a review.  [<u>See</u> Doc. 441 at 13–15].  The Court declines to do Delta's work for it in this respect and uses the above marks for purposes of evaluating Delta's arguments regarding similarity.  <u>See</u> Am. Compl. ¶ 14 (Delta identifying these marks as evidence of the "sans-serif font and blue and white colors in connection with its Delta Marks").  Independently, Delta's failure to identify and compare the *specific* marks at issue provides reason enough for the Court to find that Delta fails to carry its burden to demonstrate similarity of the marks, as would be necessary to make a prima facie showing of trademark infringement.  <u>See, e.g.</u>, <u>Celotex</u>, 477 U.S. at 325; <u>Frehling Enters.</u>, 192 F.3d at 1337; <u>Tana</u>, 611 F.3d at 773; <u>Tomasini</u>, 315 F. Supp. 2d at 1260 n.11 (explaining that a district court is not obligated to "scour the record" to determine whether triable issues exist).

## Acquired Delta Hotels Marks Examples[17]




## Updated Delta Hotels Marks





Upon review and consideration, viewing the evidence in the light most favorable to Marriott (as the non-movant), the Court finds that a reasonable jury could conclude that the Delta Hotels Marks are insufficiently similar to the Delta Marks. On the one hand, the Acquired Delta Hotels Marks are similar to the Delta Marks in that they use the word "Delta" in all capital letters. However, the Acquired Delta Hotels Marks employ a different font, color scheme, and spacing between the characters than the Delta Marks; include a prominent, cursive "D" larger than any

---

[17] The Court distinguishes between the Acquired and Updated Delta Hotel Marks when comparing them to the above exemplars of the Delta Marks. Although all of the Delta Hotels Marks are at issue in this suit, the Acquired and Updated Delta Hotels Marks are indisputably different, and the Court finds they require separate assessments to determine similarity to the Delta Marks.

other letter, unlike the Delta Marks; and include either the words "Hotels" or "Resorts," whereas the Delta Marks do not. See Tarsus Connect, LC v. Cvent, Inc., 452 F. Supp. 3d 1334, 1351 (N.D. Ga. 2020) ("The mere fact that two marks contain the same word does not, in itself, make the marks 'substantially similar'").

On the other hand, the Updated Delta Hotels Marks bear greater resemblance to the Delta Marks. For example, the word "Delta" in the Updated Delta Hotels Marks appears in the same sans-serif font as in the Delta Marks. Pl.'s SOMF ¶ 191. However, the Updated Delta Hotels Marks use a lighter shade of blue than the Delta Marks; include a stylized "D" at the top that is larger than any other character, unlike the Delta Marks; utilize somewhat narrower spacing between the letters than the Delta Marks; and are accompanied by the words "Hotels," "Marriott," or both in a vertical arrangement, whereas the Delta Marks do not.[18] See Wreal, 38 F.4th at 131 ("The presence of a housemark is indeed likely to dispel confusion in ordinarily prudent customers."). Indeed, the Delta Marks emphasize horizontal length, as demonstrated by the wider line of text and large spacing between the characters, whereas the Updated Delta Hotels Marks stress vertical length, as evidenced by the multiple stacked lines and narrower spacing. Additionally, the Delta Marks

---

[18] Delta contends that the "most prominent, salient element" of the Delta Hotels Marks is the word "Delta." [Doc. 441 at 13]. However, a reasonable factfinder could conclude that the most prominent element of the Delta Hotels Marks is the stylized "D" as it appears at the top of the mark, is larger than any other character, and is in a unique style that sets it apart from the rest of the text in the Delta Hotels Marks.

sometimes include a triangular symbol whereas the Delta Hotels Marks include no symbols.  In sum, the "overall impression" of the Delta Marks and Delta Hotels Marks reveals differences such that a reasonable jury could conclude that they are not sufficiently similar.[19]

Otherwise, the Court finds that disputes of fact exist as to the manner in which the Delta Hotels Marks appear and are used.  See, e.g., Wind Rebuttal Report ¶¶ 66–77; Corrected Expert Report of Ravi Dhar ¶¶ 152, 244–47 [Doc. 461-5]; Expert Report of Robert J. Kwortnik ("Kwortnik Report") ¶¶ 97–98 [Doc. 518-17]; [Docs. 449-23; 456-21; 463-9; 517-8].  Thus, because a reasonable jury could find that the Delta Marks and the Delta Hotels Marks are not sufficiently similar, this factor of the likelihood of confusion analysis does not weigh in favor of granting summary judgment to Delta.

### c.   Similarity of goods and services

In analyzing the third factor of the likelihood of confusion analysis, a court evaluates whether "the products are the kind that the public [could] attribute[] to a single source[.]"  Wreal, 38 F.4th at 132; accord Frehling Enters., 192 F.3d at 1338 (stating that this factor involves determining whether the products "are so related in

---

[19] Delta references what a consumer "could" think regarding if cobranding is occurring and if Delta provided Marriott a license to use the Delta Marks and contends that other words in the Delta Hotels Marks are often "virtually illegible." [Doc. 441 at 14–15].  However, such speculation not only fails to support Delta's motion for summary judgment, but also further demonstrates the existence of factual disputes that are proper for a jury to resolve.

the minds of consumers that they get the sense that a single producer is likely to put out both goods"). "The greater the similarity between the products and services, the greater the likelihood of confusion." See Exxon Corp. v. Tex. Motor Exch. of Hous., Inc., 628 F.2d 500, 505 (5th Cir. 1980). This analysis is "intensely factual." Checkpoints Sys., Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 287–88 (3d Cir. 2001).

Upon review and consideration, the Court finds genuine disputes of material fact remain as to the degree of similarity between the Parties' goods and services. According to Delta, its offerings include non-air travel hospitality services, such as lounges, amenities, and travel packages. See, e.g., Deposition of Shannon Womack ("Womack Dep.") at 98:8–12 [Doc. 459-11]; Expert Report of Norm Rose ("Rose Expert Report") ¶¶ 23–42 [Doc. 463-10]; [Doc. 463-11 at 12–17]. Marriott also offers hospitality services, including hotel stays, vacation packages, and other amenities. [See, e.g., Docs. 453-2, 453-5]; Deposition of Brian J. King ("King Dep.") at 237:8–22 [Doc. 434-7]; Rose Expert Report ¶¶ 43–52. Additionally, airline services such as Delta and hotel services such as Marriott sometimes partner and can be booked together. See, e.g., Rose Expert Report ¶¶ 64–70, 122, 143; [Doc. 449-25]. Marriott purportedly took advantage of this "natural connection" by opening Delta Hotels near airports and offering airport shuttle services to customers. See, e.g., Rose Expert Report ¶¶ 52, 112–19; [Doc. 463-9].

Conversely, according to Marriott, the Parties offer "fundamentally different services: airline transportation versus hotel accommodations." [Doc. 516 at 16]. For example, record evidence supports that Delta has a limited presence in the hotel industry in the United States; ███████████████████████████████

███████████████████████████. See, e.g., Def.'s SOAF ¶¶ 55, 57; Wind Rebuttal Report ¶ 35. Additionally, record evidence supports that hotel and airline services are most often booked directly on the company's website and that most consumers book their hotel and airline reservations separately. Def.'s SOAF ¶¶ 75–77. And according to Marriott's expert, Delta's brand is relatively weak outside of the airline industry and consumers are not likely to confuse the Parties' products as originating from the same source when attempting to book hotel and airline services through various channels. See Wind Rebuttal Report ¶¶ 33–38, 78–115; see also Expert Report of Dr. Christopher K. Anderson ("Anderson Expert Report") ¶¶ 45–48 [Doc. 472-1]. Therefore, viewing the evidence in the light most favorable to Marriott (as the non-movant), a reasonable factfinder could conclude that, although the Parties both broadly operate in the travel industry, their products are only *somewhat* similar and are not likely to be confused as attributable to a common single source. See Checkpoint Sys., 269 F.3d at 288 ("When two products are part of distinct sectors of a broad product category, they can be sufficiently unrelated that customers are not likely to assume the products originate from the same mark.").

Accordingly, this factor weighs against granting Delta's motion for summary judgment.

### d. Similarity of sales channels and consumers

The fourth factor of the likelihood of confusion analysis "takes into consideration where, how, and to whom the parties' products are sold." Frehling Enters., 192 F.3d at 1339. Here, the Parties agree that they generally offer their services through common technologies such as websites, telephone calls, and cell phone apps. [See Docs. 441 at 19; 516 at 18]. Undisputed record evidence also supports that the Parties generally advertise in similar locations nationwide. Pl.'s SOMF ¶¶ 174–79; [Docs. 441 at 21; 516 at 19 (Marriott's response brief only objecting to this portion of Delta's brief in that Delta purportedly failed to adduce evidence of audience overlap)]. Similarly, undisputed record evidence supports that both Delta and Marriott target travelers, including air travelers. See Frehling Enters., 192 F.3d at 1339 ("The parties' outlets and customer bases need not be identical, but some degree of overlap should be present."); see also, e.g., Expert Rebuttal Report of Robert J. Kwortnik ("Kwortnik Rebuttal Report") ¶¶ 56–57 [Doc. 518-18]; Corrected Expert Report of David Franklyn at 53 [Doc. 465-11]; [Docs. 449-23, 453-8, 453-21, 456-2, 463-8]; King Dep. at 204:25–205:10.

Otherwise, disputes of fact exist as to the extent the Parties offer their services in the same channels, particularly regarding "how" they offer their services.

Frehling Enters., 192 F.3d at 1339. On the one hand, as Delta points out, record evidence supports that customers can book Delta flights and Marriott's Delta Hotels together as one purchase through the same medium. See, e.g., Pl.'s SOMF ¶ 146; [Doc. 449-25]; Rose Expert Report ¶¶ 64–70. On the other hand, record evidence supports that more than eight (8) in ten (10) consumers book their travel components separately and that hotel and airfare are generally booked directly on the providing company's website. Def.'s SOAF ¶¶ 75–77; [Doc. 512-6 at 42].

On the whole, the Court finds that this factor weighs somewhat in favor of finding a likelihood of confusion.

### e. Similarity of advertising media

The fifth factor of the likelihood of confusion analysis considers "each party's method of advertising" and is concerned with "whether there is likely to be significant enough overlap in the readership of the publications in which the parties advertise that a possibility of confusion could result." See Wreal, 38 F.4th at 135. Delta presents extensive record evidence of the similarity in both the Parties' advertisements and locations, which Marriott only disputes in general fashion. [See Docs. 441 at 21; 516 at 19 (disputing only because Delta supposedly did not present evidence of audience overlap and that a jury should "consider the differences in the [P]arties' ads themselves")]. Therefore, this factor weighs in favor of finding a likelihood of confusion.

### f.    Intent to misappropriate

In analyzing the sixth factor of the likelihood of confusion analysis, a court "must determine whether the defendant adopted [the] plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation." See Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC, 605 F.3d 931, 940 (11th Cir. 2010) (internal quotation marks and citation omitted). In other words, this factor concerns whether the defendant "copie[d] a design intending to cause confusion" rather than just engaging in intentional copying. See Yellowfin Yachts, Inc. v. Baker Boatworks, LLC, 898 F.3d 1279, 1293 (11th Cir. 2018). "This distinction is an important one. If a defendant intentionally copies an aspect of the plaintiff's product, but not with intent to confuse consumers, then the defendant's intent has little bearing on the ultimate question: whether the allegedly infringing product is likely to confuse consumers." Id. "Such intent involves bad faith in the adoption and use of a trademark that normally involves efforts by a party to pass off its product as that of another. Mere knowledge of another's mark does not create an inference of intent to misappropriate." Off Lease Only, Inc. v. Lakeland Motors, LLC, 825 F. App'x 722, 730 (11th Cir. 2020).

Upon review and consideration and viewing the evidence in a light most favorable to Marriott (as the non-movant), the Court finds that disputes of material fact exist. In support of Marriott's supposed intent to cause customer confusion by

using the Delta Hotels Marks, Delta identifies the following: (1) despite knowing of Delta, Marriott bought Delta Hotels—a company with a similar name and located primarily in Canada—to expand Delta Hotels to the United States; (2) Marriott externally stressed Delta Hotels' ties to Canada while internally planning to bring the brand to the United States; (3) Marriott internally nicknamed the Delta Hotels acquisition ████████████████████████; (4) Marriott opened Delta Hotels near airports; (5) Marriott changed the Acquired Delta Hotels Marks in an effort to supposedly "mimic[]" the Delta Marks and █████████████████ ████████████; (6) Marriott's internal communications between 2015 and 2019 following its acquisition of Delta Hotels repeatedly reference the confusion occurring between Delta and Delta Hotels; and (7) Marriott took advantage of Delta's high search volume and bought advertisement keywords with ███ and ███ [Doc. 441 at 22–25].

However, viewed in a light favorable to Marriott, this record evidence is largely capable of more than one explanation. For example, a reasonable factfinder could view Marriott's internal communications referencing the confusion between Delta and Delta Hotels as merely acknowledging that such confusion was occurring and attempting to resolve it rather than evidence of its intent to cause and capitalize on it. See Off Lease Only, 825 F. App'x at 730 ("Mere knowledge of another's mark does not create an inference of intent to misappropriate."); [see also, e.g., Docs.

33

459-3 ██████████████████████████████████████████

████████████████████████████████████████████████

██████████ (emphasis added)); 459-5 (claiming that ████████

████████████████████ and that the Delta Hotels Marks also ██████

██████); 464-20 (stating that Marriott should ████████████████

████████████████████████████); 464-21 (striving to

create content for Delta Hotels so that ████████████████████

████████████████████); 464-23 (discussing ████████████

████████████████████████████████████)].

Similarly, that Marriott opened Delta Hotels near airports is not conclusive evidence

of its intent to cause confusion because, as discussed above, Marriott markets itself

to travelers, including those traveling by airplane. Further, Marriott's purchase of

advertisement keywords ████████████████████████████████████ is

not irrefutable evidence that Marriott intended to capitalize on Delta's existing

goodwill. Further, Marriott presents record evidence to rebut Delta's position,

including that Marriott (1) acquired the Delta Hotels brand to "fill a void in its

portfolio" rather than to capitalize on Delta's brand and confuse consumers; (2) also

nicknamed a past endeavor ████████████ and only used that name for the

acquisition because its ████████████████ was finally able to ████████; (3)

communicated with Delta regarding its purchase of Delta Hotels; and (4) created the

Updated Delta Hotels Marks to more clearly associate that product with Marriott and modernize the brand, not to cause customer confusion.  [Doc. 516 at 20–23].

In sum, disputes of fact abound, and a reasonable jury could find that Marriott did not intend to cause consumer confusion or trade off Delta's goodwill.  Therefore, this factor does not favor a likelihood of confusion as a matter of law.

### g.    *Actual confusion*

In assessing the seventh factor of the likelihood of confusion analysis, a court looks to see whether members of the consuming public were actually confused by the infringing mark.  See Wreal, 38 F.4th at 127.   "Evidence of actual confusion is the best evidence of a likelihood of confusion[;] . . . even a very little amount of actual confusion is highly probative."  Id. at 137.   The strongest evidence of confusion includes "actual customers [who] were confused by the use of a mark as opposed to other categories of people."  Aronowitz v. Health-Chem Corp., 513 F.3d 1229, 1240 (11th Cir. 2008).   "Actual confusion by a few customers is evidence of likelihood of confusion by many customers."  Silverton Mortg. Specialists, Inc. v. FDIC for Silverton Bank, N.A., Civil Action No. 1:09-CV-1583-AT, 2012 WL 13001592, at *18 (N.D. Ga. Sept. 28, 2012).   "Such instances of confusion include customer inquiries regarding possible affiliation between the parties or attempts to purchase goods or services actually offered by the other party."  Id.  Survey results can also be evidence of actual confusion.  See Rice v. Brand Imports, L.L.C., Civil

Action No. 1:09-CV-3254-MHS, 2010 WL 11549769, at *4 (N.D. Ga. Sept. 16, 2010).

Delta identifies the following as evidence of actual confusion between Delta and Delta Hotels: (1) Marriott's internal documents discussing confusion occurring; (2) online comments and reviews for Delta Hotels; (3) searches for "delta hotels" on Google which also include questions regarding the associations between Delta and Delta Hotels in the "People also ask" section; (4) complaints to Delta; (5) complaints to Marriott; (6) media commentary; and (7) comments from sophisticated business operatives.  [Doc. 441 at 25–29].  Of these categories, the online comments[20] [see Docs. 454-1 ("name 'Delta' is confusing and misleading as for some reason I thought it is associated with Delta airlines and can get miles"), 454-2 ("Delta is an excellent airline so the hotel can definitely up the game a bit"), 454-6 ("I'm mad at myself for missing the window to tell Delta/Marriott how horrible their hotel is")]; complaints to Delta [Docs. 464-3, 464-4, 464-6]; and complaints to Marriott [Docs. 464-7, 464-8, 464-10] are the strongest evidence of actual customer confusion.  See Aronowitz,

---

[20] Several exhibits Delta cites do not conclusively support actual customer confusion because many of those customer reviews acknowledge that the Delta Hotels brand is owned by Marriott, merely refer to Delta Hotels as "The Delta," or generally reference their Delta flight without stating that they believed that Delta Hotels is affiliated with Delta.  [See, e.g., Docs. 453-25 ("I wasn't sure if the hotel was related to Delta Airlines, but when I saw Marriott's name along with the hotel name . . . I decided to give it a try"), 454-3, 454-4, 454-5].  Additionally, the Parties dispute whether the "People also ask" section on Google shows questions from actual consumers.  See, e.g., Anderson Expert Report ¶¶ 34–37.  Otherwise, the Parties dispute the nature and interpretation of much of the other categories of evidence Delta cites that do not come from actual consumers.

513 F.3d at 1240 (noting the strongest evidence of confusion comes from actual customers). Delta also adduces survey evidence demonstrating an average confusion rate of 26.8%. [Doc. 441 at 28–29]; Corrected Expert Report of David Franklyn at 49 [Doc. 465-11]; Expert Report of David Neal, Ph.D. at 16 [Doc. 458-11]; Expert Report of Phillip C. Zerrillo at 19 [Doc. 458-12]; Expert Report of Carol A. Scott, Ph.D. at 16–29 [Doc. 458-13].

Marriott dismisses the online comments and complaints from customers as a "compilation of misdirected communications, inquiries on whether the [P]arties are affiliated, and statements indicating the authors understand there is no relation." [Doc. 516 at 27]. Although *some* of Delta's cited evidence does not demonstrate actual confusion, the record evidence the Court cites above clearly indicates actual customer confusion regarding the affiliation between Delta and Delta Hotels. Otherwise, Marriott produces its own expert who presents competing statistics regarding actual confusion and disputes Delta's experts' findings on this issue. See Expert Rebuttal Report of Dr. Bruce Isaacson ("Isaacson Rebuttal Report") [Doc. 511-18]; see also Expert Report of Dr. Bruce Isaacson ("Isaacson Expert Report") [Doc. 511-19].

Given that "even a very little amount of actual confusion is highly probative" and the clear record evidence of at least some actual consumer confusion in this case,

the Court finds that this factor weighs in favor of finding a likelihood of confusion at this stage.  See Wreal, 38 F.4th at 137; Aronowitz, 513 F.3d at 1240.

### h.    Summary of trademark infringement factors

In sum, only three (3) of the seven (7) factors weigh in Delta's favor as to a likelihood of confusion at this procedural juncture.  Otherwise, as detailed above and in the Parties' briefs, a plethora of disputes of material fact currently exist.  Thus, the Court finds that likelihood of confusion is more appropriate for a jury to resolve, and the Court denies Delta's motion for summary judgment on its Counts I–IV.

### 2.    Delta's counts V–VI[21]

To establish a claim of trademark dilution, a plaintiff must show:

> (1) that the plaintiff's mark is "famous," meaning that "it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner," (2) that the defendant is making a commercial use of the mark in interstate commerce, (3) that defendant's use of the mark began after the mark became famous, and (4) defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

Chanel, Inc. v. Bryan, Civil Action No. 1:07-CV-0225-ODE, 2008 WL 11336327, at *5 (N.D. Ga. Nov. 18, 2008) (cleaned up).  Marriott does not appear to dispute

---

[21] The same analysis governs Delta's Count V for federal trademark dilution and its Count VI for trademark dilution pursuant to O.C.G.A. § 10-1-451.  See Crossfit, Inc. v. Quinnie, 232 F. Supp. 3d 1295, 1310 (N.D. Ga. 2017).  Thus, the Court analyzes these claims together.

that Delta meets the second and third factors of the trademark dilution analysis. [See Doc. 516 at 31–44]. The Court therefore assesses the first and fourth factors in turn.

### a. Element one: are the Delta Marks famous?

In determining if a mark is famous, courts consider factors such as:

(1) the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark was registered.

Bell v. Foster, Civil Action No. 1:13-CV-0405-TWT, 2013 WL 6229174, at *6 (N.D. Ga. Dec. 2, 2013). Delta offers undisputed record evidence of its advertising and publicity regarding the Delta Marks since 1929, its billions of dollars in sales, survey data demonstrating high recognition of the Delta Marks, and that the Delta Marks are federally registered. [Doc. 441 at 30–32]. In its response brief, Marriott does not dispute this record evidence but argues that Delta "fail[s] to isolate which" of the Delta Marks gained fame through these means and points to its expert's opinion that the Delta Marks are not as strong and must be separated from the Delta brand. [Doc. 516 at 36–37]. However, the Court assesses the fame of the Delta Marks collectively because, at minimum, they all use the word "Delta." [See Doc. 459-7 at 10–120]; New Balance Athletics, Inc. v. USA New Bunren Int'l Co. Ltd. LLC, 424 F. Supp. 3d 334, 350–51 (D. Del. 2019) (finding New Balance's family of "N" marks famous given its longstanding advertising, revenue, and registration

without specifically examining each mark).  Thus, on the whole, the above-factors

weigh in favor of a finding that the Delta Marks are famous for purposes of Delta's

trademark dilution claims.  <u>See</u> <u>Delta Air Lines, Inc. v. Wunder</u>, Civil Action No.

1:13-CV-3388-MHC, 2015 WL 11242003, at *15 (N.D. Ga. Dec. 15, 2015) ("It

cannot be contested that Delta's mark is a famous mark.").

### b. *Element four: likely dilution by blurring*

Dilution by blurring is defined as "association arising from the similarity

between a mark or trade name and a famous mark that impairs the distinctiveness of

the famous mark."  15 U.S.C. § 1125(c)(2)(B).  In determining whether a mark "is

likely to cause dilution by blurring, the court may consider all relevant factors,"

including (1) the similarity between the marks, (2) the distinctiveness of the famous

mark, (3) if the owner of the famous mark is engaging in substantially exclusive use

of the mark, (4) recognition of the famous mark, (5) whether the user of the other

mark intended to create an association between it and the famous mark, and (6) any

actual association between another mark and the famous mark.[22]  Id.  There is "substantial overlap" between the trademark infringement and trademark dilution factors.  Adidas Am., Inc. v. Skechers USA, Inc., 890 F.3d 747, 759 (9th Cir. 2018); accord Wunder, 2015 WL 11242003, at *15 ("In determining whether there is dilution by blurring, the Court must consider factors similar to those assessed in the likelihood of confusion analysis" (cleaned up)).

Of the six (6) factors courts consider in assessing a trademark dilution claim, only the recognition factor weighs in Delta's favor at this stage for the same reasons the Court found the Delta Marks to be famous.  See New Balance Athletics, Inc.,

---

[22] Marriott argues that the Court should consider an additional factor—that Delta "fail[ed] to identify any evidence of impairment[.]"  [Doc. 516 at 33–35].  However, since 2006, the law has been that "a plaintiff need establish only likely dilution[,]" *not* actual dilution.  Louis Vuitton Malletier, S.A. v. Hyundai Motor Am., No. 10 Civ. 1611(PKC), 2012 WL 1022247, at *5 (S.D.N.Y. Mar. 22, 2012) (discussing this requirement at summary judgment); accord 15 U.S.C. § 1125(c)(1); see also, e.g., Provide Com., Inc. v. Preferred Com., Inc., No. 07-80185 CIV, 2008 WL 926777, at *4 (S.D. Fla. Apr. 4, 2008) (noting that after the 2006 amendments, a plaintiff "need only prove likelihood of dilution rather than actual dilution"); World Triathlon Corp., Inc. v. Dawn Syndicated Prods., No. 8:05-CV-983-T-27EAJ, 2007 WL 2875456, at *9 (M.D. Fla. Sept. 28, 2007) (discussing this 2006 change to the trademark dilution analysis).  Indeed, the Supreme Court case Marriott cites in its brief was decided prior to these revisions.  [See Doc. 516 at 33] (citing Moseley v. V Secret Catalogue, Inc., 537 U.S. 418 (2003)).  And the revised statute sets out a non-exhaustive list of six (6) factors that the Court should consider in determining if there is a likelihood of dilution.  See 15 U.S.C. § 1125(c)(2)(B).  In other words, the six (6) non-exhaustive factors help determine whether there has been "association . . . that impairs the distinctiveness of the famous mark."  Id.  Thus, at this juncture, the Court considers those six (6) statutory factors in determining whether Delta has established a likelihood of dilution by blurring as a matter of law. Id.  Record evidence of actual dilution or impairment might be helpful as one of the "relevant factors" that the Court can consider in making that determination, but it is neither required nor dispositive.  See id.; see also, e.g., Visa Int'l Serv. Ass'n v. JSL Corp., 610 F.3d 1088, 1091 (2d Cir. 2010) ("a plaintiff seeking to establish a likelihood of dilution is not required to go to the expense of producing expert testimony or market surveys; it may rely entirely on the characteristics of the marks at issue").

424 F. Supp. 3d at 351 (finding the marks at issue had a high degree of recognition for the same reasons the court found the marks famous).  As discussed above, disputes of fact exist regarding (1) the similarity of the Delta Marks and Delta Hotels Marks, (2) the distinctiveness of the Delta Marks and Delta's substantially exclusive use of the same given the extensive presence of third parties who use the word "Delta," and (3) whether Marriott intended to create an association between the Delta Marks and Delta Hotels Marks.[23]  Supra, part III.B.1; see also Am. Dairy Queen Corp. v. W.B. Mason Co., Inc., No. 18-CV-693 (SRN/ECW), 2022 WL 2760024 at *83–84 (D. Minn. July 14, 2022) (noting that some courts have used caution in granting summary judgment on dilution claims with respect to common words such as "Blizzard" and that "the extent to which the word is used on other branded products or services in the marketplace," including those in separate industries, is relevant to the mark's distinctiveness and if the user engaged in substantial exclusive use); Bath & Body Works Brand Mgmt., Inc. v. Summit Ent., LLC, 7 F. Supp. 3d 385, 400 (S.D.N.Y. 2014) (finding the substantially exclusive use factor favored the defendant in part because there were at least sixty-three (63) active trademark registrations involving the word "twilight" which the plaintiff's mark also used); Herman Miller, Inc. v. Belnick LLC, Civil Action No. 1:18-CV-

---

[23] The portions of the Parties' briefs discussing the dilution factors largely rely on similar arguments and evidence as the likelihood of confusion elements of Delta's trademark infringement claim.  [Docs. 441 at 33–39; 516 at 38–44].

05012-WMR, 2021 WL 2582563, at *1 (finding third-party use relevant to evaluating the distinctiveness of a mark for a trademark dilution claim); <u>Gucci Am., Inc. v. Guess?, Inc.</u>, 868 F. Supp. 2d 207, 252 (S.D.N.Y. 2012) (finding a mark distinctive in the trademark dilution context for the same reasons it found the mark strong in the trademark infringement context). As for actual association, it is unclear if this factor is similar to actual confusion in the trademark infringement context in that the strongest evidence is actual association by customers. <u>See</u> <u>Aronowitz</u>, 513 F.3d at 1240. Thus, although Delta produces some record evidence of actual customer confusion and association between it and Delta Hotels, the Parties' experts fiercely dispute the existence of actual association. [<u>Compare, e.g.</u>, Doc. 456-18 ¶ 16], <u>with</u> Expert Rebuttal Report of Jackie Chorn, Ph.D. ("Chorn Rebuttal Report") ¶¶ 25–41, 69, 70–72 [Doc. 511-25]. Therefore, this factor weighs in neither Parties' favor at this juncture.[24]

In sum, because five (5) of the six (6) dilution by blurring factors implicate disputes of fact, the Court finds that Delta's trademark dilution claims are more appropriate for a jury's resolution and denies Delta's motion for summary judgment on its Counts V and VI.

---

[24] Even if this factor weighed in Delta's favor, just as with Delta's trademark infringement claim, the Court would still not grant Delta's motion for summary judgment given the disputes of fact that exist with regard to the other trademark dilution factors.

### C. Marriott's Affirmative Defenses

Marriott asserts the affirmative defenses of laches, acquiescence, equitable estoppel, and waiver in response to Delta's claims. Answer ¶¶ 93–96. The Parties both move for summary judgment as to each of these four (4) defenses. The Court addresses each defense in turn.

### 1. Laches

Delta contends it is due summary judgment on Marriott's laches defense because the earliest any laches clock could have begun was April 21, 2016—the date Marriott opened its first Delta Hotels location after acquiring that brand—and Delta filed suit less than four (4) years after that date. [Doc. 441 at 50–54]. Contrarily, Marriott asserts it is due summary judgment because (1) Delta Hotels existed in the United States since the 1980s and (2) following Marriott's acquisition of Delta Hotels in 2015, record evidence supports that Delta knew of Marriott's use of the supposedly infringing marks.[25] [Doc. 479 at 47–51]. Thus, Marriott contends that regardless of whether the laches clock began as early as the 1980s or as late as 2015, Delta's present suit was filed more than four (4) years later (on March 11, 2020), and is therefore time-barred. [Id.]

> The equitable defense of estoppel by laches may be applied to bar claims for trade dress or trademark infringement brought under the Lanham Act. Though the doctrine is an equitable doctrine that should

---

[25] At this stage, Marriott only seeks summary judgment as to Delta's claims for monetary relief in Counts I, II, IV, V, and VI. [Doc. 479 at 47 n.22].

be applied flexibly, a defendant must demonstrate the presence of three elements in order to successfully assert laches as a defense: (1) a delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted. The Lanham Act does not contain a statute of limitations. However, in trademark cases th[e Eleventh Circuit] has followed the Sixth Circuit, which applies the period for analogous state law claims as the touchstone for laches.

Kason Indus., Inc. v. Component Hardware Grp., Inc., 120 F.3d 1199, 1203 (11th Cir. 1997) (internal citations omitted). The Parties agree that the analogous state law in this trademark action is the Georgia Deceptive Trade Practices Act, which carries a four (4)-year limitations period. [See Docs. 441 at 51; 479 at 48]; see also Groucho's Franchise Sys., LLC v. Grouchy's Deli, Inc., 683 F. App'x 826, 829 (11th Cir. 2017). Thus, where the delay in asserting the right or claim is "less than four years," "the plaintiff's claims are not barred by laches. Unique Sports Prods., Inc. v. Babolat VS, 403 F. Supp. 2d 1229, 1241 (N.D. Ga. 2005); accord Angel Flight of Ga., Inc. v. Angel Flight Se., Inc., 424 F. Supp. 2d 1366, 1370 n.5 (N.D. Ga. 2006) ("if [a trademark claim] is filed after the analogous limitations period has expired, the presumption is that laches is a bar to some or all remedies sought in the suit" (quoting THOMAS MCCARTHY, McCarthy on Trademarks and Unfair Competition § 31.23 (4th ed. 1997)), aff'd sub nom. Angel Flight of Ga., Inc. v. Angel Flight Am., Inc., 522 F.3d 1200 (11th Cir. 2008).

As to the first and second elements, "delay is to be measured from the time in which the plaintiff knows or should know [it] has a provable claim for infringement."

Kason Indus., Inc., 120 F.3d at 1206; accord Pinnacle Advert. & Mktg. Grp., Inc. v.
Pinnacle Advert. & Mktg. Grp., LLC, 7 F.4th 989, 1005–06 (11th Cir. 2021). In this
regard, the plaintiff "has no obligation to sue until the likelihood of confusion looms
large." Kason Indus., Inc., 120 F.3d at 1206 (quoting MCCARTHY, supra, § 31.19).
Use of the infringing mark in other countries does not start the laches clock.
MCCARTHY, supra, § 31.19. Neither does merely registering the supposedly
infringing mark in the United States begin the laches period. See id. § 31.40; Valmor
Prods. Co v. Standard Prods. Corp., 464 F.2d 200, 204 (1st Cir. 1972) (refusing to
begin the laches clock on the date of the registration). Additionally, "any change in
the format or method of use of the mark or expansion into new product lines or
territories" is sufficient to excuse delay in filing suit. MCCARTHY, supra, § 31.19;
see also Univ. of Pittsburgh v. Champion Prods. Inc., 686 F.2d 1040, 1046 (3d Cir.
1982) (holding that delay did not bar the suit in part because "the character and scope
of the alleged infringement changed substantially over the years").

As for the third element, "[c]ourts have previously recognized two categories
of prejudice caused by a delay in bringing a trademark infringement suit—
evidentiary prejudice and economic prejudice." Pinnacle Advert. & Mktg. Grp., 7
F.4th at 1010 (citing MCCARTHY, supra, § 31.12). "Economic or expectation-based
prejudice encompasses actions made by the defendant that it would not have taken

or consequences it would not have experienced had the plaintiff brought suit promptly." MᴄCᴀʀᴛʜʏ, supra, § 31.19 (collecting cases).

Upon review and consideration, the Court denies Marriott summary judgment on its laches defense and grants in part and denies in part summary judgment to Delta regarding the same. First, the Court grants Delta summary judgment on Marriott's laches defense to the extent that Marriott asserts that the laches clock began prior to Marriott's acquisition of Delta Hotels in 2015. Prior to Marriott's acquisition, the record evidence supports that Delta Hotels had—at best—a very limited presence in the United States. [See, e.g., Docs. 459-1, 464-12]. Indeed, before Marriott acquired it, Delta Hotels only opened a single property in the United States called "Delta Court of Flags," and that property operated using a different mark than those at issue here and closed years before Marriott's acquisition. See Pl.'s SOMF ¶¶ 183–84, 187–88; Def.'s SOAF ¶¶ 92–93, 132; King Dep. at 47:19–48:14; [Doc. 468-10]. Otherwise, Marriott only provides a scintilla of evidence regarding Delta Hotels' presence in the United States prior to Marriott's acquisition of the same.[26] [See Docs. 473-14 (a 1986 letter from Mr. Paul Zampol referencing Delta Hotels' desire to advertise and construct hotels in the United States); 479-3 (a 1984 Delta Hotels

---

[26] Marriott also references that, in 1986, Delta withdrew (with prejudice) its opposition to other trademark applications made by Delta Hotels. [Doc. 479 at 49–50]. However, the marks at issue in those proceedings expired long before Marriott's acquisition of Delta Hotels. [See Docs. 447-13; 447-14; 473-19; 473-20; 479-12 at 144–46]. Regardless, trademark proceedings have only limited preclusive effect on subsequent lawsuits. See Beasley v. Howard, 14 F.4th 226, 233–35 (3d Cir. 2021); MᴄCᴀʀᴛʜʏ, supra, § 32:82.

advertisement in a Fargo, North Dakota newspaper)]; Deposition of Richard Hoffman ("Hoffman Dep.") at 141:11–142:22 [Doc. 479-4] (testifying that Delta Hotels was "using" its mark in the United States without reference to any specific year or activity)).

Following the 2015 acquisition, Marriott expanded the Delta Hotels brand to the United States using the Delta Hotels Marks to an extent and in a manner different from and beyond its predecessor's previous use and activity.  See, e.g., Pl.'s SOMF ¶¶ 151, 165, 183, 185, 187–88, 191; Def.'s SOMF ¶¶ 14–17, 92–93; Def.'s SOAF ¶¶ 93, 123–25, 127–28, 132; [Docs. 443-4 at 18; 461-13; 473-12 at 162, 164; 479-14; 513-17; 513-23].  Therefore, assuming *arguendo* that Delta delayed in bringing suit prior to Marriott's 2015 acquisition of the Delta Hotels brand, that delay is excused as a matter of law because the undisputed record evidence supports that Marriott's acquisition of Delta Hotels in 2015 led to "change in the format or method of use of the [Delta Hotels Marks] or expansion into new product lines or territories[.]"  MCCARTHY, supra, § 31.19.

However, the Court denies Delta summary judgment on Marriott's laches defense to the extent that Marriott asserts that defense based on the time between Marriott's 2015 acquisition of Delta Hotels and March 11, 2016—four (4) years before Delta initiated this suit.  See Compl. (filed March 11, 2020).  Disputes of material fact exist as to whether Delta knew or should have known of its potential

infringement claims and the likelihood of consumer confusion during this time period.[27]  [See, e.g., Docs. 443-4 at 3–5 (Marriott claiming to have used the Updated Delta Hotels Marks in the United States as early as January 2016); 454-28 (April 21, 2016 press release announcing opening of the first of Marriott's Delta Hotels properties in the United States); 461-11 (Mr. Benjamin's August 6, 2018 email to Mr. Kilmer claiming the issue of the Delta Hotels Marks "just came to our attention"); 473-12 at 51–56 (Marriott's February 9, 2016 opposition to Delta's attempt to register the "DELTA ONE" mark and claiming to be the owner of "DELTA" composite marks and that it has the "exclusive right to use the marks in commerce"), 162 (Delta stating that "[n]either Marriott nor its subsidiary Delta Hotels and Resorts operated any 'Delta' branded properties in the United States *until December 2015*" (emphasis added)), 164 (Delta's response to Marriott's opposition to Delta's U.S. trademark application for the "DELTA ONE" mark stating that as of May 6, 2015, it was "aware that Marriott and its predecessor in interest had generally used" marks that included the word "'Delta' in connection with" two (2) of the

---

[27] Delta argues that, even if the laches clock began in 2015, time spent in settlement talks does not count towards the laches time calculation.  [Docs. 441 at 52–53; 528 at 54 n.41].  Delta identifies a 2018 email as evidence that it attempted to resolve this dispute with Marriott, and thus any time between that 2018 email and the filing of this suit does not count.  Id. (referencing [Doc. 461-11]).  However, factual disputes exist between the Parties as to the nature of this 2018 email and if the Parties' subsequent discussions concerned all of the Delta Hotels Marks or just the Updated Delta Hotels Marks.  [Docs. 516 at 53; 542 at 26].  At minimum, there is not sufficient evidence in the record for the Court to determine any definite period of time to exclude from the laches clock as a matter of law.

Acquired Delta Hotels Marks); 513-17 (June 5, 2015 news article showing one of the Acquired Delta Hotels Marks integrated with Marriott's advertisement for its rewards program)]; Def.'s SOMF ¶ 100.  Thus, because a reasonable jury could find that the laches clock began at some point between Marriott's 2015 acquisition of Delta Hotels and March 11, 2016, and therefore, that the four (4)-year laches period expired prior to Delta filing this suit on March 11, 2020, the Court denies Delta summary judgment on Marriott's laches defense to that extent.

Additionally, disputes of material fact exist regarding the third element of Marriott's laches defense: whether Marriott faced prejudice as a result of Delta's failure to earlier initiate this suit.  Specifically, Marriott's expert Mr. John G. Plumpe contends that Marriott has incurred economic prejudice in an amount in excess of ███████.[28]  See Supplemental Expert Report of John G. Plumpe ("Plumpe Supplemental Report") ¶ 171 [Doc. 479-15]; see also Pinnacle Advert. & Mktg. Grp., 7 F.4th at 1010 (holding the district court did not clearly err in finding economic prejudice due to investments made in promoting both the business generally and the disputed mark); MCCARTHY, supra, § 31.19 ("Economic or

---

[28] Marriott also claims to have been prejudiced in the form of "lost memories and documents." [Docs. 479 at 51 n.24; 516 at 55].  However, in support of this argument, Marriott only cites to the deposition of Mr. Paul Zampol regarding his involvement with Delta in the 1980s and 1990s.  [Id.] (citing Deposition of W. Paul Zampol [Doc. 436-4]); see also Def.'s SOAF ¶ 96.  Because the Court grants Delta summary judgment on any laches argument regarding conduct prior to Marriott's 2015 acquisition of the Delta Hotels brand, even if Marriott presents evidence of prejudice from the time period before that acquisition, including the '80s and '90s, it is irrelevant.

expectation-based prejudice encompasses actions made by the defendant that it would not have taken or consequences it would not have experienced had the plaintiff brought suit promptly." (collecting cases)).  Contrarily, record evidence suggests that Marriott proceeded with its Delta Hotels business activities and brand expansion while simultaneously acknowledging potential confusion between it and Delta—and while acknowledging Delta's objections to these activities and expansion.  [E.g., Docs. 459-5 at 6 (transcript of July 5, 2015 phone call in which Marriott representatives acknowledge ███████████████████████████);

461-11 (Mr. Benjamin's August 6, 2018 email to Mr. Kilmer noting the similarities between Delta and Marriott's marks and logos and stating that Delta is "obviously very concerned about the risks of marketplace confusion" and requesting that Marriott "agree to discontinue these versions of its marks"); 461-13 (Marriott memorandum showing that it opened twenty-one (21) Delta Hotels by Marriott since Mr. Benjamin's August 6, 2018 email); 473-12 at 51–56 (Marriott's February 9, 2016 opposition to Delta's attempt to register the "DELTA ONE" mark claiming to be the owner of "DELTA" composite marks and that it has the "exclusive right to use the marks in commerce")].

In sum, the Court denies Marriott's motion for summary judgment on its laches defense.  The Court grants Delta's motion for summary judgment to the extent it argues that Marriott is barred as a matter of law from arguing its laches defense

based on pre-acquisition events and conduct. The Court denies Delta's motion for summary judgment with regard to Marriott's laches defense to the extent that defense is based on the time period between Marriott's acquisition of Delta Hotels and March 11, 2016.

2.    Acquiescence

"Generally speaking, acquiescence is an equitable doctrine that permits the court to deny relief in an action for trademark infringement if the evidence shows that the owner of the mark has, through his words or conduct, conveyed his consent to the defendant's use of the mark." Hyson USA, Inc. v. Hyson 2U, Ltd., 821 F.3d 935, 940 (7th Cir. 2016). The defense of acquiescence requires "(1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." SunAmerica Corp. v. Sun Life Assur. Co., 77 F.3d 1325, 1334 (11th Cir. 1996). "The difference between acquiescence and laches is that laches denotes passive consent and acquiescence denotes active consent." Angel Flight of Ga., Inc., 522 F.3d at 1207; accord Piper Aircraft Corp. v. Wag-Aero, Inc., 741 F.2d 925, 933 (7th Cir. 1984) ("acquiescence is associated with intentional abandonment" (internal marks and citations omitted)). Indeed, acquiescence is applicable "only in those cases where the trademark owner, by *affirmative* word or deed, conveys its implied consent to another." See

MCCARTHY, supra, § 31.41 (emphasis in original). "'Active consent' does not necessarily mean an explicit promise not to sue. It only requires 'conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his trademark rights against the defendant.'" Univ. of Ala. Bd. of Trustees v. New Life Art, Inc., 683 F.3d 1266, 1282 (11th Cir. 2012) (quoting Creative Gifts, Inc. v. UFO, 235 F.3d 540, 547–48 (10th Cir. 2000)).

Upon review and consideration, the Court finds that Delta is due summary judgment on Marriott's acquiescence defense. Based on the record evidence, no reasonable jury could conclude that Delta actively consented to Marriott's use of the purportedly infringing Delta Hotels Marks. Marriott cites to seven (7) categories of evidence that purportedly demonstrate Delta's "active consent": (1) Delta's express consent per the Agreement not to challenge such marks; (2) consent agreements that Delta signed for marks in other countries; (3) Delta's failure to file oppositions to certain of Marriott's trademark applications; (4) Delta's booking portal displaying the Updated Delta Hotels Marks; (5) Delta booking rooms for its employees and passengers at Delta Hotels; (6) allowing customers to book rooms at Delta Hotels through the Delta website; and (7) entering into a "room agreement" with a Delta Hotels property in 2018. [Doc. 479 at 54–55].

The Court finds this evidence insufficient for at least four (4) reasons. First, as explained in more detail below, the Court finds that the Agreement does not

include a promise not to challenge trademarks outside of Hong Kong and China.
Infra, part III.E.  Second, consent to marks in other countries does not amount to
active consent to use the same marks domestically.  See, e.g., Gibson Brands, Inc. v.
John Hornby Skewes & Co. Ltd., No. CV 14-00609-DDP(SSx), 2016 WL 7479317,
at *5 (C.D. Cal. Dec. 29, 2016) ("A party might decline to litigate extraterritorial
trademark violations for any number of reasons, while still intending to prosecute
any claim that might arise in the domestic context.").  Third, Delta's failure to file
opposition to Marriott's trademark registrations in certain instances, by definition,
is not "active" conduct consenting to Marriott's use of the same.  See Active
Conduct, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Behavior that involves a
person *doing something*" (emphasis added)).  Fourth, the other conduct Marriott
cites is too disconnected and attenuated from the specific trademark disputes at bar
for this Court to find that a reasonable factfinder could conclude that such unrelated,
tangential conduct amounts to active consent or an implied assurance that Delta
would not later assert its trademark rights with respect to the Delta Hotels Marks in
the United States.[29]  See Top Tobacco, L.P. v. Star Importers & Wholesalers, Inc.,
Civil Action No. 1:19-CV-4939-MLB, 2021 WL 4081627, at *13 (finding no

---

[29] Further, Marriott does not provide evidence as to whether this is attributable to Delta as a whole.
See MCCARTHY, supra, § 31.39 ("A corporation is not charged with notice if business dealings
with defendant were conducted by lower echelon employees who had no duty to report instances
of trademark infringement").  Instead, Marriott only asserts in conclusory fashion that "higher
echelon employees would be aware of" this conduct given the ███████████
involved.  [Doc. 542 at 29].

dispute of material fact with regard to active consent for acquiescence even though the plaintiff's agents visited the defendant's warehouses where the supposed infringement occurred); see also, e.g., McCARTHY, supra, § 31.41 (stating that acquiescence applies "only in those cases where the trademark owner, by *affirmative* word or deed, conveys its implied consent to another" (emphasis in original)); Elvis Presley Enters., Inc. v. Elvisly Yours, Inc., 936 F.2d 889, 894 (6th Cir. 1991) ("acquiescence is intentional"). At most, this conduct demonstrates Delta's awareness of Marriott's Delta Hotels brand rather than "active consent" to Marriott's use of the Delta Hotels Marks. Thus, Marriott's acquiescence defense fails as a matter of law, and the Court denies Marriott's motion for summary judgment and grants Delta's motion for summary judgment as to the same.

### 3. Equitable estoppel

A party seeking to invoke equitable estoppel must establish:

(1) conduct amounting to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; and (3) knowledge, actual or constructive, of the real facts[.]

Hall v. U.S. Fin. Life Ins. Co., Civil Action No. 3:08-CV-00140-WSD, 2010 WL 11500902, at *5 (N.D. Ga. Feb. 23, 2010) (quoting Medders v. Smith, 537 S.E.2d 153, 155 (Ga. Ct. App. 2000)). "Estoppels are not favored by the law and for an equitable estoppel to arise some intended deception in the conduct or declarations of

the party to be estopped must be shown." Id. (quoting Cobb Bank & Trust Co. v. Am. Mfrs. Mut. Ins. Co., 459 F. Supp. 328, 334 (N.D. Ga. 1978)).

Upon review and consideration, the Court grants Delta's motion for summary judgment on Marriott's equitable estoppel defense and denies Marriott's motion for summary judgment as to the same. Even when viewed in a light favorable to Marriott, the Court finds that no reasonable jury could conclude that the record evidence Marriott cites (the majority of which is enumerated and discussed above) amounts to deliberate false representations, concealment, or intent by Delta to deceive Marriott into believing that it would not assert its rights in the Delta Marks in United States. [Docs. 479 at 53–58; 516 at 56]. At most, the record demonstrates Delta's awareness of the Delta Hotels brand, rather than any intentionally false or deceptive representation by Delta to Marriott that it would not challenge the use of the Delta Hotels Marks in the United States.

### 4. Waiver

"To establish a waiver defense, a party must bring forth proof of an intent to relinquish a known right." Am. Historic Racing Motorcycles Ass'n, Ltd. v. Team Obsolete Promotions, 33 F. Supp. 2d 1000, 1007 (M.D. Fla. 1998); accord Flowers Bakeries Brands, Inc. v. Interstate Bakeries Corp., 2010 WL 2662720 at *11 (N.D. Ga. June 30, 2010). "[T]he evidence must so clearly indicate an intent to relinquish a known right as to exclude any other reasonable explanation." Allstate Fin. Corp.

v. Dundee Mills, Inc., 800 F.2d 1073, 1075 (11th Cir. 1986); accord Air Prods. &

Chems., Inc. v. La. Land & Exploration Co., 867 F.2d 1376, 1379 (11th Cir. 1989).

"Waiver is more difficult to prove than either laches or acquiescence, as it involves

not sleeping on one's rights but intentionally relinquishing them." RE/MAX Int'l,

Inc. v. Trendsetter Realty, LLC, 655 F. Supp. 2d 679, 711 n.12 (S.D. Tex. 2009).

Here, Marriott fails to produce record evidence based on which a reasonable

factfinder could conclude that Delta intentionally relinquished its rights to enforce

the Delta Marks against Marriott in the United States. Marriott primarily relies on

the fact that Delta provided trademark registration consents in other countries in

support of its waiver argument. [Doc. 479 at 59–60]. However, as explained above,

foreign consents are irrelevant to Delta's decision to litigate the instant domestic

suit. See Gibson Brands, 2016 WL 7479317, at *5 ("A party might decline to litigate

extraterritorial trademark violations for any number of reasons, while still intending

to prosecute any claim that might arise in the domestic context."). Thus, the Court

grants summary judgment for Delta on Marriott's waiver defense and denies

Marriott's motion for summary judgment as to the same.

### D.      Delta's Damages

Delta moves for summary judgment on Marriott's apportionment[30] and disgorgement arguments.[31]  [Doc. 441 at 55].  Specifically, Delta claims that it has proven Marriott's sales associated with its purported infringement and that Marriott fails to offer sufficient record evidence that (1) attributes certain profits to factors other than the Delta Hotels Marks or (2) proves any costs or deductions that should be taken into account in a damages calculation should Delta prevail on its claims at trial.  [See id. at 55–58].  In response, Marriott asserts that an award of its profits to Delta is not justified here, it does not profit from "cost reimbursements" such that this category must be excluded from any damages calculation (if Delta prevails), that there is record evidence supporting deductions that should be made from Delta's calculation, and apportionment should occur given that some of Marriott's profit is attributable to non-infringing activities (that is, not from its allegedly infringing use of the Delta Hotels Marks).  [Doc. 516 at 57–59].

---

[30] Apportionment is "the determination of the profits attributable to the use of an accused trademark, separate from those profits associated with other non-accused elements."  Paycargo, LLC v. Cargosprint LLC, No. 1:19-CV-22995-LOUIS, 2021 WL 2633657, at *3 (S.D. Fla. June 25, 2021).

[31] In the portion of its motion for summary judgment concerning damages (and potential apportionment and disgorgement), Delta appears to attempt to incorporate by reference arguments from its motion to exclude Marriott's damages expert, Mr. Schoettelkotte.  [Doc. 441 at 55–58] (citing to large portions of its "Schoettelkotte Mot." throughout).  However, the Court will not consider arguments that merely incorporate by reference to a separate motion because to do so would effectively allow Delta to exceed the page limit for its summary judgment brief.  See Biedermann v. Ehrhart, Civil Action No. 1:20-CV-01388-JPB, 2021 WL 1061794, at *1 (N.D. Ga. Mar. 19, 2021); see also LR 7.1(F), NDGa.

In general, a violation of the Lanham Act entitles a plaintiff, "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). "The plaintiff of course is not entitled to profits demonstrably not attributable to the unlawful use of his mark." Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203, 206 (1942). "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction." 15 U.S.C. § 1117(a). However, the Eleventh Circuit has held "that an accounting of a defendant's profits is appropriate where: (1) the defendant's conduct was willful and deliberate, (2) the defendant was unjustly enriched, or (3) it is necessary to deter future conduct." Optimum Techs., Inc. v. Home Depot U.S.A., Inc., 217 F. App'x 899, 902 (11th Cir. 2007).

Here, as detailed above, questions of fact remain regarding Marriott's intent and whether its conduct was willful or deliberate. Coupled with the fact that Delta has yet to obtain judgment in its favor on its claims, it is unclear at this stage if Delta is entitled to Marriott's profits. Nevertheless, should Delta ultimately prevail in this suit, the Court finds that genuine disputes of material fact exist regarding if Marriott is entitled to any apportionment or disgorgement of its profits. First, as to apportionment, Delta contends that Marriott "offers no cognizable evidence or method by which to apportion its revenue" and instead relies only on "speculation"

from its damages expert regarding the amount of profit that can be attributed to use of the Delta Hotels Marks. [Doc. 441 at 56–57]. In his primary rebuttal report, Marriott's damages expert highlights a number of factors to support that a "considerable portion of the profits generated by Marriott from Delta Hotels properties in the United States . . . is due to factors separate and apart from the allegedly infringing marks." Rebuttal Expert Report of W. Todd Schoettelkotte ("Schoettelkotte Rebuttal Report") ¶¶ 74–83 [Doc. 518-21]. Although Delta takes issue with the fact that Mr. Schoettelkotte's report supposedly does not offer "raw data, consumer studies, a cognizable and replicable method, or evidence that any quantifiable portion of profits" is attributable to factors other than the Delta Hotels Marks, [Doc. 441 at 56–57], "[h]ighlighting such factors will be helpful for the jury to weigh the evidence presented at trial." Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC, No. 09-61490-Civ, 2011 WL 2295269, at *6 (S.D. Fla. June 8, 2011) (permitting a rebuttal expert who did not "parse out the percentage attributable to each factor she identifies" and instead discussed factors the other expert should have considered in the apportionment analysis). At minimum, Mr. Schoettelkotte's rebuttal reports create a dispute of fact regarding what amount of Marriott's profits, if any, should be apportioned (if Delta prevails on its claims), and a jury can decide how much weight to ultimately afford such testimony.

Second, as to disgorgement, "[i]f a defendant can show the costs required to make its sales, then it may deduct those costs from its gross sales." Flowers Bakeries Brands, 2010 WL 2662720, at *13. However, only those costs "actually related" to the sale of the infringing product may be deducted. Id. This includes variable costs incurred because of the infringing product or a proportion of fixed costs if the infringing product "actually increased overhead expenses" and if "the sales of the infringing product were more than a small percentage of total sales." Id. (quoting Maltina Corp. v. Cawy Bottling Co., 613 F.2d 582, 586 (5th Cir. 1980) (internal marks omitted)). But see Health & Sun Rsch., Inc. v. Australian Gold, LLC, No. 8:12-CV-2319-T-33MAP, 2014 WL 988762, at *9 (M.D. Fla. Mar. 13, 2014) (refusing to require jury charges to instruct that the infringing product was more than a small percentage of sales because the Eleventh Circuit has never adopted such a requirement).

Delta argues that Marriott fails to carry its burden of proving that its cost reimbursement revenue should be deducted from its profits because it has not provided sufficient record evidence beyond "vague, undifferentiated" overhead

costs.[32]  [Doc. 441 at 57–58].  According to Delta, Marriott's cost reimbursement revenue (totaling ███████████) should be included as part of Marriott's ill-gained profits that flow from its infringement, which would bring Delta's total recoverable damages estimate to ███████████.  [Id.]  Conversely, Marriott provides record evidence supporting that (1) it does not profit from its cost reimbursements and, therefore, that category does not fall within its "profits" eligible for damages pursuant to 15 U.S.C. § 1117(a); (2) the cost reimbursements are unrelated to any purported infringement and are thus irrelevant to the damages calculation; and (3) even if its cost reimbursements qualify as "profits" related to infringement pursuant to 15 U.S.C. § 1117(a), deductions apply.  See, e.g., Supplemental Rebuttal Expert Report of W. Todd Schoettelkotte ("Schoettelkotte Supplemental Report") ¶¶ 12–16, 22–36 [Doc. 518-22]; Schoettelkotte Rebuttal Report ¶¶ 72–73; Def.'s SOAF ¶¶ 267–82.  Viewed in the light most favorable to Marriott, the Court finds that this record evidence at minimum creates disputes of fact, a reasonable jury could conclude that Marriott's cost reimbursement revenue either is not applicable in the damages calculation or that deductions apply to those expenses, and Delta fails to

---

[32] "Under [Marriott's] management and franchise agreements, hotel owners and franchisees participate in certain centralized programs and services, such as marketing, sales, reservations, and insurance programs.  Marriott operates these programs and services for the benefit of its hotel owners."  See Schoettelkotte Rebuttal Report ¶ 16 (cleaned up).  Marriott then "recovers the costs that it incurs for these programs and services from its hotel owners," but does "not seek a mark-up," and thus, these services are not operated to "generate a profit[.]"  Id. (cleaned up).  This is known as "cost reimbursement" to Marriott.  Id.

demonstrate that it is entitled to a determination on any potential disgorgement as a matter of law at this juncture.[33]

### E.    Marriott's Counterclaim

The Parties each move for summary judgment on Marriott's counterclaim for breach of the Agreement.[34]   According to Delta, it is due summary judgment on Marriott's counterclaim because the Agreement only applies to Hong Kong and China.   [Doc. 441 at 39–48].   Delta contends it therefore did not breach the Agreement when it opposed Marriott's use and registration of various marks outside of those jurisdictions.   [Id. at 49–50].   Marriott opposes Delta's motion and argues

---

[33] Delta's reliance on <u>Maltina Corporation v. Cawy Bottling Company</u> does not compel a different result.   <u>See</u> 613 F.2d 582 (5th Cir. 1980).   In that case, the United States Court of Appeals for the Fifth Circuit upheld the district court's determination that the defendant failed to provide sufficient evidence that the expenses it sought to deduct from its profits were related to the sale of the infringing product or that its overhead costs increased by virtue of the infringing product.   <u>Id.</u> at 586.   However, the district court made this determination during the damages phase after the portion of trial on the merits during which it was able to weigh evidence.   <u>Id.</u> at 583–84.   And here, Marriott presents evidence that create disputes of fact on these issues.   Moreover, nowhere does Delta define what constitutes impermissible "overhead costs" or how Marriott's cost reimbursement revenue indisputably qualifies as such.   [<u>See</u> Docs. 441 at 57–58; 563 at 29–30].   Delta's only argument is its bare assertion that Marriott's cost reimbursement revenue is "exactly like" the impermissible overhead deductions in <u>Maltina</u>.   [Doc. 441 at 57].   To the extent Delta relies on <u>Maltina</u>'s list of overhead expenses, which were specific to that case (repairs, rent, taxes, utilities, etc.), the Court finds that Marriott's cost reimbursement revenue is dissimilar such that the Court cannot decide as a matter of law that all of Marriott's cost reimbursement revenue is precluded from deduction.   <u>See</u> 613 F.2d at 586–87; see also, e.g., Def.'s SOAF ¶ 276 (one of the cost reimbursements was for a ███████████████████ directed toward ███████████ ███████).

[34] Although Marriott's counterclaim concerns breach of both paragraphs 6 and 9 of the Agreement, the Parties now agree that the first sentence of paragraph 9 is unenforceable under Hong Kong law.   [Docs. 441 at 44; 479 at 38 n.20].   Otherwise, the Parties' briefs regarding Marriott's counterclaim almost exclusively concern the application of paragraph 6.   [<u>See generally</u> Docs. 441 at 39–48; 479 at 27–39].

that it is due summary judgment on its counterclaim because (1) the Agreement applies worldwide and (2) paragraph 6 of the Agreement obligates Delta not to oppose certain trademark registrations, a provision it has now breached through this litigation. [Docs. 479 at 27–39; 516 at 45–50]. Alternatively, if the Court interprets paragraph 6 of the Agreement as only limiting Delta's obligations within Hong Kong and China, Marriott asserts that the Court should find that the Agreement still applies globally pursuant to the doctrine of estoppel by convention. [Doc. 479 at 39–45].

The Court applies Hong Kong law to Marriott's breach of contract counterclaim because the Agreement states that it is governed by Hong Kong law. [See Doc. 474-14 ¶ 11]; Mullins v. M.G.D. Graphics Sys. Grp., 867 F. Supp. 1578, 1580 (N.D. Ga. 1994) (explaining that "a federal court sitting in diversity is to apply the choice of law rules of the forum state"); CS-Lakeview at Gwinnett, Inc. v. Simon Prop. Grp., Inc., 659 S.E.2d 359, 361 (Ga. 2008) (noting that in Georgia, "the law of the jurisdiction chosen by parties to a contract to govern their contractual rights will be enforced unless application of the chosen law would be contrary to the public policy or prejudicial to the interests of this state"). Neither Party disputes that Hong Kong law governs Marriott's counterclaim. [See Docs. 441, 479, 516, 528, 542, 563].

Pursuant to Hong Kong law, a claim for breach of contract requires (1) "express or implied contractual terms requiring the [party] to act in some manner[]

and (2) that the [party] has acted contrary to those express or implied terms." Jet Midwest Int'l Co., Ltd. v. Jet Midwest Grp., LLC, No. 17-06005-CV-SJ-DW, 2017 WL 11483955, at *2 (W.D. Mo. Oct. 25, 2017) (internal marks and citations omitted).  In interpreting a contract pursuant to Hong Kong law, words should be given their "natural and ordinary meaning."  See Expert Report of Anthony Houghton SC ("Houghton Report") ¶ 41(5) [Doc. 459-23]; Expert Report of Winnie Tam SC ("Tam Report") ¶ 24 [Doc. 459-24];[35] see also Eminent Invs. (Asia Pac.) Ltd v. DIO Corp, [2020] 23 H.K.C.F.A.R. 487, 504 (C.F.A.).  And contracts are to be construed as a whole, giving meaning to all parts of the agreement.  See Houghton Report ¶¶ 43–45; Tam Report ¶ 29.  Additionally, courts consider the objective factual background reasonably available to the parties, known as the "factual matrix."  See Houghton Report ¶ 37.4; Tam Report ¶ 24.  This matrix includes the recitals and extrinsic evidence but does not include prior negotiations or the parties' subjective understandings, intentions, objectives, or subsequent conduct.  See Houghton Report ¶¶ 37.5–37.6; Tam Report ¶¶ 24–28.  The recitals are an "express[ion] in general terms [of] the intention with which the agreement was made" but do not override or restrict the clear operative terms of a contract.  See

---

[35] The Parties retained senior Hong Kong barristers who previously served as Hong Kong judges as experts in this case.

_Wui Fung Lee Inv. Co Ltd v. Inc. Owners of Hong Kong Mansion, Causeway Bay_, [2019] H.K.C.F.I. 2739, § 71(3) (C.F.I.); Houghton Report ¶ 54; Tam Report ¶ 28.

"If the ordinary meaning of the words make sense in relation to the rest of the document and the factual background, then the court will give effect to that language[.]" _Jumbo King Ltd v. Faithful Props. Ltd & Others_, [1999] 2 H.K.C.F.A.R. 279, 296G (C.F.A.). "[W]here there are conflicting interpretations, account should be taken of the natural and ordinary meaning of the provision in question, the purpose of the contract and of the provision, other relevant provisions, the facts and circumstances known or assumed by the parties at the time the contract was executed, the quality of drafting of the instrument, and commercial common sense." _Eminent Invs. (Asia Pac.) Ltd_, [2020] 23 H.K.C.F.A.R. at 504. Where the language of a pertinent provision is unclear or ambiguous, courts may take the recitals into account beyond the factual matrix. _See_ Houghton Report ¶ 54; Tam Report ¶¶ 28, 75(2). Thus, contract interpretation pursuant to Hong Kong law "involves having regard, not merely to the individual words the[ parties] have used, but to the agreement as a whole, the factual and legal background against which it was concluded[,] and the practical objects which it was intended to achieve." _Jumbo King Ltd_, 2 H.K.C.F.A.R. at 296D–E. Ultimately, "the overriding objective . . . is to give effect to what a reasonable person rather than a pedantic lawyer would have understood the parties to mean." _Id._

Finally, "[t]he interpretation of a contract, or agreement, presents a question of law," and "[w]hen the only question a court must decide is a question of law, summary judgment may be granted." Saregama India Ltd. v. Mosley, 635 F.3d 1284, 1290 (11th Cir. 2011); accord Baloco ex rel. Tapia v. Drummond Co., Inc., 640 F.3d 1338, 1349 n.13 (11th Cir. 2011) (noting that Rule 44.1 permits courts to determine foreign law and that such a determination "should be treated as ruling on a question of law"); Ungaro-benages v. Dresdner Bank AG, No. 01-2547-CIV, 2003 WL 25729923, at *10 n.24 (S.D. Fla. Feb. 20, 2003) ("the existence of disputes between the parties concerning German law and the way it ought to be applied does not foreclose summary judgment").

Upon review and consideration, the Court finds that Delta is due summary judgment on Marriott's counterclaim because the Agreement—in particular, paragraph 6—limits Delta's obligations to Hong Kong and China. The Court's conclusion is supported by (1) the objective factual matrix and (2) the specific provisions of the Agreement and the Agreement as a whole.

First, the objective, admissible factual matrix includes the following: (1) Delta and Delta Hotels each operated using "Delta" as a name or brand and had done so for decades prior to the Agreement (although Delta Hotels' presence outside of Canada in the years preceding the Agreement was limited), (2) the Parties' trademarks had existed simultaneously in other jurisdictions before, (3) Delta Hotels

filed trademark applications in Hong Kong in 2013 which Delta opposed, (3)
Marriott announced its intention to acquire Delta Hotels in January 2015, and (4)
Delta and Delta Hotels executed the Agreement in March 2015. [36] See Houghton
Report ¶¶ 89–93; Tam Report ¶¶ 16(1)–(3), 35. Additionally, the recitals explicitly
and almost exclusively concern the Hong Kong and China Delta Hotels and Delta
Marks. [Doc. 33-1 at 1–2]. The recitals do not state (or reasonably imply) that the

---

[36] Marriott's proposed factual matrix includes the "nature of the parties' global businesses,"
Marriott's public announcement that it would use the Delta Hotels Marks worldwide, statements
to Delta's in-house counsel Mr. Alan Arnold supposedly informing him that Marriott did not want
to acquire Delta Hotels until the trademark disputes were resolved, and the "decades of
coexistence" between the Delta and Delta Hotels Marks. [Doc. 479 at 35–36]. According to
Marriott, these supposed objective facts support that the parties to the Agreement intended for
paragraph 6 to apply globally such that Delta is barred from challenging the Delta Hotels Marks
anywhere, not just Hong Kong and China. The Court disagrees. First, the fact that Delta and Delta
Hotels both generally operated businesses worldwide (to varying degrees) and previously had
trademarks coexist in other jurisdictions does not support that they must have intended for the
Agreement to serve any purpose other than solving specific regional disputes, such as those
existing in Hong Kong and China. Further, as explained above, Delta Hotels' presence outside of
Canada was, at best, limited at the time it made the Agreement with Delta. [See, e.g., Docs. 459-
1; 464-12]; King Dep. at 47:19–48:14. Second, the press release Marriott cites in support makes
only general reference to Marriott's desire to "grow[] the brand in Canada and in other markets
around the world," states that the acquisition of Delta Hotels demonstrates Marriott's focus on
"growing in attractive regions outside the U.S." (such as Hong Kong and China), and describes
Delta Hotels as a brand centered in Canada. [Doc. 479-14]. Such generic, nondescript statements
fall far short of objective, factual evidence showing that Delta Hotels intended to resolve trademark
disputes with Delta worldwide through the Agreement. Third, the deposition transcripts that
Marriott cites to supposedly showing that Mr. Arnold (as Delta's counsel) ████████████████
████████████████████████ do not clarify the issue of the Agreement's scope, since
these deposition transcripts reference ████████████████████████████████████████
████████████████████████████████████ See Hoffman Dep. at 197:15–199:11; Deposition
of Alan Arnold at 18:22–22:6 [Doc. 479-20]; [see also Docs. 461-4 at 310 (Marriott's Asset
Purchase Agreement with Delta Hotels representing that the ████████████████████████
███████████████); 531-2 at 3 (the email Mr. Arnold references in his deposition in which Mr.
Hoffman states that the "subject matter" of the Agreement is "China and Hong Kong")]. Thus,
Marriott's proposed factual matrix does not objectively support that Delta and Delta Hotels
believed the Agreement "was intended to resolve current and any future conflicts throughout the
world once and for all," as Marriott contends. [Doc. 479 at 36].

Agreement was meant to have any worldwide effect.  [See id.]  Recitals A through

D primarily set out the Hong Kong and China Delta and Delta Hotels Marks and

recount the specific disputes in Hong Kong and China.[37]  [See id.]  And just before

the Agreement's operative provisions, recital E states that "Delta Hotels and Delta

Air Lines have mutually agreed that the [Hong Kong and China Delta Hotels Marks]

may co-exist with the [Hong Kong and China Delta Marks] *in Hong Kong and*

*[China]* in accordance with the terms and conditions as set out in this Agreement."

[Id. at 2] (emphasis added).  Thus, the objective factual matrix supports that at the

time of the Agreement, Delta and Delta Hotels were primarily focused on resolving

their trademark disputes in Hong Kong and China.  Indeed, whereas the Agreement

explicitly references Delta and Delta Hotels' intention to resolve their disputes in

Hong Kong and China, the Agreement contains no mention of any supposed intent

---

[37] As Marriott's expert points out, recital B also briefly mentions other "Delta" marks that Delta owns and specifically identifies two (2) such "Delta Vacations" marks in the United States and Japan as set out in Schedule 3 of the Agreement.  Tam Report ¶ 36.  According to Marriott's expert, this indicates that the signatories also considered "Delta" marks in other jurisdictions relevant to the Agreement which supports its worldwide applicability.  Id. ¶¶ 37–38.  However, this does not undermine the Court's conclusion with regard to the factual matrix and the meaning of paragraph 6 because that brief portion of recital B is specifically addressed elsewhere in the Agreement.  Indeed, paragraph 9 mirrors this portion of recital B and states that the Parties "will cooperate in good faith" with regard to potential conflicting uses of "Delta" marks, including the "Delta Vacations" mark, in other jurisdictions and prevents Delta Hotels from challenging the "Delta Vacations" marks in the United States and Japan as set out in Schedule 3.  [Doc. 33-1 at 5].  Thus, the fact that recital B briefly references "Delta" marks in other jurisdictions and highlights two (2) specific "Delta Vacations" marks—which the Agreement later squarely addresses in paragraph 9—does not alter that the signatories primarily intended to limit the Agreement as a whole—including paragraph 6—to Hong Kong and China as evidenced by the other recitals, provisions, and objective facts.

to resolve or preclude Delta and Delta Hotels' trademark disputes around the world in one fell swoop.

Second, the Agreement and its provisions support geographic limitation of paragraph 6. Although paragraph 6 does not explicitly limit Delta's obligations to future trademarks in Hong Kong and China, the context of that provision (and consideration of the entire Agreement) reveals that the only reasonable interpretation is to read it as contemplating this geographic limitation. [See generally id.] The paragraphs preceding paragraph 6 entirely concern the signatories' obligations with respect to the Hong Kong and China Delta and Delta Hotels Marks. [Id. at 3–4]. Specifically, paragraphs 1 through 4 discuss amending existing Delta Hotels' trademark applications in Hong Kong and China with regard to various classes and services and Delta withdrawing its opposition to the same. [Id.] Paragraph 5 states that Delta will not challenge the Hong Kong and China Delta Hotels Marks in classes 35, 39, 41, and 43 covering services permitted in paragraphs 1 through 4 in Hong Kong and China. [Id. at 4]. Paragraph 6 then reads:

> Delta Air Lines will not in the future challenge, object to and/or oppose the use and registration of, and upon Delta Hotels' request will consent in writing to, any future application(s) and registrations by Delta Hotels or its affiliates or successors in interest for the mark "Delta" or any mark incorporating "Delta" (including its transliteration in Chinese and other languages) in Classes 35, 39, 41 and 43, provided that the goods and services claimed in such application(s) and registrations are consistent with the services covered by the [Hong Kong and China Delta Hotels Marks] and permitted under paragraphs 1 through 4 above.

[Id.]  When read in the context of the Agreement, a reasonable person would understand paragraph 6 as preventing Delta from challenging Delta Hotels' future trademark applications in Hong Kong and China that incorporate the word "Delta"— a broader set of trademarks than the Hong Kong and China Delta Hotels Marks identified and discussed in paragraph 5—so long as those future trademarks are consistent with the trademarks, classes, and services already contemplated by the Agreement.[38]  In paragraph 5, Delta already agreed not to oppose the Hong Kong and China Delta Hotels Marks in certain classes and services in Hong Kong and China; therefore, it is logical that in paragraph 6 Delta would agree to permit similar future trademarks incorporating "Delta" in Hong Kong and China that are consistent with those already-consented-to trademarks and registrations outlined in paragraphs 1 through 5.

This conclusion is supported by the fact that interpreting paragraph 6 to apply worldwide would not comport with at least three (3) other provisions of the Agreement (excluding the recitals).  First, paragraph 6 requires Delta to consent to future trademarks in certain classes and services that are consistent with the Hong Kong and China Delta Hotels Marks and paragraphs 1 through 4.  [Id.]  However,

---

[38] Even if the Court were to find that paragraph 6 was unclear or ambiguous given that it does not explicitly state whether it applies just to Delta and Delta Hotels Marks in Hong Kong and China or worldwide, the Court would still find that paragraph to be geographically limited after considering the Agreement as a whole, including the recitals, for the reasons discussed throughout this section.

paragraph 1 requires Delta Hotels to delete all services in class 39 in its Honk Kong trademark applications while paragraph 3 permits Delta Hotels to include some Class 39 services in its China trademark applications. [Id. at 3]. Given the unique location-specific requirements in paragraphs 1 and 3, it is unclear how paragraph 6 could require Delta to consent to other registrations worldwide.

Second, paragraph 13 of the Agreement provides for its termination if the signatories abandon the Hong Kong and China Delta Hotels and Delta Marks. [Id. at 6]. Under Marriott's proposed interpretation of the Agreement, the supposed sweeping global permission provided to Delta Hotels pursuant to paragraph 6 could be unilaterally revoked if either Delta Hotels *or* Delta abandoned its trademarks in just two (2) locations. Such a construction defies common sense and supports that paragraph 6 is reasonably understood to be limited to Hong Kong and China. According to Marriott, the inconsistencies between its proposed global interpretation of paragraph 6 and the requirements of paragraphs 1 and 3 are "trivial" and the termination provision in paragraph 13 makes sense because the Parties would not abandon their trademarks "in the business-critical jurisdictions of Hong Kong and China[.]" [See Doc. 516 at 47–48]. However, these explanations would require the Court to simply ignore the implications of Marriott's preferred interpretation. Put simply, Marriott is attempting to fit a square peg in a round hole.

Third, paragraph 9 provides in relevant part:

> Each of Delta Hotels and Delta Air Lines undertakes to the other that it will cooperate in good faith to agree upon a mutually acceptable compromise, consent[,] and/or co-existence along the lines set forth in this Agreement if the [Hong Kong and China Delta Hotels and Delta Marks], or similar variations including transliteration in Chinese and other languages thereof and marks for or comprising "DELTA" such as "DELTA VACATIONS" owned by Delta Air Lines, appear to conflict or overlap in *other jurisdictions* in the future.

[Doc. 33-1 at 5] (emphasis added). Marriott argues that paragraph 9 is not inconsistent with a worldwide application of paragraph 6 because paragraph 9 contemplates trademark disputes involving services other than those enumerated in paragraph 6. [Docs. 479 at 37–38; 516 at 49]. However, paragraph 9 makes no mention of other services. And if paragraph 6 applies worldwide and requires Delta to consent to trademarks incorporating "Delta" consistent with the classes and services provided for in the Agreement around the globe, then paragraph 9 would be partially redundant. Indeed, if paragraph 9 applies generally to disputes over trademarks involving "Delta" in all services, that necessarily includes disputes over trademarks in the classes and services enumerated in paragraph 6 which, pursuant to Marriott's interpretation, already globally resolves such disputes. See Tam Report ¶ 29 (Marriott's expert acknowledging that contracts should be construed "to avoid any part being rendered redundant"). Marriott's own expert appears to concede this implication. See id. ¶ 41(1)(e). Instead, the more reasonable and natural interpretation of paragraph 9 is that it purports to obligate the Parties to use good faith in resolving disputes involving trademarks similar to the ones governed by the

73

Agreement or that involve "Delta"—including those contemplated in paragraph 6—in "other jurisdictions" because the Agreement does not globally resolve such disputes and paragraph 6 only applies to Hong Kong and China.

Otherwise, Marriott's arguments that paragraph 6 is meant to have worldwide application simply rely on the fact that paragraph 6 does not explicitly state that it only applies in Hong Kong or China.[39] [Doc. 479 at 31–33, 37–39]. However, contract interpretation requires "regard[] not merely to the individual words the[ parties] have used, but to the agreement as a whole, the factual and legal background against which it was concluded[, ] the practical objects which it was intended to achieve[,]" considering "what a reasonable person . . . would have understood the parties to mean." See Jumbo King Ltd, 2 H.K.C.F.A.R. at 296D–E; see also Houghton Report ¶ 45 ("A true construction of a written agreement must therefore avoid undue focus on individual words and phrases in the abstract, in effect

---

[39] Marriott also argues that paragraphs 6 and 8 support the Agreement's worldwide application because those paragraphs—unlike paragraphs 5 and 7, which explicitly only apply to Hong Kong and China—contain the phrase "transliteration in Chinese and other languages" (similar to paragraph 9, which explicitly references "other jurisdictions") and the primary languages in Hong Kong and China are Chinese and English. [Doc. 479 at 33]. Therefore, Marriott contends, if the Agreement only applied to Hong Kong and China, there would be no need for such a qualification. [Id.] However, as explained above, paragraph 6 contemplates a broader set of trademarks and disputes that may arise in the future, whereas paragraphs 5 and 7 concern the already existing and disputed Hong Kong and China Delta Hotels and Delta Marks. Thus, because paragraph 6 revolves around a broader, less definite set of future marks and disputes in Hong Kong and China, it is reasonable that the signatories would comprehensively qualify the languages in which those future marks might appear. Indeed, although Chinese and English are the primary languages in Hong Kong and China, they are not the only languages in which a mark may be registered in those jurisdictions. See Houghton Report ¶ 37; Deposition of Winnie Tam at 187:23–188:3 [Doc. 459-22].

neglecting the context provided by the contract as a whole."). Thus, adopting Marriott's interpretation would be decidedly unreasonable as it would require the Court to view paragraph 6 in a vacuum and ignore the context within which it appears in the Agreement, the other operative provisions, the Agreement as a whole, and the factual matrix, including the recitals. Further, it would defy "commercial common sense" for the Court to find that the signatories intended for paragraph 6 to have global application and expressed that intent only through implication and omission rather than explicitly stating such a breathtakingly broad proposition. See Eminent Invs. (Asia Pac.) Ltd, [2020] 23 H.K.C.F.A.R. at 504. Indeed, the absence of any affirmative statements supporting global application of the Agreement presents a stark contrast with the several provisions of the Agreement that explicitly reflect the signatories' intent to resolve their disputes in Hong Kong and China. Therefore, Hong Kong contract law supports granting Delta summary judgment on Marriott's counterclaim and denying Marriott summary judgment on the same.

Alternatively, Marriott argues that the doctrine of estoppel by convention requires the Court to apply paragraph 6 of the Agreement globally. [Docs. 479 at 39; 516 at 50; 542 at 13]. Pursuant to Hong Kong law, estoppel by convention "may arise where parties to a transaction act on an assumed state of facts or law, the assumption being either shared by them both or made by one and acquiesced in by the other." See Unruh v. Seeberger & Anon, [2007] 2 H.K.C. 609, 650 (C.F.A.).

Put differently, when parties "are both under a common mistake" as to the meaning of a contract and "embark on a course of dealing on the footing of that mistake," the original terms of the contract are replaced by the "conventional basis on which they both conduct their affairs[.]" <u>See</u> Houghton Report ¶ 161 (internal marks and citations omitted). Estoppel by convention operates to "preclude a party from denying the assumed facts or law if it would be unjust to allow [the party] to go back on the assumption." <u>Unruh</u>, 2 H.K.C. at 650. This common assumption must be "clear and unequivocal," meaning that is it "not capable of more than one explanation[.]" <u>See id.</u> at 652 (noting that the "clarity required will seldom fall below what is unequivocal"); <u>Sealegend Holds. Ltd v. China Taiping Ins. (HK) Co Ltd & Others</u>, HCAJ 95/2012 ¶ 64 (C.F.I. Oct. 24, 2014); Houghton Report ¶¶ 167–69. "Silence and inaction is by nature equivocal." <u>Sealegend Holds. Ltd</u>, HCAJ 95/2012 ¶ 64.

In support of its argument that the Parties shared a "common assumption" with regard to the worldwide applicability of paragraph 6, Marriott cites to multiple communications following the execution of the Agreement in which Delta indicates that the Parties had an obligation to consent to trademark applications outside of Hong Kong and China that were consistent with the services and classes covered in the Agreement. [Docs. 479 at 40–42; 542 at 15–18]. Although some record evidence suggests that the Parties believed that paragraphs 6 and 8 were intended to

apply globally, this evidence is not dispositive and other record evidence supports that the Parties did not assume paragraphs 6 and 8 apply worldwide. [See, e.g., Docs. 461-4 at 310 (Marriott's Asset Purchase Agreement with Delta Hotels representing that the discussions towards the Agreement were ███████████████████████ ████████████████████████████████████████████); 464-19 (Mr. Hoffman's email to Mr. Arnold following Marriott's acquisition of Delta Hotels thanking him for "breaking the log jam on the trademark issue in Hong Kong"); 480-24 (Mr. Benjamin indicating that the Agreement required Delta to "consent to future applications in other countries" where the trademarks were consistent with the Agreement without reference to a specific provision and expressing the need for a new agreement "that would provide far more clarity, avoid ambiguity[,]" and provide "a much greater degree of certainty"); 480-25 (Mr. Benjamin discussing drafting Class 43 services in a trademark application consistent with "the letter and spirit of the" Agreement and which Marriott "is required to consent to under the Agreement[,]" but also asking if moving the services from Class 43 to 39 would "be sufficient to resolve this issue for Marriott" and mentioning other applications that Delta "had the right to object to under the Agreement" but did not object to "in good faith and as a courtesy"); 531-2 (email from Mr. Hoffman describing the subject matter of the Agreement as "regarding China and Hong Kong"); 532-4 (email reflecting Delta's understanding of the "narrow agreement

governing use and registration in Hong Kong and China" and Marriott's position that "there is already a global co-existence agreement")]; Deposition of Greta Moran ("Moran Dep") at 215:18–216:14 [Doc. 531-6] (stating that Delta entered into the Agreement because "it was limited to Hong Kong and China"). Moreover, none of the cited evidence expressly references paragraph 6 of the Agreement. Thus, it is possible that the Parties believed they had to consent to trademarks in other jurisdictions involving trademarks consistent with the Agreement pursuant to paragraph 9—rather than paragraphs 6 and 8—which requires the Parties to "cooperate in good faith to agree upon a mutually acceptable compromise, consent and/or co-existence *along the lines set forth in this Agreement*" if the trademarks identified in the Agreement "or similar variations" such as those "for or comprising 'Delta' . . . appear to conflict or overlap in other jurisdictions in the future." [Doc. 33-1 at 5]; see Sealegend Holds. Ltd, HCAJ 95/2012 ¶ 64 (noting that "clear and unequivocal" means "not capable of more than one explanation"); see also, e.g., Moran Dep. at 250:23–251:16 (stating that Delta understood paragraph 9 to require the Parties to "in good faith take a look" at similar marks brought in other jurisdictions); Hoffman Dep. at 222:19–25 (stating that Marriott was ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████ ).    Therefore, Marriott's alternative argument based on estoppel by convention fails as a matter of law and the Court rejects it.[40]

In sum, after considering paragraph 6, "the [A]greement as a whole, the factual and legal background against which it was concluded[, ]the practical objects which it was intended to achieve[,]" and "what a reasonable person . . . would have understood the parties to mean," the Court finds that paragraph 6's application is limited to Hong Kong and China.  <u>Jumbo King Ltd</u>, 2 H.K.C.F.A.R. at 296D–E. Therefore, Delta did not breach the Agreement when it challenged Marriott's use and registration of trademarks outside of Hong Kong and China.  Accordingly, the Court grants Delta summary judgment on Marriott's breach of contract counterclaim and denies Marriott summary judgment as to the same.

## IV.    Delta's Daubert Motions [Docs. 437, 439, 442, 445, 450, 455, 460, 466, 471]

Delta also seeks to exclude several expert witnesses proffered by Marriott. The Court assesses these challenges below after setting forth the relevant legal standard.

---

[40] Consistent with its obligations at this stage of proceedings, the Court does not weigh evidence or make credibility determinations in reaching the above finding.  Instead, because estoppel by convention requires that any common assumption be clear and unequivocal, the Court highlights the disputed evidence to demonstrate the absence of a clear, unequivocal, or common assumption between the Parties regarding Marriott's proposed interpretation of paragraph 6.

## A.    Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony

and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and methods; and
>
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  Although the rule on its face provides the Court with only limited

guidance as to when expert testimony is admissible, the Supreme Court's opinion in

Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), is instructive.  As the

Court observed in that opinion, "[u]nlike an ordinary witness, . . . an expert is

permitted wide latitude to offer opinions, including those that are not based on

firsthand knowledge or observation."  Daubert, 509 U.S. at 592.  However, a jury

may find it difficult to evaluate an expert's opinion.  See id.  Trial courts are

therefore tasked with acting as "gatekeepers" to ensure that a proposed expert's

testimony is not only relevant, but reliable.  Id.  To that end, district courts are

"charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." Corwin v. Walt Disney Co., 475 F.3d 1239, 1250 (11th Cir. 2007).

In performing this gatekeeping function, a trial court must engage in a "rigorous three-part inquiry" to determine whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)). Although the three (3) prongs of this analysis inevitably overlap, trial courts must be cautious not to conflate them, and the proponent of expert testimony bears the burden to show that each requirement is met. Id.; Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1113–14 (11th Cir. 2005).

While many factors bear on the Court's inquiry, there is no definitive checklist. See Maiz v. Virani, 253 F.3d 641, 665 (11th Cir. 2001); see also United States v. Scott, 403 F. App'x 392, 397 (11th Cir. 2010) (finding that Daubert provides only general guidelines and that the trial judge has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable" (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152

(1999))).  There are multiple ways, for instance, that an individual may be qualified to give expert testimony.  Indeed, the text of Rule 702 makes clear that expert status may be based on "knowledge, skill, experience, training, *or* education."  FED. R. EVID. 702 (emphasis added) advisory committee's notes to 2000 amendment ("Nothing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony.").

Likewise, Daubert sets forth a list of "general observations" regarding the reliability of a proposed expert's testimony.  Factors to be considered include: (1) whether the expert's theory can be and has been empirically tested; (2) whether the expert's theory has been subjected to peer review and publication; (3) the known or potential error rate of the expert's theory and whether that rate is acceptable; and (4) whether the expert's theory is generally accepted in the scientific community.  See Daubert, 509 U.S. at 593–94.  Importantly, not every factor "will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion."  Frazier, 387 F.3d at 1262; accord FED. R. EVID. 702 advisory committee's notes to 2000 amendment.  Thus, the trial court has considerable leeway to determine whether proffered expert testimony is reliable.  Frazier, 387 F.3d at 1262.

Finally, the district court must assess whether the expert testimony will assist the trier of fact.  Put another way, the court must ask whether the expert testimony

"concerns matters that are beyond the understanding of the average lay person." Id. If the proffered expert testimony "offers nothing more than what lawyers for the parties can argue in closing arguments," it should not be admitted. Id. at 1262–63.

**B.    Discussion**

1.    Motion to exclude Dr. Yoram (Jerry) Wind's rebuttal survey

Dr. Yoram (Jerry) Wind's rebuttal survey concerns "whether the [Delta Hotels] brand is likely to dilute the [Delta] brand, or to cause harm to [Delta.]" See Wind Rebuttal Report ¶ 29.   Delta argues that this survey should be excluded because (1) Dr. Wind's methodology is novel and unreliable, (2) the survey does not include an adequate control group, (3) Dr. Wind asked irrelevant and incomplete questions during the survey, and (4) other factors render the survey unreliable.[41] [See generally Doc. 438].  In response, Marriott disputes many of Delta's arguments and contends that such inquiries are more appropriate for cross-examination and do not render Dr. Wind's survey inadmissible.  [See generally Doc. 508].  Upon review and consideration, the Court agrees with Marriott and finds that Dr. Wind is qualified and that his rebuttal survey and conclusions derived therefrom are, at minimum, sufficiently relevant and reliable such that they are admissible.

---

[41] By its instant motion, Delta only seeks to exclude Dr. Wind's rebuttal survey rather than his entire expert opinion.  [Doc. 438 at 3 n.1].

First, Delta argues that Dr. Wind's rebuttal survey is unreliable because it is "not aware of a single court that has relied on [similar] methodology" and that established, accepted practices in the trademark dilution survey field support that Dr. Wind's survey is not methodologically sound because Dr. Wind measured dilution at a single point in time rather than over time. [Doc. 438 at 9–13]. As an initial matter, the fact that a methodology is novel does not render it inadmissible; instead, the standard for admitting expert testimony only requires that such testimony be reliable. See, e.g., Delta T, LLC v. Dan's Fan City, Inc., No. 8:19-CV-1731-VMC-SPF, 2021 WL 458022, at *8 (M.D. Fla. Feb. 9, 2021). In this regard, Dr. Wind's rebuttal survey sufficiently relies on accepted principles. As Dr. Wind testified and demonstrates in his rebuttal report, he designed his rebuttal survey using "common elements in studies" such as open-ended questions, brand evaluation based on a set of attributes and an accompanying scale, and stimuli. See, e.g., Wind Rebuttal Report ¶¶ 24–31; Deposition of Yoram Jerry Wind ("Wind Dep.") at 61:3–25, 113:4–114:15 [Doc. 437-4]. And although Delta's expert and another expert not a part of this case disagree with Dr. Wind's methodology, which involved using exposure at a single point in time, neither of those disagreeing experts decisively support that failing to measure exposure over time renders a dilution survey fundamentally flawed or unreliable. [See Doc. 438 at 10–12]; see also, e.g., Wind Dep. at 87:13–25, 91:19–25 (explaining why measuring exposure over time was not

necessary in this case).  Instead, these arguments bear on the persuasiveness of Dr. Wind's survey.  See, e.g., Jellibeans, Inc. v. Skating Clubs of Ga., Inc., 716 F.2d 833, 844–45 (11th Cir. 1983).

Second, Delta asserts that Dr. Wind's survey is unreliable because he failed to properly account for the possibility that some of the individuals in his control group could have previously been exposed to Delta Hotels.[42]  [Doc. 438 at 13–16]. However, Delta's speculation regarding purported deficiencies in the survey's control group goes to the weight a jury should afford Dr. Wind's rebuttal survey rather than its admissibility.  See, e.g., Saxon Glass Techs., Inc. v. Apple Inc., 393 F. Supp. 3d 270, 290–91 (W.D.N.Y. 2019) (admitting a survey that "likely" did not use a "proper control" because "the general rule is that cross-examination, and not exclusion by the Court, is the appropriate way to raise criticisms of the survey's methods" (cleaned up)).

Third, Delta contends that Dr. Wind posed poorly designed or irrelevant questions in his rebuttal survey such that it is not reliable and relevant.  [Doc. 438 at 17–21].  Specifically, according to Delta, questions one and two fail to differentiate between the Delta brand and the Delta Marks and improperly used words like "distinctive" or "unique," while the third question irrelevantly asked whether

---

[42] In the control group, participants were shown stimuli containing the word "Debut" rather than "Delta."  Wind Rebuttal Report ¶¶ 26–28.

respondents were likely to fly using Delta after seeing either the control or test stimuli, but ignored potential negative outcomes (or "harms") beyond lost sales, including other reasons respondents might choose one airline over another.  [Id.]  In general, these "alleged technical deficiencies affect the survey's weight . . . and not its admissibility."  Jellibeans, 716 F.2d at 844 (finding that the district court did not err in admitting a survey with "poorly designed questions"); Nightlight Sys., Inc. v. Nitelites Franchise Sys., Inc., Civil Action No. 1:04-CV-2112-CAP, 2007 WL 4563873, at *8 (N.D. Ga. July 17, 2007) ("To the extent the particular terms used in the questions or the questions themselves are flawed in this particular case goes to the weight afforded the survey, and not its admissibility").  As for Delta's relevance argument regarding Dr. Wind's survey data that purport to demonstrate a lack of lost sales or change in attitudes towards Delta after exposure to Delta Hotels, the Court disagrees that it is irrelevant to the point of inadmissibility.  [See Doc. 558 at 1].  For example, a jury could credit this purported evidence as an indication that the distinctiveness of the Delta Marks is not impaired and thus, dilution by blurring is not likely; indeed, in Delta's own words, "impairment [is] the natural result of [trademark] dilution."  [See Doc. 558 at 1]; 15 U.S.C. § 1125(c)(2)(B) (stating that a court "may consider all relevant factors" in determining if dilution by blurring is likely); Seamon v. Remington Arms Co., LLC, 813 F.3d 983, 988 (11th Cir. 2016) (noting that "helpfulness, or fit goes primarily to relevance"—a "liberal" standard—

and that an expert opinion need only have a "valid scientific connection to the pertinent inquiry"); FCOA LLC, 57 F.4th at 948–49 (distinctiveness of a mark includes commercial strength); Wind Rebuttal Report ¶¶ 20, 21, 29, 186 (stating that if dilution were occurring and the distinctiveness of the Delta Marks was diminished he would expect his survey to show evidence of impairment of distinctiveness such as intent not to fly with Delta). Just because lost sales might not be the only harm that could result from infringement and consumers might have other reasons for not choosing Delta does not render Dr. Wind's rebuttal survey inadmissible; instead, those are considerations a jury might weigh after Delta probes those issues on cross-examination. Finally, Delta's arguments regarding "other flaws" in the survey— such as respondent's purportedly being "distracted, rushed, or guessing" and Dr. Wind adding a color dot to the stimuli—all similarly bear on the weight to be accorded to Dr. Wind's rebuttal survey rather than its admissibility. See Jellibeans, 716 F.3d at 844 ("technical deficiencies" and "errors in execution" of a survey bear on its weight).

In conclusion, the Court finds that Dr. Wind's rebuttal survey is sufficiently reliable, relevant, and helpful and that Dr. Wind is qualified to offer it. Therefore, the Court denies Delta's motion to exclude the same.

2.  Motion to exclude Dr. Jackie Chorn's rebuttal survey

Dr. Jackie Chorn's rebuttal survey purportedly tested association and whether the Delta Hotels Marks impair the distinctiveness of the Delta Marks.  See generally Chorn Rebuttal Report.  Dr. Chorn found that they likely did not.  See id. ¶ 71.  In support of its motion to exclude Dr. Chorn's rebuttal survey, Delta argues that the survey is unreliable and irrelevant for three (3) reasons: (1) the rebuttal survey did not focus on Delta Hotels but rather showed participants a Marriott webpage with many different names and marks, (2) Dr. Chorn introduced that webpage as being "from a hotel company" instead of as a "webpage of a hotel," and (3) Dr. Chorn asked participants what companies they "associate" with Marriott as opposed to asking "what, if anything, came to mind"—meaning that respondents could have been thinking about a mental connection or a more formal association such as a business partnership.  [Doc. 439-1 at 15–25].  In response, Marriott argues that (1) the rebuttal survey replicated actual conditions in which a customer might encounter the Delta Hotels Marks, such as on Marriott's webpage, which contains other information; (2) Dr. Chorn's introduction did not impermissibly prime participants to answer the survey question asking about what companies they associate with the "hotel named in the webpage"; and (3) Dr. Chorn permissibly used the word "associate" in her questions.  [Doc. 500 at 12–23].  Otherwise, Marriott maintains

that Delta's criticisms of Dr. Chorn's rebuttal survey go to its weight, at best, rather than its admissibility. [Id. at 23–24].

Upon review and consideration, the Court agrees with Marriott and finds that Dr. Chorn's rebuttal survey is admissible because it is sufficiently relevant and reliable and Dr. Chorn is qualified. See Chorn Rebuttal Report at 1–4 (Dr. Chorn's qualifications), 21–34 (describing the principles and methodology of the rebuttal survey and its application). Delta's arguments to the contrary concern that survey's weight rather than its admissibility. First, that Dr. Chorn's rebuttal survey is not unreliable because she used Marriott's webpage as opposed to specifically focusing on the Delta Hotels Marks. Indeed, authority supports that it is permissible for a survey to "mirror the situation in which the ordinary person would encounter the trademark[.]" See MCCARTHY, supra, § 32.163; see also, e.g., Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 736 F.3d 198, 210 (2d Cir. 2013) (noting that a survey had "limited probative value because the defendant's marks were not presented to survey respondents as they are actually 'presented and packaged' in commerce'"); Beaulieu Grp. LLC v. Mohawk Carpet Distrib., Inc., Civil Action No. 4:15-CV-0124-HLM, 2016 WL 11745982, at *4 (N.D. Ga. Oct. 25, 2016) ("It is important for expert surveys to try and—as closely as possible—recreate market conditions"); Def.'s SOAF ¶¶ 75–77 (record evidence supporting that hotel bookings are often made through the hotel's website). Otherwise, Dr. Chorn's choice of presentation

of survey images "is a classic example of a question that goes to the weight of the survey, not its admissibility[.]"  See Stone Brewing Co., LLC v. MillerCoors LLC, No. 3:18-CV-00331-BEN-LL, 2020 WL 907060, at *11 (S.D. Cal. Feb. 25, 2020); see also Beaulieu Grp., 2016 WL 11745982, at *4 (collecting cases).

Second, Dr. Chorn's introduction above the webpage stimulus that stated it was "from a hotel company" rather than just "of a hotel" did not impermissibly prime participants such that the survey is unreliable.  Following this introductory text, participants were specifically asked about what companies they associate with the "hotel named in the webpage."  Chorn Rebuttal Report at 17–23.  A reasonable participant could have understood the introduction to be referencing a webpage from Delta Hotels by Marriott (given that those are the most prominent words at the forefront of the webpage) and for the question to be asking what companies they associate with Delta Hotels by Marriott (as opposed to other hotels listed in much smaller font at the bottom and corner of the webpage).  Although Delta argues that the webpage contained multiple hotels and that participants could have been confused and focused on "Marriott" as it appeared on the webpage because it is both a hotel company and a hotel, such criticism goes to the weight of the survey and is more appropriately probed on cross-examination.  See, e.g., Jellibeans, 716 F.2d at 844 ("technical deficiencies," "poorly designed questions," and "errors in execution" impact a survey's weight).

Third, that Dr. Chorn used the word "associate" rather than asking a more open-ended question is not a basis for finding the survey unreliable and inadmissible. Dr. Chorn's survey was tailored to the statutory standard for dilution by blurring, which includes some form of "association" in the mind of a consumer. See 15 U.S.C. § 1125(c)(2)(B); see also Am. Dairy Queen Corp., 2022 WL 2760024, at *33 (using an expert's likelihood of dilution survey that asked "do you associate" the Dairy Queen logo with a certain number of companies or brands). And, as Marriott points out, Dr. Chorn's question uses the word "associate" rather than "association," indicating she intended the verb rather than the noun referencing a formal business partnership. [Doc. 500 at 22]. Delta's contention that the survey's association rate was lower because participants could have thought the survey was asking about a formal business association when Dr. Chorn used the word "associate" rather than just a mere mental connection goes to the weight of the survey rather than its admissibility. See Nightlight Sys., 2007 WL 4563873, at *8 ("To the extent the particular terms used in the questions or the questions themselves are flawed in this particular case goes to the weight afforded the survey, and not its admissibility").

In sum, the Court finds that Dr. Chorn's rebuttal survey is sufficiently relevant and reliable as to be admissible. Thus, the Court denies Delta's motion to exclude the same.

### 3. Motion to exclude Dr. Robert A. Leonard

Marriott retained Dr. Leonard "to prepare a linguistic analysis investigating the meaning(s) and usage(s) in American English of the word 'delta.'" See Leonard Report at 4. After consulting, among other things, various dictionaries; the Corpus of Contemporary American English; and trademarks, companies, products, and services containing the word "delta," Dr. Leonard concluded the following:

> (1) "delta" has many meanings[;] (2) users of American English cannot and do not assume that "delta" has one specific meaning[;] (3) "delta" identifies many different companies, products and services[;] (4) users of American English cannot and do not assume that "delta" refers to one specific company, product or service[;] and (5) users of American English must distinguish between referents each time they hear or see the word "delta." As a result, people need context to understand how and what a particular "delta" represents. This context can come in a variety of forms. For example, adding HOTELS BY MARRIOTT to DELTA tells people that particular use of "delta" is for a "hotel" that is offered by the "Marriott" company.

See id. at 5, 7–8, 31. By its motion, Delta seeks to exclude Dr. Leonard's conclusions because (1) he is not qualified to discuss the public's assumptions or conclusions with regard to the word "delta," (2) his methodology is unreliable, and (3) his testimony will not be helpful. [See Doc. 442-1].

First, the Court finds that Dr. Leonard is qualified to testify to the conclusions in his report. Dr. Leonard received his Ph.D. in linguistics from Columbia University and has taught linguistics at the collegiate level for approximately thirty-five (35) years. See Leonard Report at 1. Dr. Leonard's specialty is "the meaning

of words and how humans communicate in the real world." Id. at 1, 4 (a linguist

includes "a scientist who studies human language as a set of real-world

phenomena"). Although Delta contends that some of Dr. Leonard's opinions bear

on what "consumers" assume or conclude as they interact with products in the

marketplace, he focuses his conclusions on what "delta" means and what "users of

American English" do *not* assume when they encounter that word in the real world,

including as it relates to products, services, and companies. Id. at 5, 31. Just because

Dr. Leonard's opinion at some level implicates, among other things, consumers and

the marketplace, this does not require him to be an expert on consumer behavior.

See, e.g., Invisible Fence, Inc. v. Fido's Fence, Inc., No. 3:09-CV-25, 2014 WL

201457, at *3–4 (E.D. Tenn. Jan. 17, 2014) (admitting a linguistic expert who drew

conclusions about how users of "American English customarily use and understand"

words related to the trademarks at issue when used in a specific context because the

testimony would help "determine the use of the terms at issue and how they are

generally understood"); Git-R-Done Prods., Inc. v. Giterdone C Store, LLC, No.

1:15-CV-386-LG-RHW, 2017 WL 11681859, at *3 (S.D. Miss. Jan. 3, 2017)

(admitting a linguistic expert because her testimony would "provide[] helpful

guidance as to how people use the phrase and the roots of" the phrase at issue

(cleaned up)). Instead, Dr. Leonard's conclusions and testimony about how users of

American English understand the word "delta" as it appears in the real world—

including in the marketplace—are limited and related to his expertise regarding what words mean and how people understand and communicate them in the world. Therefore, the Court finds that Dr. Leonard is qualified to offer this expert testimony.[43]

Second, the Court finds that Dr. Leonard's testimony and conclusions are derived from a reliable methodology. In his report, Dr. Leonard states that he uses the methodology of corpus linguistics. <u>See</u> Leonard Report at 5–8. Dr. Leonard describes that method, cites to multiple sources that affirm that method is an accepted methodology in the linguistic field, and states how he applied that methodology to the case at hand. <u>Id.</u>; <u>see also</u> <u>Am. Airlines, Inc. v. Delta Air Lines, Inc.</u>, No. 4:19-CV-1053-O, 2021 WL 3629735, at *8 (N.D. Tex. May 18, 2021) (finding that the "expertise and methodology here applying corpus linguistics" was reliable). Delta's arguments that Dr. Leonard is unreliable are unpersuasive. Delta relies on a case from this district in which Dr. Leonard's testimony was excluded. [Doc. 442-1 at 13–14] (citing <u>D.H. Pace Co., Inc. v. Aaron Overhead Door Atlanta LLC</u>, 526 F. Supp. 3d 1360, 1370–73 (N.D. Ga. 2021)). However, in that case,

---

[43] Delta's arguments with regard to its deposition colloquy with Dr. Leonard about the meaning of the word "assume" and that Dr. Leonard overstates his conclusions do not change the Court's determination that Dr. Leonard is qualified and are more appropriate topics for cross-examination. [<u>See</u> Doc. 442-1 at 10–12]; <u>United States v. Andrews</u>, Civil Action No. 1:06-CR-422-02-JEC-AJB, 2007 WL 8718824, at *31 (N.D. Ga. Dec. 3, 2007) ("what the phrase means, and whether the underlying statistics are correct and/or [the expert] has overstated her conclusions, are perfect subjects for cross-examination"), <u>report and recommendation adopted</u>, 2008 WL 11432075 (Apr. 25, 2008).

another Judge of this district found that Dr. Leonard failed to "offer any description or explanation of any uniform methodology [he] used . . . as he examined various databases" and that he had not demonstrated that his methodology was "testable" or had been "generally accepted in the scientific community." D.H. Pace, 526 F. Supp. 3d at 1371–72. In contrast, here, Dr. Leonard provided a detailed account of his methodology with regard to his corpus analysis and sources affirming the use of corpus linguistics, and his method is testable as evidenced by the fact that Delta's own expert replicated Dr. Leonard's methodology in searching databases. See, e.g., Leonard Report at 5–8, 18, 27–30; Deposition of Patrick Farrell, Ph.D. at 113:9–25 [Doc. 501-7]; see also, e.g., Navajo Nation v. Urban Outfitters, Inc., No. 12-195 BB/LAM, 2016 WL 9819870, at *1 (D.N.M. Aug. 12, 2016) (admitting a linguistics expert who only gathered data "from dictionaries, online sources, and [the d]efendants' advertisements").

Otherwise, Delta's arguments regarding Dr. Leonard's use of documents provided to him by Marriott's counsel, Marriott's failure to supply Dr. Leonard with evidence or witnesses from Delta, Dr. Leonard's purported decision to ignore sources and research tools he has previously used, and Dr. Leonard's supposed "history of using unreliable methodologies" are unconvincing, unsupported, or irrelevant as they relate to evaluating his reliability in the specific case at hand. [See Doc. 442-1 at 14–17] (citing PODS Enters., Inc. v. U-Haul Int'l, Inc., 2014 WL

12628664, at \*3–4 (M.D. Fla. June 27, 2014) (finding Dr. Leonard's testimony unreliable only as it related to a specific time period where he "blindly accept[ed]" U-Haul's "description of the usage" of the pods at issue; where almost "[e]very data point . . . was provided to him by U-Haul's counsel"; and where he failed to "apply any analytical methodology," refused to consult other sources, and "ignored data suggesting a contrary conclusion")).

Finally, the Court finds that Dr. Leonard's testimony would, at minimum, be helpful and relevant to the trier of fact. Dr. Leonard's report includes information regarding the various meanings, uses, and understandings of the word "delta" that may not be known to a layperson. See generally Leonard Report. Additionally, Dr. Leonard's testimony is relevant to the trademark infringement and dilution analysis, which require in part an examination of likelihood of confusion, the similarity of the marks at issue such as the manner in which they are used, the distinctiveness and commercial strength of the Delta Marks, and Delta's substantially exclusive use of the same.[44] Accordingly, the Court denies Delta's motion to exclude Dr. Leonard.

_____

[44] Delta argues that Dr. Leonard's conclusions are of limited relevance because infringement and dilution can still occur even where consumers understand that Delta Hotels is "offered" by Marriott. [Doc. 442-1 at 20–22]. These subjects are better suited for cross examination because they do not implicate the admissibility of Dr. Leonard's opinions. [Id.] Otherwise, a reasonable jury could afford weight to Dr. Leonard's conclusion that "adding HOTELS BY MARRIOTT to DELTA tells people that particular use of 'delta' is for a 'hotel' that is offered by the 'Marriott' company" when considering the elements of likelihood of confusion or dilution by blurring. Supra, part III.B; 15 U.S.C. § 1125(c)(2)(B) (the court can consider "all relevant factors" in determining likelihood of dilution); Seamon, 813 F.3d at 988 (noting that "helpfulness, or fit goes primarily to relevance"—a "liberal" standard—and that an expert opinion need only have a "valid scientific connection to the pertinent inquiry").

4.   Motion to exclude Judge Rany Simms

In his initial expert report, Judge Rany Simms discusses various practices and procedures of the United States Patent and Trademark Office (the "USPTO") related to publishing and registering trademarks, several of the Parties' previous trademark applications, other trademarks containing the word "delta," USPTO Examining Attorneys' criteria in determining if any likelihood of confusion exists between applicant and existing trademarks, specific searches related to some of the Parties' trademark applications, and what trademarks he believes the Examining Attorneys uncovered and reviewed as a result of their searches while assessing the Parties' various trademarks for registration.   See Simms Report at 4–44.   Based on his experience and review of these materials, Judge Simms concludes that the USPTO has found dozens of times that no likelihood of confusion exists between various of the Delta Marks, Delta Hotels Marks, and third-party marks. Id. at 44.  In his rebuttal report, Judge Simms reviews the implications of dismissing a USPTO opposition with prejudice and extrinsic evidence he claims could be relevant in deciding if laches, acquiescence, or estoppel apply in this suit.  See Rebuttal Expert Report of Rany Simms ("Simms Rebuttal Report") at 5, 10 [Doc. 445-5].

As an initial matter, the Court grants Delta's motion to exclude Judge Simms' testimony to the extent that motion requests exclusion of Judge Simms' rebuttal report.   That rebuttal report entirely concerns what effect the 1987 trademark

97

opposition proceedings (involving Delta Hotels trademarks that expired in 2008 and are not at issue in this suit) and two (2) letters from 1986 and 1993, respectively, that Judge Simms opines are relevant to issues of laches, acquiescence, and estoppel. See generally Simms Rebuttal Report. However, the Court has already found that Marriott is barred as a matter of law from arguing acquiescence, estoppel, or laches based on conduct and events prior to its acquisition of Delta Hotels. Supra, part III.C. Therefore, Judge Simms' rebuttal report is not relevant or helpful to determining any remaining issue in this case, and the Court grants Delta's motion to exclude it.

As for Judge Simms' initial expert report, Delta's motion to exclude is due to be granted in part and denied in part. Specifically, the Court finds that Judge Simms is qualified to testify as to the practices and procedures of the USPTO, including what Examining Attorneys generally must do and consider in determining whether a likelihood of confusion exists between applicant and existing trademarks, and the implications of approving a trademark—such as the Parties' trademarks or third-party trademarks—for publication and registration. Judge Simms worked for decades as an "Administrative Trademark Judge with the Trademark Trial and Appeal Board" ("TTAB") where he "wrote hundreds of decisions in appeals from refusals to register trademarks (and service marks), in opposition proceedings . . ., and in cancellation proceedings" and, prior to that experience, as "an Interlocutory

98

Attorney with the TTAB" and as "a USPTO Trademark Examining Attorney[.]" See Simms Expert Report at 1, 3–4. In his expert report, Judge Simms provides an overview of the USPTO trademark registration process, consults the Parties' and third-party trademark registrations, and—based on his knowledge, experience, and review of relevant materials—concludes that the USPTO found that these trademarks were not likely to cause confusion with existing marks by virtue of the fact that they were approved for registration. The Court finds that this reliable expert testimony would be helpful to the trier of fact in this case.

Delta's arguments that the Court should exclude Judge Simms' initial report are unavailing. First, Delta argues that Judge Simms' report is merely a recitation of publicly available facts such as trademark registrations. [Doc. 446 at 6–7]. However, Judge Simms' report belies this assertion as he provides interpretation of trademark registrations and other materials based on his knowledge of the USPTO's practices and procedures. See, e.g., Simms Expert Report at 25–26, 28–30, 39–40. Otherwise, experts "are allowed to articulate the factual underpinning upon which their opinions are based." Duling v. Domino's Pizza, LLC, Civil Action No. 1:13-CV-01570-LMM, 2015 WL 3407602, at *13 (N.D. Ga. Jan. 14, 2015). Second, Delta contends that Judge Simms' list of trademarks, including third-party registrations, is misleading because registrations do not evidence actual use of the trademarks, which is the relevant inquiry here. [Doc. 446 at 8–10, 14–16].

Similarly, Delta maintains that the USPTO's decisions regarding trademark applications and implicit determinations as to likelihood of confusion are inadmissible because the Examining Attorneys rely on a standard for registration that differs from the relevant legal standard for likelihood of confusion, they consult limited evidence in determining likelihood of confusion, and they do not issue written explanations when they approve trademarks; therefore, it is unknown why the Examining Attorneys made any such determination or what exact materials they consulted in that process. [Id. at 10–13]. Thus, according to Delta, Judge Simms' methodology is unreliable and if he testifies about these issues, he is likely to mislead the jury. [Id. at 13–15].

Although the existence of potentially similar registered trademarks is not, standing alone, demonstrative of use in the trademark infringement or dilution by blurring contexts, it is relevant to the Examining Attorneys' determination of likelihood of confusion in assessing a trademark application. As Judge Simms discusses at length, in determining whether a trademark qualifies for publication and registration, Examining Attorneys are "trained" and "proficient" in "how to search for conflicting marks," are required to search for such marks, and must consider a number of factors to determine if the applicant trademark and existing trademarks are impermissibly similar and likely to cause confusion. See Simms Expert Report at 2–4, 7–8. Thus, after consulting several trademark registrations and relevant

materials, Judge Simms concludes that the USPTO must have found that various of the Parties' trademarks and other existing third-party trademarks were not likely to cause confusion with current existing trademarks by virtue of the fact that they were approved.[45]  See id. at 10–26, 39–41.  This general inference regarding likelihood of confusion is permissible given that, as Judge Simms details, Examining Attorneys are required to perform searches for similar existing marks and may not register a trademark that "so resembles a mark registered . . . or a mark . . . previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive[.]"  See 15 U.S.C. § 1052(d); Simms Expert Report at 4 (noting this specific inquiry and discussing that "[a] search for conflicting marks is not optional" but is rather "required as part of a complete examination of an application file"); Saint-Vil v. City of Mia. Beach, No. 19-24640-Civ-SCOLA/TORRES, 2022 WL 2132086, at *6 (S.D. Fla. June 14, 2022) ("experts are allowed to make reasonable inferences from the evidence and provide testimony about those inferences").

And though the USPTO's likelihood of confusion determination is implicit and not dispositive of Delta's present trademark claims, a jury is entitled to weigh Judge Simms' informed testimony in this regard at trial.  See Royal Palm Props.,

---

[45] In this determination, Judge Simms also relies in part on his interpretation of various searches the Examining Attorneys conducted in assessing some of the Parties' trademark registration applications.  See Simms Expert Report at 26–28, 30.  However, as explained below, the Court finds that Judge Simms is not qualified to testify in that regard.

LLC v. Pink Palm Props., LLC, 950 F.3d 776, 789 n.9 (11th Cir. 2020) (stating that the USPTO's "confusingly-similar determination" can serve as "some evidence" in the likelihood of confusion determination in a trademark infringement action); Carling Brewing Co. v. Philip Morris Inc., 297 F. Supp. 1330, 1337 (N.D. Ga. 1968) ("While the various Patent Office decisions referred to are not binding upon this court, they are certainly entitled to the most respectful consideration because of the Patent Office's day-to-day expertise in adjudicating cases wherein the ultimate question decided is the question of 'likelihood of confusion' as that term is employed in various parts of the Lanham Act."); see also 15 U.S.C. § 1115(a) (registration of a mark is "prima facie evidence of [its] validity"); A&H Sportswear, Inc v. Victoria's Secret Stores, Inc., 237 F.3d 198, 221 (3d Cir. 2000) (reviewing a district court's bench trial findings and holding that "an initial [US]PTO determination by an examining attorney may be considered" but that it does not necessarily have to be given weight).  Delta's specific qualms regarding the potential weaknesses and limitations of Judge Simms' inferences and conclusions are more appropriately reserved for cross examination.[46]  See, e.g., Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1345 (11th Cir. 2003) (noting that cross-examination is the

---

[46] Indeed, many of the cases Delta cites concern what weight to afford USPTO decisions at the summary judgment stage rather than in the context of a Daubert motion and admissibility for purposes of trial.  [Doc. 446 at 11–13].  Otherwise, the Court does not locate controlling authority suggesting that evidence and expert testimony regarding the USPTO's decision to allow a trademark registration and the implications of that decision are inadmissible or otherwise improper for a jury's consideration.

"appropriate means of attacking shaky but admissible evidence" and that "so long as the expert's testimony rests upon good grounds, it should be tested by the adversary process" (cleaned up)).

On the other hand, the Court finds that Judge Simms utilized an unreliable methodology and is not qualified to testify as to the *specific* trademark searches that he thinks were performed by the Examining Attorneys during their review of the trademark applications at issue here or what those searches revealed. In his expert report, Judge Simms construes several searches he contends the Examining Attorneys conducted when evaluating some of the Parties' trademark applications and concludes those searches would have revealed the other Party's existing trademarks and other third-party marks, and, therefore, the USPTO has found no likelihood of confusion specifically between those marks. See Simms Expert Report at 26–28 (detailing the searches Examining Attorneys conducted with respect to twelve (12) of the Parties' trademarks and stating that the searches were broad enough to have produced the other Party's trademarks), 30 (claiming that the Examining Attorneys' searches were broad enough to include a number of third-party "delta" marks). However, throughout his deposition, Judge Simms testifies that he has never been in a position to "review an [E]xamining [A]ttorney's search strategies" or "have occasion to criticize" the same; has never conducted an electronic search for conflicting marks; and does not know the scope of what is

contained in the USPTO database, what Examining Attorneys view when they search for conflicting marks, if the searches he conducted on the publicly accessible USPTO database are the same as what Examining Attorneys use, or what several aspects of the trademark search results an Examining Attorney consults mean or include.[47]  See, e.g., Deposition of Rany Simms ("Simms Dep.") at 173:5–174:6, 175:6–21, 179:11–182:1, 189:15–190:13, 193:9–12, 196:3–198:5 [Doc. 489-8]. Thus, the Court finds that Judge Simms may not testify about the specific searches at issue here, the exact procedure or mechanics of how Examining Attorneys conduct searches for conflicting marks, or the specific results he believes were the product of such searches.  See Simms Expert Report at 26–28, 30; Brown v. Progressive Mountain Ins. Co., Civil Action No. 3:21-CV-0175-TCB, 2023 WL 9193005, at *4–5 (N.D. Ga. Sept. 20, 2023) (permitting an expert to testify broadly about the used-car industry but not as to the defendant's specific valuation process because "[i]t is not enough for an expert to be qualified in a subject area generally; the expert must be qualified to address the particular issue he is testifying on").

For the foregoing reasons, the Court grants in part and denies in part Delta's motion to exclude Judge Rany Simms' testimony.

---

[47] For example, in his expert report, Judge Simms states that the Examining Attorney assessing the "Delta Privilege" mark "searched for the word DELTA across all service classes" in line 6.  See Simms Expert Report at 28.  However, when asked about this portion of his report in his deposition, Judge Simms states that lines 1–5 indicate such a search and that he is "not sure" what line 6 shows.  Simms Dep. at 196:3–197:1.

5.    Motion to exclude Dr. Bruce Isaacson's confusion survey

Marriott retained Dr. Bruce Isaacson to conduct a survey that measures likelihood of confusion between Delta Hotels by Marriott and Delta. See Isaacson Expert Report at 1. Dr. Isaacson showed participants actual or control stimuli related to Delta Hotels, asked questions probing what company owns or operates the hotel, other products and services offered by that company, and if that company is connected or affiliated with other companies. Id. at 27–30. He asked follow-up questions if participants answered "Delta" to some of the questions. Id. at 31. Dr. Isaacson counted respondents as confused when they mentioned "Delta Air Lines" or "any term possibly related . . . such as flight, airline, or similar themes," and found only 2.1% net likelihood of confusion. Id. at 30, 41. Delta moves to exclude Dr. Isaacson's survey because it (1) failed to test for permission confusion, (2) was biased in favor of Marriott given that it contained a myriad of flaws, and (3) improperly coded participants as not confused. [See Doc. 450-1.]

Upon review and consideration of Dr. Isaacson's expert report and likelihood of confusion survey, the Court finds that he is qualified, utilized reliable methodology based on sufficient facts and data, and will be helpful to the trier of fact. See generally Isaacson Expert Report at 21–24 (qualifications), 25–42 (methodology, application, and conclusions). Therefore, the Court finds that Dr. Isaacson's testimony and survey are admissible.

Delta's arguments to the contrary are unconvincing. First, Delta argues that Dr. Isaacson's survey is fatally flawed because he failed to explicitly ask questions related to permission confusion or if Delta Hotels was sponsored or endorsed by other companies, a type of confusion relevant to consumer confusion and this case. [Doc. 450-1 at 11–16]. However, Delta fails to establish that an explicit line of questioning related to permission confusion is necessary such that failure to include it renders any resulting survey irrelevant, unreliable, and inadmissible. See, e.g., Flowers Bakeries Brands, 2010 WL 3075318, at *7–8 (admitting a likelihood of confusion survey that purportedly only focused on source confusion and failed to explicitly ask about sponsorship or affiliation confusion). And "alleged technical deficiencies affect the survey's weight . . . not its admissibility." Jellibeans, 716 F.2d at 844 (finding that the district court did not err in admitting a survey with "poorly designed questions"). Moreover, Dr. Isaacson's survey question regarding if participants "think that the company that owns or operates the hotel [they] just viewed . . . is connected or affiliated with another company" could be interpreted as probing both affiliation and permission confusion. See Isaacson Expert Report at 33; Deposition of Bruce Isaacson ("Isaacson Dep.") at 191:13–16 (stating that "sponsorship is subsumed under the categories of affiliation or connection") [Doc. 497-2]. Regardless, even if Dr. Isaacson should have explicitly asked about permission confusion, at worst, that makes his survey less than ideal and of limited

value rather than inadmissible.  See, e.g., Jellibeans, 716 F.2d at 844; Flowers

Bakeries Brands, 2010 WL 3075318, at *7.  Delta can probe the survey's perceived

weaknesses on cross-examination, and the jury can decide what weight to afford it

in deciding what, if any, type of confusion exists in this case.

Second, Delta contends that Dr. Isaacson's survey was biased in favor of

Marriott because participants were supposedly encouraged to answer "don't know"

as opposed to providing a substantive answer and a plethora of purported

deficiencies existed, including a lack of follow-up questions unless a participant

provided a specific answer, the timing of the follow-up questions, the phrasing and

use of a "full-filter" question, the use of the singular "company" in questions, and

failure to ask about other brands.  [Doc. 450-1 at 16–23].  However, "poorly

designed questions," "the format of the questions," "errors in execution," "the

manner of conducting the survey," and other "alleged technical deficiencies affect

the survey's weight . . . and not its admissibility."  Jellibeans, 716 F.2d at 844

(cleaned up); Nightlight Sys., 2007 WL 4563873, at *8 ("To the extent the particular

terms used in the questions or the questions themselves are flawed in this particular

case goes to the weight afforded the survey, and not its admissibility"); see also Vital

Pharms., Inc. v. Monster Energy Co., 553 F. Supp. 3d 1180, 1227–29 (S.D. Fla.

2021) (weighing one of Dr. Isaacson's likelihood of confusion surveys with similar

questions at a bench trial).  Contrary to Delta's assertions regarding inadmissibility,

authority supports Dr. Isaacson's use of "don't know" answers and prompts, <u>see</u> <u>Beaulieu Grp. LLC</u>, 2016 WL 11745982, at *2 ("The screener portion instructed surveyees not to guess but to click the 'Don't know' icon on any question for which they were unsure"), and "full-filter" questions. <u>See</u> <u>Nat'l Distillers Prods. Co., LLC</u> <u>v. Refreshment Brands, Inc.</u>, 198 F. Supp. 2d 474, 483–84 (S.D.N.Y. 2002) (giving weight to a survey that used similar filter questions); <u>see also</u> Isaacson Dep. at 267:14–271:6 (stating that he has used similar filter questions in every likelihood of confusion survey he has done in connection with an expert report or testimony). Moreover, the Court is satisfied that Dr. Isaacson provided sufficient opportunity to capture confusion such that his survey is, at minimum, admissible, given that he counted respondents as confused if they mentioned "Delta Air Lines or . . . any term possibly related to Delta Air Lines, such as flight, airline, or similar themes" in response to at least six (6) questions. <u>See</u> Isaacson Expert Report at 20. In sum, Delta fails to sufficiently support that these supposed shortcomings in the survey justify its exclusion.

Finally, Delta argues that Dr. Isaacson's methodology was unreliable based on the way he "coded the verbatim responses." [Doc. 450-1 at 23–25]. According to Delta, Dr. Isaacson, "improperly counted responses which indicated potential confusion as evidence of no consumer confusion," including when participants answered with "Delta Hotels" but were not asked follow-up questions. [<u>Id.</u>]

However, Dr. Isaacson provides justification for this decision, stating that he did not ask follow-up questions of these participants because "if someone says Delta Hotles, we know that they're referring to Marriott and we know that they're not referring to Delta Air Lines" because "[o]nly one party in this matter is named Delta Hotels, and only one party claims to be named Delta Hotels. That answer is nonambiguous as to which party it refers to." See Isaacson Dep. at 293:2–294:5, 297:19–298:11. In any event, Delta's criticism goes to the survey's weight rather than its admissibility. See Atlanta Allergy & Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta, LLC, 685 F. Supp. 2d 1360, 1374–75 (N.D. Ga. 2010) (finding objections that the expert was "not objective in coding" because "he counted the words 'Atlanta Allergy' as the equivalent of" the plaintiff's mark related to the survey's weight and not its admissibility).

In sum, almost all of Delta's specific objections are contested, and none of them—taken alone or together—render Dr. Isaacson's survey inadmissible. Therefore, the Court denies Delta's motion to exclude the same.

6.  Motion to exclude portions of Mr. W. Todd Schoettelkotte's rebuttal and supplemental reports

Marriott offers the rebuttal expert opinion of Mr. Schoettelkotte in response to Delta's proffered expert on damages, Ms. Julie Davis. Ms. Davis concludes that Marriott's revenue associated with its use of the Delta Hotels Marks is ████████████; the cost reimbursement revenue is ████████████; and that the

total revenue associated with use of the Delta Hotels Marks is ███████████. See Expert Report of Julie Davis at 21 [Doc. 457-1]; Supplemental Expert Report of Julie Davis at 15 [Doc. 457-2]. In the relevant portions of his rebuttal and supplemental reports, Mr. Schoettelkotte calculates Marriott's revenues associated with the Delta Hotels properties as ███████████ and argues that (1) cost reimbursement revenue should be excluded from any revenue calculation because it is not "profits," (2) even if the cost reimbursement revenue is a "profit" only some of it is attributable to Delta Hotels and deductions apply, and (3) a "considerable portion" of profits should be apportioned. See, e.g., Schoettelkotte Rebuttal Report ¶¶ 46, 83, 101; Schoettelkotte Supplemental Report ¶¶ 16–36. Delta moves to exclude these portions of Mr. Schoettelkotte's reports. [Doc. 457].

Upon review and consideration, the Court finds that Mr. Schoettelkotte is qualified to offer his rebuttal and supplemental reports, those reports are based on a reliable methodology, and his testimony will assist the trier of fact. See Schoettelkotte Rebuttal Report ¶¶ 5–6 (qualifications), 10, 74–101; Schoettelkotte Supplemental Report ¶¶ 16–36. Delta argues that Mr. Schoettelkotte's apportionment and disgorgement opinions should be excluded. [Doc. 457 at 9–25]. First, as to apportionment, Delta contends the Court should exclude this testimony because (1) Mr. Schoettelkotte lacks the proper qualifications, (2) he does not articulate a reliable methodology, (3) he fails to establish a causal connection, and

(4) he fails to quantify how much of Marriott's supposed profits should be apportioned. [Doc. 457 at 9–19].

Delta's first argument claims that Mr. Schoettelkotte is unqualified because his expertise is in accounting rather than in evaluating a hotel endorsement or system to determine what costs should be apportioned. [See id. at 10–12]. However, based on Mr. Schoettelkotte's extensive experience providing "economic and financial consulting services," including a variety of damages assessments and accounting and valuation assessments, the Court finds that he is, at minimum, qualified to offer his testimony on damages in this case, including what profits are attributable to Marriott's use of the Delta Hotels Marks and should be apportioned. See Schoettelkotte Rebuttal Report ¶¶ 5–6; Maiz v. Virani, 253 F.3d 641, 665 (11th Cir. 2001) (upholding district court's admission of expert on lost value damages because she had a background in estimating damages and in economics despite that she had "no real estate development experience"); Paycargo, 2021 WL 2633657, at *2 (finding expert qualified to testify as to apportionment because he worked at "an economic consulting firm" and "whose practice has focused on the analysis of damages, monetary relief and valuation issues in commercial disputes"); see also Hard Candy, LLC v. Anastasia Beverly Hills, Inc., 2018 WL 10322164, at *9–10 (S.D. Fla. Jan. 13, 2018)

Second, according to Delta, Mr. Schoettelkotte failed to articulate a reliable methodology tied to his apportionment opinions. However, Mr. Schoettelkotte detailed the factors he believes warrant apportionment based on his analysis of the case, interviews with various Marriott personnel, and review of the evidence. *See* Schoettelkotte Rebuttal Report ¶¶ 74–83. The Court finds that this is a sufficiently reliable methodology. *See* Kumho Tire, 526 U.S. at 142 ("the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination" (emphasis in original)); Allison v. McGhan Medical Corp., 184 F.3d 1300, 1312 (11th Cir. 1999) (stating that the proponent of expert testimony need only prove it is reliable by a preponderance of the evidence); United States v. 0.161 Acres of Land, 837 F.2d 1036, 1040 (11th Cir. 1988) (noting that a district court should not exclude testimony that "has a reasonable factual basis"); Hard Candy, 2018 WL 10322164, at *9 (admitting an expert on damages and apportionment whose methodology included considering information and facts from the case, independent research, and interviews with relevant individuals); *see also* Paycargo, 2021 WL 2633657, at *3 (admitting an expert who in part relied on "review of deposition testimony and discussions with" personnel along with revenue analysis and apportionment calculation).

Third, Delta claims that Mr. Schoettelkotte fails to establish a causal connection between Marriott's endorsement and system and its profits related to

Delta Hotels. [Doc. 457 at 13–16]. Delta disputes the strength of the evidence upon which Mr. Schoettelkotte relies to establish a causal connection. [Id.] However, the Court finds that Delta's contentions as to the strength of Mr. Schoettelkotte's opinions and their factual bases are more appropriate for cross-examination and a jury's consideration. See, e.g., Hard Candy, 2018 WL 10322164, at *11 ("when evaluating an expert's methodology, it is not for the court to determine the accuracy or correctness of the conclusions reached"); Putnam v. Henkel Consumer Adhesives, Inc., Civil Action No. 1:05-CV-2011-BBM, 2007 WL 4794115, at *8 (N.D. Ga. Oct. 29, 2007) ("it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony"); U.S. for Use & Benefits of S. Site & Underground, Inc. v. McCarthy Improvement Co., No. 3:14-CV-919-J-PDB, 2017 WL 10434414, at *5 (M.D. Fla. Feb. 3, 2017) ("Challenges to the accuracy or source of facts underlying an expert's opinion are challenges to its weight rather than its admissibility"). Otherwise, the Court is satisfied that Mr. Schoettelkotte's testimony in this regard is, at minimum, reliable enough to be admissible.

Delta's final argument with regard to Mr. Schoettelkotte's apportionment analysis is that it should be excluded for failure to quantify the amount of Marriott's supposed profits that should be apportioned. [Doc. 457 at 17–20]. However, Delta fails to establish any requirement that Mr. Schoettelkotte must provide specific

apportionment amounts in order for his rebuttal testimony to be admissible.  See Pandora Jewelers 1995, 2011 WL 2295269, at *5 (admitting a rebuttal expert on apportionment who did not provide exact figures and instead identified four (4) factors that she believed the plaintiff's expert ignored or failed to account for in her damages calculation).   Although Delta claims Marriott's caselaw is inapposite because Mr. Schoettelkotte's opinion regarding apportionment is not in his capacity as a rebuttal expert responding to Ms. Davis but is "rather affirmatively assert[ing]" that such apportionment should occur, the Court disagrees.  [Doc. 553 at 10].  Just as in Pandora Jewelers 1995, Mr. Schoettelkotte's arguments regarding apportionment are in direct response to Ms. Davis' failure to conduct any such evaluation in her own assessment of potential damages.  See 2011 WL 2295269, at *4–5 ("A rebuttal expert can testify as to the flaws that she believed are inherent in another expert's report that implicitly assumes or ignores certain facts.").

Turning to Mr. Schoettelkotte's testimony regarding Marriott's cost reimbursement revenue and disgorgement, Delta claims such testimony should be excluded because it (1) fails to follow controlling law which prohibits deduction of (a) expenses that are unrelated to the sale of the infringing product, and (b) overhead expenses where such expenses did not increase related to the infringing product and where the infringing product constitutes only a small percentage of profits; and (2) inappropriately relies on Marriott's internal accounting policies.  [Doc. 457 at 19–

25].  In support, Delta points to <u>Maltina</u> to contend that Mr. Schoettelkotte's reports should be excluded because his reports concern Marriott's cost reimbursement revenue, which Delta maintains qualify as "overhead" expenses that are not sufficiently related to the Delta Hotels Marks and cannot be deducted from Marriott's profits in quantifying damages.  [<u>Id.</u> at 20–21] (citing 613 F.2d at 585–86).  In <u>Maltina</u>, the Court of Appeals for the Fifth Circuit upheld the district court's disallowance of deductions for certain costs and overhead expenses following a trial on the merits and during the damages phase of the case.  <u>See</u> 613 F.2d at 583–84. The panel in that case held that the district court permissibly found that the defendant failed to meet its burden of establishing deductions (1) for its expenses because it did not produce sufficient evidence to determine whether its sought cost deductions were actually related to the sale of the infringing product and (2) for its overhead costs (such as repairs, rent, taxes, utilities, etc.) because there was no evidence that those costs increased as a result of the sale of the infringing product and the infringing product "constitute[d] only a small percentage of total sales."[48]  <u>Id.</u> at 586–87.

Here, it is unclear to the Court how <u>Maltina</u> precludes Mr. Schoettelkotte's testimony, and the Court finds Delta's arguments in that regard unconvincing for at

---

[48] Contrary to Delta's assertion, "overhead expenses" are not categorically precluded as a deduction as a matter of law.  [<u>See</u> Doc. 553 at 14]; <u>Maltina</u>, 613 F.2d at 585–86; <u>Flowers</u>, 2010 WL 2662720, at *13.

least four (4) reasons. First, contrary to Delta's general assertions, it is not established that Mr. Schoettelkotte's reports only concern nondeductible and unrelated "overhead" costs—a term Delta does not attempt to define. <u>See, e.g.</u>, <u>supra</u>, part III.D. Second, Mr. Schoettelkotte's rebuttal expert report is largely unrelated to deductions analyzed in <u>Maltina</u> because Mr. Schoettelkotte's rebuttal expert report primarily argues that the cost reimbursement revenue is not a "profit" pursuant to 15 U.S.C. § 1117(a) and thus should not be considered in the damages inquiry in the first place. <u>See, e.g.</u>, Schoettelkotte Rebuttal Report ¶ 101. Third, if the cost reimbursement revenue is a "profit" and may be considered in assessing damages, Mr. Schoettelkotte's supplemental rebuttal report addresses what portion is attributable to Delta Hotels properties and what cost deductions should apply. <u>See</u> <u>id.</u> ¶¶ 16–36. This methodology, at minimum, does not appear to run afoul of <u>Maltina</u> and a finder of fact could consider its results in determining whether deductions are appropriate (assuming Delta prevails at all on the merits). <u>Id.</u>; <u>Maltina</u>, 613 F.2d at 586 (holding that the district court did not err in finding that the evidence did not sufficiently relate or attribute the requested cost deductions to sale of the infringing product); <u>see also</u> <u>Hard Candy</u>, 2018 WL 10322164, at *11 ("when evaluating an expert's methodology, it is not for the court to determine the accuracy or correctness of the conclusions reached"); <u>Putnam</u>, 2007 WL 4794115, at *8 ("it is not the role of the trial court to evaluate the correctness of facts underlying one

expert's testimony").  Fourth, whether Marriott has met its burden of establishing that its cost reimbursement revenue qualifies for deductions in a manner consistent with Maltina—including whether the cost reimbursement revenue is a profit attributable to the infringement such that it should be included in the damages calculations, whether the expenses associated with the cost reimbursements are related to sales in connection with the Delta Hotels Marks and eligible for deductions, whether any expenses qualify as "overhead," or whether those overhead expenses increased as a result of the Delta Hotels Marks—is the subject of factual disputes and does not bear on the admissibility of Mr. Schoettelkotte's reports.[49] See, e.g., Schoettelkotte Supplemental Report ¶¶ 16, 22–36; id. at Supplemental Schedule 4.1–4.2; Schoettelkotte Expert Report ¶¶ 16, 47–72, 92–96; Def.'s SOAF ¶¶ 267–82; [Doc. 495-3 at 42]; supra, part III.D.  Therefore, the Court finds that Mr. Schoettelkotte's reports and conclusions are based on a reliable methodology and do not clearly contradict the standard for permissible expert opinion on deductions (as

---

[49] Similarly, Delta's argument that Delta Hotels ██████████████████████ of Marriott's sales is not a sufficient basis to disqualify Mr. Shoettelkotte.  Although this fact may influence what, if any, deductions Marriott is entitled to related to overhead costs during the damages phase of this case, it has no bearing on if Mr. Shoettelkotte's expert testimony is admissible.  Health & Sun Rsch., 2014 WL 988762, at *9 (refusing to require jury charges to include that the infringing product was more than a small percentage of sales because the Eleventh Circuit has never included such a requirement).  Indeed, the majority of the arguments Delta asserts against Mr. Shoettelkotte's disgorgement opinions do not concern admissibility at all, and instead press the merits of any potential disgorgement. [See, e.g., Doc. 553 at 13–14] ("Marriott expressly failed to prove any deductions, so may not deduct its costs.").  As discussed supra, part III.D, Delta appears to attempt to improperly incorporate by reference its instant motion into its summary judgment brief.

articulated in <u>Maltina</u>). Accordingly, Mr. Schoettelkotte's reports and conclusions are appropriate for a finder of fact to consider in the damages assessment, should this litigation reach that stage. <u>See</u> <u>Select Comfort Corp. v. Tempur Sealy Int'l, Inc.</u>, No. 13-2451 (DWF/SER), 2016 WL 5496340, at *10 (D. Minn. Sept. 28, 2016) ("Plaintiff can challenge on cross-examination the factual basis for [the expert's] opinions with respect to certain deductions from revenues that Plaintiff claims are inappropriate").

Finally, the Court is not persuaded that Mr. Schoettelkotte's use of Marriott's net and gross reimbursed revenue figures rather than the total revenue generated is a sufficient basis to exclude his testimony. [Doc. 457 at 22–23]; <u>Mcgarity v. FM Carriers, Inc.</u>, No. CV-410-130, 2012 WL 1028593, at *7 (S.D. Ga. Mar. 26, 2012) ("Conflicting expert witness testimony is not grounds to exclude—the identification of flawed data or facts relied upon by an expert is precisely the role of cross-examination and does not render expert testimony inadmissible"). In sum, the Court finds that Mr. Schoettelkotte is qualified to offer his rebuttal and supplemental reports and that those reports are based on reliable methodology and will assist the trier of fact. Thus, the Court denies Delta's motion.

7.     <u>Motion to exclude John G. Plumpe's testimony</u>

Marriott offers the expert report of Mr. John G. Plumpe, which Delta moves to exclude. [Doc. 462]. In that report, Mr. Plumpe opines on (1) Marriott's damages

118

related to its breach of contract counterclaim and (2) undue prejudice associated with Marriott's affirmative defenses.  See generally Plumpe Supplemental Report.  As to undue prejudice, Mr. Plumpe asserts that Marriott incurred expenses of at least ███████████ associated with Delta Hotels between 2015 and 2022 as a result of Delta's delay in bringing suit.  See id. at 85–98.  As an initial matter, the Court grants Delta's motion to the extent it seeks to exclude the portion of Mr. Plumpe's testimony related to Marriott's breach of contract counterclaim damages.  [Doc. 462 at 7–19].  The Court herein grants summary judgment to Delta on Marriott's counterclaim, and therefore, Mr. Plumpe's testimony with regard to counterclaim damages is now moot and not relevant to any remaining issue.  See supra, part III.E.

As for Mr. Plumpe's testimony regarding undue prejudice against Marriott, the Court finds that Mr. Plumpe is qualified to offer this opinion, he relies on sufficient facts and data and a reliable methodology, and his opinion will be helpful to the trier of fact.  See Plumpe Supplemental Report at 1–2, 85–98.  Delta argues that Mr. Plumpe's opinion should be excluded because (1) he generally assessed whether Marriott was prejudiced by Delta's purported delay in filing suit between 2015 and 2022 rather than identifying exactly when the delay period began, thus rendering his opinion unreliable and (2) his statement that Marriott was prejudiced in an amount exceeding ████████ between 2015 and 2022 "can be adjusted accordingly" depending on when the factfinder determines the delay period began,

and thus, his opinion is impermissibly "subject to change at a later date" in violation of Federal Rule of Civil Procedure 26. [Id. at 20–25].

The Court finds that Delta's arguments do not warrant exclusion of Mr. Plumpe's undue prejudice testimony. As explained above, the determination of when the laches period began in this case involves a dispute of fact for the jury to resolve. See supra, part III.C.1. If the jury determines that the laches period began more than four (4) years before Delta filed this suit, it can then consult Mr. Plumpe's calculation of various categories of prejudice from the time of acquisition in 2015 through 2022 and consider what weight to afford that testimony and how to apply it in determining Marriott's prejudice during the relevant time period. Delta's argument that Mr. Plumpe's testimony is inadmissible because he failed to state when he believed the delay period began and tailor his calculations accordingly is unconvincing. See, e.g., United State v. Williams, 865 F.3d 1328, 1340 (11th Cir. 2017) ("To be admissible, expert testimony need not answer every question"); FC Online Marketing, Inc. v. Champions Fund, Inc., No. 8:13-CV-01713-T-27TBM, 2014 WL 12629760, at *2 (M.D. Fla. Nov. 14, 2014) (admitting an expert who was "simply providing the fact finder with the tools to calculate appropriate damages"); Quiet Tech. DC-8, 326 F.3d at 1345–46 (noting that objections to "inadequacies" and "shortcomings" are best tested on cross-examination); Archer Western – De Moya Joint Venture v. Ace Am. Ins. Co., No. 1:22-CV-21160-GOODMAN, 2023

WL 8767434, at *4 (S.D. Fla. Dec. 19, 2023) (noting that "[a] less-than-perfect expert opinion may still be admitted even if it contains gaps" and "[o]nly if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded" (internal marks and citations omitted)).

As for Delta's argument that Mr. Plumpe's expert report is not in accordance with Rule 26 because he failed to provide a definite prejudice opinion and deprived Delta the opportunity to properly probe it during his deposition or prepare for trial, the Court disagrees. Rule 26 requires that certain experts provide a report that, among other things, contains "a complete statement of all opinions the witness will express and the basis and reasons for them[.]" FED. R. CIV. P. 26(a)(2)(B)(i). In this case, Mr. Plumpe's opinion is that Marriott experienced varying types of prejudice in excess of ████████ between 2015 and 2022. See Plumpe Supplemental Report at 98. He supports this conclusion by outlining amounts associated with different types of prejudice and when that prejudice occurred between 2015 and 2022. Id. at 85–98. Delta claims that this is impermissibly indefinite and subject to change because Mr. Plumpe does not make his calculations with regard to any particular delay period and states that the total prejudice amount "can be adjusted" once the factfinder determines the period of delay (if such delay is found). [Doc. 462 at 23–24]; Plumpe Supplemental Report at 86. However, Mr. Plumpe is merely accurately referring to the fact that the jury can weigh and apply his calculations as

it sees fit depending on the specific delay period it determines. Moreover, Mr. Plumpe is permitted to "extrapolate from existing data" provided in his expert report and testify as to prejudice totals that result when the delay period is changed or narrowed. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Delta can probe any weaknesses in Mr. Plumpe's extrapolations on cross-examination, and the jury can decide what weight to afford such testimony. Therefore, the Court is satisfied that Mr. Plumpe's expert report does not violate Rule 26 and finds that his testimony is admissible.

**8. Motion to exclude certain testimony of Dr. Robert J. Kwortnik**

As relevant to Delta's instant motion to exclude, Marriott disclosed the expert report of Dr. Robert J. Kwortnik wherein he opines on the strength of the Marriott brand, consumer expectation, and cobranding, see Kwortnik Report at ¶¶ 18–78, and his expert rebuttal report that opines on consumer categorization and market theory. See Kwortnik Rebuttal Report at ¶¶ 12–35. Delta moves to exclude these opinions. [Doc. 470]. Upon review and consideration of Dr. Kwortnik's reports, the Court finds that he is qualified to offer them, see Kwortnik Expert Report at ¶¶ 1–10; Kwortnik Rebuttal Report at ¶¶ 1–3, that his opinions are based on sufficient facts and data and the product of reliable principles and methods, and that his testimony is relevant and helpful to the trier of fact. The Court addresses Delta's specific arguments regarding admissibility of Dr. Kwortnik's above-mentioned opinions.

Delta argues that Dr. Kwortnik's opinions concerning Delta and Marriott's brands are inadmissible because (1) the Marriott brand is not at issue in this case, (2) he failed to disclose most facts and data he considered, and (3) his methodology is unreliable given that he supposedly cherry-picked brand metrics and benchmarks. [Doc. 470 at 8–12]. The Court finds each argument unmoving. First, Dr. Kwortnik's opinion that Marriott's brand is strong and that it had "nothing to gain by sowing confusion or trading off on [Delta's] reputation" is potentially relevant and helpful to a jury. See Kwortnik Expert Report ¶ 100 (cleaned up). In its Amended Complaint, Delta alleges that Marriott acquired Delta Hotels in an effort to "trade off on Delta's strong reputation and trademark rights" and for its own "commercial benefit." Am. Compl. ¶¶ 1, 23, 46. Thus, Dr. Kwortnik's testimony on Marriott's brand strength is, at minimum, relevant and could be helpful to the jury in weighing evidence of Marriott's potential motivation or lack thereof for any purported infringement. Daubert, 509 U.S. at 587 (noting that the "basic standard of relevance thus is a liberal one").

Second, Delta contends that Dr. Kwortnik only disclosed the ten (10) brand metrics he relied on in forming his opinion and not the over fifty (50) he reviewed and considered. [Doc. 470 at 10–11]. Therefore, Delta urges the Court to exclude his testimony for violating Rule 26's requirement that an expert disclose "the facts or data considered" in forming their opinion. [Id.]; FED. R. CIV. P. 26(a)(2)(B)(ii).

As an initial matter, it is unclear whether Dr. Kwortnik should have disclosed all of the brand metrics he reviewed alongside the ten (10) he ultimately chose to form the basis of his expert opinion. Compare Premise Health Holding Corp. v. Thomas, No. 6:21-CV-2166-WWB-LHP 2023 WL 1967580, at *3 (M.D. Fla. Feb. 13, 2023) ("Courts have defined the term 'considered' broadly to include materials that an expert reviews, reflects upon, reads, and/or uses" "regardless of whether the expert expressly relied upon the document in formulating his or her opinion" (cleaned up)), with Kleiman v. Wright, No. 18-CV-80176-BLOOM/Reinhart, 2020 WL 6729362, at *7 (S.D. Fla. Nov. 16, 2020) (noting that disclosures are sufficient where they comply with the objectives of the expert discovery rules to prevent surprise and provide notice as to what the expert will testify to during their deposition and that "[t]here is no suggestion in Rule 26(a)(2) that an expert report is incomplete unless it contains sufficient information and detail for an opposing expert to replicate and verify in all respects both the method and results described in the report"), and Etherton v. Owners Ins. Co., No. 10-CV-00892-MSK-KLM, 2011 WL 684592, at *2 (D. Colo. Feb. 18, 2011) (holding that the defendant was not required to disclose the expert's "working notes" or "preliminary analysis"). However, assuming *arguendo* that Marriott was required to disclose the brand metrics Dr. Kwortnik appraised but did not use to form the conclusions in his expert report, the Court finds that such

failure does not warrant exclusion of Dr. Kwortnik's testimony. FED. R. CIV. P. 37(c)(1).

> [E]xclusion of a witness is not automatic when a party fails to comply with the applicable disclosure rules. . . . Rather, the court must first assess whether there was a substantial justification for the failure to disclose or whether the failure to disclose was harmless. In so doing, court typically consider four factors: (1) the importance of the excluded testimony; (2) the explanation of the party for its failure to comply with the required disclosure; (3) the potential prejudice that would arise from allowing the testimony; and (4) the availability of a continuance.

Chau v. NCL (Bahamas) Ltd., No. 16-21115-CIV, 2017 WL 3623562, at *5 (S.D. Fla. May 3, 2017) (citing Lips v. City of Hollywood, 350 F. App'x 328, 340 (11th Cir. 2009)); FED. R. CIV. P. 37(c)(1). Exclusion of an expert witness for disclosure failures is a "drastic remedy" and within the "broad distraction" of the district court. Dero Roofing, LLC v. Triton, Inc., 344 F.R.D. 566, 573 (M.D. Fla. 2023); accord Pitts v. HP Pelzer Auto. Sys., Inc., 331 F.R.D. 688, 692 (S.D. Ga. 2019).

Upon consideration of the above-mentioned factors, the Court finds that they do not "weigh in favor of the harsh sanction" Delta seeks. Kleiman v. Wright, 2020 WL 6729362, at *8. Dr. Kwortnik's testimony is relevant and important to a number of issues in this case. Further, Marriott's explanation for failure to disclose is sufficient. Dr. Kwortnik maintained handwritten notes as he decided which of the more than fifty (50) brand metrics he should use to inform his opinion and, once he chose the ten (10) brand metrics upon which to base his report, he discarded these notes, as is his standard practice. See Deposition of Robert Joseph Kwortnik, Ph.D.

("Kwortnik Dep.") at 365:21–366:22, 369:16–370:15 [Doc. 434-13]; see also Kleiman, 2020 WL 6729362, at *8 (declining to exclude an expert where his "destruction of notes" was his "standard practice" and was not "done in bad faith or with wrongful intent"). And although Dr. Kwortnik did not disclose all of the brand metrics he reviewed, he provided the sources he consulted that contained those brand metrics, provided ample data on the ten (10) brand metrics he actually relied on in forming his opinion, and testified as to why he chose these brand metrics and not others and his process in evaluating the same. See Kwortnik Dep. at 290:1–291:17, 363:9–365:20; Kwortnik Expert Report ¶¶ 30–69. Moreover, Delta had the opportunity to produce an expert to rebut and challenge Dr. Kwortnik's opinions on brand strength. Regardless, Delta can further probe the persuasiveness of Dr. Kwortnik's reasons for choosing the ten (10) brand metrics to the exclusion of others and his credibility on cross examination. Thus, the Court finds the potential prejudice here is relatively minimal and that the harsh, drastic remedy of exclusion of Dr. Kwortnik's testimony is not warranted.

Third, Delta asserts that the Court should exclude Dr. Kwortnik's brand comparison testimony because he "cherry-picked" the ten (10) brand metrics he relies upon in his report to favor Marriott. [Doc. 470 at 12]. However, Dr. Kwortnik testified as to how and why he chose these ten (10) brand metrics as opposed to others. See Kwortnik Dep. at 290:1–291:17, 363:9–365:20; Kwortnik Expert Report

¶ 30.  Thus, the Court is satisfied that Dr. Kwortnik's methodology is, at minimum, reliable and that Delta can probe his credibility and the persuasiveness of his reasons for choosing these ten (10) brand metrics to the exclusion of others on cross examination.  See, e.g., In re Chantix (Varenicline) Prods. Liability Litig., 889 F. Supp. 2d 1272, 1288 (N.D. Ala. 2012) (why the expert "chose to include or exclude data . . . is a matter for cross-examination").

Next, Delta contends that Dr. Kwortnik's opinions on cobranding and consumer expectations should be excluded because (1) his definition of cobranding is narrow and unreliable and (2) his research on consumer expectations is methodologically flawed.  [Doc. 470 at 13–17].  First, Delta argues that Dr. Kwortnik's purportedly narrow definition of cobranding is misleading and that Delta's claims concern "other types of brand affiliations" and not just cobranding. [Id. at 13–14].  However, the Court is not convinced that this is a reason to exclude Dr. Kwortnik's testimony on cobranding, which is supported by his "experience and the literature on branding, brand strategy, and brand management[.]"  Kwortnik Expert Report ¶ 78.  Delta can scrutinize his definition of cobranding on cross-examination, and the jury is capable of weighing its persuasiveness and to what extent it applies to the claims and facts at issue here.  See Chemfree Corp. v. J. Walter, Inc., Civil Action No. 1:04-CV-3711-JTC, 2009 WL 2914276, at *5 (N.D. Ga. May 27, 2009) (finding arguments that the expert's opinions are flawed because

of his "definition of a person of ordinary skill . . . better suited at trial"); Quiet Tech. DC-8, 326 F.3d at 1348 (testimony can be admitted where it is relevant to one issue but not others).

Second, Delta requests that the Court exclude Dr. Kwortnik's testimony regarding the lack of empirical support for the idea that "travel consumers expect airlines to operate hotels or hotels to operate airlines." Kwortnik Expert Report ¶ 74. According to Delta, this opinion is flawed because Dr. Kwortnik relied on Google and Google Scholar searches and did not conduct any surveys or consider any empirical data. [Doc. 470 at 15–16]. The Court finds that Delta's arguments do not warrant exclusion of Dr. Kwortnik's testimony. Dr. Kwortnik merely concludes that he was unable to find empirical support that customers expect airlines to operate hotels or vice versa after conducting searches for such studies and data. Kwortnik Expert Report ¶¶ 70–78. Thus, Delta's contentions regarding his failure to conduct his own study or to consider empirical studies have no bearing on the admissibility

of and are misaligned with Dr. Kwortnik's opinion that no such data exists.[50]
Otherwise, Dr. Kwortnik's testimony is at minimum helpful and relevant to issues
in this case, and the supposed weaknesses in Dr. Kwortnik's opinion are better suited
for cross-examination.

Finally, Delta urges the Court to exclude Dr. Kwortnik's testimony regarding
how consumers categorize hotel and airline companies and whether they would be
confused between Delta Hotels and Delta because Dr. Kwortnik's opinion
supposedly relies on circular reasoning; Delta further seeks to exclude Dr.
Kwortnik's "likelihood of confusion" opinions because it claims Dr. Kwortnik
improperly defines that phrase.  [Doc. 470 at 17–19].   Delta's arguments are
unavailing.  Dr. Kwortnik states in his report that, based on marketing theory and
consumer categorization, he believes that consumers separately categorize Delta as
an airline transportation service and Delta Hotels/Marriott as a hospitality service

---

[50] Without additional argument or citation in its main brief in support of its instant motion, Delta
states that Dr. "Kwortnik did not even produce the searches that he ran." [Doc. 470 at 20].  In its
reply brief, Delta minimally elaborates and argues in a cursory fashion that this failure violates
disclosure requirements pursuant to Rule 26.  [Doc. 549 at 12].  To the extent Dr. Kwortnik was
required to produce the Google searches he ran that inform his opinion that no empirical studies
support that consumers expect airlines to operate hotels or vice versa, the Court finds this failure
harmless.  See FED. R. CIV. P. 37(c); In re Disposable Contact Lens Antitrust, 329 F.R.D. 336, 382
(M.D. Fla. 2018) ("Failure to disclose is harmless where there is no substantial prejudice to the
party entitled to receive the disclosures." (internal marks omitted)); Kleiman, 2020 WL 6729362,
at *7 (noting that a disclosure is sufficient where it meets the discovery rule purposes of preventing
surprise and providing sufficient notice as to what the expert will testify to at their deposition).
Indeed, Delta does not even attempt to argue it was prejudiced by Dr. Kwortnik's failure to disclose
the exact searches he performed.  [Docs. 470 at 16; 549 at 12].  Moreover, Delta asked questions
about these very searches during Dr. Kwortnik's deposition, including where and how Dr.
Kwortnik performed this research.  See Kwortnik Dep. at 306:13–309:17.

and are unlikely to confuse these categories because consumers use "top-down" analytic information processing. See Kwortnik Rebuttal Report ¶¶ 29–35. In his deposition, Dr. Kwortnik agreed that this marketing theory "necessarily assume[s] that consumers psychologically distinguish between transportation and lodging companies on a cognitive processing level[.]" Kwortnik Dep. at 346:9–14. However, Dr. Kwortnik, at minimum, provides a basis for this assumption in his rebuttal report and in his deposition testimony. See id. at 346:15–348:8; Kwortnik Rebuttal Report ¶¶ 12–35; Kwortnik Expert Report ¶ 70; see also Rosenfeld v. Oceania Cruises, Inc., 654 F.3d 1190, 1194 (11th Cir. 2011) (attacking the expert's assumptions go to the weight of the testimony rather than its admissibility); Lord v. Univ. of Mia., No. 13-22500-CIV-ALTONAGA/McAliley, 2022 WL 18023293, at *9 (S.D. Fla. July 26, 2022) ("district courts should permit expert testimony when a factual basis for the expert's assumptions exist"); Hard Candy, 2018 WL 10322164, at *11 ("when evaluating an expert's methodology, it is not for the court to determine the accuracy or correctness of the conclusions reached"). Thus, Delta's qualms with the strength of Dr. Kwortnik's conclusions based on this specific assumption are more appropriate for cross-examination and do not render his testimony inadmissible.

Additionally, Delta's argument that Dr. Kwortnik fails to entirely capture what constitutes likelihood of confusion in the trademark infringement context

similarly provides no basis for exclusion. Even accepting Delta's argument that Dr. Kwortnik "only examined one of the three prongs" related to likelihood of confusion, there is no requirement that Dr. Kwortnik opine on every factual or legal issue in this case. See, e.g., Williams, 865 F.3d at 1340 ("To be admissible, expert testimony need not answer every question"). Moreover, the deposition colloquy that forms the basis of Delta's argument involved a question to Dr. Kwortnik regarding if he "ha[s] an understanding of what 'consumer confusion' means[,]" to which Dr. Kwortnik answered that he had "a general understanding" that it involves consumers "confus[ing] maybe the – the ownership . . . that there would be some confusion about the airline versus the lodging company." Kwortnik Dep. at 82:11–83:5. Dr. Kwortnik was only opining on his "general understanding" of what consumer confusion means in response to a general question rather than attempting to provide a precise, legal definition of any and every type of confusion that could exist in the context of a trademark infringement lawsuit.

For the foregoing reasons, the Court finds that Dr. Kwortnik's opinions and reports are admissible. Therefore, the Court denies Delta's motion to exclude the same.

9.    <u>Motion to exclude certain testimony of Dr. Christopher K. Anderson</u>

Finally, Marriott offers the expert report of Dr. Christopher K. Anderson in which he generally opines on Google search results and how consumers interact with

that search engine as well as his rebuttal report wherein he discusses search traffic and search page results, among other things. See generally Anderson Expert Report; Anderson Rebuttal Report [Doc. 511-17]. Delta moves to exclude Dr. Anderson's opinions regarding (1) the "People also ask" questions that appear on Google search results, (2) incognito mode, (3) the Parties' search interests, (4) Google trends analysis, and (5) consumer search behavior. [Doc. 472 at 9–18]. The Court addresses each of Delta's arguments for exclusion in turn below and finds that Dr. Anderson is qualified to offer his reports and opinions, his conclusions are the product of reliable principles and methods and rest on sufficient facts and data, and his testimony is relevant and helpful to the trier of fact.

First, Delta contends that Dr. Anderson's conclusion that "the questions in the 'People also ask' section of search engine results pages may not reflect questions that consumers ask in their search engine queries." [Id. at 9] (citing Anderson Expert Report ¶ 9(iii)). According to Delta, this opinion is speculative given that it uses the word "may," contradicts Google's own statements, misunderstands Google's related patent, and is otherwise unsupported. [Id. at 9–12]. The Court disagrees. Dr. Anderson concludes that the "People also ask" section of Google may not necessarily reflect real questions consumers ask because they are "derived by Google from numerous sources and queries," including the Parties' own websites. See Anderson Expert Report ¶ 35. Delta fails to establish that Dr. Anderson's use

of the word "may" renders his testimony inadmissible. His conclusion rests on a factual basis, not merely speculation or conjecture, and the Court is only concerned with the sufficiency of his methodology rather than the accuracy of his conclusions. See, e.g., Hard Candy, 2018 WL 10322164, at *11 ("when evaluating an expert's methodology, it is not for the court to determine the accuracy or correctness of the conclusions reached"). Next, the fact that Google simply states that the "People also ask" section reflects "questions people commonly search on Google" is not dispositive of the admissibility of Dr. Anderson's opinion. During his deposition, Dr. Anderson states that, based on his research, he has reason to believe that this brief statement from Google does not fully capture the nuance of how the "People also ask" questions are generated. See Deposition of Christopher Kenneth Anderson ("Anderson Dep.") at 408:15–413:2 [Doc. 434-12]. It is for the jury rather than for this Court to weigh Dr. Anderson's credibility and the import of his admissible conclusions. See, e.g., Quiet Tech. DC-8, 326 F.3d at 1341.

Similarly, Delta's reliance on Google's patent fails to conclusively show that Dr. Anderson's opinion entirely lacks a reliable foundation. Google's U.S. Patent No. 9,213,748 (the "'748 Patent") concerns its methods for "identifying related questions for a search query." [See Doc. 471-12]. The '748 Patent states, in part, that the "question database includes search queries that have previously been submitted by users to the search system," but that "[o]ptionally, the question

database can also include questions obtained from other sources, e.g., from content published on resources." [Id. at 4:25–26, 4:41–43]. Therefore, Dr. Anderson's opinion is not so plainly contradicted and unsupported by other record evidence such that it is inadmissible, and it is for the jury to weigh the persuasiveness of Dr. Anderson's testimony and measure his credibility in light of any conflicting evidence. See Korsing v. United States, No. 16-22190-CIV-LENARD /GOODMAN, 2017 WL 7794276, at *4 (S.D. Fla. Aug. 24, 2017) (excluding expert testimony that was "unsubstantiated by *any* factual basis," "not supported by *any* evidence in the record," and "assume[d] facts *affirmatively* contradicted by the record evidence" (emphasis added)); Souder v. Floyd Cnty., Civil Action No. 4:03-CV-0085-HLM, 2005 WL 6218033, at *6 (N.D. Ga. Mar. 22, 2005) ("contrary evidence goes not to the admissibility of the expert testimony").

Otherwise, Dr. Anderson's conclusion is based on his own informed analysis of the "People also ask" section and Google Trends. See, e.g., Anderson Expert Report ¶¶ 35–44; Anderson Rebuttal Report ¶¶ 34–41; Anderson Dep. at 408:15–413:10, 416:17–418:6; [Docs. 506-3, 506-4]. Therefore, the Court finds that Dr. Anderson's opinion regarding the "People also ask" section rests on a sufficiently reliable methodology and basis such that it is, at minimum, admissible. Delta's identification of supposed inconsistencies, flaws in Dr. Anderson's methodology, nuances and limitations in Dr. Anderson's conclusions, and contradictory evidence

are more appropriate for cross-examination.  See, e.g., Daubert, 509 U.S. at 596 ("Vigorous cross-examination" and "presentation of contrary evidence" are the "traditional and appropriate means of attacking shaky but admissible evidence"); Demarzo v. Healthcare Trust of Am., Inc., 565 F. Supp. 3d 1253, 1257 (S.D. Fla. 2021) (holding that the "potential flaws" in the expert's methodology went to the testimony's weight rather than admissibility).

Second, Delta moves to exclude Dr. Anderson's opinions that some of the search engine results pages produced in this case "are not reliable examples of what consumers might actually see[,]" in part because search results reflect personalization based on user data, and in part because using Incognito Mode does not fully prevent customized search results or represent the posture in which the average consumer performs searches.  See Anderson Expert Report ¶¶ 9(i), 14–20, 32–34; Anderson Rebuttal Report ¶¶ 26–33.  Dr. Anderson outlines the bases for this opinion and details how he came to this conclusion in his expert report. Anderson Expert Report ¶¶ 1–4, 9(i), 14–20, 32–34; Anderson Rebuttal Report ¶¶ 26–33.  Therefore, the Court is satisfied that this opinion is sufficiently supported, and any purported weaknesses can be explored on cross-examination.

Third, Delta argues that Dr. Anderson's opinion that Marriott's search interest exceeds Delta's is irrelevant based on "an erroneous reading of his own chart" and other methodological flaws.  [Doc. 472 at 15–16].  Upon review, Delta's arguments

fall flat with respect to admissibility. Dr. Anderson's opinion is relevant because it is offered in his rebuttal report in direct response to Delta's expert Mr. Jonathan Hochman's assertion that "Delta had consistently two to three times the Google search volume as Marriott." <u>Compare</u> Expert Report of Jonathan Hochman ¶ 30 [Doc. 506-6], <u>with</u> Anderson Rebuttal Report ¶¶ 10–15. Additionally, the Court has reviewed the charts Delta disputes, <u>see</u> Anderson Rebuttal Report at pp. 9–10, Dr. Anderson's conclusions related to those charts, <u>id.</u> ¶¶ 13–14, and relevant portions of his deposition. Based on this review, the Court finds Delta's arguments that Dr. Anderson "bases his analysis on an erroneous reading" and utilizes fundamentally flawed methodology are, at most, disputes over interpretation of one of Dr. Anderson's charts and what variables Dr. Anderson should have tested. Thus, Delta fails to provide a sufficient basis to exclude Dr. Anderson's testimony and its disagreements with him are better suited for cross-examination. <u>See</u> <u>Johnson v. ABF Freight Sys., Inc.</u>, No. 2:18-CV-01835-MHH, 2020 WL 7320994, at *3 (N.D. Ala. Dec. 11, 2020) (a reliable methodology with "inaccurate or improper data" or that involves a "failure to include variables" goes to weight and not admissibility).

Fourth, Delta requests that the Court exclude Dr. Anderson's Google Trends analysis for failure to comply with Federal Rule of Civil Procedure 26. [Doc. 472 at 16–17]. Dr. Anderson's Google Trends analysis involves two (2) exhibits that are one page each and show Dr. Anderson searching two (2) separate questions in

Google Trends which returned no results. [Docs. 506-3, 506-4]. According to Delta, Dr. Anderson considered this Google Trends data in his rebuttal report but Marriott only disclosed it during Dr. Anderson's deposition. [Doc. 472 at 17–18]. Marriott does not dispute that this disclosure was untimely. [Doc. 506 at 20–22]. However, the Court finds that this untimely disclosure was harmless such that exclusion is not warranted pursuant to Federal Rule of Civil Procedure 37(c). Once the failure to disclose was discovered during the deposition, Marriott's counsel promptly produced the two (2) documents; Delta's counsel extensively questioned Mr. Anderson about each of the one-page exhibits, see Anderson Dep. at 437:3–445:22; the exhibits "did not interject an additional, and considerably complex, legal theory" or "substantially change the character of the case and render obsolete much of the [P]arties' trial preparation"; did not result in postponement of trial, see Lamonica v. Hartford Ins. Co. of the Midwest, 336 F.R.D. 682, 686–87 (N.D. Fla. 2020); and Dr. Anderson explained that he did not think he needed to provide these exhibits in his report because they concern "disproving other arguments" whereas his "report is about forming the argument[.]" See Anderson Dep. at 413:22–414:11; see also Blacklick Hotspot Corp. v. Mansfield Oil Co. of Gainesville, Inc., Civil Action No. 2:21-CV-0214-RWS, 2023 WL 6373897, at *4–6 (N.D. Ga. Aug. 14, 2023) (finding untimely disclosure harmless after assessing similar factors and the fact that the party seeking exclusion would not "suffer any real prejudice"). Indeed, in its brief in

support of the instant motion, Delta does not even contend that it was prejudiced by this late disclosure. [Doc. 472 at 16–17].

Finally, Delta contends that Dr. Anderson's opinion on consumer search behavior is irrelevant and unhelpful. [Doc. 472 at 17–18]. According to Dr. Anderson, travel research is of a "complex, multi-step nature" that "typically involv[es] multiple web searches and visiting multiple websites" before making a purchasing decision. Anderson Expert Report ¶¶ 45–48. The Court finds that this opinion is, at minimum, relevant to some of the remaining issues in this case and could prove helpful to the trier of fact. Daubert, 509 U.S. at 587 (noting that the "basic standard of relevance thus is a liberal one").

In sum, the Court finds that Dr. Anderson's opinions and reports are admissible as expert testimony in this case. Therefore, the Court denies Delta's motion to exclude the same.

## V. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Delta's motion for summary judgment. [Doc. 440]. The Court **GRANTS** that motion with respect to Marriott's affirmative defenses of acquiescence, equitable estoppel, waiver, and laches to the extent the laches defense is based on activity prior to Marriott's acquisition of Delta Hotels. The Court also **GRANTS** Delta's motion with regard to Marriott's counterclaim. The Court **DENIES** the

motion in all other respects.  Therefore, the Court **DIRECTS** the Clerk to **ENTER JUDGMENT** in Delta's favor on Marriott's counterclaim.  The Court **DENIES** Marriott's motion for summary judgment in its entirety.  [Doc. 468].

The Court **DENIES** Delta's motion to exclude Dr. Yoram (Jerry) Wind's rebuttal survey [Doc. 437], motion to exclude Dr. Jackie Chorn's rebuttal survey [Doc. 439], motion to exclude Dr. Robert A. Leonard [Doc. 442], motion to exclude Dr. Bruce Isaacson's confusion survey [Doc. 450], motion to exclude Mr. W. Todd Schoettelkotte [Doc. 455], motion to exclude Dr. Robert J. Kwortnik [Doc. 466], and motion to exclude Dr. Christopher K. Anderson [Doc. 471].

The Court **GRANTS IN PART AND DENIES IN PART** Delta's motion to exclude Dr. John G. Plumpe.  [Doc. 460].  Specifically, the Court **GRANTS** the motion to the extent it seeks to exclude any testimony regarding Marriott's counterclaim damages.  The Court **DENIES** that motion in all other respects.

The Court **GRANTS IN PART AND DENIES IN PART** Delta's motion to exclude Judge Rany Simms.  [Doc. 445].  The Court **GRANTS** the motion to the extent it seeks to exclude Judge Simms' rebuttal report and testimony regarding Marriott's affirmative defenses and to exclude Judge Simms' testimony on certain aspects of Examining Attorneys' trademark search process and procedure, which the Court details and outlines fully above.  See supra, part IV.B.4.  The Court **DENIES** that motion in all other respects.

The Court **ORDERS** the Parties to attend mediation within sixty (60) days of this order. In the interim, the Court **DIRECTS** the Clerk to **ADMINISTRATIVELY CLOSE** this action so that it does not remain on the Court's active docket pending the Parties' forthcoming mediation.[51]

The Parties may mutually agree upon a private mediator within twenty-one (21) days of this order, and if they do, the Court **DIRECTS** them to file a notice so informing the Court (which should include the date of the scheduled mediation). If the Parties are unable to agree on a private mediator within twenty-one (21) days of this order, the Court **DIRECTS** them to file a notice with the Court requesting referral to the next available Magistrate Judge for mediation (to occur within the overarching sixty (60)-day mediation period). The Court **DIRECTS** the Parties to, within seven (7) days of the conclusion of their mediation, jointly file a notice on the docket informing the Court of the outcome of the same. A table reflecting the deadlines set forth by this order appears below:

| Task | Deadline |
|---|---|
| Parties to jointly file a notice apprising the Court of their agreement on a private mediator, or alternatively, requesting for this case to be referred to a Magistrate Judge for mediation | Twenty-one (21) days from this order |
| Parties to complete mediation (whether private mediation or mediation before a Magistrate Judge) | Sixty (60) days from this order |

---

[51] The Court notes that administrative closure will not prejudice the rights of any Party to this litigation. A Party need only file a motion to reopen the case if it so chooses.

| Task | Deadline |
|------|----------|
| Parties to jointly file a notice informing the Court of the outcome of their mediation | Seven (7) days from the completion of mediation |

If the Parties are unable to resolve this case during mediation or fail to timely file their joint status update within seven (7) days of the conclusion of mediation, the Court will automatically reopen this case and require the Parties to file their proposed Local Rule 16.4 Consolidated Pretrial Order within thirty (30) days. The Court **CAUTIONS** the Parties that it is not inclined to grant any extensions of the deadlines set forth herein. Finally, the Court **DIRECTS** the Clerk to resubmit this matter to the undersigned after sixty-eight (68) days.

**SO ORDERED**, this 29th day of February, 2024.

Eleanor L. Ross
United States District Judge
Northern District of Georgia