# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

DELTA AIR LINES, INC.,

     Plaintiff,

  v.

MARRIOTT INTERNATIONAL, INC.,

     Defendant.

C. A. NO. 1:20-CV-01125-ELR

## DELTA AIR LINES, INC.'S TRIAL BRIEF

**TABLE OF CONTENTS**

I.  INTRODUCTION ....................................................................................1

II. MARRIOTT'S USE OF THE DELTA HOTELS MARKS CREATES A
    LIKELIHOOD OF CONFUSION ............................................................4

    A.  The DELTA Marks Are Strong....................................................6

        1.  The DELTA Marks Are Conceptually Strong............................7

        2.  The DELTA Marks Are Commercially Strong .........................8

    B.  The Parties' Marks Are Similar ............................................15

    C.  The Parties Offer Both Complementary and Overlapping
        Services....................................................................24

        1.  The Parties' Services Are Closely Related,
            Complementary Services that Consumers Research,
            Book, and Use Together in a Single Trip .................................26

        2.  Delta Offers an Expansive Array of Services that
            Directly Overlap with those Marriott Offers under the
            DELTA HOTELS Brand ........................................................31

        3.  Marriott Agrees Hotel and Airline Services Are So
            Closely Related as to Cause Confusion ....................................35

    D.  The Sales Channels and Consumers Are the Same............................37

    E.  The Parties Advertise Their Services in the Same Places...................41

    F.  Marriott Intended to Cause Confusion and Trade Off Delta's
        Reputation ................................................................43

    G.  The Evidence Will Show Actual Customer Confusion Between
        Delta and Delta Hotels .......................................................49

III. MARRIOTT'S USE OF DELTA HOTELS CREATES A LIKELIHOOD
     OF DILUTION.......................................................................56

    A.  The DELTA Marks Are Famous and Were Famous Before
        Marriott Began Using the DELTA HOTELS Marks .........................58

i

B. The Evidence Will Show a Likelihood of Dilution by Blurring of the Famous DELTA Marks .................................................................. 62

  1. The Marks Are Similar ................................................................ 63

  2. The DELTA Marks Are Distinctive ........................................ 64

  3. Delta's Use Is Substantially Exclusive .................................... 65

  4. The DELTA Marks Are Widely Recognized .......................... 68

  5. Marriott Intended to Create Association .................................. 69

  6. There Is Extensive Evidence of Actual Association ................ 69

IV. **MARRIOTT CANNOT ESTABLISH LACHES ....................................... 72**

 A. Marriott Cannot Prove that Delta Delayed ......................................... 73

  1. Marriott Cannot Prove Delta Knew or Should Have Known of a Provable Claim that Loomed Large Before March 11, 2016 .......................................................................... 75

  2. Even if the Delay Period Began Earlier than March 11, 2016, Settlement Discussions Tolled the Laches Period Beginning August 6, 2018 ....................................................... 86

 B. Marriot Cannot Prove Any Purported Delay Was Inexcusable ......... 89

 C. Marriott Will Not Meet Its Burden of Establishing Prejudice ........... 91

V. **DELTA IS ENTITLED TO MONETARY AND INJUNCTIVE RELIEF ................................................................................................. 95**

 A. Delta is Entitled to $232 Million In Disgorgement of Marriott's Profits ................................................................................................. 95

  1. Delta Will Carry Its Burden of Showing Marriott's Revenues from the U.S. Delta Hotels Are ███████ ........ 96

  2. Marriott Cannot Meet Its Burden of Proving Its Costs Directly Relate to the Infringement ......................................... 98

3.    Marriott's Overhead Costs Related to the U.S. Delta Hotels Are Too Small as a Percentage of Marriott's Total Business to Be Deductible Under Maltina..............................102

4.    Marriott Has Not Proven Any Profits Awarded Should Be Apportioned ......................................................................103

B.    Delta Is Entitled to Permanent Injunctive Relief .............................107

VI.   **DELTA HAS THE RIGHT TO A JURY TRIAL** ...................................**113**

VII.  **CONCLUSION** ........................................................................................**113**

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*,
  960 F.2d 1020 (Fed. Cir. 1992) ..........................................................89

*A.T. Cross Co. v. Jonathan Bradley Pens, Inc.*,
  470 F.2d 689 (2d Cir. 1972) ..............................................................22

*AAA Alarm & Sec. Inc. v. A3 Smart Home LP*,
  2021 WL 3857417 (D. Ariz. Aug. 30, 2021) ...................................16

*Abbott Lab'ys v. Unlimited Beverages, Inc.*,
  218 F.3d 1238 (11th Cir. 2000) .......................................................103

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
  600 U.S. 412 (2023)............................................................................49

*Am. Century Proprietary Holdings, Inc. v. Am. Century Cas. Co.*,
  295 F. App'x 630 (5th Cir. 2008) ........................................19, 20, 23

*AmBrit, Inc. v. Kraft, Inc.*,
  812 F.2d 1531 (11th Cir. 1986) .............................................55, 94, 95

*Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*,
  522 F.3d 1200 (11th Cir. 2008) .................................................72, 108

*Apple, Inc. v. Samsung Elecs. Co.*,
  920 F. Supp. 2d 1079 (N.D. Cal. 2013)............................................71

*Atlas IP, LLC v. Medtronic, Inc.*,
  2014 WL 5741870 (S.D. Fla. Oct. 6, 2014) ...................................105

*Augusta Nat., Inc. v. Nw. Mut. Life Ins. Co.*,
  1976 WL 21052 (S.D. Ga. Nov. 24, 1976).......................................57

*Babbit Elecs., Inc. v. Dynascan Corp.*,
  828 F. Supp. 944 (S.D. Fla. 1993)....................................................98

*Banff, Ltd. v. Federated Dep't Stores, Inc.*,
  841 F.2d 486 (2d Cir. 1988) ..............................................................22

*Bd. of Supervisors for Louisiana State Univ. Agr. & Mech. College v. Smack Apparel Co.*,
550 F.3d 465 (5th Cir. 2008) ..............................................22

*Bell v. Foster*,
2013 WL 6229174 (N.D. Ga. Dec. 2, 2013) ................................59, 64

*Bentley Motors Corp. v. McEntegart*,
976 F. Supp. 2d 1297 (M.D. Fla. 2013)....................................54, 62

*Blumenfeld Dev. Corp. v. Carnival Cruise Lines, Inc.*,
669 F. Supp. 1297 (E.D. Pa. 1987)........................................26, 40

*Boulan S. Beach Master Ass'n, Inc. v. Think Props., LLC*,
617 F. App'x 931 (11th Cir. 2015)...........................................110

*Buccellati Holding Italia SPA v. Laura Buccellati, LLC*,
5 F. Supp. 3d 1368 (S.D. Fla. 2014) ......................................74, 88

*Burberry Ltd. v. Euro Moda, Inc.*,
2009 WL 1675080 (S.D.N.Y. June 10, 2009) ........................60, 61, 62

*Burger King Corp. v. Mason*,
855 F.2d 779 (11th Cir. 1988) ...............................................96

*Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*,
2008 WL 11407323 (N.D. Ga. Sept. 30, 2008)................................56

*Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*,
605 F.3d 931 (11th Cir. 2010) ...........................................44, 55

*In re Chatam Int'l Inc.*,
380 F.3d 1340 (Fed. Cir. 2004) ..........................................16, 18

*Churchill Downs Inc. v. Commemorative Derby Promotions, Inc.*,
2013 WL 5350830 (N.D. Ga. Sept. 23, 2013)..........................*passim*

*Combe Inc. v. Dr. August Wolff GmBH & Co. KG Arzneimittel*,
382 F. Supp. 3d 429 (E.D. Va. 2019) ....................................11, 52

*Corbitt Mfg. Co. v. GSO Am., Inc.*,
197 F. Supp. 2d 1368 (S.D. Ga. 2002) .......................................56

*Cottonwood Fin. Ltd. v. Cash Store Fin. Servs., Inc.*,
 778 F. Supp. 2d 726 (N.D. Tex. 2011) ........................................................*passim*

*Cross Country Home Servs., Inc. v. Home Serv. USA Corp.*,
 2010 WL 331752 (S.D. Fla. Jan. 20, 2010).....................................74, 75, 87, 88

*Crossfit, Inc. v. Quinnie*,
 232 F. Supp. 3d 1295 (N.D. Ga. 2017).....................................................57, 109

*D.H. Pace Co., Inc. v. Aaron Overhead Door Atl. LLC*,
 2021 WL 2819778 (N.D. Ga. May 24, 2021)..................................................113

*Davidoff & CIE, S.A. v. PLD Int'l Corp.*,
 263 F.3d 1297 (11th Cir. 2001) .......................................................................112

*Dawn Donut Co. v. Hart's Food Stores, Inc.*,
 267 F.2d 358 (2d Cir. 1959) ........................................................................75, 82

*Decatur Fed. Sav. & Loan Ass'n v. Peach State Fed. Sav. & Loan Ass'n*,
 1978 WL 21348 (N.D. Ga. Dec. 29, 1978)........................................................30

*Deere & Co. v. FIMCO Inc.*,
 302 F. Supp. 3d 837 (W.D. Ky. 2017)..........................................................59, 61

*Delta Air Lines, Inc. v. Influence Direct, LLC*,
 2016 WL 310068 (M.D. Tenn. Jan. 15, 2016) ..................................................59

*Delta Air Lines, Inc. v. Wunder*,
 2015 WL 11242003 (N.D. Ga. Dec. 15, 2015) .........................................*passim*

*Diesel S.p.A v. Diesel Power Gear, LLC*,
 2022 WL 956223 (S.D.N.Y. Mar. 30, 2022)........................................44, 62, 68

*E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*,
 756 F.2d 1525 (11th Cir. 1985) ............................................................28, 30, 37

*Eli Lilly & Co. v. Nat. Answers, Inc.*,
 233 F.3d 456 (7th Cir. 2000) ...........................................................................61

*Ewe Grp., Inc. v. Bread Store, LLC*,
 54 F. Supp. 3d 1343 (N.D. Ga. 2014)......................................................*passim*

*Express Franchise Servs., L.P. v. Impact Outsourcing Sols., Inc.*,
    244 F. Supp. 3d 1368 (N.D. Ga. 2017)..............................................................25

*Express Welding, Inc. v. Superior Trailers, LLC*,
    700 F. Supp. 2d 789 (E.D. Mich. 2010) ........................................................22

*Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*,
    628 F.2d 500 (5th Cir. 1980) ..........................................................................52

*FCOA LLC v. Foremost Title & Escrow Servs. LLC*,
    57 F.4th 939 (11th Cir. 2023) ..................................................................*passim*

*Ferrellgas Partners, L.P. v. Barrow*,
    143 F. App'x 180 (11th Cir. 2005)...........................................108, 109, 110, 111

*In re Fiesta Palms, LLC*,
    85 U.S.P.Q.2d 1360 (T.T.A.B. 2007) ..............................................................22

*Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*,
    830 F.3d 1242 (11th Cir. 2016) ............................................................5, 7, 49

*Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*,
    647 F. Supp. 3d 145 (S.D.N.Y. 2022) .............................................................34

*Ford Motor Co. v. O.E. Wheel Dists., LLC*,
    868 F. Supp. 2d 1350 (M.D. Fla. 2012)...........................................................93

*Freedom Sav. & Loan Ass'n v. Way*,
    757 F.2d 1176 (11th Cir. 1985) ..........................................................25, 28, 37

*Frehling Enters., Inc. v. Int'l Select Grp., Inc.*,
    192 F.3d 1330 (11th Cir. 1999) ..............................................15, 25, 41, 53

*Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*,
    754 F.2d 591 (5th Cir. 1985) ....................................................................25, 50

*George Nelson Found. v. Modernica, Inc.*,
    12 F. Supp. 3d 635 (S.D.N.Y. 2014) ...............................................................60

*Gold Kist, Inc. v. ConAgra, Inc.*,
    708 F. Supp. 1291 (N.D. Ga. 1989).................................................................13

*In Re Golden Griddle Pancake House Ltd.*,
   17 U.S.P.Q.2d 1074 (T.T.A.B. 1990) ...................................................20

*Gruma Corp. v. Mexican Restaurants, Inc.*,
   497 F. App'x 392 (5th Cir. 2012) ...................................16, 18, 20, 24

*Gucci Am., Inc. v. Guess?, Inc.*,
    868 F. Supp. 2d 207 (S.D.N.Y. 2012) ............................64, 68, 71, 72

*Hi-Tech Pharms., Inc. v. Nutrition Res. Servs., Inc.*,
   717 F. Supp. 3d 1318 (N.D. Ga. 2024)..............................8, 10, 15, 48

*Interim Healthcare, Inc. v. Interim Healthcare of Se. Louisiana, Inc.*,
   2020 WL 3078531 (S.D. Fla. June 10, 2020) ....................................44

*Jacobs v. Mid-Continent Cas. Co.*,
   2021 WL 4077956 (S.D. Fla. Sept. 8, 2021) ...................................105

*Jada Toys, Inc. v. Mattel, Inc.*,
   518 F.3d 628 (9th Cir. 2008) ....................................................71, 72

*Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*,
   716 F.2d 833 (11th Cir. 1983) ...................................16, 49, 55

*JPMorgan Chase & Co. v. Chase Fin. Grp.*,
   2007 WL 9702856 (N.D. Ga. May 14, 2007)....................................64

*JTH Tax, Inc. v. Freedom Tax, Inc.*,
   2019 WL 2057323 (W.D. Ky. Mar. 15, 2019) .................................16

*Kason Indus., Inc. v. Component Hardware Grp., Inc.*,
   120 F.3d 1199 (11th Cir. 1997) ...............................................*passim*

*King v. Fulton-Dekalb Hosp. Auth.*,
   2009 WL 10665526 (N.D. Ga. Aug. 17, 2009) ..............................113

*In re Knight's Home Prods. Inc.*,
   175 U.S.P.Q. 447 (T.T.A.B. 1972) ................................................22

*Maltina Corp. v. Cawy Bottling Co., Inc.*,
   613 F.2d 582 (5th Cir. 1980) ...........................................99, 102, 103

*In re Martin's Famous Pastry Shoppe, Inc.*,
    748 F. 2d 1565 (Fed. Cir. 1984) ............................................................25, 28, 37

*McAlister-Jones v. Foote*,
    720 F. App'x 971 (11th Cir. 2017) ................................................................113

*Metrokane, Inc. v. The Wine Enthusiast*,
    160 F. Supp. 2d 633 (S.D.N.Y. 2001) .............................................................34

*Mishawaka Rubber v. S.S. Kresge Co.*,
    316 U.S. 203 (1942)........................................................................................104

*Mutual of Omaha Ins. Co. v. Novak*,
    836 F.2d 397 (8th Cir. 1987) ...........................................................................52

*Nat'l Pork Bd. & Nat'l Pork Producers Council v. Sup. Lobster &
    Seafood Co.*,
    96 U.S.P.Q.2d 1479 (Jun. 11, 2010)................................................................69

*National Trailways Bus System v. Trailway Van Lines, Inc.*,
    269 F. Supp. 352 (E.D. N.Y. 1965) .................................................................84

*New Balance Athletics, Inc. v. USA New Bunren Int'l Co. Ltd.*,
    424 F. Supp. 3d 334 (D. Del. 2019).........................................................*passim*

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
    704 F. Supp. 2d 305 (S.D.N.Y. 2010) ...........................................57, 59, 69, 71

*New York Yankees P'ship v. Iet Prods. & Servs., Inc.*,
    114 U.S.P.Q.2d 1497 (T.T.A.B. 2015) .............................................................61

*Nike Inc. v. Variety Wholesalers, Inc.*,
    274 F. Supp. 2d 1352 (S.D. Ga. 2003) .........................................60, 62, 99, 103

*Nike, Inc. v. Nikepal Int'l, Inc.*,
    2007 WL 2782030 (E.D. Cal. Sept. 18, 2007) ..........................................64, 69

*Nike, Inc. v. WNBA Enters., LLC*,
    85 U.S.P.Q.2d 1187 (TTAB 2007) ..................................................................23

*Nikon Inc. v. Ikon Corp.*,
    987 F.2d 91 (2d Cir. 1993) ..............................................................................16

*Nutradose Labs, LLC v. Bio Dose Pharma, LLC*,
710 F. Supp. 3d 1200 (S.D. Fla. 2024) ............................................................110

*Nutrivida, Inc. v. Inmuno Vital, Inc.*,
46 F. Supp. 2d 1310 (S.D. Fla. 1998) ................................................................98

*Octocom Sys., Inc. v. Houston Comput. Servs., Inc.*,
918 F.2d 937 (Fed. Cir. 1990) .....................................................................28, 37

*Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Credito Oriental*,
698 F.3d 9 (1st Cir. 2012) ................................................................................81

*Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc.*,
642 F. Supp. 1031 (N.D. Ga. 1986) ..................................................................64

*Paycargo v. Cargosprint*,
2021 U.S. Dist. LEXIS 118712 (S.D. Fla. June 25, 2021) .............................104

*Pepsico, Inc. v. #1 Wholesale, LLC*,
2007 WL 2142294 (N.D. Ga. July 20, 2007) ..............................................60, 62

*Planetary Motion, Inc. v. Techsplosion, Inc.*,
261 F.3d 1188 (11th Cir. 2001) ..................................................................24, 31

*Plasticolor Molded Prods. v. Ford Motor Co.*,
698 F. Supp. 199, 7 U.S.P.Q.2d 1885 (C.D. Cal. 1988) ..............................76, 83

*PlayNation Play Sys., Inc. v. Velex Corp.*,
924 F.3d 1159 (11th Cir. 2019) ..............................................................*passim*

*PODS Enters., LLC v. U-Haul Int'l, Inc.*,
126 F. Supp. 3d 1263 (M.D. Fla. 2015) ...................................................*passim*

*Quality Inns Int'l, Inc. v. McDonald's Corp.*,
695 F. Supp. 198 (D. Md. 1988) .......................................................................52

*R.F.M.A.S., Inc. v. Mimi So*,
619 F. Supp. 2d 39 (S.D.N.Y. 2009) .................................................................34

*Reinalt-Thomas Corp. v. Mavis Tire Supply, LLC*,
391 F. Supp. 3d 1261 (N.D. Ga. 2019) .............................................................56

*Rice v. Brand Imports, L.L.C.*,
   2010 WL 11549769 (N.D. Ga. Sept. 16, 2010)....................................................50

*Robert Bruce, Inc. v. Sears, Roebuck & Co.*,
   343 F. Supp. 1333 (E.D. Pa. 1972)....................................................................23

*Rolex Watch U.S.A., Inc. v. Jewelry Unlimited, Inc.*,
   757 F. Supp. 3d 1342 (N.D. Ga. 2024)..........................................................74, 85

*Rolls-Royce Motors Ltd. v. A & A Fiberglass, Inc.*,
   428 F. Supp. 689 (N.D. Ga. 1976)..................................................................54, 73

*Romag Fasteners, Inc v. Fossil, Inc.*,
   590 U.S. 212 (2020)...........................................................................................96

*Rosetta Stone Ltd. v. Google, Inc.*,
   676 F.3d 144 (4th Cir. 2012)..............................................................................44

*Rothschild & Co. Continuation Holdings A.G. v. Sklarov*,
   2020 WL 1467256 (N.D. Ga. Feb. 24, 2020)....................................................12

*S.C. Johnson & Son, Inc. v. Drop Dead Co.*,
   144 U.S.P.Q. 257 (S.D. Cal. 1965)..................................................................102

*Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*,
   675 F.2d 1160 (11th Cir. 1982).................................................................*passim*

*Sara Lee Corp. v. Kayser-Roth Corp.*,
   81 F.3d 455 (4th Cir. 1996).........................................................................81, 86

*Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*,
   983 F.3d 1273 (11th Cir. 2020)..........................................................................43

*Select Auto Imps. Inc. v. Yates Select Auto Sales, LLC*,
   195 F. Supp. 3d 818 (E.D. Va. 2016)...........................................................22, 30

*Silverton Mortg. Specialists, Inc. v. FDIC for Silverton Bank, N.A.*,
   2012 WL 13001592 (N.D. Ga. Sept. 28, 2012)............................................50, 53

*Spotify AB v. U.S. Software Inc.*,
   2022 WL 110251 (T.T.A.B. Jan. 10, 2022).......................................................68

*Stein v. Reynolds Sec., Inc.*,
667 F.2d 33 (11th Cir. 1982) ..............................................................99

*SunAmerica Corp. v. Sun Life Assur. Co. of Canada*,
77 F.3d 1325 (11th Cir. 1996) ...................................................108, 112

*Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*,
889 F.2d 1018 (11th Cir. 1989) ........................................................24

*Tandy Corp. v. Malone & Hyde, Inc.*,
769 F.2d 362 (6th Cir. 1985) .............................................................79

*The Black and Decker Manufacturing Co. v. Big Yank Corp.*,
231 U.S.P.Q. (BNA) ¶ 484 (T.T.A.B. Aug. 28, 1986) ......................30

*Times Mirror Mags., Inc. v. Las Vegas Sports News, L.L.C.*,
212 F.3d 157 (3d Cir. 2000) ..............................................................57

*Tiramisu Int'l, LLC v. Clever Imports, LLC*,
741 F. Supp. 2d 1279 (S.D. Fla. 2010) ......................96, 101, 110, 112

*TIVO Brands LLC v. TIVOLI, LLC*,
2018 WL 6921323 (T.T.A.B. Dec. 31, 2018) ..............................65, 67

*Tommy Hilfiger Licensing, Inc. v. Goody's Fam. Clothing, Inc.*,
2003 WL 22331254 (N.D. Ga. May 9, 2003)................................96, 99

*Top Tobacco, L.P. v. Panjwani*,
2021 WL 1351443 (N.D. Ga. Mar. 15, 2021) ...................................44

*Top Tobacco, L.P. v. Star Importers & Wholesalers, Inc.*,
2021 WL 4081627 (N.D. Ga. Sept. 7, 2021).........................72, 91, 93

*UMG Recordings, Inc. v. Mattel, Inc.*,
100 U.S.P.Q.2d 1868 (T.T.A.B. 2011) .........................................65, 67

*Unique Sports Prods., Inc. v. Babolat VS*,
403 F. Supp. 2d 1229 (N.D. Ga. 2005)...............................................73

*Univ. of Georgia Athletic Ass'n v. Laite*,
756 F.2d 1535 (11th Cir. 1985) ........................................................53

*Valmor Prods. Co v. Standard Prods. Corp.*,
  464 F.2d 200 (1st Cir. 1972) ...................................................................85

*Varitronics Sys., Inc. v. Merlin Equip., Inc.*,
  682 F. Supp. 1203 (S.D. Fla. 1988) ...............................87, 88, 91, 94

*Vina Casa Tamaya S.A. v. Oakville Hills Cellar, Inc.*,
  784 F. Supp. 2d 391 (S.D.N.Y. 2011) .....................................................85

*Visa Int'l Serv. Ass'n v. JSL Corp.*,
  610 F.3d 1088 (9th Cir. 2010) ...............................................................69

*Visa Int'l Serv. Ass'n v. Visa Hotel Grp., Inc.*,
  561 F. Supp. 984 (D. Nev. 1983)................................................*passim*

*Vision Info. Techs., Inc. v. Vision IT Servs. USA, Inc.*,
  156 F. Supp. 3d 870 (E.D. Mich. 2016) ...............................................20

*W. E. Bassett Co. v. Revlon, Inc.*,
  435 F.2d 656 (2d Cir. 1970) .............................................................22, 29

*Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*,
  833 F.2d 1484 (11th Cir. 1987) .............................................................96

*Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*,
  225 U.S. 604 (1912)...............................................................................104

*Wreal, LLC v. Amazon.com, Inc.*,
  38 F.4th 114 (11th Cir. 2022) .........................................6, 16, 49, 50

*Wynn Oil Co. v. Am. Way Serv. Corp.*,
  736 F. Supp. 746 (E.D. Mich. 1990) ....................................................29

*Yamaha Int'l Corp. v. Hoshino Gakki Co.*,
  840 F.2d 1572 (Fed. Cir. 1988) .............................................................65

**Statutes**

15 U.S.C. § 1057................................................................................................5

15 U.S.C. § 1114................................................................................................5

15 U.S.C. § 1115................................................................................................5

15 U.S.C. § 1116 ................................................................108

15 U.S.C. § 1117 ................................................95, 96, 98

15 U.S.C. § 1125 ................................................*passim*

28 U.S.C. § 1961 ................................................................98

2006 Trademark Dilution Revision Act ..............................59

O.C.G.A. § 9-3-31 .............................................................73

O.C.G.A. § 10-1-451(b) .....................................................56

**Rules**

Local Rule 16.4 ....................................................................1

**Other Authorities**

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (4th ed.
   1997) ..............................................................................73

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (5th ed.)................*passim*

Restatement (Third) of Unfair Competition ................104, 112

Plaintiff Delta Air Lines, Inc., ("Delta")[1] submits this trial brief in advance of the upcoming bench trial beginning October 20, 2025 in the above-captioned matter.[2]

# I. INTRODUCTION

This case concerns Marriott's purposeful plan to trade off the goodwill and reputation of Delta's famous trademark, DELTA. Delta has been using this mark in connection with a wide range of travel industry services—including flights, hotel bookings, vacation packages, and lounges—for nearly 100 years, and has grown it into one of the most valuable brands in the United States. Sensing it could capitalize on Delta's strong U.S. reputation, in 2015 Marriott embarked on an acquisition

---

[1] Delta objects to Marriott's continued reference to Delta as "DAL." As Marriott's own witnesses testified, Delta is known as "Delta." *See* Dkt. 528 at 1 n.1.

[2] Prior to the filing of the Pretrial Order on June 17, 2024, the parties had conferred regarding the submission of trial briefs, which Local Rule 16.4 contemplates be included with the filing of the Pretrial Order. In the Pretrial Order, the parties "jointly request[ed] that each side be permitted to submit trial briefs, on a schedule at the Court's convenience." Dkt. 598 at 20. Thereafter, as the parties were updating their pretrial submissions, Delta conferred with Marriott about the timing of trial briefs, and suggested a particular deadline. Marriott then reversed course from its prior representations and took the position that neither party is permitted to file any trial brief, because this Court had not ruled on the Pretrial Order or otherwise ordered trial briefs. Marriott's position was contrary to the parties' prior agreement to file trial briefs, at a date closer to trial, and as contemplated by the Local Rules. Marriott would not agree to a date for filing trial briefs, though Delta continued to attempt to agree upon a mutual date. Delta ultimately informed Marriott in advance that it would file its trial brief by October 6, 2025, and Marriott never responded. To the extent Marriott raises an objection regarding Delta's trial brief, Delta respectfully requests that such objection be overruled.

***named*** ████████████ With this acquisition, Marriott purchased a Canadian hotel brand called "Delta Hotels"—even though pre-acquisition ████████████ ████████████ between Delta Hotels and Delta's prior trademark rights—and surreptitiously expanded the hotel chain into the United States where Marriott could grift off Delta's pre-established name recognition to draw confused consumers.

Internal Marriott documents confirm that its plan succeeded. Indeed, while trademark infringement requires only a ***likelihood*** of confusion, this is the rare case where there is rampant evidence of ***actual*** confusion, including within Marriott's ***own documents***. As early as July 15, 2015, before Marriott opened its first hotel, Marriott's marketing firm raised the issue of ████████████████ ████ PTX-0289 at '187. Marriott responded, ██████ *Id.* In August 2016, after the first hotel opened, a Marriott employee acknowledged, ████████████ ████████████████████████████████████ ████████ PTX-0210 at '645. Two months later, Marriott stated in a presentation that ████████ for Delta Hotels include ████████████ with Delta. PTX-0219 at '268. The following year, in August 2017, a Marriott Marketing Brief stated that Delta Hotels must ████████ consumers that ████████████████ ████████████████ PTX-0296 at '961. In March 2018, Marriott's former Senior Director of Global Paid Media Strategy & Planning stated the issue plainly: ████████████████████████████████ PTX-2676.

Numerous subsequent marketing briefs similarly acknowledged that Delta Hotels is . PTX-0305 at '283; PTX-0301 at '327; PTX-3741 at '478; PTX-3663 at '809; PTX-1876 at '893; PTX-3669 at '951; PTX-2664 at '890; PTX-3752 at '140. Later documents also admitted that PTX-0238 at '358, and PTX-1093 at '036. And these are just some, of many, examples of such internal Marriott documents admitting actual confusion between Delta and Delta Hotels.

Yet in the face of this admitted confusion, which arose repeatedly over the years, Marriott chose not to switch its Delta Hotels properties to one of the dozens of other non-infringing brands that it owns or pick a new name for the hotels; nor did it ask Delta for a license to use the DELTA mark. Instead, it ***expanded*** the Delta Hotels brand, and leaned further into causing confusion. For example, just weeks after the 2017 marketing brief stated that consumers had to be between Delta Hotels and airlines, Marriott not only opened a Delta Hotel at an airport, but included "Airport" ***in the name*** ("Delta Hotels by Marriott Grand Rapids Airport").[3] In the months immediately after Marriott's former

---

[3] Marriott's "Airport" Delta Hotels are explicitly marketed as being at or near the airport, with amenities such as airport shuttle vans, all to cater to airline travelers.

Global Paid Media Senior Director admitted that there ███████ in March 2018, Marriott proceed to open *four* Delta Hotels properties *in Delta's "hub" locations*, *i.e.*, the cities where Delta operates the most flights. Delta Hotels properties also added restaurants with names like "Hangar 58" and "Lift"—obvious references to airline services. Even after Delta learned about Marriott's use of the Delta Hotels name in the United States and complained to Marriott in August 2018, Marriott kept expanding, opening *over 30 hotels* after being put on notice that Delta objected to Marriott's use.

Marriott has purposefully and knowingly profited off the goodwill Delta spent almost a century cultivating. Its brazen disregard for Delta's nearly 100-year-old rights must finally stop. As described below, and as this Court will hear from Delta's and Marriott's employees, former employees, and numerous experts at trial, Marriott's conduct constitutes willful trademark infringement and dilution under federal and state law. Monetary and injunctive relief prohibiting Marriott's continued use of the name "Delta" are proper. Delta looks forward to proving as much at trial.

## II. MARRIOTT'S USE OF THE DELTA HOTELS MARKS CREATES A LIKELIHOOD OF CONFUSION

Trademark infringement occurs when a defendant uses a trademark in a manner "that 'is likely to cause confusion' that a relationship exists between the parties." *FCOA LLC v. Foremost Title & Escrow Servs. LLC,* 57 F.4th 939, 946

(11th Cir. 2023) (quoting 15 U.S.C. § 1114(1)), *cert. denied,* 144 S. Ct. 103 (2023).[4]

As the Eleventh Circuit recently explained:

> That relationship can take two forms. First, a consumer could be confused about the source of the marks, thinking that the goods or services associated with a second mark are produced by the original mark holder. Second, a consumer may be confused as to the existence of an affiliation, connection, or sponsorship between the parties.

*Id*. n.9; *see also* 15 USC § 1125(a)(1)(A) (likelihood of confusion can occur as to "the affiliation, connection, or association" between two entities, "or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities").[5]

To determine whether a likelihood of confusion exists, courts in this Circuit first consider seven factors: (1) strength of the plaintiff's mark; (2) similarity of the marks; (3) similarity of the goods and services; (4) similarity of trade channels and customers; (5) similarity of advertising media; (6) defendant's intent; and (7) actual confusion. *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.,* 830 F.3d 1242, 1255 (11th Cir. 2016). "Of these factors, the type of mark and the evidence of actual confusion are the most important." *Id*. Notably, the Court found in Delta's favor on both on summary judgment. Dkt. 574 at 19, 37-38.

---

[4] To succeed on its infringement claims, Delta must also show that it has valid, enforceable trademark rights. There is no dispute as to this issue. Dkt. 574 at 15. Delta's 29 trademark registrations are "conclusive evidence of the validity of its marks." 15 U.S.C. §§ 1057(b), 1115(b).

[5] In Counts I-IV of the First Amended Complaint, Delta brings infringement claims under federal and state law. The likelihood of confusion analysis is the same for all four claims. *See* Dkt. 574 at 14.

After assessing these factors, Courts then consider the factors or "circumstantial facts—independently and then together—to determine whether the ultimate fact, likelihood of confusion, can reasonably be inferred." *Id*. at 947. A plaintiff need not win on every factor to establish a likelihood of confusion. *Id*.; *see also Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 127 (11th Cir. 2022) ("[B]ecause the weight to be given to each factor will vary depending on the circumstances of the case, summary judgment may still be appropriate even if some of the factors do not support the movant."). But the evidence will show here, all seven factors favor Delta, thus confirming that this is a clear case of infringement between the DELTA Marks[6] and the DELTA HOTELS Marks.[7]

## A.     The DELTA Marks Are Strong

The first factor considers the strength and distinctiveness of the DELTA Marks. "The stronger the mark, then, the greater the likelihood of confusion and the

---

[6] The issue in this case concerns Marriott's use of Delta's mark "DELTA" in all of its formats. To that end, the "DELTA Marks" refer to all of Delta's marks that include the word "DELTA." Delta has moved to admit its relevant federal registrations. *See* Dkt. 721; PTX-0001 through PTX-0056; *see* Dkt. 420 (Court order regarding scope of Plaintiff's claims holding that "This case arises from a dispute over what . . . the 'Delta Marks,' defined as . . . 'Delta's trademarks that include the word DELTA . . . .'").

[7] The "DELTA HOTELS Marks" refers to the trademarks Marriott has used in the U.S. that include the word DELTA. Dkt. 420 (Court order regarding scope of claims holding that "Delta's claims are based on Marriott's alleged use of the Delta Hotels Marks, which are defined as 'Marriott's trademarks that include the word DELTA . . . .'").

greater the protection given to the mark." *FCOA*, 57 F.4th at 948; *see also Delta Air Lines, Inc. v. Wunder*, 2015 WL 11242003, at *10 (N.D. Ga. Dec. 15, 2015) ("Strong marks are given more extensive protection."). In assessing a mark's strength, courts consider both its conceptual and commercial strength. *FCOA*, 57 F.4th at 948. The Northern District of Georgia held a decade ago in another case involving Delta's DELTA Marks that the strength factor "weighs strongly in favor of Delta" as the DELTA Marks are both commercially and conceptually strong. *Delta*, 2015 WL 11242003, at *10 (finding a likelihood of confusion from Defendant's use of DELTA for travel club promotional materials). Given the continued growth in Delta's advertising, sales, awards, and press, the DELTA Marks are even stronger now than they were in 2015, when that case was decided.

1. ***The DELTA Marks Are Conceptually Strong***

The "type of mark" is among the two most important likelihood of confusion factors. *Fla. Int'l Univ. Bd. of Trs.,* 830 F.3d at 1255. On summary judgment, the Court found that Delta's marks are conceptually strong. Dkt. 574 at 19-20. As the Court noted, the "primary characteristic" of the DELTA Marks is the term "Delta," which "bears no logical relationship to, and is arbitrary with respect to, the nationwide travel services Delta offers." *Id.* (internal quotations omitted). Thus, "the Delta Marks are conceptually strong." *Id.* at 20.

## 2. *The DELTA Marks Are Commercially Strong*

Commercial strength refers to "real-world consumer recognition of a mark[.]" *FCOA*, 57 F.4th at 950. Relevant evidence of strength includes advertising, sales and number of customers, recognition in media or trade coverage, survey evidence, and third-party use. *Id.* The evidence presented at trial will show that the DELTA Marks are extraordinarily well known.

**Advertising and Promotion:** As Delta's Head of Commercial Marketing and its SVP and Chief Communications Officer will testify, the DELTA Marks are extensively and widely promoted throughout the United States and have been for nearly 100 years. Indeed, except for the 2020 and 2021 COVID years, Delta has spent ███████████████ on domestic advertising since 2009, and its domestic advertising expenditures exceeded ████████████████████ ████. PTX-3853. This investment has translated to ███████████████ on the public. PTX-2640; PTX-3857; *Delta*, 2015 WL 11242003, at \*10 ("investment in marketing" supported finding mark "exceptionally strong"); *PODS Enters., LLC v. U-Haul Int'l, Inc.*, 126 F. Supp. 3d 1263, 1277 (M.D. Fla. 2015) (ad spent between $70 million and $186 million supported finding that mark was famous); *Hi-Tech Pharms., Inc. v. Nutrition Res. Servs., Inc.*, 717 F. Supp. 3d 1318, 1327 (N.D. Ga. 2024) ("twenty years" of use and "much money" spent on advertising supported strength), *aff'd*, 2024 WL 4973107 (11th Cir. Dec. 4, 2024)

Delta advertises across a wide range of media, including television commercials, magazines, newspapers, in airports, on billboards, on radio, on Google, and through digital media. This advertising includes a number of high-profile TV commercials featuring the voice of renowned actress Viola Davis, the official spokesperson of the DELTA brand. These commercials have aired during some of the most widely viewed programs in the United States, including the Grammys, the Olympics, and the Superbowl.

In recent years, Delta has also advertised extensively online, including on its website (Delta.com), the Fly Delta app, and the @Delta and @DeltaVacations social media accounts. These resources receive millions of visitors per month. For example, from October 2017 to December 2022 alone, Delta.com and the Fly Delta app averaged nearly ███████████████████████████████████ ████████████████ in recent years. PTX-3858.

Delta also promotes the DELTA brand through national partnerships and sponsorships. For example, Delta has well-known co-branding partnerships with numerous companies including Uber, Starbucks, Biscoff, and American Express, which offers Delta SkyMiles credit cards through which Delta earned over $7 billion in 2024 with numbers expected to continue growing. It also sponsors, and thus receives consumer impressions from, numerous sporting events, such as the Olympic and Paralympic Games (which it has sponsored since the 1996 Olympic Games in

Atlanta), Team USA for the Olympics and Paralympics, the Masters Tournament and various major sports teams, including the Atlanta Braves, Falcons, and Hawks, as well as other teams in its hub cities, like the New York Yankees, Mets, Rangers, Seattle Seahawks, Minnesota Vikings, and Detroit Lions, among others. It has also partnered with sports legend Tom Brady to promote the Delta brand. Delta is involved in philanthropy as well, sponsoring the American Red Cross since 1941, the Breast Cancer Research Foundation since 2005, Habitat for Humanity, and many other organizations around the country in the cities Delta serves. Through these activities, more people, including non-travelers, are exposed to and have become familiar with the DELTA Marks.

**Sales and Consumers:** Delta is the country's largest airline by revenue. It serves ███████████████ annually. PTX-0973, and its loyalty program has over ███████████████ in the United States alone. From 2010-2019, revenue exceeded ███████████ in the United States. PTX-2658; PTX-3856. Since 2022, Delta has made over ███████████ annually. *Id.*; *Delta*, 2015 WL 11242003, at *10 (Delta's status as "world's largest airline" supported finding that mark "extremely strong); *PODS Enters.*, 126 F. Supp. 3d at 1277 (sales of $3 billion per year showed mark was famous).

**Awards and Press Coverage:** Delta has received and continues to receive substantial press coverage from general interest and travel industry publications

(*e.g.*, CNBC, Forbes, *The New York Times*, *The Wall Street Journal*, The Points Guy), appearing in thousands of articles per year since 2000. Delta is also America's most awarded airline, receiving awards from both general interest and travel industry publications alike, including *Fortune*, *The Wall Street Journal*, Harris Poll, *Travel Weekly*, *Forbes*, *JD Power, TIME* Magazine, and more. PTX-3789. In addition, Delta appeared on the BrandZ Top 100 Most Valuable U.S. Brands list in all available years 2018, 2019, and 2020, confirming its status as one of the strongest brands in the United States. PTX-0191; PTX-1087; PTX-1302; *FCOA*, 57 F.4th at 950 (evidence of strength includes "recognition by trade, media, and customers").

**Survey Evidence:** Survey evidence confirms that the DELTA wordmark is strong. An April 2020 survey by Delta's expert, Dr. Deborah Jay, showed 45% unaided recall of Delta (with 97% of those respondents referring to the company simply as "Delta"), and 90% recognition of the DELTA wordmark in the U.S. This strongly supports the DELTA Marks' strength. *E.g.*, *FCOA*, 57 F4th at 952 ("survey showing that a majority of South Florida respondents had heard of FIC" supported strength factor); *Combe Inc. v. Dr. August Wolff GmBH & Co. KG Arzneimittel*, 382 F. Supp. 3d 429, 451 (E.D. Va. 2019), *aff'd*, 851 F. App'x 357 (4th Cir. 2021) (38.7% unaided recall and 85% recognition of VAGISIL supported strength of the mark).

**Third-Party Use:** Delta's use of the name "Delta" also has been substantially exclusive within the travel industry for almost 100 years. Unable to dispute Delta's

other evidence of strength, Marriott has argued that third-party companies with the word "delta" in their names diminish the strength of the DELTA Marks regardless of the industry in which these companies operate, the size of these companies, whether these companies use "Delta" as the dominant term in their names, or whether the companies target similar consumers as Delta and Marriott. Dkt. 516 at 12-13. Marriott is wrong.

As the Eleventh Circuit has explained, for purposes of likelihood of confusion, the most relevant third-party use is use "in the same market"—travel—not in "unrelated businesses." *FCOA*, 57 F.4th at 950; *see also PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1166 (11th Cir. 2019) (evidence of 30 marks that shared the word "gorilla" did not diminish the strength of the plaintiff's mark when none of the marks were used in connection with the same goods); *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1164–65 (11th Cir. 1982) ("specialized businesses" did not detract from the strength of the plaintiff's mark); *Rothschild & Co. Continuation Holdings A.G. v. Sklarov*, 2020 WL 1467256, at *5 (N.D. Ga. Feb. 24, 2020) (finding plaintiff's marks strong despite third-party use when defendant provided no evidence that the mark was used for the same services as plaintiff); *Churchill Downs Inc. v. Commemorative Derby Promotions, Inc.*, 2013 WL 5350830, at *7 (N.D. Ga. Sept. 23, 2013), *on reconsideration in part,* 2014 WL 3908521 (N.D. Ga. Aug. 8, 2014) ("[T]hird-party use of the word 'derby' in

connection with products and services unrelated to horse-racing does little to affect the distinctiveness of plaintiff's mark."); *Gold Kist, Inc. v. ConAgra, Inc.*, 708 F. Supp. 1291, 1298 (N.D. Ga. 1989) (internal quotation omitted) (third-party use must be in a "related business or on similar goods"; third-party use on "food products" generally did not detract from the strength of plaintiff's mark for poultry and meat products).

Here, the vast majority of the third-party uses Marriott identifies are outside the travel industry, and thus irrelevant.[8] Moreover, as Delta's marketing expert, Dr. Ravi Dhar, will explain, even those few third parties with trademarks in Classes 39, 41, and 43, *i.e.*, those highlighted by Marriott's expert Simms, are so insignificant and dissimilar to Delta that they do not impact the strength of Delta's 100-year-old DELTA Marks.[9] *See Churchill Downs*, 2013 WL 5350830, at *7 ("the entire name a third-party uses, as well as the kind of business in which the user is engaged" that determines if that third-party use weakens the distinctiveness of the mark). For

---

[8] Moreover, as the Court will hear, survey evidence from Dr. Itamar Simonson shows that even as to the largest third-party "Delta" brands—Delta Faucet and Delta Dental—those brands are *not* associated with Delta, *unlike* Delta Hotels. Delta Faucet and Delta Dental are also smaller than Delta and not in the travel industry.

[9] As discussed further in Section III.B.3, the non-travel industry uses do not undermine either the strength of Delta's brand or the substantially exclusive nature of its use. *See, e.g.*, *Cottonwood Fin. Ltd. v. Cash Store Fin. Servs., Inc.*, 778 F. Supp. 2d 726, 752 (N.D. Tex. 2011) (mark famous despite some third party use of CASH STORE as small size, remote location, and use of other words with "cash store" by third parties rendered their uses "inconsequential").

example, as the Court will hear at trial:

- "Delta Downs Racetrack Casino and Hotel" is a *single* racetrack, casino, and hotel in Vinton, Louisiana with visually ***different*** marks and a name that combines Delta with the *uncommon* term "downs" to create the combination mark DELTA DOWNS in which DELTA is not dominant.

- "Tri Delta Transit Eastern Contra Costa Transit Authority" is a localized bus line in Contra Costa County, California with a visually and aurally different mark, with significantly less revenues than Delta, and that uses "Delta" as the *second* word after "Tri," such that "Delta" is not the dominant part of the mark.

- "Peacock in the Delta" is a *single* standalone cottage in Shaw, Mississippi that is available for rent or short term stays which uses "Delta" in a geographically descriptive fashion, uses a visually/aurally different mark, and which also does not use "Delta" as the dominant term.

- "Delta Airport Consultants" is a small *business-to-business* engineering consulting services company that average travelers would never interact with given its business-to-business engineering focus and which uses visually different marks.

- "Delta Coves" is a local real estate company in Bethel Island, CA with a visually different mark, which provides private waterfront residences that average travelers would never interact with.

- "Delta of Venus" is a *single* standalone restaurant in Davis, California, which uses a visually/aurally different mark and combines Delta with "Venus" creating a combination in which Delta is not dominant.

- "Pappas Delta Blues" is a restaurant in Webster, Texas with a visually different mark, which consists of a symbol with "Pappas" as the primary name or "Delta Blues" with "Pappas" and "Smokehouse" surrounding it, and has significantly less revenues than Delta.

- "Delta Fuel Company" is a *business-to-business* petroleum services company incorporated in Mississippi that average travelers would never interact with, which uses a visually different mark consisting of a symbol the resembles a flame next to "Delta" and "Fuel."

A handful of companies offering localized or highly specialized services, most of which are not in the travel ribbon of airlines, hotels, and rental cars, and many of which do not use "Delta" as the dominant term are *de minimis* and have no impact on the strength of the DELTA Marks. *See Safeway Stores*, 675 F.2d at 1165 ("specialized businesses" did not detract from the strength of the plaintiff's mark); *Cottonwood*, 778 F. Supp. 2d at 752 (inconsequential uses do not impact strength); *Hi-Tech Pharms.*, 717 F. Supp. 3d at 1327 (mark strong despite third party use, as the third-party marks had "more differences" than plaintiff's mark and "a trademark owner is not required to act against every infringing use").

## B.     The Parties' Marks Are Similar

The more similar the marks, the greater the likelihood of confusion. *FCOA*, 57 F.4th at 952. In evaluating the similarity of marks, the "court compares the [allegedly infringed and infringing] marks and considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1337 (11th Cir. 1999). "Because of its malleability, [the Eleventh Circuit] has described this analysis as a subjective eyeball test." *FCOA*, 57 F.4th at 952. "[T]he closer the marks are, the more likely reasonable consumers will mistake the source of the product that each mark represents." *Frehling Enters.*, 192 F.3d at 1337.

Trademarks need not be identical, or even highly similar, for this second factor

to favor a plaintiff and for infringement to be found. *See Wreal*, 38 F.4th at 130 ("[T]he marks need not be identical."); *see e.g.*, *PlayNation Play Sys.*, 924 F.3d at 1168 (GORILLA PLAYSET and GORILLA GYM similar); *Gruma Corp. v. Mexican Restaurants, Inc.*, 497 F. App'x 392, 396 (5th Cir. 2012) (MISSION and MISSION BURRITO marks were similar, even though "the MISSION BURRITO mark contains additional words, burrito and also 'fresh food fast' or later 'more choices, more flavor'"); *In re Chatam Int'l Inc.*, 380 F.3d 1340, 1342 (Fed. Cir. 2004) (JOSE GASPAR GOLD and GASPAR'S ALE marks similarly); *Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 94 (2d Cir. 1993) (IKON and NIKON similar, including where defendant used stylized "I"); *AAA Alarm & Sec. Inc. v. A3 Smart Home LP*, 2021 WL 3857417, at *6 (D. Ariz. Aug. 30, 2021) (AAA ALARM & SECURITY similar to A3 SMART HOME LP in granting preliminary injunction); *JTH Tax, Inc. v. Freedom Tax, Inc.*, 2019 WL 2057323, at *3 (W.D. Ky. Mar. 15, 2019) (LIBERTY TAX and FREEDOM TAX similar in granting temporary restraining order).

Indeed, the Eleventh Circuit has found marks were similar in far less obvious cases. In *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, the Court upheld the district court's decision finding the general impression of the plaintiff's LOLLIPOPS mark and defendant's JELLIBEANS mark similar. 716 F.2d 833, 842 (11th Cir. 1983). The court noted visual similarity (the marks were plural and both used "i"), aural similarity, and similarity in meaning (both candies). *Id.*

Here, the parties' respective marks are nearly identical. Marriott itself knows this is the case as it has argued to the U.S. Patent and Trademark Office (in opposing Delta's trademark applications for lounges), that the parties' marks "***so closely resemble[]***" each other "in appearance, sound and meaning" that confusion is likely. PTX-2872 at '606; PTX-0313 at '631 (emphasis added).

Marriott is right. The parties' marks are DELTA and its related DELTA-formative marks (e.g., DELTA VACATIONS, DELTA CARGO, DELTA ONE), on the one hand, and DELTA HOTELS, which uses the same naming convention of DELTA plus a generic or descriptive term, on the other. Notably, Delta owns an incontestable trademark registration for the word DELTA alone, without any symbols, logos, or stylization. PTX-0001. As Delta's witness will testify, DELTA has been the brand name for nearly a century. For instance, Delta's logo uses DELTA alone, its website is www.delta.com, and its handle on major social media platforms such as Instagram is @delta. PTX-1074; PTX-1050; PTX-0357. And Marriott cannot have it both ways.

With respect to Marriott's DELTA HOTELS Marks, the evidence will show that Marriott's executives admitted that the most prominent, salient aspect of the marks is DELTA. In fact, Marriott even refers to the brand internally as just "Delta." *See e.g.*, PTX-2873 ("Delta's first branded hotel;" "new Delta logo was revealed;" "integration of the Delta brand into the Marriott family."). This is also supported by

the fact that the very first word of the mark is DELTA, and that is the word that typically appears the largest in the primary logo for the DELTA HOTELS Marks. *E.g.*, PTX-1708; PTX-1717; PTX-1718. Numerous courts have found that similar facts strongly support a finding of similarity, even where the marks were more different than they are here. *See e.g.*, *PlayNation Play Sys.*, 924 F.3d at 1168 (GORILLA PLAYSET and GORILLA GYM similar); *Gruma Corp.*, 497 F. App'x at 396 (MISSION and MISSION BURRITO marks similar); *In re Chatam Int'l*, 380 F.3d at 1342 (JOSE GASPAR GOLD and GASPAR'S ALE marks similar).

Although such similarity in the words (when seen and spoken) would be sufficient for this factor to favor Delta, on top of that, Marriott's logos for the DELTA HOTELS Marks are also highly similar to prominently used logos for Delta's DELTA Marks. As seen in the examples below, the parties' respective logos both primarily feature blue, and are written in a sans-serif font.



Courts have recognized that logos that are far less similar are likely to cause confusion. *E.g.*, *PlayNation Play Sys.*, 924 F.3d at 1168 ( 



(GORILLA PLAYSET) mark and (GORILLA GYM) mark similar despite different coloring, font, placement, and surrounding words); *Am. Century Proprietary Holdings, Inc. v. Am. Century Cas. Co.*, 295 F. App'x 630,



636 (5th Cir. 2008) (plaintiff's mark , consisting of AMERICAN CENTURY alone or followed by the words "Proprietary Holdings, Inc." or "Investments" and often with a tree logo, found to be similar to defendant's mark



, consisting of AMERICAN CENTURY CASUALTY COMPANY with an Eagle design); *FCOA*, 57 F.4th at 953 (  mark, and

mark is similar despite differences in color and font).

    To the extent Marriott argues that the parties' marks are insufficiently similar, that is wrong and contrary to the facts, the law, and Marriott's own admissions before the USPTO. **First**, the inclusion of the word "HOTELS" in Marriott's DELTA HOTELS Marks does not distinguish the marks. It is well-established that the

addition of generic or descriptive words does not distinguish otherwise similar marks, as they are not distinctive. *See Safeway Stores*, 675 F.2d at 1165 (defendant's use of the SAFEWAY mark for drug stores, with the additional words "discount center" or "discount drugs," likely to cause confusion with plaintiff's SAFEWAY mark used in connection with its grocery store chain); *Gruma Corp.*, 497 F. App'x at 396 (MISSION and MISSION BURRITO marks similar where "burrito" is descriptive or generic); *In Re Golden Griddle Pancake House Ltd.*, 17 U.S.P.Q.2d 1074, 1075 (T.T.A.B. 1990) (GOLDEN GRIDDLE and GOLDEN GRIDDLE PANCAKE HOUSE "identical with the exception of the addition to applicant's mark of the descriptive words, PANCAKE HOUSE"); *Vision Info. Techs., Inc. v. Vision IT Servs. USA, Inc.*, 156 F. Supp. 3d 870, 882 (E.D. Mich. 2016) ("[A] descriptive phrase is not considered in determining whether two marks are similar."). Further, the addition of "HOTELS" does not distinguish the parties' respective marks because Delta itself offers hotel bookings, and Delta has even used "Delta Hotels" and "Delta Stays" in connection with such offerings. *E.g.*, PTX-1092; PTX-1683; PTX-2881; PTX-2672. The relationship between hotels and airlines (discussed further below), also means that the addition of "HOTELS" in Marriott's marks does not protect against consumer confusion.[10]

---

[10] It also is noteworthy that Marriott and its franchisees commonly refer to Delta Hotels simply as "Delta," which reinforces the likelihood of confusion. *See Am. Century Proprietary Holdings*, 295 F. App'x at 636 (noting third parties referenced

***Second***, nor can the inclusion of the word "MARRIOTT," in some (but not all) presentations of the DELTA HOTELS Marks, distinguish Marriott's DELTA HOTELS Marks from Delta's DELTA Marks. As a preliminary matter, this so-called distinction is a red herring as Marriott frequently presents the DELTA HOTELS Marks without the MARRIOTT mark, which makes sense as DELTA HOTELS is the brand name (similar to SHERATON, W HOTELS, WESTIN, COURTYARD, MOXY, and Marriott's many other brands). PTX-1721; PTX-1722; PTX-1719; PTX-1996 at 4-5. For instance, Marriott uses signage on its hotels that simply says DELTA HOTELS without the term "Marriott." PTX-1721; PTX-1722; PTX-1719. Marriott also shows the Delta Hotels logo on its website simply as

, without "MARRIOTT" in the logo (even though it includes "MARRIOTT" in the logos of other hotel brands in the same part of its website, like AC Hotels:

). PTX-1996 at 4-5.

And to the extent that Marriott includes the MARRIOTT mark with the DELTA HOTELS Marks, that inclusion is legally insufficient. It is well-accepted that "one cannot appropriate the entire mark of another" merely by adding a house

---

defendant's mark as just "American Century" in finding marks similar). Moreover, Delta has a pattern of marks with DELTA followed by a descriptive term, such as DELTA VACATIONS, DELTA CARGO, and DELTA ONE, which consumers are used to seeing and understand come from Delta.

mark. *In re Knight's Home Prods. Inc.*, 175 U.S.P.Q. 447 (T.T.A.B. 1972); *see also Bd. of Supervisors for Louisiana State Univ. Agr. & Mech. College v. Smack Apparel Co.* ("*LSU*"), 550 F.3d 465, 482-83 (5th Cir. 2008); *Express Welding, Inc. v. Superior Trailers, LLC*, 700 F. Supp. 2d 789, 799 (E.D. Mich. 2010); *In re Fiesta Palms, LLC*, 85 U.S.P.Q.2d 1360, 1366–67 (T.T.A.B. 2007). Indeed, "a purchaser could well think [Delta] had [given a] license[]," or that Delta and Marriott had otherwise partnered on the DELTA HOTELS brand. *A.T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689, 692 (2d Cir. 1972). "[T]he addition [of MARRIOTT] is thus 'an ***aggravation***, not a justification.'" *Id.* (emphasis added) Accordingly, courts routinely find marks similar even where defendant includes its own house mark. *E.g.*, *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 492 (2d Cir. 1988) ("Bloomingdale's attachment of its company name . . . does not offset the marks' similarity because the name is in very small letters and ***may actually increase the misappropriation by linking defendant's name to plaintiff's goodwill***.") (emphasis added); *W. E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 662 (2d Cir. 1970) (CUTI-TRIM and TRIM "so similar" and defendant's use of REVLON with the allegedly infringing mark to be a "tactic" that "might indeed promote[] confusion"); *Select Auto Imps. Inc. v. Yates Select Auto Sales, LLC*, 195 F. Supp. 3d 818, 835–36 (E.D. Va. 2016) (SELECT AUTO IMPORTS and YATES SELECT AUTO SALES marks similar and noting that "[t]he addition of a house

mark 'to one of two otherwise similar marks will not serve to avoid a likelihood of confusion.'" (citing *Nike, Inc. v. WNBA Enters., LLC*, 85 U.S.P.Q.2d 1187 (TTAB 2007)) (collecting cases); *Robert Bruce, Inc. v. Sears, Roebuck & Co.*, 343 F. Supp. 1333, 1347 (E.D. Pa. 1972) (finding GRUBB and NEETS N GRUBS confusingly similar and that the use of defendant's SEARS house mark "aggravates and compounds the likelihood of confusion"). This is especially so in light of Delta's history of partnering with companies like American Express, Uber, Starbucks, and Biscoff.

**Third**, any distinctions between the parties' respective logos does not make the marks insufficiently similar either. It does not matter that Marriott does not include Delta's widget logo, or that Marriott's DELTA HOTELS Marks sometimes include a "D" logo. As an initial matter, consumers do not say "widget" or "D" when referring to Delta or Delta Hotels. It is not even clear how they would pronounce it. Further, as discussed above, courts have found even more distinct logos to be sufficiently similar, such that confusion is likely. *E.g.*, *PlayNation Play Sys.*, 924 F.3d at 1168; *Am. Century Proprietary Holdings, Inc.*, 295 F. App'x at 636.

**Finally**, as described further in Section II.C.3, Marriott essentially admitted the parties' marks are similar as it, remarkably, argued to the USPTO that Delta's DELTA ONE mark ***infringes DELTA HOTELS.*** PTX-2872 at '606. Within that filing, it explicitly stated that DELTA ONE "closely resembles Opposer's DELTA

Marks in appearance, sound and meaning[.]" *Id*. at ¶12. In light of that admission, it is not credible for Marriott to now claim DELTA and DELTA HOTELS are not similar.

Accordingly, the similarity of marks factor strongly supports that confusion is likely. *E.g.*, *Safeway Stores*, 675 F.2d at 1165-1166; *PlayNation Play Sys.*, 924 F.3d at 1168; *Gruma Corp.*, 497 F. App'x at 396.

## C. The Parties Offer Both Complementary and Overlapping Services

The third factor (the similarity of the products) "concerns whether the products are of a kind the public could *think* originate from a single source." *FCOA*, 57 F. 4th at 953. As the Eleventh Circuit recently explained, this factor can also favor confusion if the parties' products are so similar or closely related that consumers would assume there is an "affiliate" relationship, or similar relationship, between the parties. *Id*. at 953 (reversing summary judgment to defendant because reasonable consumers could assume that defendant was an "affiliate or subsidiary" of plaintiff where defendant obtained title insurance for real estate closings and plaintiff provided other types of insurance policies); *see also Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1027 (11th Cir. 1989) (services "related" because consumers could believe a cable broadcast "is from the same source *or is somehow affiliated*" with an educational telecourse (emphasis added)); *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1201 (11th Cir. 2001) (a trademark owner has

"protection against use of its mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner").

Thus, direct competition is not required for this factor to favor confusion. *Frehling Enters.*, 192 F.3d at 1339 ("Direct competition between the parties is not required for this factor to weigh in favor of a likelihood of confusion."); MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:24 (5th ed.) ("MCCARTHY"). Rather, services need only be related. *Id*. As numerous courts have explained, "complementary" products are "particularly susceptible to confusion." *See Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha,* 754 F.2d 591, 598 (5th Cir. 1985) (collecting cases; presses and equipment for building presses complementary and thus similar); *see also Freedom Sav. & Loan Ass'n v. Way,* 757 F.2d 1176, 1184 (11th Cir. 1985) (because "real estate sales and real estate finance are highly complementary services," district court "clearly erred" in finding services not similar); *In re Martin's Famous Pastry Shoppe, Inc.*, 748 F. 2d 1565, 1567 (Fed. Cir. 1984) (bread and cheese confusingly similar as products are "often used in combination" and "complementary use has long been recognized as a relevant consideration in determining a likelihood of confusion"); *Express Franchise Servs., L.P. v. Impact Outsourcing Sols., Inc.*, 244 F. Supp. 3d 1368, 1377 (N.D. Ga. 2017) ("employee leasing company" providing HR services and company providing

"staffing and recruiting services" similar as services were "complementary").

Courts have also found that different or non-competitive services are related where they are both in the travel industry. For example, in *Visa International Service Ass'n v. Visa Hotel Group, Inc.*, the court held that "financial and hotel services," despite being "different and noncompetitive," were "definitely related" because "they exist as complementary products in the same general industry, i.e., the travel and entertainment industry." 561 F. Supp. 984, 991 (D. Nev. 1983). The court further reasoned that "VISA bank cards and travelers cheques are commonly used while traveling," "[t]he main consumer market for hotels is travelers," "VISA card holders who have come to expect a certain standard of quality in dealing with the credit card company may assume a 'VISA HOTEL GROUP' hotel will exhibit the same standard of quality," and "Defendants' hotels accept the VISA card and travelers cheques." *Id.*; *see also, e.g.*, *Blumenfeld Dev. Corp. v. Carnival Cruise Lines, Inc.*, 669 F. Supp. 1297, 1313 (E.D. Pa. 1987) (holding that cruise ships and casinos were related services, and that they shared a "market" because "[t]he broadest definition of the travel, vacation, entertainment market is that it includes all people who have discretionary income to spend on travel, entertainment and vacations").

1. ***The Parties' Services Are Closely Related, Complementary Services that Consumers Research, Book, and Use Together in a Single Trip***

The evidence will show that airline services and hotel services are closely

related, complementary products that consumers frequently research together, book together, and use on a single trip. In particular:

- Delta's Head of Commercial Marketing, Shannon Womack, will testify about the wide range of services Delta offers under the DELTA brand, including hotel stays, flights, vacation packages, and car rentals, all of which consumers can book and research simultaneously through the Delta website, www.delta.com, and app, Fly Delta.

- The Court will also hear testimony that Marriott offers vacation packages that include flights, hotels, and/or rental cars.

- Delta's travel industry expert, Norm Rose will also show that hotels and airlines are frequently booked and researched simultaneously and used during a single trip. For example, other airlines (in addition to Delta), hotel companies (in addition to Marriott), online travel agencies (*e.g.*, Expedia.com), American Express travel, and traditional travel agencies all sell ***both*** flights and hotels, and offer vacation packages through which consumers can ***book flights and hotels together*** as part of a package deal.

- Hotels frequently brand properties as "airport hotels." In fact, Marriott has had at least nine Delta Hotels properties listed or planned to be listed as "airport" hotels with the word "airport" in the name. Examples include "Delta Hotels Indianapolis Airport," "Delta Hotels Norfolk Airport," and "Delta Hotels Detroit Metro Airport".

- Hotels and airlines partner with each other to allow travelers to earn and use loyalty points through one another's services. For example, Marriott has a "preferred partnership" with United Airlines and partners with dozens of other airlines in the United States and around the world to allow consumers to use and accumulate loyalty points; Delta had a preferred partnership with Starwood; and American Airlines and Hyatt have a preferred partnership with each other.

- Confirming the close relationship between hotels and airlines, hotel and airline companies also offer services to reduce friction as people travel from their flights to their hotels. For example, as noted above, hotels often have shuttles to transport people to/from the airport. And Marriott itself has advertised that Delta Hotels provide a "streamlined," "seamless," and "full-service travel experience".

- The press treats airlines and hotels as closely related products, as it frequently reports on hotels and airlines together. For example, many well-known travel websites such as The Points Guy, View from the Wing, and Million Mile Secrets cover both hotels and airlines.

- Hotels and airlines are part of the same trade associations as well. Examples include the Global Business Travel Association, U.S. Travel Association, and The American Society of Trade Advisors.

Given the extraordinarily close relationship between air travel and hotel stays, hotel services and airline services are precisely the types of services that consumers are likely to conclude are from the same source, affiliated, or in a sponsorship relationship. *See In re Martin's Famous Pastry Shoppe, Inc.*, 748 F. 2d at 1567 (bread and cheese related); *Freedom Sav. & Loan Ass'n,* 757 F.2d at 1184 (real estate sales and real estate finance similar); *Octocom Sys., Inc. v. Houston Comput. Servs., Inc.,* 918 F.2d 937, 943 (Fed. Cir. 1990) (computer programs and modems similar); *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1530 (11th Cir. 1985) (cognac and brandy related to wine); *PlayNation Play Sys.*, 924 F.3d at 1168 (outdoor playground equipment and indoor pullup bar for all ages sufficiently similar); *Visa Int'l Serv. Ass'n v. Visa Hotel Grp., Inc.*, 561 F. Supp. 984, 991 (D. Nev. 1983) (financial and hotel services "exist as complementary products in the same general industry, i.e., the travel and entertainment industry, and they are definitely related").

The prevalence of co-branding in the travel industry makes confusion even more likely. Indeed, as noted above, Marriott and Delta already partner with one

another so that consumers can earn Delta SkyMiles loyalty points through stays at Marriott properties and/or book those stays using their SkyMiles points. The parties also have official co-brands, partnerships, or sponsorship relationships with dozens of third parties, including American Express (both parties), Uber (both parties), Starbucks (both parties), Hertz (both parties), Biscoff (Delta), United Airlines (Marriott), Chase (Marriott), Equinox (Delta), Fitness on Demand (Marriott), PGA Tour (Delta), and Sweetwater (Delta). Consumers are thus predisposed to think a hotel using an airline's name is doing so as part of an official or formal relationship when that is not the case here. As a result, contrary to Marriott's claim, adding "Marriott" or "by Marriott" to the Delta Hotels name does nothing to dispel confusion, as consumers will merely think that Delta and Marriott have entered a sponsorship or co-branding relationship just as they have done with dozens of other companies.[11] *FCOA*, 57 F. 4th at 953 (mistaken belief that parties are in an "affiliate" relationship sufficient to establish infringement); *W. E. Bassett*, 435 F.2d at 662 (addition of REVLON house mark "could not ensure against, but might indeed promote, confusion"); *Wynn Oil Co. v. Am. Way Serv. Corp.*, 736 F. Supp. 746, 752 (E.D. Mich. 1990) ("defendant's use of the words "the American Way" together with

---

[11] As discussed further below, evidence of actual confusion, including survey evidence, confirms this, as consumers still express confusion notwithstanding the presence of the "Marriott" name. And consumers specifically have referenced the belief that both Delta and Marriott are involved in the Delta Hotels brand.

the mark does not dispel the implication that Wynn has approved of this use of its trademark") a*ff'd in part, rev'd in part,* 943 F.2d 595 (6th Cir. 1991); *Decatur Fed. Sav. & Loan Ass'n v. Peach State Fed. Sav. & Loan Ass'n,* 1978 WL 21348, at \*6 (N.D. Ga. Dec. 29, 1978) ("the defendant's use of its trade name is insufficient to preclude confusion and, in fact, may intensify it"); *Select Auto Imps.*, 195 F. Supp. 3d at 836 ("addition of a house mark can aggravate, rather than mitigate confusion"); *The Black and Decker Manufacturing Co. v. Big Yank Corp.*, 231 U.S.P.Q. (BNA) ¶ 484 (T.T.A.B. Aug. 28, 1986) (addition of "BY BIG YANK" did not dispel confusion because consumers could think it was under a license relationship).

Numerous airlines have also owned hotels and vice versa. As travel industry expert Norm Rose will testify, examples include Virgin Atlantic and Virgin Hotels; American Airlines and Americana Hotels; and the Trump Shuttle and Trump Hotel; and Evergreen Group operating Evergreen Hotels and Eva Airways. In addition, several hotel brands began as offshoots of airlines. And this Court will hear testimony ███████████████████████████████████████████████ ███████████████████████████. Given this evidence, consumers could "easily conclude" that Delta expanded further into the hotel business by opening a property called "Delta Hotels" or entering into a partnership with Marriott for the hotel, when it did not. *See E. Remy Martin*, 756 F.2d at 1530 (goods related as consumers could "easily conclude" plaintiff expanded its brandy and cognac business into wine).

Put another way, that numerous airlines, including Delta, have owned hotels shows that hotel ownership and related services, such as flight check-ins at hotels or Delta lounge experiences within hotels, are within Delta's "natural expansion" zone (and, indeed, as discussed more below, Delta has already expanded into that space). *Planetary Motion*, 261 F.3d at 1201 (explaining that a trademark owner's rights extend to areas "within the realm of natural expansion"). Therefore, Delta can enforce its rights in the DELTA Marks to prevent use of the word DELTA in that hotel space to stop a company, like Marriott, from blocking Delta's natural expansion. *Id*. (service for checking email within the natural zone of expansion for an email notification software company as (1) both "belong to the same general field of commerce, *i.e.*, information technology," (2) both "deal with" email, and (3) other "major firms in this field sell e-mail software as well as provide e-mail service").

2.    ***Delta Offers an Expansive Array of Services that Directly Overlap with those Marriott Offers under the DELTA HOTELS Brand***

The complementary nature of air and hotel services alone resolves the third factor in Delta's favor, as discussed above. The evidence, however, does not end there. Rather, this is a rare case where the parties also offer many ***identical*** services. As this Court will hear, Delta does not merely fly consumers from one place to another. It is an end-to-end hospitality service and has been since the 1970s, long before Marriott purchased Delta Hotels. As such, it offers many of the same exact

services as Marriott. *Safeway Stores,* 675 F.2d at 1166 (although plaintiff "primarily sells groceries while [defendant] sells non-grocery goods," the court found "significant overlap in each company in the goods that are dominant sales items of the other; [plaintiff] sells items, such as brooms, that [defendant] emphasizes and [defendant] sells some grocery items, primarily canned and boxed foods, that are [plaintiff's] specialty").

**First**, dating back to the 1970s, Delta has been offering consumers the option to **book hotel stays directly through Delta**. It also offers direct bookings for cruises, car rentals, and vacation packages. As the Court will hear, Delta offers these services by phone, on its website (www.delta.com), and through its DELTA app (Fly Delta) under the brands DELTA, DELTA STAYS (for standalone hotel bookings), DELTA VACATIONS (for packages that include hotels and flights), DELTA CARS (car rentals), and DELTA CRUISES (cruises). In fact, for years Delta answered the phone line for its hotel booking service with the message, "Thank you for calling Delta Hotels." PTX-2672.

Marriott similarly offers hotel booking services under the Delta Hotels brand. Thus, as shown below, the parties offer identical services under their respective DELTA brands, namely, the booking of hotel stays.



Delta Hotels, PTX-1504



Delta, PTX-1559

Marriott may attempt to discount this evidence by arguing that such hotel

33

booking services constitute ███████████████████████████████

███████████████████ *See, e.g.*, PTX-2580 (███████████████████

███████████████████████████████████████████████████████ ).

Courts have found strong trademark rights based on far fewer sales. *See, e.g.*, *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*, 647 F. Supp. 3d 145, 214 (S.D.N.Y. 2022) (sales of $8.7 to $21.2 million per year); *R.F.M.A.S., Inc. v. Mimi So*, 619 F. Supp. 2d 39, 81 (S.D.N.Y. 2009) ($4 million sales indicative of secondary meaning); *Metrokane, Inc. v. The Wine Enthusiast*, 160 F. Supp. 2d 633, 640 (S.D.N.Y. 2001) ($3 million revenues held "indisputable sales success").

**Second**, Delta has been offering food and beverage services through its DELTA-branded lounges for decades. While many of these lounges are in airports, Delta also has numerous standalone lounges. These include suites at several well-known sports stadiums (*e.g.*, Truist Park, State Farm Arena, and Mercedes-Benz Stadium in Atlanta, Yankees Stadium in New York, Target Field and U.S. Bank Stadium in Minnesota, CenturyLink Field in Seattle, Delta Center in Salt Lake City) and pop-up lounges at the Sundance Film Festival, South Beach Wine & Food Festival, the Grammys, and the annual Consumer Electronics Show, among others. Marriott similarly offers food and beverage services in connection with its DELTA HOTELS Marks, including through the "Delta Bar," "The Delta Pantry," the "Delta Prime Steakhouse," and airline-themed restaurants "Hangar 58" and "Lift," all of

which are located at Delta Hotels properties. *E.g.*, PTX-1680; PTX-1965; PTX-1998; PTX-3915.

**Third**, Delta offers many other amenities, both in its lounges and on flights, that overlap with those offered at Delta Hotels and other hotel properties. These include branded napkins, glasses, and menus; amenity kits; sleep accessories (*e.g.*, blankets, eye masks, and earplugs); WiFi; in-flight television and movie services; stretch and meditation classes; and spa services and showers in select lounges.

**Finally**, as noted above, Delta has considered ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████

Thus, not only are the parties' services highly related and complementary as discussed in Section II.C.1, they also have many directly overlapping offerings. This favors a likelihood of confusion. *See, e.g.*, *Safeway Stores,* 675 F.2d at 1166 (although "primary" offerings were not the same, that each party offered products with those offered by the other favored likelihood of confusion).

3.    ***Marriott Agrees Hotel and Airline Services Are So Closely Related as to Cause Confusion***

Despite its arguments here, Marriott's past conduct confirms that it *agrees* that hotels and air travel services are so closely related as to create a likelihood of confusion.

**First**, the evidence will show that Marriott itself "threatened" an airline that

35

sought to name itself "Moxy" because that is the same name Marriott uses for its Moxy Hotels, telling the airline, "Don't do that." PTX-1096 at '167. Notably, it did not say that using a different logo from Marriott's Moxy logo or that words like "hotel" or "air" would somehow avoid or dispel confusion. Yet now Marriott argues hotels and airlines are not confusingly similar and that the parties' logos and references to "Hotel" or "Marriott" do prevent confusion. Its about-face is disingenuous and inconsistent with the evidence. Just as Marriott thought an airline using the same name as a preexisting hotel chain was likely to cause confusion and interfere with Marriott's rights and branding, a hotel chain using the same name as a famous, preexisting airline is likely to cause confusion.

*Second*, Marriott also attempted to enforce its purported trademark rights in DELTA HOTELS *against* Delta. For example, it argued to the USPTO that Delta's trademark DELTA ONE for, among other things, "Providing premium food and beverage services *for air travelers*" (emphasis added) infringed Marriott's purported rights in DELTA HOTELS for hotel accommodations, restaurant, and bar services. PTX-2872 at '606. In other words, it claimed that services offered *specifically to air travelers* would create a likelihood of confusion with Marriott's DELTA HOTELS brand. *Id*. If there was any doubt as to whether air travel and hotel services are so closely related as to cause confusion, Marriott's efforts to enforce its alleged rights to prevent Delta's registration of a DELTA trademark related to air travel confirms

the strong overlap of services.

For all of these reasons, the similarity of services factor strongly favors Delta. The parties offer complementary and overlapping services, and Marriott's conduct shows that it believes the services are so similar there is likely to be confusion. *See, e.g., In re Martin's Famous Pastry Shoppe, Inc.*, 748 F. 2d at 1567 (bread and cheese similar); *Freedom Sav. & Loan Ass'n,* 757 F.2d at 1184 (real estate sales and real estate finance similar); *Octocom Sys.,* 918 F.2d 937, 943 (Fed. Cir. 1990) (computer programs and modems similar); *E. Remy Martin*, 756 F.2d at 1530 (cognac and wine similar); *Visa*, 561 F. Supp. At 991 (D. Nev. 1983) (financial and hotel services similar); *Safeway Stores,* 675 F.2d at 1166 (similarity where secondary services overlapped).

### D.    The Sales Channels and Consumers Are the Same

Confusion is more likely "if the products are sold through the same channels to the same purchasers." *Churchill Downs*, 2013 WL 5350830, at *9 (internal quotes omitted). This fourth factor requires only "some overlap between the parties' respective retail outlets and customer bases." *Ewe Grp., Inc. v. Bread Store, LLC*, 54 F. Supp. 3d 1343, 1350 (N.D. Ga. 2014). On summary judgment, the Court found that this factor weighs at least "somewhat" in favor of a likelihood of confusion. Dkt. 574 at 31. Trial evidence will show that this factor favors Delta.

**Same Channels:** As discussed above, the parties sell their services through

many of the exact same channels: online travel agencies, traditional travel agencies, Google, credit card travel agencies (e.g., Amex, Chase, VISA), and one another's websites. Indeed, consumers can purchase both a Delta flight and a stay at a Delta Hotels property by clicking a *single* button and making a *single* payment, as shown, for example, in the image below from Booking.com:



PTX-1811. The parties also sell their services through other overlapping channels, such as websites and apps. *Churchill Downs,* 2013 WL 5350830 at *9 (channels similar where both parties sold through "online stores, retail outlets, and souvenir stores in the Louisville Airport"). Consumers use the parties' services together as well as part of a single travel journey.

Marriott has tried to discount this direct overlap by noting that many consumers still purchase flights directly from airlines and hotel stays directly from hotel companies. This argument misses the mark. ***First***, Marriott forgets that airlines *sell hotel stays* and hotel companies *sell flights*. It thus does not solve anything to say that consumers will buy their Delta flights directly from Delta's website or app and their Delta Hotels stays directly from Marriott; the Delta website **has listings for Marriott properties** and the Marriott website **has vacation packages with Delta flights**, as shown below:



Thus, consumers can still encounter both parties' brands even when searching either of the parties' websites. ***Second,*** regardless of where consumers ultimately purchase flights and hotels, this Court will hear evidence that they frequently use online travel agencies and other outlets where ***both*** parties' flights and hotel stays are sold. ***Third***, even the data Marriott relied on for its argument showed that over

20% of consumers surveyed purchased vacation packages with multiple components together. Dkt. 512-6 at 27. Thus, there is no doubt there is "some overlap" in the parties' trade channels, which is all that is required. *Ewe Grp.*, 54 F. Supp. 3d at 1350.

Marriott's thin arguments aside, there is no doubt that consumers can purchase and research Delta flights and Delta Hotels stays through the same channels and use them one after the other in a single trip.

**Same Consumers:** As the evidence will also show, the parties sell their services to the same consumers, i.e., travelers. This too is beyond serious dispute. Indeed, if Delta Hotels did not target air travelers, there would be no reason for it to open "airport" hotels, offer airport shuttles, use airline terms in the names of restaurants, or advertise in airports (as discussed more below). *See, e.g.*, PTX-0217; PTX-1858; PTX-0362 at '150. Yet Marriott does ***all*** =these things because the target market for its Delta Hotels properties plainly includes travelers.

Survey data and internal Marriott documents confirm this. In fact, an internal Marriott research document states that Delta Hotels' customers' interests ***include*** ▮▮▮▮▮▮▮▮▮▮. PTX-3916 at '429. Moreover, a survey by Delta's expert, Prof. David Franklyn, found that 67% of hotel consumers also were consumers of flights.

This factor thus strongly favors confusion, as the trade channels and customers are identical. *See Blumenfeld Dev. Corp.,* 669 F. Supp. at 1313 ("Hotel

casinos and cruise lines appeal to substantially the same market."); *Churchill Downs,* 2013 WL 5350830 at *9.

### E. The Parties Advertise Their Services in the Same Places

The fifth factor considers the parties' advertising methods and "whether there is likely to be significant enough overlap in the readership of the publications in which the parties advertise that a possibility of confusion could result." *Frehling Enters.*, 192 F.3d at 1340. On summary judgment, the Court found that this factor weighs in favor of a likelihood of confusion. Dkt. 574 at 31. Trial evidence will only reinforce this conclusion.

The evidence will show that the parties use many of the same types of advertising channels, such as social media, online travel agencies, Google (where their websites appear one after the other in response to such common searches as "delta hotels" and "delta hotel"), Google Adwords[12] (where the parties both have purchased adwords with the word "delta"), billboards and other signage, national TV, and print ads. Such similarity in advertising channels is all that is required for this factor to favor a likelihood of confusion. *Ewe Grp.*, 54 F. Supp. 3d at 1350 (factor favored confusion where the parties "use the same types of advertising

---

[12] Google AdWords are keywords that a party purchases on a pay-per-click basis to target their advertising to show in response to Google searches that contain the purchased keywords. *See* https://mailchimp.com/resources/what-is-google-adwords/.

methods (including social media and word-of-mouth advertising)").

While such evidence would be enough to show that this factor favors Delta, the evidence goes even further. ***First***, Marriott advertises hotels, including Delta Hotels, ***in airports***, *i.e.*, the exact place where airline travelers, including those travelling on Delta flights, are found. *See, e.g.*, PTX-1881 at '259-260. ***Second***, Marriott has also advertised Delta Hotels ***on flights*** in the United States, including with Southwest and Air Canada. *See, e.g.*, PTX-0397 at '815. ***Third***, Marriott and Delta both advertise in the same publications, such as *Conde Nast* and *Travel and Leisure*. ***Fourth***, on social media, Marriott frequently advertises in ways that connect Delta Hotels to Delta. For example, after consumers used the hashtag #dogsofdelta on social media to show pictures of dogs on Delta flights, PTX-0246, Marriott adopted this ***same exact*** hashtag to promote Delta Hotels. PTX-0384 '902, 9069-07; PTX-0385 at '823, 825; PTX-0250 at '780. Marriott's social media posts about DELTA HOTELS also frequently includes plane imagery, as in the example below:



PTX-1845.

The fifth factor strongly favors Delta. *Ewe Grp.*, 54 F. Supp. 3d at 1350 (parties both use social media and word-of-mouth); *Delta*, 2015 WL 11242003 at *11 (factor favored a likelihood of confusion where both parties used the postal service to send advertising); *Visa*, 561 F. Supp. at 993-96 (channels converged where both marketed to general public and plaintiff advertised the use of its credit card in travel, while defendant offered hotel marketing).

## F. Marriott Intended to Cause Confusion and Trade Off Delta's Reputation

The sixth factor in the likelihood of confusion analysis is whether the defendant intended to infringe the plaintiff's mark. In evaluating this factor, courts consider whether a "defendant copied the marks with the intent to confuse customers" or "deriv[e] a benefit from" the plaintiff's business reputation. *Savannah*

*Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 983 F.3d 1273, 1285 (11th Cir. 2020) (intent to confuse); *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 940 (11th Cir. 2010) (intent to benefit from business reputation). As with other factors in the likelihood-of-confusion analysis, a finding of intent is not required, but where intent is found, it weighs in favor of a finding of likelihood of confusion. *E.g., Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 170 (4th Cir. 2012); *Diesel S.p.A v. Diesel Power Gear, LLC*, 2022 WL 956223 at *17-19 (S.D.N.Y. Mar. 30, 2022); *New Balance Athletics, Inc. v. USA New Bunren Int'l Co. Ltd.*, 424 F. Supp. 3d 334, 353 (D. Del. 2019). Indeed, "[t]rademark infringement is a strict liability offense." *Interim Healthcare, Inc. v. Interim Healthcare of Se. Louisiana, Inc*., 2020 WL 3078531, at *18 (S.D. Fla. June 10, 2020) *Top Tobacco, L.P. v. Panjwani*, 2021 WL 1351443, at *3 (N.D. Ga. Mar. 15, 2021), *aff'd sub nom. Top Tobacco, L.P. v. Novelties*, 2023 WL 5372541 (11th Cir. Aug. 22, 2023) (holding that defendants "may be held liable without regard to his knowledge of or willful blindness towards infringement as long as he actively caused the infringement as moving, conscious force.")

Delta will present substantial evidence that Marriott intended to trade off Delta's goodwill and cause confusion. At the time Marriott acquired the Delta Hotels brand, there were no Delta Hotels properties in the United States. PTX-0277 at '381. Per Marriott's own documents, Delta Hotels was a █████████████████████

█████████████████████████ was in Canada. PTX-2624 at '055; PTX-2584 at '912.

As testimony will show, however, Marriott was aware of Delta's use of the DELTA Marks within the United States before the acquisition. Moreover, Delta and its DELTA Marks were flagged for Marriott during due diligence on the acquisition as presenting a "Potential Conflict" given Delta's prior trademark rights, including in particular in the United States. PTX-0277 at '690, '695. Thus, Marriott was on notice not only of Delta's valid trademark rights in the United States, but of the "Potential Conflict" its use of the Delta Hotels Marks in the United States would pose to Delta's prior rights. (*Id.*)

Despite these warnings, and despite Delta Hotels' utter lack of a U.S. presence, Marriott moved forward with the acquisition. And in a not-so-subtle nod to its plan to freeload off Delta's U.S. reputation, it named the acquisition ████ ██████████████████████ *to Delta* as this Court will hear. PTX-0270 at '885; PTX-2805 at 3-5; PTX0216 at '177.

Marriott then surreptitiously adopted a new logo for the Delta Hotels brand that closely matches Delta's logo. As shown below, the original logo included a "D" in loopy script and the word "Delta" written in a font with serifs, but Marriott opted to instead use a logo with a plain D, block letters, and no serifs:



███████████████████████████████████████████████████████████████.
PTX-0270 at '885; PTX-2805 at 3-5; PTX-0216 at '177; PTX-2586. Meanwhile, it publicly stated that its focus was on *Canada* and "growing in attractive regions *outside of the U.S.*" PTX-0192 at '597. Marriott's CEO himself also made the decisions to scrap plans for a ████████████████████████████████████ ███████████████ (as for other new logos), likely so that Delta would not find out. PTX-0206 at 1; PTX-0209 at '894; PTX-2628 at '600. In other words, Marriott internally planned to expand to the United States under a logo that mimicked Delta's while publicly throwing Delta off the scent by issuing a misleading press release and keeping its logo out of the press.

Throughout this planning, Marriott knew the Delta Hotels name would likely cause confusion in the United States, *see, e.g.*, PTX-0289, yet it pushed forward anyway. In 2015, before Marriott opened any U.S. Delta Hotels, its marketing agency flagged ████████████████████████████████ *Id.* at '187. Marriott ignored this warning, ████████████████████ *Id*. It then held the grand opening of its first U.S. hotel a few months later on April 21, 2016. PTX-2873 at '342.

In August 2016, a senior marketing executive at Marriott warned that ██

PTX-0210 at '554 (emphasis added). Marriott responded by opening 10 Delta Hotels properties in 2017. PTX-0216 at '177

An August 2, 2017 ▮▮▮▮▮▮▮▮▮▮ referred to the need to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PTX-0297 at '905 (emphasis added). Rejecting this advice, a few weeks later, the first Delta Hotels property branded as an "airport hotel" (*i.e.,* a hotel within miles of an airport targeted toward guests travelling to and from the airport) opened under the name "Delta Hotels by Marriott Grand Rapids Airport." PTX-0216 at '181. In other words, after internal documents said to showcase the hotel as ***not*** an airline due to the mistaken confusion and association, Marriott promptly opened a hotel at an airport with "Airport" in the name.

And the confusion continued. In March 2018, a Delta Hotels general manager said that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PTX-0299 at '767 (emphasis added). The same month, a Marriott executive told ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ of confusion with Delta, while also admitting ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PTX-2676 at '483 (emphasis added). Consistent with Marriott's ▮▮▮▮ attitude, Marriott ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

█████████ PTX-0216 at '181.

Internal Marriott documents acknowledging confusion kept accumulating. *E.g.*, PTX-0305 at '283 (Delta Hotels ███████████████) (emphasis added); PTX-0303 at '496; PTX-3663 at '809; PTX-0238 at '358 ████████

████████████████████████████████████████████

█████████ (emphasis added). Yet Marriott kept expanding under the Delta Hotels name. PTX-0216 at '176. Even after Delta complained, Marriott opened dozens of hotels. *Hi-Tech*, 2024 WL 4973107, at *3 (continued marketing after receiving a cease and desist letter supported finding of intent to trade off goodwill).

The reason Marriott kept the "Delta" name and kept opening hotels was simple. Marriott knew Delta Hotels was ███████████████ PTX-2624 at '055. By using the Delta name, Marriott could siphon off Delta's goodwill and reputation to drive traffic to Delta Hotels properties without having to invest its own money in advertising or promoting the brand. PTX-0522 at '241 (Marriott presentation acknowledged that "[c]omplaints over low brand awareness and marketing spend often arise"); PTX-0299 at '767 (franchisee complained that "Marriott literally commits zero marketing dollars to Delta"). Marriott even bought keywords that included the word "delta" allowing it to divert traffic when consumers searched for Delta online.

Marriott did not just ignore confusion. Rather, confusion was part of the

█████████████ strategy. Marriott intended to trade off Delta's goodwill, and repeatedly took steps to do so (*e.g.*, adopting a similar logo; opening airport hotels; expanding to hub cities; adopting aviation-themed names for restaurants in Delta Hotels; using airplane images on social media) in the face of numerous internal warnings about confusion. Trial evidence will show that the intent factor favors Delta. *Jellibeans*, 716 F.2d at 843 (affirming finding of intent to confuse based on circumstantial evidence, namely, that defendants knew about plaintiff's use and had previously used different naming conventions for their other locations)

### G. The Evidence Will Show Actual Customer Confusion Between Delta and Delta Hotels

The seventh factor – actual confusion – is among the two most important factors in the Circuit. *Fla. Int'l Univ. Bd. of Trs.,* 830 F.3d at 1255. As this Court has already found, it weighs in favor of Delta because actual customers already have been confused regarding the affiliation between Delta and Delta Hotels. Dkt. 574 at 35-38. To be clear, "it is not necessary to show actual confusion." *Wreal*, 38 F.4th at 137; *see also Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 423 (2023) ("Congress deemed a violation of [provisions of the Lanham Act] to occur each time a mark is used in commerce in the way Congress described, with no need for any actual confusion."). But where such evidence exists, Courts in the Eleventh Circuit consider this factor and the type of mark the most important. *Fla. Int'l Univ. Bd. of Trs.,* 830 F.3d at 1255. "[E]ven a ***very little amount*** of actual confusion is

highly probative." *Wreal*, 38 F.4th at 137 (emphasis added). In fact, courts "accord[]

substantial weight to ***any instances*** of evidence that actual customers were confused

by the use of a mark as opposed to other categories of people." *Id.* (emphasis added).

Relevant evidence of confusion includes "consumer inquiries regarding

possible affiliation between the parties or attempts to purchase goods or services

actually offered by the other party." *Silverton Mortg. Specialists, Inc. v. FDIC for

Silverton Bank, N.A.*, 2012 WL 13001592, at *18 (N.D. Ga. Sept. 28, 2012). Courts

also consider confusion evidence by non-purchasers, as actual confusion is "the best

evidence" of a likelihood of confusion and should not be disregarded "regardless of

the identity of the person confused." *Fuji Photo Film*, 754 F.2d at 597. In addition,

courts treat consumer survey results as "probative of actual confusion." *Rice v.

Brand Imports, L.L.C.*, 2010 WL 11549769, at *4 (N.D. Ga. Sept. 16, 2010).

The evidence will show that actual customers were confused about the source,

sponsorship, or affiliation relationship between Delta and Delta Hotels. As an initial

matter, this Court already found in its summary judgment order that the online

comments, complaints to Delta, and complaints to Marriott are "***clear record

evidence*** of at least some actual customer confusion in this case." Dkt. 574 at 37-38

(emphasis added). Such "clear record evidence" includes the following, which Delta

intends to also submit at trial:

- **Online Comments:** PTX-0736 at '377 (emphasis added) ("name 'Delta' is
  ***confusing and misleading*** as for some reason ***I thought it is associated with***

***Delta airlines*** [sic] and can get miles"), PTX-0904 at '111 (emphasis added) ("Delta is an excellent airline so the hotel can definitely up the game a bit"), PTX3372 at '356 ("I'm mad at myself for missing the window to tell Delta/Marriott how horrible their hotel is").

- **Complaints to Delta:** ███████████████████████████████████ ████████████████████████ *E.g.*, PTX-2630; PTX-2632; PTX-2634; PTX-2638; PTX-2652. ████████████████████ . *E.g.*, PTX-2630; PTX-2632; PTX-2634; PTX-2638; PTX-2652

- **Complaints to Marriott:** ██████████████████ ████████████ PTX-0310 at '265 (emphasis added). ████████████████ ███████ *Id.* at '823. ████████████████ ████████ PTX-0309 at '277 (emphasis added). ███████████████ *Id.* at '358 ; PTX-0310; PTX-2662 (emphasis added)

As the Court explained on summary judgment, this evidence alone tips this factor in Delta's favor. Dkt. 574 at 37-38.

But this is not the only evidence. ***First,*** the myriad internal Marriott documents ***admitting to confusion*** establish that actual confusion has occurred (and undermine Marriott's entire argument here that confusion is not likely, as Marriott knows it is not only likely, but has happened). *See, e.g.*, PTX-0295 at '549 ████████████████████████████ ; PTX-0299 ███████████████████ ███████████████████████████ ; PTX-0303 at '496 ████ ███████████████████████ ; PTX-1093 at '036 ████████ ████████████████████████████ .

**Second**, nine empirical consumer surveys conducted by four experts will demonstrate an average confusion rate **of 26.8%**, which is far above what is commonly accepted as strong evidence of confusion. *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980) (15% associating TEXON with EXXON and 23% associating it with gas supported confusion finding); *Combe*, 382 F. Supp. 3d at 462 ("19% net confusion rate . . . exceeds survey results that courts have found to be strong evidence of actual confusion."); *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 400 (8th Cir. 1987), *cert. denied*, 488 U.S. 933 (1988) (survey showing 10% of respondents associated plaintiff with defendant's product "should be given substantial weight" as "manifestations of actual confusion serve as strong evidence of a likelihood of confusion"); *Quality Inns Int'l, Inc. v. McDonald's Corp.*, 695 F. Supp. 198, 219 (D. Md. 1988) (16.3% rate evinced that "an appreciable number of consumers are likely to be confused"); MCCARTHY § 32:188 ("Generally, figures in the range of 25% to 50% have been viewed as solid support for a finding of a likelihood of confusion.").[13]

**Third**, Google searches for "delta hotels" include questions in the "People also ask" section such as "Are Delta Hotels part of Delta Airlines?" and "Are Delta

---

[13] Marriott's flawed confusion survey by Bruce Isaacson shows substantial levels of confusion when properly analyzed as well. As expert Dr. Ran Kivetz will explain, the survey actually shows that 26% of respondents likely were confused.

Hotels owned by Delta Airlines?" PTX-1481; PTX-1538 at '518; PTX-3345 at '005-006; PTX-3371 at '483; PTX-3373 at '111; PTX-3374 at '115-116; PTX-3375 at '120-121; PTX-3376 at '212-213; PTX-3723 at '378;*Univ. of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535, 1546 (11th Cir. 1985) (affidavit regarding "inquiries" constituted "persuasive evidence of actual confusion between the two marks"); *Silverton*, 2012 WL 13001592, at *18 (finding actual confusion in part due to inquiries, because "instances of [actual] confusion include consumer inquiries regarding possible affiliation between the parties"); *Ewe Grp.*, 54 F. Supp. 3d at 1346, 1351 ("inquiries from customers, vendors, and employees' friends about whether [products] are affiliated" constituted "competent evidence showing actual confusion between the parties' marks by the relevant consuming public").

*Fourth*, media commentary has noted confusion between Delta Hotels and Delta. *E.g.*, PTX-3318. *Fifth*, comments from sophisticated business operatives have expressed confusion about the affiliation between Delta and Delta Hotels, which courts have held is particularly relevant. PTX-3313; PTX-3318; Dkt. 441 at 25-29. *See Frehling Enters.*, 192 F.3d at 1341 ("confusion of someone very familiar with the enterprise (like the professional buyer in the instant case) is relevant evidence of actual confusion."); *Ewe Grp.*, 54 F. Supp. 3d at 1350 ("Confusion of someone who is very familiar with the industry and enterprise at issue is relevant evidence of actual confusion.").

**Lastly,** Delta will present testimony from individuals who were actually confused. Marriott has sought to exclude their testimony because two of these individuals are Delta employees. But the fact that employees, who are among the most knowledgeable consumers in the travel industry, were confused is highly relevant because if people with close familiarity with the industry can be confused, anyone can. Courts in this Circuit regularly rely on such evidence.[14] *See, e.g.*, *Ewe Grp.*, 54 F. Supp. 3d at 1351 (finding probative testimony from "one of [plaintiff's] certified public accountants, that she asked [plaintiff's] owners about Sweet Talk because she "was under the impression that the Sweet Talk restaurant . . . was owned by [plaintiff]"); *see also* Dkt. 741.

The evidence of actual confusion is far more extensive than what is typical, including in cases where infringement is found. *PlayNation Play Sys.*, 924 F.3d at 1167–68 (affirming district court ruling that two instances of actual confusion

---

[14] Marriott also is wrong that courts are only narrowly concerned with purchasers, or confusion that occurs in the context of purchaser confusion. Actual "confusion need not always be that of a potential purchaser but can exist where the defendant duplicated the protected trademarks and sold them to the public knowing that the public would identify them as being the [plaintiffs'] trademarks." *Bentley Motors Corp. v. McEntegart*, 976 F. Supp. 2d 1297, 1311 (M.D. Fla. 2013) (quoting *Rolls-Royce Motors Ltd. v. A & A Fiberglass, Inc.*, 428 F. Supp. 689, 694 (N.D. Ga. 1976)); *see also Ewe Grp.*, 54 F. Supp. 3d at 1346 (noting that actual confusion evidence can include questions or inquiries from customers, friends, family, or acquaintances). And while Marriott tellingly has moved to exclude various evidence of confusion, such efforts are baseless. *See* Dkt. 741 (Opposition to Marriott's motion in limine re actual confusion testimony); Dkt. 746 (Opposition to Marriott's motion in limine re actual confusion evidence).

presented at trial were sufficient to support a finding of actual confusion); *Caliber Auto. Liquidators*, 605 F.3d at 938 n.29 ("Although the instances of actual customer confusion only number two, the confusion is not 'minimal.'"); *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1544 (11th Cir. 1986) (affirming finding of trade dress infringement and holding that "four bona fide instances of actual confusion are sufficient to support the district court's finding of actual confusion"); *Jellibeans*, 716 F.2d at 845 (affirming finding of infringement, in part because "survey evidence combined with the testimony of the three witnesses sufficiently support[ed] a finding of actual confusion"). "Taken as a whole," this evidence is more than "sufficient to support a finding of actual confusion by the consuming public." *Ewe Grp.,* 54 F. Supp. 3d at 1351; *see also PlayNation Play Sys.*, 924 F.3d at 1167–68 (affirming district court ruling that just two instances of actual confusion presented at trial were sufficient to support a finding of actual confusion and holding "the number of instances need not be large to be probative of confusion"). Thus, this factor favors Delta. Indeed, as the Court will hear, this evidence likely significantly undercounts confusion because consumers who are confused do not always know it, and thus do not report it, and even if they do realize it, they may not report it.

Aside from merely establishing this factor in Delta's favor, the confusion evidence also is relevant for another reason: it shows that Marriott's theories about how its lack of a "widget" logo design, use of the word "Marriott," or the presence

of third-party brands containing the word "delta" will dispel confusion, **are wrong**. Irrelevant third parties exist, Marriott uses the word "Marriott" with Delta Hotels, and Marriott does not use Delta's widget. Yet **still** confusion was so rampant that Marriott's own employees and marketing affiliates had to acknowledge year after year that confusion happened.

\* \* \*

For the foregoing reasons, each of the likelihood of confusion factors favors Delta, and they collectively point in only one direction: Marriott's use of the name "Delta" for its hotel chain is likely to cause (and indeed has caused) extensive confusion with Delta's famous DELTA Marks.

## III. MARRIOTT'S USE OF DELTA HOTELS CREATES A LIKELIHOOD OF DILUTION

In addition to trademark infringement, Marriott is liable for dilution of Delta's famous DELTA Marks under both state and federal law.[15] Dilution law grants extra protection to famous marks against a use that is likely to cause the plaintiff's mark

---

[15] As this Court explained on summary judgment, the dilution assessment is the same under state and federal law. Dkt. 574 at 14. The only difference is that state law requires only distinctiveness in Georgia, not fame, a threshold Delta easily meets. *See, e.g., Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 2008 WL 11407323, at \*14 (N.D. Ga. Sept. 30, 2008) (fame is not a required showing under O.C.G.A. § 10-1-451(b), but the mark must be distinctive) (citing *Corbitt Mfg. Co. v. GSO Am., Inc.*, 197 F. Supp. 2d 1368, 1379 (S.D. Ga. 2002)); *Reinalt-Thomas Corp. v. Mavis Tire Supply, LLC*, 391 F. Supp. 3d 1261, 1281 (N.D. Ga. 2019).

to "lose the ability to serve as a unique identifier of the plaintiff's product" without requiring "actual or likely confusion, competition, or actual economic injury." *Crossfit, Inc. v. Quinnie*, 232 F. Supp. 3d 1295, 1309 (N.D. Ga. 2017); *see also New Balance*, 424 F. Supp. 3d at 350 (dilution "grants extra protection to strong, well-recognized marks even in the absence of a likelihood of consumer confusion . . . if the defendant's use diminishes or dilutes the strong identification value associated with the plaintiff's famous mark") (quoting *Times Mirror Mags., Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 163 (3d Cir. 2000)).

In this case, Delta alleges dilution by "blurring." The Lanham Act defines dilution by blurring as the "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark[.]" 15 U.S.C. § 1125. Blurring occurs "when there is a possibility that the [plaintiff's] mark will lose its ability to serve as a unique identifier of an owner's products, due to another party's use." *New York City Triathlon, LLC v. NYC Triathlon Club, Inc*., 704 F. Supp. 2d 305, 322–23 (S.D.N.Y. 2010) (citation omitted). Given the nature of dilution, courts agree that dilution by blurring occurs gradually over time through repeated exposure to the defendant's mark, which whittles away at the distinctiveness or strength of the senior mark. *See, e.g.*, *Augusta Nat., Inc. v. Nw. Mut. Life Ins. Co.*, 1976 WL 21052, at *1 (S.D. Ga. Nov. 24, 1976) (blurring refers to the "gradual erosion of the value and significance of the [famous]

name"). In other words, blurring is likely to occur if there is a risk consumers will start associating the trademark at issue (here, Delta) with both the plaintiff and the defendant, when the mark had previously been associated primarily with the famous brand; the mark loses its ability to primarily call to mind the plaintiff.

To establish dilution by blurring, Delta must show that (1) its mark is "famous" among the general public in the United States and became famous before Marriott began using the DELTA HOTELS Marks in the United States, and (2) Marriott's DELTA HOTELS Marks are likely to cause dilution by blurring. 15 U.S.C. § 1125(c)(1).[16] The evidence will show that Delta meets both elements.

### A. The DELTA Marks Are Famous and Were Famous Before Marriott Began Using the DELTA HOTELS Marks

A famous mark is one that is widely recognized by the U.S. general consuming public as designating the source of the mark owner's goods and services. 15 U.S.C. §1125(c)(2)(A). In determining whether a mark is famous, courts consider factors such as: "(1) the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the

---

[16] Delta must also show that Marriott used the DELTA HOTELS mark in commerce, but there is no dispute as to this element. *See* Dkt. 574 at 38–39. Nor did Marriott dispute that, to the extent the mark is famous, it became famous before Marriott began using Delta Hotels. *Id.*

mark was registered." Dkt. 574 at 39 (quoting *Bell v. Foster*, 2013 WL 6229174, at *6 (N.D. Ga. Dec. 2, 2013).

On summary judgment, the Court found that "the above-factors weigh in favor of a finding that the DELTA Marks are famous for purposes of Delta's trademark dilution claims." *Id.* at 40 (citing *Delta*, 2015 WL 11242003, at *15. Other courts have also found Delta is famous or noted that it is. *Delta*, 2015 WL 11242003 at *15 ("***It cannot be contested that Delta's mark is a famous mark.***") (emphasis added); *Delta Air Lines, Inc. v. Influence Direct, LLC*, 2016 WL 310068, at *5 (M.D. Tenn. Jan. 15, 2016) ("The Court finds that Delta's marks are famous."); *Deere & Co. v. FIMCO Inc.*, 302 F. Supp. 3d 837, 895 (W.D. Ky. 2017), *superseded in part*, 301 F. Supp.3d 704 (W.D. Ky. 2018) (naming Delta as a brand courts have found famous); *New York City Triathlon*, 704 F. Supp. 2d at 322 (listing Delta as one of the "[n]umerous well-known and famous brands [that] have joined the team as sponsors" of plaintiff's sporting event); MCCARTHY §24:107 (Delta listed as one of the marks "held to be 'famous' under the criteria of the 2006 Trademark Dilution Revision Act").

Trial evidence will confirm that the DELTA marks are extraordinarily famous and distinctive, both throughout the United States and in Georgia, and were famous at least by 2015 when Marriott purchased DELTA HOTELS. Such evidence includes:

- **Length of Use:** Delta has used its DELTA Marks for nearly 100 years, and had been using the marks for almost 90 years when Marriott acquired Delta Hotels. Courts have found marks famous based on fewer years of use. *Nike Inc. v. Variety Wholesalers, Inc.*, 274 F. Supp. 2d 1352, 1356, 1372 (S.D. Ga. 2003), *aff'd*, 107 F. App'x 183 (11th Cir. 2004) (length of use supported fame when registrations for Nike's marks were issued between 1983 and 1989).

- **Advertising Scope:** Delta has engaged in extremely high-profile advertising for years, including airing commercials during the Super Bowl and Grammy's, sponsoring the Olympics, PTX-1061, sponsoring professional sports teams like the Atlanta Braves, Hawks, and Falcons, *see, e.g.,* PTX-0860, and partnering with other well-known brands like American Express, Starbucks, Uber, and Biscoff. Its advertising efforts have resulted in trillions of impressions per year starting as early as 2011. PTX-2640, PTX-3857, PTX-0903, PTX-0996, PTX-3785. Courts have found marks famous based on less evidence of advertising. *See George Nelson Found. v. Modernica, Inc.*, 12 F. Supp. 3d 635, 649 (S.D.N.Y. 2014) (finding fame where the plaintiff's mark appeared in well-known national magazines).

- **Advertising Expenditure:** Delta has spent over ███████████ annually on domestic advertising since 2009 (with the exception of 2020 and 2021). PTX-3853. In 2014 alone, Delta spent ███████████ on U.S. advertising. *Id.* Courts have found marks famous where less was spent on advertising. *See PODS Enters.*, 126 F. Supp. 3d at 1277 (finding fame at least since 2008 where PODS spent "$70 million in advertising by 2008 and in excess of $186 million in 2014").

- **Sales Data:** Since 2010, Delta has earned over ███████████ in domestic revenue *annually*. PTX-2658. This far exceeds what other courts have found sufficient to have a strong brand. *PODS Enters., LLC*, 126 F. Supp. 3d at 1277 (noting PODS had shown "nationwide network of locations and franchises and cumulative sales of more than $3 billion"); *Pepsico, Inc. v. #1 Wholesale, LLC*, 2007 WL 2142294, at *1, *4 (N.D. Ga. July 20, 2007) (finding PepsiCo's marks famous where it sold "billions of dollars worth of beverages, snack foods and merchandise under the PepsiCo Marks").

- **Website/App Visitors:** Delta's website and app have received upwards of 78 million visitors every month since 2017. Less evidence has supported a finding of fame. *Burberry Ltd. v. Euro Moda, Inc.*, 2009 WL 1675080, at *12 (S.D.N.Y. June 10, 2009) (hundreds of thousands of visitors per week to the Burberry website supported finding of fame).

- **Awards and Rankings:** Delta is America's most awarded airline. For example, since 2010, Delta has been named the top carrier for business travelers by Business Travel News. Fortune has ranked Delta the No. 11 spot on Fortune's World's Most Admired Companies since 2013, and No. 15 spot on Fortune's 100 Best Companies to Work For since 2017. In 2024, Delta was named No. 12 on the TIME's inaugural list of the "World's Best Companies." PTX-3789. Kantar, a leading marketing research company, ranked Delta in its since-discontinued list of Top 100 Most Valuable U.S. Brands from 2018-2020. PTX-0191; PTX-1087; PTX-1302.

- **Press Coverage:** Delta appeared in over 5,200 articles ***per year*** from 2000-2022, including in CNBC, Fox News, and Forbes. PTX-1077-PTX-1079; PTX-2646 at '841; PTX-2648 at '667. Since 2022, Delta has continued to garner significant attention from notable news sources, like CBS News and Wall Street Journal. *See, e.g.*, PTX-0999; PTX-3822; PTX-3793. Courts have found marks famous based on less. *See New York Yankees P'ship v. Iet Prods. & Servs., Inc.*, 114 U.S.P.Q.2d 1497 (T.T.A.B. 2015) ("THE HOUSE THAT RUTH BUILT" marks famous where 25 full-text articles from newspapers around the United States published during the years 2000 through 2007 that contained both the terms YANKEES and THE HOUSE THAT RUTH BUILT); *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456 (7th Cir. 2000) (likelihood of success in proving a likelihood of dilution in part because plaintiff's mark received "considerable media attention since its rollout in in 1988, appearing twice (March 26, 1990, and February 7, 1994) on the cover of Newsweek. In 1999 Fortune magazine named it one of the top six 'health and grooming' products of the 20th Century").

- **Registrations:** Delta owned 14 federal trademark registrations for its DELTA Marks as of 2015, and now owns 29 federal registrations. PTX-0001; PTX-0003; PTX-0004; PTX-0013; PTX-0050; PTX-0022; PTX-0027; PTX-0028; PTX-0032-41; PTX-0044-48; PTX-0051-56. Further, as of 2015, five of those registrations were incontestable and now 19 are. PTX-0001; PTX-0004; PTX-0013; PTX-0050; PTX-0022; PTX-0027; PTX-0028; PTX-0032-45. Such extensive registration also supports a finding of fame. *Visa*, 590 F. Supp. 2d at 1314; *Burberry*, 2009 WL 1675080 at *2, 12 (plaintiff's marks, for which plaintiff owned ten registrations, famous).

- **Survey Evidence:** Delta's 2020 survey from expert Dr. Deborah Jay shows that 90% or more of U.S. consumers recognize the DELTA Marks. Such high numbers exceed what courts have found support a finding of fame. *See e.g.*, *Deere*, 302 F. Supp.3d at 874 (holding that a fame survey where 74% of the

general public respondents identified John Deere as the brand or maker of green and yellow tractors was sufficient to show plaintiff's mark was famous and finding dilution.) *See* MCCARTHY § 24:106 ("[A] minimum threshold survey response should be in the range of 75% of the general consuming public of the United States.")

Delta's nearly century-long use of the DELTA Marks, breadth of advertising, tens of billions of dollars earned in revenue, long list of awards, receipt of extensive unsolicited press coverage, federal ownership of numerous DELTA Marks, and strong survey evidence compels the inevitable conclusion that Delta is indeed famous. *E.g.*, *Nike*, 274 F. Supp. 2d at 1372; *PODS Enters., LLC*, 126 F. Supp. 3d at 1277; *Burberry*, 2009 WL 1675080, at *12; *Pepsico, Inc.*, 2007 WL 2142294, at *4.

## B. The Evidence Will Show a Likelihood of Dilution by Blurring of the Famous DELTA Marks

The Lanham Act identifies six nonexclusive factors for assessing the likelihood of dilution by blurring: (1) the degree of similarity between the marks; (2) the degree of inherent or acquired distinctiveness of the famous mark; (3) the extent to which the owner of the famous mark is engaging in substantially exclusive use; (4) the degree of recognition of the famous mark; (5) whether the second user intended to create an association with the famous mark; and (6) any actual association between the marks. 15 U.S.C. § 1125(c). No one factor is dispositive. *See Diesel S.p.A, LLC*, 2022 WL 956223, at *17–19; *New Balance*, 424 F. Supp. 3d at 353; *Bentley Motors*, 976 F. Supp. 2d at 1314.

Marriott previously argued that dilution by blurring also requires a showing that Marriott's use actually dilutes the distinctiveness of the DELTA Marks through impairment. This Court resoundingly rejected this argument on summary judgment, and for good reason. Dkt. 574 at 41 n. 22. The Court explained that the law changed in 2006 to require that "a plaintiff need establish only likely dilution, *not* actual dilution," and "the Supreme Court case Marriott cite[d] in its brief was decided prior to these revisions." *Id.* (quotation omitted; emphasis in original). This makes sense, as dilution occurs over time, so it not possible to pinpoint a moment when distinctiveness is impaired. Further, the statutory dilution factors show whether the defendant's mark is likely to impair the distinctiveness of the plaintiff's mark; a separate assessment of impairment is not necessary or required. 15 U.S.C. § 1125(c). Accordingly, Delta is not required to establish actual impairment, and the Court will consider the six blurring factors "in determining whether Delta has established a likelihood of dilution by blurring as a matter of law." *Id.* The evidence will show that all six blurring factors favor Delta.

### 1.    *The Marks Are Similar*

The parties' marks share the identical dominant term: DELTA. Marriott has even issued marketing materials referring to Delta Hotels solely as "Delta," with no logo, thus confirming that "Delta" is the dominant part of the DELTA HOTELS Mark. *See, e.g.*, PTX-2873 ("Delta's first branded hotel;" "new Delta logo was

revealed;" "integration of the Delta brand into the Marriott family."). Delta, meanwhile, has used the phrase "Delta Hotels" on its website and phone answering service for its hotel booking service. And it owns an incontestable registration for the word DELTA alone, regardless of the form, which it uses extensively, along with its other DELTA Marks. *See* PTX-0001. This factor favors Delta, as courts have found similarity based on far less similar marks. *E.g.*, *Visa*, 590 F. Supp. 2d at 1318 (EVISA and VISA similar for dilution); *Nike, Inc. v. Nikepal Int'l, Inc.,* 2007 WL 2782030, at *7 (E.D. Cal. Sept. 18, 2007) (NIKEPAL and NIKE similar for dilution); *Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc.*, 642 F. Supp. 1031, 1037 (N.D. Ga. 1986) ( "Cabbage Patch Kids" and design similar to "Garbage Pail Kids" and design); *Bell*, 2013 WL 6229174, at *6 ("The New Jack the Rapper Convention" similar to "Jack the Rapper"); *JPMorgan Chase & Co. v. Chase Fin. Grp.*, 2007 WL 9702856, at *7 (N.D. Ga. May 14, 2007) ("Chase" and "Chase Financial Services" similar).

## 2. *The DELTA Marks Are Distinctive*

The second blurring factor considers the degree of inherent and acquired distinctiveness, similar to the analyses of conceptual and commercial strength discussed above. MCCARTHY § 24:120; *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 251 (S.D.N.Y. 2012). As this Court already held, the DELTA Marks are "arbitrary or fanciful and are thus conceptually strong." Dkt. 574 at 19. The DELTA

Marks have also acquired distinctiveness through Delta's decades of use, nationwide use, extensive advertising, high sales, numerous awards, and decades of press coverage. *Supra* Sections II.A.2 and III.A. This factor thus favors a likelihood of dilution by blurring.

### 3. *Delta's Use Is Substantially Exclusive*

This factor considers "[t]he *extent to which*" Delta's use of the DELTA Marks is "*substantially* exclusive." 15 U.S.C. §1125(c)(2)(B); *Cottonwood*, 778 F. Supp. 2d at 752. Exclusive use is not required; instead, the dilution analysis allows for "use by others which may be inconsequential or infringing and which therefore does not necessarily invalidate" plaintiff's claim. *Id.* (quotations omitted). In assessing whether use in inconsequential, courts consider *"the nature of"* each use, including its extent and the similarity of the marks and services. TMEP 1202.05(b); *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 1583 (Fed. Cir. 1988). The ultimate issue is whether third-party uses detract from the plaintiff's mark's distinctiveness, such that defendant's use is unlikely to cause dilution. *E.g.*, *Cottonwood*, 778 F. Supp. 2d at 752-53; *UMG Recordings, Inc. v. Mattel, Inc.*, 100 U.S.P.Q.2d 1868, *18 (T.T.A.B. 2011); *TIVO Brands LLC v. TIVOLI, LLC*, 2018 WL 6921323, at *18 (T.T.A.B. Dec. 31, 2018).

Here, the brand DELTA is strongly associated with Delta, as shown through Delta's fame survey, Delta's ranking in BrandZ's analyses of the most valuable

brands in the United States, the extensive press coverage for Delta, the longevity of Delta's use, and the breadth of Delta's advertising and services, which have created trillions of consumer impressions. *Supra* Sections II.A.2 and III.B.3. As Delta's marketing expert, Dr. Ravi Dhar, explains, no other company with "Delta" in its name holds a candle to Delta in terms of revenue, customer base, marketing, or consumer recognition. These other uses are thus inconsequential. *See Cottonwood*, 778 F. Supp. 2d at 752-53 (mark famous despite some third-party use of CASH STORE as small size, remote location, and use of other words with "cash store" by third parties rendered their uses "inconsequential").

The mistake Marriott and its experts make in discussing third party use is that they forget that not all uses are equal. Marriott's linguistic expert, Robert Leonard, for example, provides a list of third-party brands with Delta in the name to argue that "Delta" identifies many companies, and consumers do not assume "Delta" refers to one company. As Delta's rebuttal linguistic expert, Dr. Phillip Carter, will explain, these conclusions fail to take into account that the word "Delta" is over 2000% more likely to be used in American English to refer to Delta than to refer to the next closest brand. Specifically, in a common linguistic corpus for analyzing language (COCA) that both parties' experts use, the brand "Delta" appears in reference to Delta *at least 496* times. PTX-1453. As the Court will hear from Delta's linguistic expert, the next closest brand has only 22 hits. This indicates that other brands have not taken away

from the prominence or strength of the DELTA Marks, as Delta is by far the most dominant "Delta" brand in public discourse.

Delta's marketing expert, Dr. Dhar, will similarly explain that these third-party uses are so insignificant in terms of revenue and advertising, and/or so dissimilar from Delta and Marriott in terms of the services offered, consumers served, and/or the appearance of the marks that they are unlikely to impact the substantially exclusive nature of Delta's use. Rather, in light of the nature and scope of the third-party uses, such uses are inconsequential and immaterial to the dilution analysis. *See Cottonwood*, 778 F. Supp. 2d at 752-53; *UMG Recordings*, 100 U.S.P.Q.2d 1868 at *18; *TIVO Brands LLC*, 2018 WL 6921323 at *18.

Empirical survey evidence also supports Delta's position that these other companies have not impacted Delta's rights. Because Delta Dental and Delta Faucets are the two largest third-party Delta brands—by ad spend and revenue (though both are much smaller than Delta)— cited by Marriott, survey expert Dr. Itamar Simonson conducted surveys to assess whether consumers associate these brands with Delta. He found that they do not. Less than 4% of respondents in each of these surveys said that Delta Dental or Delta Faucets calls to mind Delta. In stark contrast, a survey of Delta Hotels that used the same survey methodology found that 29% of respondents thought Delta Hotels called to mind the DELTA Marks. These results strongly show that although consumers associate Delta Hotels with Delta, they do

not associate these other third-party brands with Delta. These other brands thus do not impact the fact, strength, or substantially exclusive nature of the DELTA marks.

*Finally*, the evidence will show that Delta has dozens of trademark registrations for its DELTA marks and has enforced its rights. This too supports a finding of substantially exclusive use. *New Balance*, 424 F. Supp. 3d at 352 (federal registration plus policing efforts supported finding the N design was substantially exclusive).

### 4.    *The DELTA Marks Are Widely Recognized*

As discussed above, the DELTA Marks are widely recognized. *Supra* Sections II.A.2 and III.A. As testimony and documents will show, (1) the DELTA brand is nearly 100 years old; (2) Delta serves over 200 million customers in the United States each year; (3) the DELTA brand has been ranked as one of the most valuable brands in the United States; (4) Delta advertises the DELTA Marks and associated services on some of the largest platforms in the world, such as the Super Bowl, Olympics, Grammy's, NFL, MLB, NBA, WNBA, NWSL, and PGA Tour; and (5) survey evidence shows that the DELTA Marks are widely recognized by consumers, both in Georgia and nationwide. This factor favors Delta. *E.g.*, *Gucci*, 868 F. Supp. 2d at 251; *Diesel S.p.A.*, 2022 WL 956223, at *18; *Spotify AB v. U.S. Software Inc.*, 2022 WL 110251, at *11, *16 (T.T.A.B. Jan. 10, 2022); *New Balance*, 424 F. Supp. 3d at 350–51.

### 5. *Marriott Intended to Create Association*

This factor considers whether the defendant "intended to create an association" with the famous brand. *New York City Triathlon*, 704 F. Supp. 2d 305 at 323. Here, for the reasons discussed above, Marriott plainly did. It code-named the acquisition ███████████████████████████████████████ ████████████ and redid the logo to mimic Delta's yet chose not to announce that change. *See supra* Section II.F. Internal documents ████████████████████, yet Marriott continued opening U.S. hotels that brought the brand ***closer*** to Delta, including by opening "airport" hotels, opening hotels in hub cities, and having aviation-themed restaurants on Delta Hotels properties. *Id.* This factor favors Delta. *E.g.*, *New York City Triathlon*, 704 F. Supp. 2d 305 at 323; *Nat'l Pork Bd. & Nat'l Pork Producers Council v. Sup. Lobster & Seafood Co.*, 96 U.S.P.Q.2d 1479, *20 (Jun. 11, 2010); *Nike*, 2007 WL 2782030, at *7.

### 6. *There Is Extensive Evidence of Actual Association*

The final dilution factor considers "actual association," meaning whether there is evidence that one mark "brings to mind" or "calls to mind" the other, even if there is no confusion. *Visa Int'l Serv. Ass'n v. JSL Corp.,* 610 F.3d 1088, 1090 (9th Cir. 2010) (dilution occurs when a mark "brings to mind" two products, even if they are not confused as to the source of a product); McCarthy § 24:117 (association in dilution law means "that the ordinary person on encountering the junior user's mark

will *think of* the senior user's famous mark. Or in other words, the accused mark will call to mind the senior user's famous mark."). Here, substantial evidence shows that consumers *actually associate* Delta Hotels with Delta. Therefore, not only is association likely; it has actually occurred.

**First**, the extensive, anecdotal evidence of confusion discussed above also supports a finding of association. *PODS Enters.,* 126 F. Supp. 3d at 1278 (evidence of "at least some actual confusion" supported a finding of dilution by blurring) *see also New Balance*, 424 F. Supp. 3d at 352 ("Survey results showing actual confusion . . . is one way to establish actual association."). While association is a less exacting standard, all confused consumers also (by definition) mentally associate the two marks. There is thus ample evidence of association, including consumers complaints (*e.g.*, as a Marriott consumer wrote ████████████████████████ ██████████████████████████████████████ PTX-0310 at '823); press articles associating the names (*e.g.*, PTX-3318; *see also* PTX-3313); Google data reflecting that consumers have asked whether the entities are connected (*e.g.*, PTX-3371; PTX-1538; PTX-1481; PTX-3375; PTX-3345; PTX-3373; PTX-3376; PTX-3374; PTX-3723); and Marriott's internal documents noting, repeatedly, that ████████████████████████ (*e.g.*, PTX-0238 at '358 (stating Marriott would ██████████████████████ that the ████ ████████████████ ; PTX-1093 at '036 (████████████████████

█████████████████████ ). Such proof of actual association strongly supports a finding of dilution. *E.g.*, *Apple, Inc. v. Samsung Elecs. Co.,* 920 F. Supp. 2d 1079, 1098 (N.D. Cal. 2013) (press associating the products supported dilution) *aff'd in part, rev'd in part on other grounds,* 786 F.3d 983 (Fed. Cir. 2015), *rev'd and remanded,* 580 U.S. 53 (2016); *New York City Triathlon*, 704 F. Supp. 2d at 323 (that a "sophisticated member of the triathlon community associated Defendant's triathlon club with Plaintiff's operations" supported dilution).

**Second**, survey evidence also supports a finding of association. As this Court will hear, Delta's expert Sarah Parikh conducted an association survey of U.S. consumers using widely accepted questions for assessing association in the context of a dilution claim. Dr. Parikh's surveys found an overall association rate of 29%. Such results support a finding of association. *E.g.*, *Jada Toys, Inc. v. Mattel, Inc.,* 518 F.3d 628, 636 (9th Cir. 2008) (surveys with rates of 28% and 7% "indicate that consumers associate one mark with the other"); *Gucci*, 868 F. Supp. 2d at 233 (12% "valid, relevant evidence" of the likelihood of association). Marriott presented a rebuttal survey to purportedly "correct" Dr. Parikh's survey. This survey is deeply flawed as it used vague, leading questions and did not ensure that respondents were responding to the Delta Hotels brand as opposed to another hotel.[17] Yet what is most

---

[17] The survey showed respondents a website that referred to Delta Hotels and dozens of other Marriott brands. The survey questions then asked respondents what they "associate" with the "hotel" on the webpage. Although Marriott's expert Dr. Chorn

striking is that despite these problems it ***still*** resulted in an association rate of 10.9%, which ***supports*** Delta's dilution claim. *E.g.*, *Jada Toys*, 518 F.3d at 636 (7%); *Gucci*, 868 F. Supp. 2d at 233 (12%).

Actual association "is not necessary to prevail on a dilution claim." *New Balance*, 424 F. Supp. 3d at 352–53. Here, however, the ample evidence of actual association further supports a finding that Marriott's DELTA HOTELS Marks dilute the distinctiveness of Delta's famous DELTA Marks.

## IV.    MARRIOTT CANNOT ESTABLISH LACHES

To succeed on its laches defense, Marriott has the burden and "must demonstrate" (1) Delta delayed in asserting a right or claim; (2) the delay was not excusable; and (3) the delay caused Marriott undue prejudice. *Kason Indus., Inc. v. Component Hardware Grp., Inc*., 120 F.3d 1199, 1206 (11th Cir. 1997). Marriott cannot meet its burden on any element.[18]

---

intended to test reactions to Delta Hotels, respondents could have been reacting to any of the other hotels on the page.

[18] Even if Marriott could succeed on its laches defense—and it cannot—that would only be a defense against Delta's claims for monetary relief, *not* injunctive relief. *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008) ("Laches and acquiescence are inapplicable to the facts of this case because the public is confused. . . . Laches or acquiescence do not preclude the Court's issuance of an injunction to prevent further acts of trademark confusion by [defendants]."); *Top Tobacco, L.P. v. Star Importers & Wholesalers, Inc*., 2021 WL 4081627, at *12 n.16 (N.D. Ga. Sept. 7, 2021) ("The existence of laches, even if proven, would not prevent the issuance of injunctive relief to prevent further acts of trademark infringement. Even in cases where laches bars a suit for damages due to inequity to the infringer, the Court may still grant injunctive relief to avoid 'putting

## A.    Marriott Cannot Prove that Delta Delayed

As this Court explained in its summary judgment order, "where the delay in asserting the right or claim is 'less than four years,' 'the plaintiff's claims are not barred by laches.'" Dkt. 574 at 45 (quoting *Unique Sports Prods., Inc. v. Babolat VS*, 403 F. Supp. 2d 1229, 1241 (N.D. Ga. 2005)); *Kason Indus.*, 120 F. 3d at 1204-05 (applying four-year limitations period set forth in O.C.G.A. § 9-3-31 for laches purposes in Lanham Act suit brought in Georgia).

To evaluate delay, courts do not merely look at the defendant's date of first use or the date when the plaintiff first became aware of some level of infringement. *Id.* at 1206; MCCARTHY § 31:19 (explaining that under the Eleventh Circuit's decision in *Kason*, it is "error to measure delay from the date that the trademark owner was first aware of some level of infringement"). Instead, "delay is to be measured from the time at which the plaintiff knows or should know she has a ***provable claim for infringement***," bearing in mind that plaintiffs are under "no obligation to sue until 'the likelihood of confusion ***looms large***.'" *Kason Indus.*, 120 F.3d at 1206 (court erred by focusing on date 9 years earlier when plaintiff sent a

---

a judicial stamp of approval on conduct which will confuse customers.'") (quoting 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31.10 (4th ed. 1997)); *Rolls-Royce Motors*, 428 F. Supp. at 696 ("[L]aches goes only to the propriety of damages [and] does not bar injunctive relief against future infringements[.]"); *Kason Indus.*, 120 F.3d at 1207 (injunctive relief not barred by laches). Marriott has conceded this point as well. Dkt. 516 at 54 n.26.

letter to defendant) (emphasis added); *Rolex Watch U.S.A., Inc. v. Jewelry Unlimited, Inc.*, 757 F. Supp. 3d 1342, 1366 (N.D. Ga. 2024) ("[T]he law is clear that the period for laches does not start when a plaintiff first had notice that its mark was being used . . . but rather when a plaintiff believes it has a provable claim."); *Buccellati Holding Italia SPA v. Laura Buccellati, LLC*, 5 F. Supp. 3d 1368, 1375 (S.D. Fla. 2014) ("Delay is measured from the time the plaintiff knew or should have known that it had a provable claim for infringement, but it is under no obligation to sue until the likelihood of confusion looms large."); Dkt. 574 at 46. Because delay does not begin upon first use, the delay analysis considers factors such as "progressive encroachment, damage the plaintiff was suffering, and the likelihood of confusion at the time the plaintiff sued." *Kason Indus.*, 120 F.3d at 1206. As Professor McCarthy explained in his canonical treatise on trademark law:

> Laches is not measured from defendant's first unpermitted use of the contested mark. Laches is measured from the date when there was an infringing use sufficient to require legal protest and possible lawsuit. In most cases, this requires legal action only when defendant's infringing acts significantly impact on plaintiff's good will and business reputation.

McCARTHY § 31.19 (collecting cases).

Additionally, it is well established that settlement negotiations toll the laches clock. *Cross Country Home Servs., Inc. v. Home Serv. USA Corp.*, 2010 WL 331752, at *10 (S.D. Fla. Jan. 20, 2010) (for laches "the time the parties were negotiating is not counted in calculating the delay"). The proper analysis is, thus, from when a

plaintiff had a provable claim of infringement that loomed large until the parties began settlement discussions. *Id.*

On summary judgment, this Court dismissed Marriott's laches claim for the period prior to April 2015. Dkt. 574 at 47-52. Therefore, to establish the first element of laches at trial, Marriott must prove that (1) Delta knew or should have known of a provable claim against Marriott that loomed large sometime between April 2015 and March 11, 2016—four years before Delta filed this lawsuit on March 11, 2016 *and* (2) the parties' 19 months of settlement discussions beginning in August 2018 did not toll the laches period. It cannot. Its laches claim thus fails at the very first element (and for similar reasons, it fails the second element of laches as well).

1. ***Marriott Cannot Prove Delta Knew or Should Have Known of a Provable Claim that Loomed Large Before March 11, 2016***

Marriott cannot prove that Delta either knew or should have known of a provable claim, or a claim that "loomed large," before March 11, 2016. Rather, Delta did not know of, and had no reason to know of, a provable claim until long after that date.

a. Marriott Cannot Prove Delta Knew of a Provable Claim Against Marriott More Than Four Years Before Delta Initiated This Action

As an initial matter, trial testimony will show that no one with relevant trademark responsibilities was aware of Marriott's U.S. usage until July 2018. *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 363 (2d Cir. 1959) (knowledge

by someone with "no duty to investigate" unauthorized trademark usage not imputed to company); *Plasticolor Molded Prods. v. Ford Motor Co.,* 698 F. Supp. 199 (C.D. Cal. 1988) (a large corporation with many employees who have no role in trademark enforcement is not charged with their knowledge of defendant's trademark infringement); MCCARTHY §31:39. As discussed in greater detail below, Delta then immediately raised the issue with Marriott and entered into settlement discussions to resolve the dispute. Marriott thus cannot prove Delta "knew" of a provable claim more than four years before filing this action.

b.     <u>Marriott Cannot Prove Delta Should Have Known of a Provable Claim Against Marriott More Than Four Years Before Delta Initiated This Action</u>

Marriott also cannot establish that Delta "should have known" of a provable claim against Marriott that loomed large before March 11, 2016.

i.     *Marriott Did Not Have the Grand Opening of Its First U.S. Delta Hotels Location Until April 21, 2016*

Marriott did not have the official grand opening of its ***first*** U.S. Delta Hotels location until April 21, 2016—***fewer than*** four years before Delta filed this matter. In other words, this grand opening was less than four years before Delta initiated this lawsuit. Marriott's own press release from April 21, 2016 confirms this, as it states that "Delta Hotels and Resorts announced today the official grand opening of the Delta Orlando Lake Buena Vista . . . Delta's first branded hotel in the United States":

## Marriott International Expands Delta Hotels and Resorts Globally With Opening Of First U.S. Property

APRIL 21, 2016 — ORLANDO, FLA



*Delta Hotels officially first hotel in U.S.; Delta Orlando Lake Buena Vista*

Delta Hotels and Resorts announced today the official grand opening of the Delta Orlando Lake Buena Vista in partnership with JHM Hotels. This is Delta's first branded hotel in the United States and signals the global expansion of the Delta brand. A new Delta logo was revealed in conjunction with the official grand opening as part of the integration of the Delta brand into the Marriott family.

PTX-2873 at '342. Marriott also did not "reveal[]" its "new Delta logo" until this "official grand opening," and even then, it did not show this new logo in its press release. *Id*. As noted above, Marriott's CEO rejected a ████████████████ ████████████████████████████. PTX-0206 at 1; PTX-0209 at '894; PTX-2628 at '600

This grand opening announcement alone resolves the question of whether Delta "should have known" of a provable claim against Marriott more than four years before Delta filed this lawsuit. Marriott cannot prove that Delta **should have known** of a claim that "loom[ed] large" before Marriott had the grand opening of its **first** U.S. property. *See Kason Indus.*, 120 F.3d at 1206.

ii. *Under the Doctrine of Progressive Encroachment, the Relevant Period Does Not Begin Until Years After March 11, 2016*

The progressive encroachment doctrine also shows that Marriott cannot prove Delta should not have known of a provable claim that loomed large prior to March 11, 2016; indeed, under this doctrine, the delay period would not begin until years after March 11, 2016. Under the progressive encroachment doctrine, when "a defendant begins use of a trademark or trade dress in the market, and then directs its marketing or manufacturing efforts such that it is placed more squarely in competition with the plaintiff, the plaintiff's delay is excused." *Kason Indus.*, 120 F.3d at 1205. This is precisely what happened here.

When Marriott acquired the Delta Hotels brand, there were no Delta Hotels properties in the United States. Consistent with Delta Hotels' lack of U.S. presence, Marriott issued a press release on January 27, 2015 (long before the press release pasted above) announcing that agreements for the acquisition of Delta Hotels had been signed and suggesting that Marriott would use the Delta Hotels brand in international markets only, not in the United States. *See* PTX-0192 at '597 ("[w]hen completed, the transaction will increase Marriott's distribution in *Canada . . .* making Marriott the largest full service hotel company in *Canada*;" "Delta has an impressive portfolio of hotels that are among the most preferred in *Canada*. With this acquisition, we are continuing our focus on building our brand portfolio and

growing in attractive regions *outside the U.S.*") (emphasis added).

Marriott then waited *a full year*, until April 2016, before the grand opening of its first Delta Hotels properties in the United States, *i.e.*, the hotel described above in Section IV.A.1.a. PTX-2873. Not only was Delta unaware of this opening, there also was no reason for it to act based on a single opening had it known. Rather, it is reasonable that a plaintiff would wait to see whether this *single* hotel in Orlando would blossom into a national chain or instead remain an isolated usage. *See Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 366 (6th Cir. 1985) ("A reasonable businessman should be afforded some latitude to assess both the impact of another's use of an allegedly infringing trademark as well as the wisdom of pursuing litigation on the issue.").

After the Orlando Lake Buena Vista Hotel, Marriott waited *nine months* before opening another Delta Hotels property (on January 16, 2017 in Baltimore, Maryland). PTX-0216 at '181. By the close of 2017, over two and a half year after the acquisition, there were only 11 Delta Hotels locations in the United States—and none in cities where Delta has a hub. *Id*.

But then Marriott encroached further. From January to June 2018, it opened *seven* new Delta Hotels properties, a 63% increase. *Id*. Put another way, Marriott opened just 11 U.S. Delta Hotels properties in the 32 months from its acquisition through December 2017, but then opened 7 hotels in only 6 months to start 2018. *Id*.

Moreover, **four** of those new hotels were in Delta hub cities (Anaheim in Los Angeles, Detroit, Minneapolis, and Seattle) and one of them was labeled an "airport" hotel located just minutes from Delta's hub at the Detroit airport. *Id*.

Unsurprisingly, Delta became aware of Marriott's U.S. usage just after this ramp up and, as discussed below, complained to Marriott almost immediately thereafter. Around the same time, Delta's legal team also was put on notice of an actual instance of confusion for the first time in September 2018, when, as this Court will hear, Kevin Warren, then President and Chief Operating Officer of the Minnesota Vikings, told Delta's Chief External Affairs Officer that he saw Delta Hotels signage and assumed Delta had started offering hotel services.

In short, prior to June 2018, there were only a handful of Delta Hotels in a few non-hub locations and Marriott had purposefully kept those hotels under the radar through its misleading press releases and the CEO's decision ████████████ ██████████████████████. But as of June 2018, Marriott positioned itself squarely in those markets and locations where Delta is most known. Under the progressive encroachment doctrine, the appropriate start date for this Court's laches analysis is 2018 when Marriott showed it would expand aggressively, including into hub cities, after its prior, lackadaisical growth. Only then did the infringement "loom large." *See Kason Indus.*, 120 F.3d at 1206 (vacating laches finding because plaintiff's knowledge of defendant's infringing products was not relevant until those

products began competing); *Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Credito Oriental,* 698 F.3d 9, 22 (1st Cir. 2012) (no delay despite over 40 years of coexistence because plaintiff acted shortly after defendant expanded the "reach" of its operations and advertising); *Sara Lee Corp. v. Kayser-Roth Corp.,* 81 F.3d 455, 462 (4th Cir. 1996) (no delay where plaintiff "chose to delay its pursuit of a remedy until its right to protection had clearly ripened").

c.    Marriott's Arguments that the Delay Period Begins Before March 11, 2016 Fail

In the face of this (and other) evidence, Marriott strains to argue that Delta knew or should have known of a provable claim before March 11, 2016. This position is untenable. It requires finding the Delta should have known of a provable claim *before* Marriott's official grand opening and announcement of its first hotel; *before* Marriott unveiled its logo; *before* Marriott revealed how, where, and to whom it would market Delta Hotels; *before* Marriott expanded beyond a single property in a non-hub city; *before* there was enough use for Delta to determine whether Delta Hotels would cause harm; and *before* Delta was on notice of actual instances of confusion. Forcing litigants to court without this material information makes no sense, is contrary to the law, and would only burden courts and parties with premature litigation based on undeveloped facts and theories.

None of Marriott's arguments proves otherwise. ***First***, Delta anticipates that Marriott will argue it "soft launched" the Orlando Lake Buena Vista hotel prior to

March 11, 2016. But despite ample discovery, Marriott has yet to provide a concrete date when this purported soft launch began or information about what the hotel looked like or what logo it used (if any). In any case, for the reasons discussed, the at-best scantly advertised, unofficial opening of a *single* hotel does not start the laches clock. There is no proof that anyone responsible for trademark enforcement at Delta should have known of this unofficial launch, let alone that Delta should have known of a provable claim based on an unofficial, purported opening. *Dawn Donut Co.*, 267 F.2d at 363 (knowledge by someone with "no duty to investigate" unauthorized trademark usage not imputed to company); MCCARTHY §31:39. The law is clear that litigants can, and should, wait to see if this type of one-off usage presents an actual threat before coming to court. *See, e.g.*, *Kason Indus.*, 120 F.3d at 1206 (the delay analysis is not based on first use, but must instead consider progressive encroachment, likelihood of confusion, and the "damage the plaintiff was suffering" to determine when the laches period starts); MCCARTHY § 31.19 ("Laches is not measured from defendant's first unpermitted use of the contested mark. Laches is measured from the date when there was an infringing use sufficient to require legal protest and possible lawsuit. In most cases, this requires legal action only when defendant's infringing acts significantly impact on plaintiff's good will and business reputation.").

This Court's summary judgment decision confirms that this single Marriott

hotel was not enough to start the laches clock. At summary judgment, Marriott argued that the laches period should have begun based on the prior, Canadian owner's long-abandoned Delta Court of Flags hotel in Orlando. This Court disagreed, holding that this was irrelevant because Delta Court of Flags was only a "single property" that "operated using a different mark." Dkt. 574 at 47. So too here. Marriott's Delta Hotels Orlando Lake Buena Vista was a "single" hotel that, to the extent it had a "soft launch" prior to April 2016, did so under a "different" logo than Marriott uses now.[19] PTX-2873.

Moreover, merely having a possible soft launch that most people would not have heard about at all, and was not extensively advertised, is not enough to trigger a claim anyway. As explained above, the "official grand opening" of this hotel did not occur until April 2016, fewer than four years before Delta initiated this lawsuit. PTX-2873. Delta also does not monitor every hotel opening, nor is it required to, so there was no reason for it to know about the alleged soft opening of this one hotel in a non-hub city. *Plasticolor Molded Prods.,* 698 F. Supp. 199 (knowledge not expected of plaintiff where defendant's sales were minimal and any of plaintiff's employees defendant alleged knew of the infringement had no role in trademark

---

[19] Internal Marriott documents also show that this pre-opening was not successful. PTX-0292 (February 2016 emails stating that "[h]otel occupancy is not good"). This further supports Delta's argument. There would have been no reason for it to know about an unsuccessful soft launch, and if it somehow had known (it did not), it would be reasonable to wait to see if the hotel would cause harm, or instead fold.

enforcement); *National Trailways Bus System v. Trailway Van Lines, Inc.*, 269 F. Supp. 352, 359 (E.D. N.Y. 1965) (knowledge not expected based on defendant's publication in telephone directory). And regardless of whether it knew or not, this purported opening would be insufficient to start the laches clock.[20]

*Second*, Marriott will likely argue that in February 2016, it filed a Notice of Opposition against Delta's registration of the DELTA ONE mark with the United States Patent and Trademark Office. But nothing in that filing said that Marriott had opened, or planned to open, Delta Hotels properties across the United States, let alone what those hotels and the associated logo would look like. DTX-1430 at '357-362. As a matter of TTAB procedure, Marriott could have objected without having a single U.S. Delta Hotel. Indeed, early in this case, Marriott moved to dismiss Delta's declaratory judgment claim related to this opposition on the ground that it related only to the abstract right to registration and had nothing to do with use of the marks in question. *See* Dkt. 29-1 (arguing that ruling on a declaratory judgment claim related to the opposition would merely be "an advisory opinion on whether [a] hypothetical offering might infringe"). Marriott explicitly argued that a "defendant's opposition to plaintiff's trademark registration . . . . is insufficient to create an actual

---

[20] Marriott has also indicated that it intends to rely on the fact that some Delta crew members or distressed passengers stayed at Delta Hotels properties. Fatally, Marriott cannot prove any of this occurred before March 11, 2016 or involved persons with relevant responsibilities at Delta.

controversy based on infringement." *Id.* at 11-12 (quoting *Vina Casa Tamaya S.A. v. Oakville Hills Cellar, Inc.*, 784 F. Supp. 2d 391, 396-397 (S.D.N.Y. 2011)). Thus, as Marriott's own argument establishes, merely filing an opposition is not enough to give rise to a significant infringement claim as required to start the laches clock. Dkt. 574 (Court Order regarding pending motions) at 46 ("Neither does merely registering the supposedly infringing mark in the United States begin the laches period."); *Valmor Prods. Co v. Standard Prods. Corp.*, 464 F.2d 200, 204 (1st Cir. 1972); MCCARTHY § 31.40.

**Third**, Marriott may also point to a statement Delta made in late 2019 in connection with the opposition proceeding, in which Delta stated that as of May 6, 2015, it was "aware" that Marriott and its predecessor-in-interest had (1) "made filings for various marks for hotel-related goods and services that included the word 'Delta,'" and (2) "generally used those marks" with the old logos. DTX-1430 at '470. Such "awareness" of Marriott's predecessor's historic "general use" outside the United States does not establish that Delta knew or should have known of a provable claim **in the United States** in May 2015, let alone one that loomed large. Indeed, the argument makes no sense. There were no Delta Hotels properties in the United States in May 2015. Therefore, it is not clear what possible claim Delta could have brought in May 2015 without its case being dismissed for lack of ripeness. *See Rolex Watch*, 757 F. Supp. 3d at 1366 ("The period for laches does not begin when

an investigation begins but rather when a plaintiff believes it has a provable claim."); *cf. Sara Lee,* 81 F.3d at 461 (noting the trademark owner's dilemma that if it "waits for substantial injury and evidence of actual confusion, it may be faced with a laches defense. If it rushes immediately into litigation, it may have little or no evidence of actual confusion and real commercial damage, may appear at a psychological disadvantage as 'shooting from the hip' and may even face a counterclaim for overly aggressive use of litigation" and finding trademark owner should be allowed to wait) (quoting 4 MᴄCᴀʀᴛʜʏ § 31.06[2][c]).

Further, as this Court has already explained, "merely registering the supposedly infringing mark in the United States" does not begin the laches period. Dkt. 574 at 46; *see also* MᴄCᴀʀᴛʜʏ §31:40 ("the trademark owner is put on notice for laches only by real world events, not by . . . a registration by defendant"). Thus, Delta's purported awareness of filings for various trademarks prior to March 2016 is irrelevant.

In short, Marriott cannot prove that the delay period here began more than four years before Delta initiated this action. Thus, Marriott cannot satisfy the first element of its laches claim.

> 2. ***Even if the Delay Period Began Earlier than March 11, 2016, Settlement Discussions Tolled the Laches Period Beginning August 6, 2018***

Marriott's delay argument also fails for the second, independent reason that

even if the delay period began earlier than March 11, 2016, settlement discussions tolled the laches period. It is well-settled that time spent negotiating settlement "is not counted in calculating the delay." *Cross Country Home*, 2010 WL 331752, at *10; MCCARTHY § 31:15 ("Time spent in attempting to resolve a dispute is not counted towards laches.") (collecting cases). This makes sense, as settlement "is a highly favored course of conduct for which a party should be rewarded, not penalized." *Varitronics Sys., Inc. v. Merlin Equip., Inc.*, 682 F. Supp. 1203, 1209 (S.D. Fla. 1988). Finding otherwise would undermine the strong public policy in favor of settlement, as it would discourage plaintiffs from entering into settlement negotiations for fear that the negotiation period would be used against them. *See id.* It would also encourage defendants to enter into sham discussions just to run out the laches clock.

As Delta's witness will explain at trial, Delta's outside counsel reached out to Marriott on August 6, 2018 to raise concerns about Marriott's use of the DELTA HOTELS trademark in the United States. Delta and Marriott then entered settlement negotiations related to this matter for 19 months before Delta filed suit, which Marriott itself described as "extensive and lengthy." Dkt. 33 ¶45. While Marriott has argued that these negotiations related only to the Delta Hotels logo, the Court will hear that the purpose of the discussions was to resolve the parties' *entire* dispute regarding the Delta Hotels brand. In other words, had the parties reached agreement

during those discussions, they would not be in court today.

Thus, there can be no laches because these settlement discussions beginning in August 2018 toll the laches clock. *Varitronics*, 682 F. Supp. at 1209; *Buccellati Holding Italia*, 5 F. Supp. 3d at 1375 (no laches despite 4-year and 7-month delay because "the parties were in constant communication, in an attempt to ascertain whether a peaceful co-existence was possible" and plaintiffs "continued to lodge formal and informal objections"). Because the time from settlement discussions to the filing of the complaint is tolled, taking this tolling into account means that even if the laches clock began before March 11, 2016 (or indeed, any time back to August 2014, which is four years before August 2018), Delta's suit is still timely. Therefore, because these settlement discussions tolled the laches period, Marriott cannot establish that Delta delayed. *Cross Country*, 2010 WL 331752, at *10 ("the time the parties were negotiating is not counted in calculating the delay"); *Varitronics*, 682 F. Supp. at 1209; *Buccellati Holding Italia*, 5 F. Supp. 3d at 1375.

It is also important to note that this dispute regarding Marriott's U.S. expansion of DELTA HOTELS was not the only trademark dispute the parties were handling during this time. Rather, in February 2016, Marriott initiated a trademark opposition proceeding in the United States Patent and Trademark Office against Delta's trademark application for DELTA ONE arguing, in stark contrast to its position in this litigation, that there *is* a likelihood of confusion between the parties'

respective DELTA marks. On July 11, 2016, Marriott initiated an opposition against Delta's trademark application for DELTA ONE AT LAX. And on January 10, 2018, it opposed an application for DELTA SKY CLUB. Although none of these proceedings involved Marriott's *use* of the DELTA HOTELS Marks, the need to address other trademark disputes is a widely recognized excuse for delay. MCCARTHY § 31:16 (a "common reason given for delay is 'other litigation.' That is, the trademark owner was engaged in litigation with others over the validity and infringement of the mark."); *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1033 (Fed. Cir. 1992), *abrogated on other grounds by SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328 (2017) (Excuses which have been recognized . . . include . . . other litigation"). In fact, *both parties* recognized as much during these opposition proceedings, as they sought several stays on the basis that, among other things, they are "large multinational corporations" dealing with "many trademark matters." PTX-1430 at '391, '397. Just as the need to address other trademark disputes excused delay in the proceedings before the Trademark Office, it excuses any purported delay here as well. *See* MCCARTHY § 31:16. And of course, as discussed above, the negotiations between the parties concerned all issues, not just the logo.

### B. Marriot Cannot Prove Any Purported Delay Was Inexcusable

The second laches element considers whether the defendant has shown that

the plaintiff's delay was not excusable. *Kason Indus.*, 120 F.3d at 1206. Even if there was delay, Marriott has not proved that the delay was inexcusable. Rather, for many of the reasons discussed above, any purported delay *was* excusable. *Kason Indus.*, 120 F.3d at 1206 (explaining that measuring the delay and determining whether it is excusable often overlap).

*First*, as detailed above, Delta did not know about, or have any reason to know about, Marriott's use of the DELTA HOTELS Marks prior to the March 11, 2016, four years before Delta filed suit on March 11, 2020. Instead, as discussed above, the "official grand opening" of the first Delta Hotels property in the U.S. was not until *April* 2016.

*Second*, regardless of whether Delta knew about this soft launch (it did not), it would have been reasonable for Delta to wait to see whether this soft launch of a single location would expand into a national brand that would harm Delta before taking action. Indeed, courts and litigants have limited resources, so are encouraged *not to* run to court over every small infraction. Rather, laches law *excuses* parties from taking action until the threat of infringement "looms large" and the parties have more information about actual confusion, harm, the scope of use, and all of the other factors relevant to a confusion analysis. *Supra* Section IV.A.1.

*Third*, as discussed above, this is a classic case of progressive encroachment. Again, Delta did not know about Marriott's U.S. use until July 2018, but regardless,

under the progressive encroachment doctrine, it would have been excused from acting until 2018, when it became clear that Marriott's use of the DELTA HOTELS mark presented a "significant danger to the mark." *Supra* Section IV.A.1.b.ii; MCCARTHY § 31:20.

**Finally**, any purported delay was also excusable because Delta tried to first resolve this dispute through settlement. *Supra* Section IV.A.c; *Varitronics*, 682 F. Supp. at 1209 (finding delay "excusable inasmuch as [plaintiff] was attempting, through the negotiation of the dealership agreement, to avoid resorting to the judicial process for relief").

### C.    Marriott Will Not Meet Its Burden of Establishing Prejudice

In addition to proving (1) that there was a delay greater than 4 years, and (2) that the delay was inexcusable, Marriott must prove (3) that it was prejudiced by Delta's purported delay to succeed on its laches defense. Courts recognize two types of prejudice from delay: "prejudice at trial due to loss of evidence or memory of witnesses, and economic prejudice based on loss of time or money or foregone opportunity." *Top Tobacco*, 2021 WL 4081627, at *12. Neither exists here.

There are no missing documents, missing witnesses, or other losses of evidence or memories from Delta waiting until settlement negotiations broke down

and its claim was ripe to start this lawsuit.[21]

Marriott also cannot show economic prejudice. The vast majority of Marriott's claimed harm consists of the ▮▮▮▮▮ purchase price for the Delta Hotels brand. However, the Court has already rejected "any laches argument regarding conduct prior to Marriott's 2015 acquisition of the Delta Hotels brand," including any prejudice allegedly caused by pre-acquisition conduct. Dkt. 574 at 50 n.28. Because there was no delay before the acquisition, Marriott of course cannot claim that it entered into the acquisition—including paying the purchase price—in reliance on any such delay. *See id.* at 48 ("assuming *arguendo* that Delta delayed in bringing suit prior to Marriott's 2015 acquisition of the Delta Hotels brand, that delay is excused as a matter of law[.]").

In addition, Marriott cannot claim prejudice for the additional reason that the purchase price for the Delta Hotels brand was based on the value of the Canadian hotel contracts in existence at the time of the acquisition. In other words, Marriott's purchase price was economically justified purely as a Canadian investment and anything it has made in the United States or elsewhere is a windfall. PTX-0406 at -

---

[21] At summary judgment, the Court already considered and rejected Marriott's assertion of lost memories and evidence related to alleged delay prior to its acquisition of the Delta Hotels brand. *See* Dkt. 574 at 50 n.28 ("Because the Court grants Delta summary judgment on any laches argument regarding conduct prior to Marriott's 2015 acquisition of the Delta Hotels brand, even if Marriott presents evidence of prejudice from the time period before that acquisition . . . it is irrelevant.").

60, -70, -77, -79, -81-82, -84.

As for alleged economic harm after the acquisition, mere advertising or marketing expenditure is not enough. *Top Tobacco*, 2021 WL 4081627, at *12 (quoting *Ford Motor Co. v. O.E. Wheel Dists., LLC*, 868 F. Supp. 2d 1350, 1366 (M.D. Fla. 2012)). Rather, the purpose of the laches defense is "to protect those defendants who spend time, effort, and money building their reputation under a particular brand name" while a plaintiff sits idly by allowing them to do so. *Ford Motor*, 868 F. Supp. 2d at 1366. In other words, economic harm means showing that there are actions the defendant "would not have taken or consequences it would not have experienced had the plaintiff brought suit" sooner. McCarthy § 31:12.

As an initial matter, Marriott did not build ***any*** reputation in the DELTA HOTELS brand prior to Delta taking action. Instead, numerous internal documents show that the Delta Hotels brand suffered from a ***lack*** of brand awareness. *See, e.g.*, PTX-0238 at '358 (March 2019 Brand Executive Summary referring to "relatively low awareness" outside Canada); PTX-3752 at '140 (October 2018 Marriott Global Media brief stating, "awareness is low"); PTX-3735 at '887 (August 2018 Delta Hotels Partnership Strategy outline stating that the "Brand is relatively unknown beyond Canada and often confused with Delta Airlines [sic] or facets [sic]").

Marriott also cannot credibly claim it would have acted differently, e.g., by not expanding or switching brands, had Delta complained sooner. The numbers

speak for themselves. On August 6, 2018, when Delta first complained about Marriott's U.S. use, there were 19 Delta Hotels properties in the United States. PTX-0216 at '181. Now, there are 52, almost 20 of which were opened after Delta filed its Complaint. Therefore, rather than mitigating the issue after Delta complained, Marriott rapidly expanded its Delta Hotels brand throughout the country, a sure sign that it would have proceeded regardless of when Delta complained.

Moreover, unlike an innocent infringer, Marriott *knew* about confusion before it even opened its first U.S. hotel—indeed *before* it completed its acquisition of the Delta Hotels brand. *Supra* Section II.F; PTX-0277. Yet it *chose* to take on the risk anyway. *Varitronics,* 682 F. Supp. at 1209 (no prejudice, as potential loss of investment was something the defendant "ought to have considered before deciding to incorporate under this name instead of under any of the other infinite combinations of letters that one may devise from our alphabet.").

This is strikingly similar to *AmBrit, Inc. v. Kraft, Inc.*, where the Eleventh Circuit upheld a finding of no prejudice. 812 F.2d 1531, 1546-47 (11th Cir. 1986). There, the defendant argued that it spent "millions of dollars" on development and promotion that it allegedly "would not have spent had [Plaintiff] presented its claim[s] immediately." *Id*. The Eleventh Circuit disagreed. As it explained:

> [Defendant] was well aware from the beginning that its Polar B'ar wrapper possibly infringed the Klondike wrapper, but this did not deter Kraft from spending money from the outset promoting and advertising that product. . . . Even after [Plaintiff] filed this action, [Defendant] continued to spend money

promoting and advertising its Polar B'ar product. It therefore appears that [Defendant] was committed to the Polar B'ar product from the outset and believed it would prevail in any lawsuit challenging the product's wrapper and packaging.

The evidence supports the court's findings of . . . little or no prejudice from that delay.

*Id*. So too here. Marriott was "aware from the beginning" of possible infringement even before it completed the acquisition and "continued" to expand the brand and open new hotels even after multiple and repeated instances of actual confusion and after Delta filed this lawsuit. They suffered no prejudice. Rather, the pattern shows they intended to take advantage of confusion for their own financial benefit. *Supra* Section II.F. It thus suffered no prejudice. Like the Defendant in *AmBrit*, any purported loss stems from Marriott's own actions.

## V.    DELTA IS ENTITLED TO MONETARY AND INJUNCTIVE RELIEF

### A.    Delta is Entitled to $232 Million In Disgorgement of Marriott's Profits

Delta is entitled to disgorgement of Marriott's profits earned from the U.S. Delta Hotels. Under the Lanham Act, a plaintiff, "shall be entitled . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). As the Eleventh Circuit has explained, "[a]n accounting for profits has been determined by this Court to further the congressional purpose by making infringement unprofitable, and is justified because it deprives the defendant of unjust enrichment and provides a

deterrent to similar activity in the future." *Burger King Corp. v. Mason*, 855 F.2d 779, 781 (11th Cir. 1988). And, as the Supreme Court has clarified, willfulness is ***not*** a prerequisite to disgorgement of profits under the Lanham Act. *Romag Fasteners, Inc v. Fossil, Inc.*, 590 U.S. 212, 218-19 (2020).

As the Lanham Act makes clear, Delta need only show Marriott's sales; Marriott has the burden to "prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a); *Tiramisu Int'l, LLC v. Clever Imports, LLC*, 741 F. Supp. 2d 1279, 1290 (S.D. Fla. 2010); *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1488 (11th Cir. 1987); *Tommy Hilfiger Licensing, Inc. v. Goody's Fam. Clothing, Inc.*, 2003 WL 22331254 at *22 (N.D. Ga. May 9, 2003). Absent proof to the contrary, it is presumed that a defendant profited from the sale of infringing goods by drawing on the mark's goodwill. MCCARTHY §2:15. "[A]ny doubts about the actual amount of gross sales or profits will be resolved against the infringing party." *Tiramisu*, 741 F. Supp. 2d at 1290; *see also* MCCARTHY §30:66.

      1.    ***Delta Will Carry Its Burden of Showing Marriott's Revenues from the U.S. Delta Hotels Are*** █████████

The evidence will show that Marriott received ██████████ from its U.S. Delta Hotels franchisees from 2015 through Q1 of 2025. PTX-4022. This revenue consists of two broad categories, both of which are moneys Marriott has received from its U.S. Delta Hotels franchisees: (1) fees from franchisees, and (2) "Cost

Reimbursement Revenue."[22] *Id.* The parties' respective experts agree that the figure for the first category is between $71.1 and $71.4 million. *Id.*; DTX-2466 at 5.

As for the second category, Marriott's Cost Reimbursement Revenues are a result of its sale of "centralized programs and services" to U.S. Delta Hotels franchisees. Dkt. 457-03, ¶¶16, 22, 86–88, 92–96. Its franchise agreements require franchisees to pay the purported cost of such services, generating "cost reimbursement" revenues for Marriott. *Id.* ¶¶95–96. Its internal documents show that these centralized programs are part of the same product as the franchise itself (*i.e.*, they are both part of the infringing sale). PTX-0691 at '862; PTX-0690 at '845. Marriott unilaterally sets the price of these mandatory services, and much of this Cost Reimbursement Revenue is calculated as a percentage of the franchisee's sales. *See e.g.*, TX-0634 at '037-038; PTX-0601 at '287, '321-322.

Outside the context of this litigation, Marriott itself refers to Cost Reimbursement Revenue as "revenue" (and indeed that word is in the name itself: "Cost Reimbursement Revenue"), most notably in its public SEC filings. *See e.g.*, PTX-0523 at 40. Even Marriott's own expert, W. Todd Schoettelkotte, concedes that Cost Reimbursement Revenue consists of money Marriott received from its Delta

---

[22] Fees from franchisees include (1) Marriott's formal "Franchise Fee"; (2) Cancellation Fees; and (3) Procurement Fees. Cost Reimbursement Revenue includes (1) Owner & Franchise Billing Cost Reimbursements; (2) Program and Services Contribution Revenue; (3) System Marketing Fund Revenue; (4) Loyalty Program Revenue; and (5) Gift Card Revenue.

Hotels franchisees.[23] The evidence will show that Marriott received a total of ███████████ in Cost Reimbursement Revenue from its U.S Delta Hotels franchisees during the period from 2015 through Q1 of 2025.[24] PTX-4022.

## 2. *Marriott Cannot Meet Its Burden of Proving Its Costs Directly Relate to the Infringement*

Marriott resists including Cost Reimbursement Revenue as part of the revenue at issue in this case, instead flouting controlling black letter law arguing that its own internal accounting policies shield over $160 million from a category that its own 10-K filings classify as "revenue." PTX-0523 at 40. Marriott's damages expert claims that all of the Cost Reimbursement Revenue for Delta Hotels ████████ ████████ because ████████████████████████████ relying on the false premise that because Marriott says Cost Reimbursement Revenues are spent on services provided to franchisees, those sums cannot be counted in a

---

[23] Even for the most contested subcategory of revenue related to Marriott's Bonvoy loyalty program, Mr. Schoettelkotte admits that Marriott ████████████ ████████████████████████████████████████████████ DTX-2466 ¶¶15-17.

[24] Delta also reserves the right, and specifically requests, a post-trial accounting of Marriott's profits for any time periods occurring after Q1 of 2025, as well as attorneys' fees, costs, pre- and post-judgment interest on Marriott's disgorged profits, and any other relief the Court deems just and proper. 15 U.S.C. § 1117(a); 28 U.S.C. § 1961; *Babbit Elecs., Inc. v. Dynascan Corp.*, 828 F. Supp. 944 (S.D. Fla. 1993), *aff'd*, 38 F.3d 1161 (11th Cir. 1994) (awarding costs, attorneys' fees, and prejudgment interest in Lanham Act case); *Nutrivida, Inc. v. Inmuno Vital, Inc.*, 46 F. Supp. 2d 1310 (S.D. Fla. 1998) ("In Lanham Act cases, prejudgment interest is available in the Court's discretion to successful plaintiffs.).

disgorgement calculation. Dkt. 457-03 ¶15; Dkt. 457-04 ¶37; DTX-2466 ¶13.

But that is not the law. Instead, in *Maltina Corp. v. Cawy Bottling Co., Inc.*, the Fifth Circuit rejected the deduction of overhead and other expenses like those Marriott incurs in providing services to its franchisees, recognizing that such deductions "if allowed, would have enabled [the defendant] to escape liability to the plaintiffs for its infringement." 613 F.2d 582, 585 (5th Cir. 1980) ("*Maltina*"). *Maltina* remains binding in this Circuit because the Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981, *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982), and the decision has been affirmed by courts in the Eleventh Circuit. *Nike*, 274 F. Supp. 2d at 1373, *aff'd*, 107 F. App'x 183 (11th Cir. 2004). Thus, in this Circuit, overhead costs "may only be deducted when they are ***actually related to the sale of the infringing product***." *Tommy Hilfiger*, 2003 WL 22331254 at *22 (citing *Maltina*) (emphasis added).

Marriott cannot satisfy its burden of showing that the Cost Reimbursement Revenue is related to the sale of the infringing product—namely, Delta Hotels franchises—for three reasons. ***First***, Marriott's Cost Reimbursement Revenue cannot be categorically deducted as costs "***actually related***" to the U.S. Delta Hotels, *id*., because Marriott "***has no obligation to ensure that any particular [] Hotel [brand, among its total of 37 brands]… benefits from Program Services on a pro-rata or other basis… proportionate to the Program Services Contributions paid by***

***Franchisee.***" PTX-0601 at '288; *see also* PTX-0634 at '055 n4. In other words, Marriott is not obligated to spend ***any*** of the Cost Reimbursement Revenue on Delta Hotels. Instead, Marriott is expressly allowed to spend this revenue on any of its 36 other brands in its portfolio. *Id*. And its own Delta Hotels franchisees have complained that Marriott has not actually spent money on marketing Delta Hotels. For instance, an internal Marriott presentation acknowledged that "[c]omplaints over low brand awareness and marketing spend often arise" with respect to the Delta Hotels brand. PTX-0522 at '241. One franchisee even complained that "***Marriott literally commits zero marketing dollars to Delta***." PTX-0299 at '767 (emphasis added).

**Second**, the evidence will show that Marriott cannot show where it spent its Cost Reimbursement Revenue because Marriott admittedly ***does not track its costs at the brand level***. In other words, Marriott tracks the money it ***receives*** from its U.S. Delta Hotels franchisees but not where it actually ***spends*** those revenues. Consequently, all of Marriott's documents purporting to show expenses specific to the U.S. Delta Hotels were created for this litigation rather than in the ordinary course of business. As this Court will hear, in at least one case, Marriott created replacement documents later in this litigation, claiming higher costs for the same years already produced.

What's more, many of these documents are transparently based on unsupported assumptions. For example, Marriott's claimed costs for its global design department assume that projects supporting different brands incur identical costs. PTX-0321; PTX-0350; PTX-3837. Accordingly, Marriott computes those costs supposedly incurred with respect to the U.S. Delta Hotels by prorating Marriott's global spend for this department by the number of projects supporting the U.S. Delta Hotels. *Id*. But the law is clear that such estimates do not meet a defendant's burden. *Tiramisu*, 741 F. Supp. 2d at 1290.

***Third***, Marriott's claimed costs cannot be deducted because, as Marriott admits, the costs constitute global overhead costs pertaining to existing programs used for ***all*** Marriott brands. Dkt. 457-03, ¶95; Dkt. 457-04, ¶30; PTX-0693 at '887 (Marriott "incurs certain periodic corporate and overhead costs of maintaining and administering the program."); PTX-0536 at '936-937. Marriott's own documents confirm that mandatory centralized program costs include rent and payroll expenses, PTX-0690 at '845-850, and are required in exchange for a license to Marriott's intellectual property. PTX-0713. Marriott's witnesses will confirm that most of its costs are "people costs," and that since 2018 Marriott employees have not tracked their hours based on what project or brand they were supporting. PTX-0325; PTX-0348.

Marriott also has produced no evidence showing that Cost Reimbursement Revenues paid by U.S. Delta Hotels franchisees have increased the incremental costs of the U.S. DELTA HOTELS brand. *Maltina*, 613 F.2d at 586. For example, it cites no evidence that the cost to operate Marriott's reservation system increased due to adding Delta Hotels to the portfolio. Marriott's own expert also admitted Marriott's employees who perform centralized programs existed prior to the Delta Hotels acquisition. Dkt. 457-05, 260:14-262:16, 269:14-20, 273:19-274:1, 275:8-18, 332:17-333:13. Thus, as the Court will hear, the amounts that Delta Hotels franchisees pay as Cost Reimbursement Revenues offset overhead costs Marriott would have incurred ***regardless of whether U.S. Delta Hotels existed***. PTX-0336; PTX-3828.

3.   ***Marriott's Overhead Costs Related to the U.S. Delta Hotels Are Too Small as a Percentage of Marriott's Total Business to Be Deductible Under Maltina***

Marriott's attempts to deduct overhead costs fail for the independent reason that the U.S. Delta Hotels comprise less than 1.5% of Marriott's business. Black-letter Eleventh Circuit law holds that a proportionate share of overhead is not deductible in determining the infringer's profits where sales of the infringing product constitute only a small percentage of total sales. *See Maltina*, 613 F.2d at 586 (citing *S.C. Johnson & Son, Inc. v. Drop Dead Co.*, 144 U.S.P.Q. 257 (S.D. Cal. 1965) (rejecting deduction of overhead costs where product

constituted less than 5.5% of defendant's business); *see also*, *Nike*, 274 F. Supp. 2d at 1373, *aff'd*, 107 F. App'x 183 (11th Cir. 2004) (rejecting defendant's proposed deductions of payroll costs, advertising expenses and operating expenses, citing *Maltina*); *Abbott Lab'ys v. Unlimited Beverages, Inc.*, 218 F.3d 1238, 1242 (11th Cir. 2000) (rejecting deduction of costs that "would have been incurred even without the sale of the prohibited product"). In *Maltina*, which controls here, just over 6% of a company's overall business was held to be too insignificant to deduct as a cost. 613 F.2d at 586.

Even if it were determined that Marriott adequately met its burden in determining the portion of overhead cost related to U.S. Delta Hotels (it cannot), the Court should still find that overhead costs (proportionate or otherwise) should not be deducted from Marriott's Cost Reimbursement Revenue considering the small size of the U.S. Delta Hotels brand as compared to Marriott's overall business. *Id*. As the Court will hear, Marriott's U.S. Delta Hotels properties are between ***0.17%–1.37%*** of Marriott's overall business, ***well below the 6%*** significance threshold in *Maltina*. 613 F.2d at 586; PTX-0338; PTX-3870; Dkt. 457-01 at 41–43. The Court should not permit a deduction of overhead expenses as U.S. Delta Hotels represent only about 1% of Marriott's business. *Maltina*, 613 F.2d at 586.

4. ***Marriott Has Not Proven Any Profits Awarded Should Be Apportioned***

Apportionment is "the determination of the profits attributable to the use of

an accused trademark, separate from those profits associated with other non-accused elements." *Paycargo v. Cargosprint*, 2021 U.S. Dist. LEXIS 118712 at *6-7 (S.D. Fla. June 25, 2021); *Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*, 225 U.S. 604, 621 (1912). To apportion the profits attributable to infringement, an infringer must "prove that his infringement had no cash value in sales made by him." *Mishawaka Rubber v. S.S. Kresge Co.*, 316 U.S. 203, 206-07 (1942); *see also* Restatement (Third) of Unfair Competition §37 Comment g. "There may well be a windfall to the trade-mark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer." *Mishakawa*, 316 U.S. at 207.

Marriott has claimed that its profits ████████████████████████████ ███████████████████ not the DELTA HOTELS Marks. Dkt. 457-03 at ¶¶74-83. As support for that position, Marriott relies solely on speculation by its damages expert that a "considerable portion" of its Delta Hotels profits ████████████ ████████████████████████████████ like Marriott's "endorsement" or "system." *Id*. Marriott offers no raw data, consumer studies, cognizable and replicable method, or evidence that any quantifiable portion of profits is attributable to the "endorsement" or "system" rather than to the infringing DELTA HOTELS Marks. As Marriott offers no cognizable evidence or method by which to apportion its revenue, it is not entitled to any apportionment. *Westinghouse*,

225 U.S. at 621 (The rule of law and equity is strict and severe" where a defendant fails to provide competent evidence of apportionment, and, thus, "[a]ll the inconveniences of the confusion is thrown upon the party who produces it, and it is for him to distinguish his own property or lose it.") (quotations and citations omitted); *Jacobs v. Mid-Continent Cas. Co.*, 2021 WL 4077956 at *4 (S.D. Fla. Sept. 8, 2021) ("no evidence from which [factfinder] could properly apportion [Defendant's] damages….Without any such evidence, [Defendant] has failed to carry her burden").

Only with appropriate evidence can a court apportion the infringer's profits so as to identify profits that may not have been due to infringement. Yet Marriott's expert, Mr. Schoettelkotte, does not identify any amount or percentage of profits generated from U.S. Delta Hotels properties due to the Marriott "endorsement" and/or "system." *See* Dkt. 457-03 at ¶¶75-82. The evidence will show that he admittedly has not calculated a specific dollar figure and does not provide a specific apportionment figure.

Further, Mr. Schoettelkotte performed no study to identify what portion of demand for the DELTA HOTELS-branded services, if any at all, is driven by use of the MARRIOTT brand or "system". Wholly absent from his discussion of the Marriott "endorsement" and "system" is any quantification of the profits from U.S. Delta Hotels that he claims are so attributable. *See, e.g., Atlas IP, LLC v. Medtronic,*

*Inc.*, 2014 WL 5741870, at *4–5 (S.D. Fla. Oct. 6, 2014) (excluding "conclusory" apportionment analysis for "not provid[ing] the requisite 'reliable and tangible, and not conjectural or speculative' evidence required").

Separately, the acquisition price Marriott paid for the DELTA HOTELS brand demonstrates that the DELTA HOTELS brand holds significant value, which directly contradicts Mr. Schoettelkotte's apportionment opinion relating to the Marriott "endorsement" and "system" and his general attempt to downplay the DELTA HOTELS brand. Marriott's acquisition was all about the name: it paid ███████ in 2015 to acquire the DELTA HOTELS brand from its Canadian predecessor, despite its lack of any U.S. presence or recognition pre-acquisition. PTX-0216 at '174, '180; PTX-0406, 5458, -70, -72, -84, -86.

What Marriott did have, however, was an excuse to try to launch Delta Hotels in the U.S. while tying into and drafting off the name and goodwill of a famous and well-known company in the travel industry—Delta. Notably, Marriott attempted to justify its purchase by claiming a gap in its service offerings. PTX-0406, 5458, -70, -72. However, it had existing brands in the same "premium" category as Delta Hotels—including Westin, Sheraton, Marriott, and Renaissance, Dkt. 457-03, ¶21—that it could have used instead to grow this category, but none of those options provided Marriott with the option to draft off Delta. It cannot be overemphasized that Marriott's internal code name for the

acquisition and expansion of DELTA HOTELS was "Project Flight," an admitted "clever reference" to Delta to assist with aggressively launching in the U.S. *Supra* Section II.F; PTX-0270.

These facts alone show that the DELTA HOTELS brand drives revenue and was designed to be the focal point of the business. Marriott has always owned the MARRIOTT brand, but it purchased the DELTA HOTELS brand so it could "compete" with other brands (using the competitive advantage of Delta's recognition and goodwill). PTX-0216 at '174, '180; PTX-0406, 5458, -70, -72, -74, -84, -86. That Marriott needed to do so shows that the DELTA HOTELS brand had value separate from Marriott's "endorsement" and/or "system." Mr. Schoettelkotte's choice to ignore that Marriott was willing to pay ▉▉▉▉▉ to acquire the DELTA HOTELS brand when it already had at least four "premium" category brands is contrary to Marriott's own analysis. Marriott chose not to use any of its 30+ existing brands to grow this category. Surely, if its "endorsement" and "system" were all-important, it would not have needed to acquire the DELTA HOTELS brand—let alone pay ▉▉▉▉▉ to do so.

## B. Delta Is Entitled to Permanent Injunctive Relief

In addition to monetary relief, the Court should grant Delta permanent injunctive relief, prohibiting Marriott from using the DELTA HOTELS Marks, or any other names containing the word DELTA, in the United States. Generally, in

trademark infringement actions, "complete injunctions against the infringing party are the order of the day." *SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d 1325, 1336 (11th Cir. 1996). To obtain a permanent injunction, Delta must demonstrate: (1) irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the parties, that a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008) (citation omitted). Delta satisfies all four elements here.

**Irreparable harm:** To begin with, Delta is entitled to a "rebuttable presumption of irreparable harm" if it succeeds on the merits of its federal claims. 15 U.S.C. § 1116. Delta, however, will also present testimony regarding the irreparable injury it has suffered and will continue to suffer from Marriott's conduct. This includes the "loss of control" over the DELTA brand and related brand attributes that Delta has spent 100 years cultivating, the "loss of trade" due to consumers inadvertently booking hotels through Delta Hotels rather than Delta's hotel booking service, and "loss of goodwill" as confused consumers complain to Delta about Delta Hotels properties due to their confusion. *Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x 180, 190 (11th Cir. 2005) (irreparable injury includes "loss of control of reputation, loss of trade, and loss of goodwill"). Indeed, as the Eleventh

Circuit has explained, the "most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods," even if "the infringer's products are of high quality." *Id.* at 190-91. Therefore, Delta "need not show that the infringer acted in such a way as to damage [Delta's] reputation," but rather that Marriott's "adoption of a confusingly similar" mark has caused Delta to lose control of its reputation. *Id.* at 191. This is precisely the type of harm Delta has suffered here.

Marriott has also harmed Delta's ability to enter into its natural area expansion, namely, hotels and the offering of services at or in connection with hotels. As many other airlines have entered this space, *supra* Section II.C.1, Marriott's conduct puts Delta at a significant disadvantage if not stopped.

Accordingly, this factor favors Delta. Marriott cannot rebut the statutory presumption of irreparable harm.

**Inadequacy of Monetary Relief:** "It is also generally recognized in trademark infringement cases that there is not adequate remedy at law to redress infringement." *Crossfit*, 232 F. Supp. 3d at 1316 (quotation omitted). And as the Eleventh Circuit has held, "[a] plaintiff need not show that the infringer acted in such a way as to damage the reputation of the plaintiff. It is the loss of control of one's reputation by the adoption of a confusingly similar mark that supplies the substantial threat of irreparable harm." *Ferrellgas*, 143 F. App'x at 191 (granting preliminary

injunction for trademark infringement). Therefore, "a sufficiently strong showing of likelihood of confusion [caused by trademark infringement] may by itself constitute a showing of ... [a] substantial threat of irreparable harm." *Id*. The evidence will show that Delta is likely to continue to suffer loss of control of its reputation and dilution of its mark if Marriott is not enjoined from using the DELTA HOTELS mark. *See Id*.; *Boulan S. Beach Master Ass'n, Inc. v. Think Props., LLC*, 617 F. App'x 931, 934 (11th Cir. 2015) ("Our precedent recognizes [] confusion as an injury that ordinarily warrants injunctive relief."). As such, the remedies available at law are inadequate to compensate Delta's injuries.

**Balance of Hardships:** The balance of hardships also favors Delta. As an initial matter, Marriott "h[as] no right to use the [DELTA] mark, and therefore could suffer no legitimate hardship by being forced to stop that which [it has] no right to do." *Id*.; *see also Nutradose Labs, LLC v. Bio Dose Pharma, LLC*, 710 F. Supp. 3d 1200, 1232 (S.D. Fla. 2024) (balance of hardships favor plaintiff due to "loss of goodwill" especially as defendant "is not entitled to sell its [products] without obtaining a license), *aff'd sub nom. Nutradose Labs, LLC v. Santamarta,* 2025 WL 337971, at *1231 (11th Cir. Jan. 30, 2025); *Tiramisu*, 741 F. Supp. 2d at 1288 (balance of hardships favored injunctive relief as plaintiff was "at risk of losing customer goodwill" while defendant "has no right to use the Tiramisu mark. Requiring it to stop using the mark, therefore, cannot cause a hardship . . . that could

outweigh the harm suffered by Tiramisu through the illegal use of its mark"). It also chose to expand despite knowing that Delta objected to its use.

In addition, Marriott has *36* other hotel brands, including *12* in the same claimed "Premium Tier" as Delta Hotels, compared to the single master brand Delta owns, namely, DELTA. Thus, Marriott could easily change to one of these many other non-infringing brands or choose another name altogether. But it assumed the risk.

Marriott also has not developed any significant goodwill in the DELTA HOTELS brand in the United States. To the contrary, its internal documents routinely lament the *lack* of brand awareness of Delta Hotels and the confusion with Delta. *See, e.g.*, PTX-0238; PTX-3752; PTX-3735, PTX-3625. Nor can Marriott argue that it is somehow harmed because it spent money purchasing the DELTA HOTELS brand. At the time, the brand existed primarily in Canada and had no U.S. locations; Marriott thus was not purchasing *any* U.S. goodwill, as there was none for the DELTA HOTELS Marks. Finally, although Marriott expanded extensively after Delta complained, its U.S. ownership and use of DELTA HOTELS is limited as compared to Delta's 100-year history. Thus, to the extent Marriott argues it will be harmed by an injunction, any such harm is "outweighed by the potential damage to [Delta's] goodwill by [Marriott's] use of its confusingly similar mark." *Ferrellgas*, 143 F. App'x at 191.

**Public Interest:** Finally, a permanent injunction would serve the public interest by protecting consumers from the extensive confusion that Marriott's brand causes. *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1304 (11th Cir. 2001) ("the public interest is served by preventing consumer confusion in the marketplace"); *Tiramisu*, 741 F. Supp. 2d at 1288 (noting the "long line of trademark cases in which [the Eleventh Circuit] has explained the 'public interest' relevant to the issuance of a permanent injunction is the public's interest in avoiding unnecessary confusion."). Indeed, "[w]hen inevitable confusion occurs in the marketplace due to unrestricted dual use of a trademark, the 'paramount' value of the public interest demands some adjustment to the status quo; some remedy must be fashioned." *SunAmerica*, 77 F.3d at 1337. For that reason, even when an infringer's laches defense is successful, courts may still grant plaintiff injunctive relief "if the likelihood of confusion is inevitable, or so strong as to outweigh the effect of the plaintiff's delay in bringing a suit." *Kason Indus.*, 120 F.3d at 1207 (citing Restatement (Third) of Unfair Competition § 31, cmt. e (1995) ("[B]ecause of the public interest in preventing the deception of consumers, delay by the trademark owner will not ordinarily disable it from obtaining an injunction if there is strong evidence of likely or actual confusion.").

Accordingly, the evidence will show that Delta is entitled to a permanent injunction to prohibit Marriott from using the DELTA HOTELS mark, or any other

name containing the word DELTA, in the United States going forward.

## VI.    DELTA HAS THE RIGHT TO A JURY TRIAL

As Delta has previously contended, because it seeks both nominal and punitive damages under Georgia law—remedies that are legal in nature—Delta is entitled to a jury trial on its claims; or, at a minimum, Georgia common law is an additional basis for its existing unfair competition claim, thus warranting amendment and a jury trial, or at the least an advisory jury. *See, e.g.*, Dkt. 641; *D.H. Pace Co., Inc. v. Aaron Overhead Door Atl. LLC*, 2021 WL 2819778, at *5-6 (N.D. Ga. May 24, 2021); *McAlister-Jones v. Foote*, 720 F. App'x 971, 974-75 (11th Cir. 2017); *King v. Fulton-Dekalb Hosp. Auth.*, 2009 WL 10665526, at *1 (N.D. Ga. Aug. 17, 2009). Although the Court denied these requests at its December 10, 2024 hearing, *see* Dkt. 674, Delta respectfully states its objection to that ruling for purposes of appellate preservation.

## VII.   CONCLUSION

For the foregoing reasons and based on the evidence that will be presented at trial, Delta respectfully requests that the Court rule in its favor on all counts and award it complete monetary relief and a permanent injunction preventing Marriott's use of DELTA HOTELS or any trademark containing Delta's longstanding, widely recognized trademark DELTA.

Dated: October 6, 2025

| | |
|---|---|
| /s/ Byung J. "Bjay" Pak | /s/ Dale M. Cendali |
| SAMUEL R. RUTHERFORD | DALE M. CENDALI |
| Georgia Bar No. 159079 | (Admitted *Pro Hac Vice*) |
| BYUNG J. "BJAY" PAK | CLAUDIA RAY |
| Georgia Bar No. 559457 | (Admitted *Pro Hac Vice*) |
| **ALSTON & BIRD LLP** | SHANTI SADTLER CONWAY |
| 1201 West Peachtree Street | (Admitted *Pro Hac Vice*) |
| Atlanta, Georgia 30309-3424 | MARY MAZZELLO |
| Tel.: (404) 881-7000 | (Admitted *Pro Hac Vice*) |
| Fax: (404) 881-7777 | JONATHAN D. BRIT |
| sam.rutherford@alston.com | (Admitted *Pro Hac Vice*) |
| bjay.pak@alston.com | JUSTIN TAYLOR |
| | (Admitted *Pro Hac Vice*) |
| DIANA M. TORRES | JEREMY KING |
| (Admitted *Pro Hac Vice*) | (Admitted *Pro Hac Vice*) |
| ALLISON W. BUCHNER | MAGGIE LAPOINT |
| (Admitted *Pro Hac Vice*) | (Admitted *Pro Hac Vice*) |
| SIERRA ELIZABETH | LILY HENDERSON |
| (Admitted *Pro Hac Vice*) | (Admitted *Pro Hac Vice*) |
| ELLISEN TURNER | **KIRKLAND & ELLIS LLP** |
| (Admitted *Pro Hac Vice*) | 601 Lexington Avenue |
| STEVEN CZAK | New York, NY 10022 |
| (Admitted *Pro Hac Vice*) | Tel.: (212) 446-4800 |
| **KIRKLAND & ELLIS LLP** | Fax: (212) 446-6460 |
| 2049 Century Park East | dale.cendali@kirkland.com |
| Los Angeles, CA 90067 | claudia.ray@kirkland.com |
| Tel.: (310) 552-4200 | shanti.conway@kirkland.com |
| Fax: (310) 552-5900 | mary.mazzello@kirkland.com |
| diana.torres@kirkland.com | jonathan.brit@kirkland.com |
| allison.buchner@kirkland.com | justin.taylor@kirkland.com |
| sierra.elizabeth@kirkland.com | jeremy.king@kirkland.com |
| ellisen.turner@kirkland.com | maggie.lapoint@kirkland.com |
| steven.czak@kirkland.com | lily.henderson@kirkland.com |

ROBIN ANN MCCUE
(Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, IL 60654
Tel.: (312) 862-2000
Fax: (312) 862-2200
robin.mccue@kirkland.com

STEPHEN TENSMEYER
(Admitted *Pro Hac Vice*)
JESSICA RAMIREZ
(Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
95 South State Street
Salt Lake City, UT 84111
Tel.: (801) 877-8090
Fax: (801) 877-8101
stephen.tensmeyer@kirkland.com
jessica.ramirez@kirkland.com

LAUREN J. SCHWEITZER
(Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Tel.: (213) 680-8400
Fax: (213) 680-8500
lauren.schweitzer@kirkland.com

KAMAL GHALI
Georgia Bar No. 805055
**CHAIKEN GHALI LLP**
1201 West Peachtree Street, NW,
Suite 2300, Atlanta, GA 30309
Tel.: (404) 795-5005
kghali@chaikenghali.com

*Attorneys for Plaintiff*
*Delta Air Lines, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Northern District of Georgia Local Rules 5.1C and 7.1D, I hereby certify that the foregoing was prepared in Times New Roman 14-point font, double-spaced, with a top margin of not less than 1 inch and a left margin of not less than 1 inch.

This 6th day of October, 2025.

<u>/s/ Dale M. Cendali</u>
Dale M. Cendali
(Admitted *Pro Hac Vice*)
dale.cendali@kirkland.com

## CERTIFICATE OF SERVICE

Counsel for Plaintiff and Counterclaim Defendant Delta Air Lines, Inc. hereby certifies that on October 6, 2025 the foregoing **DELTA AIR LINES, INC.'S MOTON IN LIMINE TO EXCLUDE ANY TESTIMONY, ARGUMENT OR EVIDENCE RELATED TO SETTLEMENT OFFERS AND POSITIONS** was filed electronically with the Clerk of the Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

Dated: October 6, 2025

*/s/ Byung J. "Bjay" Pak*

SAMUEL R. RUTHERFORD
Georgia Bar No. 159079
BYUNG J. "BJAY" PAK
Georgia Bar No. 559457
**ALSTON & BIRD LLP**
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Tel.: (404) 881-7000
Fax: (404) 881-7777
sam.rutherford@alston.com
bjay.pak@alston.com

DIANA M. TORRES
(Admitted *Pro Hac Vice*)
ALLISON W. BUCHNER
(Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
2049 Century Park East
Los Angeles, CA 90067
Tel.: (310) 552-4200
Fax: (310) 552-5900
diana.torres@kirkland.com
allison.buchner@kirkland.com

ROBIN ANN MCCUE
(Admitted *Pro Hac Vice*)

*/s/ Dale M. Cendali*

DALE M. CENDALI
(Admitted *Pro Hac Vice*)
CLAUDIA RAY
(Admitted *Pro Hac Vice*)
SHANTI SADTLER CONWAY
(Admitted *Pro Hac Vice*)
MARY MAZZELLO
(Admitted *Pro Hac Vice*)
JONATHAN D. BRIT
(Admitted *Pro Hac Vice*)
JUSTIN TAYLOR
(Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-4800
Fax: (212) 446-6460
dale.cendali@kirkland.com
claudia.ray@kirkland.com
shanti.conway@kirkland.com
mary.mazzello@kirkland.com
jonathan.brit@kirkland.com
justin.taylor@kirkland.com

LAUREN J. SCHWEITZER
(Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**

**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, IL 60654
Tel.: (312) 862-2000
Fax: (312) 862-2200
robin.mccue@kirkland.com

555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Tel.: (213) 680-8400
Fax: (213) 680-8500
lauren.schweitzer@kirkland.com

*Attorneys for Plaintiff*
*Delta Air Lines, Inc.*